1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,       : 20-CR-549(AMD)
4                                :
                                 :
5                                :
       -against-                 : United States Courthouse
6                                : Brooklyn, New York
                                 :
7                                :
                                 : Wednesday, February 21, 2024
8  CORY MARTIN,                  : 9:30 a.m.
                                 :
9          Defendant.            :
                                 :
10 - - - - - - - - - - - - - - - - X

11         TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
           BEFORE THE HONORABLE ANN M. DONNELLY
12              UNITED STATES DISTRICT JUDGE

13              A P P E A R A N C E S:

14 For the Government: BREON S. PEACE, ESQ.
                       United States Attorney
15                     Eastern District of New York
                       271 Cadman Plaza East
16                     Brooklyn, New York 11201
                  BY:  EMILY J. DEAN, ESQ.
17                     TANYA HAJJAR, ESQ.
                       ANDRES PALACIO, ESQ.
18                     Assistant United States Attorneys

19
 For the Defendant:    THE LAW OFFICE OF ANTHONY CECUTTI
20                     217 Broadway
                       Suite 707
21                     New York, New York 10007
                  BY:  ANTHONY CECUTTI, ESQ.
22

23 Court Reporter:  Nicole J. Sesta, RMR, CRR, RPR
                    Official Court Reporter
24                  E-mail:  NSestaRMR@gmail.com

25 Proceedings recorded by computerized stenography.  Transcript
   produced by Computer-aided Transcription.

1                    APPEARANCES - CONTINUED

2

3   For the Defendant:

4                    THE LAW OFFICE OF KESTINE M. THIELE
                     305 Broadway
5                    Suite 700
                     New York, New York 10007
6                    BY:  KESTINE M. THIELE, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  All rise.

2          THE COURT:  Please be seated.  Are we ready for our

3     jury?

4          MS. DEAN:  Yes, Your Honor.  I have one brief

5     matter.

6          THE COURT:  Okay.

7          MS. DEAN:  With regard to our February 8th Giglio

8     disclosure letter regarding CW-1, in that letter I had

9     reported based on a pretrial services report that she was

10    diagnosed with mental health issues, and I wrote that that

11    included bipolar personality disorder.

12         That was a mistake.  What the pretrial report

13    actually said was borderline personality disorder.  I inquired

14    when I noticed the mistake, and that actually needs a

15    correction, as well.  The diagnosis was not otherwise

16    specified, personality disorder with borderline features.  I

17    wanted to clarify that before she takes the stand.

18         THE COURT:  Okay.  Anything from the defense before

19    we start?

20         MR. CECUTTI:  No, Your Honor.

21         THE COURT:  All right.  Let's get the jurors,

22    please.

23         (Jury present.)

24         THE COURT:  All right, everybody.  Good morning.  I

25    hope you had a good evening.  We are ready to proceed with the

1   government's case.

2          Are you ready to call your next witness?

3          MS. DEAN:  Yes, Your Honor.  The government calls

4   Adelle Anderson.

5          THE COURTROOM DEPUTY:  Please raise your right hand.

6          (Witness sworn.)

7          THE COURTROOM DEPUTY:  State your name for the

8   record.

9          THE WITNESS:  Adelle Anderson.

10         THE COURTROOM DEPUTY:  Have a seat.

11         THE COURT:  Good morning, Ms. Anderson.  Are you

12  comfortable removing your mask?  You can.  Are you contagious

13  or anything?

14         THE WITNESS:  No.

15         THE COURT:  If you're comfortable with that, that's

16  fine.  I just want to give you a couple of preliminary

17  instructions before you testify.  The first thing is I want to

18  make sure everybody in the jury and at both tables can hear

19  you.  So it's important that you speak into the microphone.

20         Just a caution, the chair doesn't move but the

21  microphone does.  So I may have you pull it up a little closer

22  to you.  Do your best to answer only the question that you're

23  being asked.  I'm also going to ask you to not speak too

24  quickly.  Our court reporter takes down everything you say.

25  If you speak too fast it makes her job harder.  If there is a

1  question you don't understand and you want repeated, let me

2  know.  Okay?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Let's pull the microphone a little bit

5  closer.  You can pull it towards you.  Go ahead.

6          MS. DEAN:  Thank you, Your Honor.

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **ADELLE ANDERSON**,

2         called as a witness by the Government, having been first

3   duly sworn/affirmed by the Courtroom Deputy, was examined and

4   testified as follows:

5   DIRECT EXAMINATION

6   BY MS. DEAN:

7   Q    Good morning, Ms. Anderson.

8   A    Good morning.

9   Q    Do you know someone named Cory Martin?

10  A    I do.

11  Q    Who is Cory Martin to you?

12  A    Cory is my daughter's father.

13  Q    How long have you known him?

14  A    Since I was 13.

15  Q    Were you intimately involved with him through your life?

16  A    Yes, my whole life.

17  Q    You said he's your daughter's father?

18  A    Correct.

19  Q    How old is the daughter that you share with him?

20  A    She's going to be six on March 1st.

21  Q    What year did you have his child?

22  A    March 1, 2018.

23  Q    Do you see Cory Martin in court today?

24  A    I do.

25  Q    Can you please identify him using an article of clothing

1    that he's wearing?

2    A    He's in the blue tie and has a black suit on.

3         THE COURT:  Indicating the defendant.

4    Q    If I can show for the witness and the jury, please,

5    Government's Exhibit 1.  Do you recognize the person in

6    Government's 1?

7    A    I do.

8    Q    Who is she?

9    A    Brandy Odom.

10   Q    Who was Brandy Odom to you?

11   A    She was my friend.

12   Q    Was there a time that you lived with her?

13   A    Yes.

14   Q    Where did you first live with Brandy?

15   A    On Fulton Street, at my apartment.

16        THE COURT:  Can you repeat what you said?  What was

17   the address?

18        THE WITNESS:  My apartment 2204 Fulton Street.

19        THE COURT:  Just make sure you're speaking into the

20   microphone.  Okay?

21        THE WITNESS:  Yes, ma'am.

22   Q    Did Brandy also move in with you when you lived in a

23   second place?

24   A    Yes, in Queens.

25   Q    What address was that?

1    A    249-45 148th Road.

2    Q    Who did you and Brandy live with there?

3    A    Cory.

4    Q    Did you also work with Brandy?

5    A    Yes.

6    Q    What kind of work did you do together?

7    A    Sex work.

8    Q    Can you tell the jury what that means doing sex work?

9    A    That means we sell services for money and sexual

10   services.

11   Q    To be clear, did you have sexual intercourse for money?

12   A    Yes.

13   Q    Did Brandy do that too?

14   A    She did.

15   Q    Did the defendant, Cory Martin, have a role in your and

16   Brandy's sex work?

17   A    He did.

18   Q    What was his role?

19   A    He controlled everything.

20   Q    Could you explain to the jury what that means?

21   A    He was our pimp.

22   Q    What is a pimp?

23   A    A pimp, we used his house and he controlled how much we

24   made and what we did with our money.

25   Q    What happened to Brandy?

1   A    She was killed.

2   Q    Who killed her?

3   A    Cory did.

4   Q    How did Cory Martin kill Brandy?

5   A    He strangled her and then he chopped her up.

6   Q    He strangled her and then he what?

7   A    Chopped her up.

8   Q    Were you a part of this plan to murder Brandy Odom?

9   A    I was.

10  Q    Did you help him get rid of her body?

11  A    I did.

12  Q    Tell us about the things you did to help him.

13  A    I taped the back of the black garbage bags, and I helped

14  him clean the house and buy the products.

15  Q    What was the last thing?

16  A    Buy products, cleaning products.

17            THE COURT:  Let's move the microphone.  Pull it

18  right up there.  You bought products you said?

19            THE WITNESS:  Correct.

20            THE COURT:  Go ahead.

21  Q    Did you help the defendant dispose of Brandy's body?

22  A    Yes.

23  Q    Where did you guys do that?

24  A    In Canarsie Park.

25  Q    Why did you and the defendant leave Brandy's body parts

1  in Canarsie Park?

2  A    Because he did not want the house to be a crime scene.

3  Q    What was the reason that you guys left her body parts in

4  a park, as opposed to somewhere else?

5  A    Because he wanted a body to be found, because he said if

6  the body was not found that he could not collect money.

7  Q    Can you explain to us the reason that you and the

8  defendant planned Brandy's murder and wanted the body to be

9  found?

10 A    For insurance money.

11 Q    What kind of insurance?

12 A    A life insurance policy.

13 Q    Were you involved in taking out life insurance policies

14 on Brandy before her murder?

15 A    I was.

16 Q    How many policies did you and the defendant take out in

17 Brandy's name?

18            MR. CECUTTI:  Objection.

19 A    Two.

20            THE COURT:  Overruled.

21 Q    In what amounts?

22 A    150,000 and 50,000.

23 Q    Who filled out the life insurance policy applications for

24 Brandy?

25 A    I did.

1  Q    Did you and he expect to collect 50,000 and $150,000

2  after her death?

3  A    Yes.

4  Q    Who was going to claim the money for the life insurance

5  policies?

6  A    I was.

7  Q    What were you going to do with it?

8  A    Give it to Cory.

9  Q    And what were you and Cory going to do with that money?

10 A    Move to El Paso.

11 Q    Whose idea was that?

12 A    Cory's.

13 Q    Ms. Anderson, I want to take you back a little.  Could

14 you tell the jury how old you are now, sitting here today?

15 A    35.

16 Q    Where were you born?

17 A    I was born in Jersey.

18 Q    When is your date of birth?

19 A    October 25, '88.

20 Q    Where did you grow up?

21 A    In Canarsie.

22 Q    That's in what borough?

23 A    Brooklyn.

24 Q    Who was in your household growing up?

25 A    Me and my two sisters and my mother.

1  Q   Was your father in your life?

2  A   My stepdad was in and out, yes, and he was abusive.

3  Q   What about your biological father?

4  A   He was not around.  He's deceased.

5  Q   What are your siblings' names?

6  A   Bliss and Ashanti.

7  Q   How far did you go in school?

8  A   GED.

9  Q   Are you currently married?

10 A   No.

11 Q   Have you ever been married?

12 A   Yes.

13 Q   Around when were you married?

14 A   2009, 2008.

15 Q   Did that last?

16 A   No.

17 Q   Did you ever have a married last name?

18 A   Yes.

19 Q   What was that?

20 A   Amjad.

21 Q   How close in time to Brandy's murder was the daughter you

22 share with the defendant born?

23 A   She was born during the relationship.

24 Q   During the relationship with the defendant?

25 A   Yes.

1  Q    And remind us what her date of birth was?

2  A    March 1st, 2018.

3  Q    Do you have other children?

4  A    I do.

5  Q    How old are they?

6  A    14 and 8.

7  Q    Using their first initial only, for purposes of your

8  testimony here today, can you tell us what we will refer to

9  your children as during the course of your testimony?

10  A    Z and T.

11  Q    Who is older, Z or T?

12  A    T.

13  Q    Are they sons or daughters?

14  A    Two boys.

15  Q    What is T's date of birth?

16  A    2-12-2010.

17  Q    What is Z's date of birth?

18  A    5-4-2015.

19  Q    Are you currently working?

20  A    Not at the moment.

21  Q    Are you looking for work?

22  A    Yes.

23  Q    What is your field of work?

24  A    Electrical field.

25  Q    Doing what?

1   A      Audits.

2   Q      When were you last employed?

3   A      Last employed was December.

4   Q      Prior to this case that you're in court for today, had

5   you ever been convicted of a felony?

6   A      Never.

7   Q      Have you shoplifted before?

8   A      Yes.

9   Q      Can you tell the jury a little bit about that?

10  A      Prior to me doing sex work, I used to boost, which is

11  stealing from stores like Macy's, Target, and Walmart, and I

12  would resell the stuff that I stole on the street.

13  Q      And so around when was it that you would boost and resell

14  merchandise?

15  A      2006, 2008, 2010 and onward.

16  Q      Did there come a time when you stopped boosting and

17  reselling merchandise that you stole?

18  A      Yes.

19  Q      Around when?

20  A      When I started getting into sex work, maybe 2014.

21  Q      When T was born in 2010, did you also steal or shoplift

22  other items?

23  A      I did, Pampers and stuff for my baby.

24  Q      And after that, were there times when you shoplifted

25  other items, as well?

1  A     Snacks, drinks, random stuff.

2           THE COURT:  What did you say?  I'm sorry.

3           THE WITNESS:  Snacks, drinks, random stuff.

4           THE COURT:  What was the second thing?

5           THE WITNESS:  Food.

6           THE COURT:  Okay.

7  Q     Have you ever used drugs?

8  A     Yes.

9  Q     Prior to 2015, what kind of drugs did you use, if any?

10 A     Marijuana only.

11 Q     Did there come a time, though, that you started using

12 hard drugs?

13 A     Yes.

14 Q     What did you start using?

15 A     Cocaine, Ecstasy, and Molly.

16 Q     Who got you into those drugs that you just described?

17 A     Cory.

18 Q     Who supplied you with cocaine, Ecstasy, and Molly?

19 A     Cory.

20 Q     Around when did you start using those drugs with him?

21 A     After his mother died, so between 2015 and 2016.

22 Q     Did he do those drugs with you, as well?

23 A     He did.

24 Q     Can you tell us how you met the defendant?

25 A     I met him in high school.  He was my high school

1    sweetheart.

2    Q    Where did you and he go to high school?

3    A    Canarsie High School.

4    Q    Do you remember what year you met him?

5    A    No, not exactly.

6    Q    Does the defendant have any nicknames?

7    A    CI, Mellow, Cory with the Waves; and me and Brandy called

8    him Daddy.

9    Q    Why did you and Brandy called him Daddy?

10   A    He assumed that role, and that's what he demanded we call

11   him because he was our Daddy.

12   Q    How old is he?

13   A    A year older than me.

14   Q    Just remind us what that is.

15   A    I'm 35.

16   Q    What is his date of birth, if you remember?

17   A    June 17, '87.

18   Q    Where did the defendant live in high school?

19   A    85th L and M.

20   Q    When you say 85th L and M, what do you mean by that?

21   A    85th Street and the between streets are L and M.

22   Q    What neighborhood is that?

23   A    Canarsie.

24   Q    Did you also live in that area?

25   A    No.

1  Q     How far was the defendant's home in high school from

2  Canarsie Park?

3  A     Repeat that.

4  Q     How far was the defendant's home in high school from

5  Canarsie Park?

6  A     Walking distance.

7  Q     Does Canarsie Park have another name?

8  A     Seaview Park.

9  Q     Why is it called Seaview Park?

10 A     Because it's on Seaview Avenue.

11 Q     Can you describe to us the relationship with the

12 defendant when you first got to know him in high school?

13 A     We was boyfriend and girlfriend when I met him in high

14 school.

15 Q     What did you guys do together?

16 A     We went out on dates, double dates with our friends, we

17 would go to the park, to the movies, we would chill at his

18 house, we would do a lot of different stuff.

19 Q     Did the defendant become physically abusive with you in

20 your high school relationship?

21 A     He was.

22 Q     Can you tell the jury about that?

23 A     I had told one of my friends that he had raped me, and

24 when he found out, he beat me up and he made me fight her, as

25 well, for telling her that.

1  Q    When you say that he beat you up, can you describe to us

2  what he actually did to you?

3  A    He punched me in my face, punched me in my chest, body

4  blows.  He grabbed me by my hand and told me I need to fuck

5  her up.

6  Q    Were there other occasions in high school when the

7  defendant physically assaulted you?

8  A    Yes.

9  Q    In addition to punching you, what other things,

10 physically, did he do to you?

11 A    Bite me, slap me, and rape me.

12 Q    You mentioned that the defendant was sexually abusive in

13 high school.  How long did that go on for in the high school

14 days?

15 A    It was off and on because he would get too aggressive,

16 and I would stop talking to him and run from him and hide from

17 him.

18 Q    Did there come a time when you guys actually did break

19 up?

20 A    Yes.

21 Q    Around when was that?

22 A    Prior to me getting pregnant with T in 2010.

23 Q    Throughout your adult life, moving forward from high

24 school, did you and the defendant stay in each other's lives?

25 A    Yes, we was friends with benefits.

1  Q    Could you explain to us what that means?

2  A    A friend who you have sexual relations with.

3  Q    Was that constant or on and off?

4  A    On and off.

5  Q    Did it continue at times when you were involved with

6  other romantic partners?

7  A    It did.

8  Q    Did you cheat on romantic partners with the defendant?

9  A    I did.

10 Q    Did he cheat on romantic partners with you?

11 A    He did.

12 Q    You mentioned that you had T in 2010.  When did you have

13 Z?

14 A    2015, May.

15 Q    Were you sexually involved with the defendant during the

16 time that you were involved with the fathers of your children?

17 A    I was.

18 Q    How did the defendant react to you having children with

19 other men?

20 A    He was pissed off because he said that he's been having

21 sex with me since I was old enough to have sex, and my kids

22 should be his.

23 Q    What arguments did it cause, if any, between you two?

24 A    A lot of arguments.

25 Q    What kinds of things did he say to you about your

1    children?

2    A    That they shouldn't even be here.

3    Q    Was your relationship with the defendant healthy?

4    A    No.

5    Q    Why not?

6    A    Because he was abusive and he was disrespectful and

7    violent.

8    Q    Why did you continue to be on and off with him the way

9    you're describing to us?

10   A    Because I loved him and he was trying.

11   Q    Did the defendant have a particular way that he would

12   describe the two of you as a couple?

13   A    Yes.  He would call me his Harley Quinn and him my Joker.

14   Q    Can you explain to us what that means?

15   A    Harley is girlfriend's -- Joker's girlfriend, and they

16   have a toxic relationship.  And he fuels her with a bunch of

17   crazy stuff and he likes it.

18   Q    And when you're saying Harley and the Joker, are you

19   talking about characters from the Batman series?

20   A    Yes, ma'am.

21   Q    Does the defendant have any tattoos?

22   A    Yes.

23   Q    What does he have?

24   A    He has a tattoo on the side of his chest that said "God's

25   gift".

1  Q     Does the nickname Sincere mean anything to you?

2  A     Yes.  That's what he made females call him.

3  Q     When you say "he", who are you talking about?

4  A     Cory.

5  Q     Do you know why he made females call him Sincere?

6  A     Yes.  Because it wasn't the name that dudes called him,

7  and it came across that he was sincere, kind, and honest.

8  Q     Were you sexually involved with the defendant during your

9  pregnancy with your second son?

10  A     Yes.

11  Q     I want to specifically talk to you about the defendant's

12  reaction to that pregnancy.  How did he react to your

13  pregnancy with Z?

14  A     He was pissed off.  He hit the roof and we stopped

15  talking because we got into an argument about my pregnancy,

16  because he was having a baby with his wife and I was having a

17  baby with Alex but he felt like it should have been his.

18  Q     And so just to be clear, who was Alex?

19  A     Z's father.

20  Q     What is Alex's true name, his first and last name?

21  A     Villardouin Villard.

22        MS. DEAN:  I can spell it for the court reporter.

23        THE COURT:  That might be helpful.

24        MS. DEAN:  V-I-L-L-A-R-D-O-U-I-N  V-I-L-L-A-R-D.

25  Q     Ms. Anderson, did I spell it correctly?

1    A    Correct.

2    Q    You said the defendant was having a child with his wife.

3    So he was married around the time you had Z?

4    A    He was.

5    Q    What was his wife's name?

6    A    Jade.

7    Q    And without saying their names, did the defendant, in

8    fact, have children?

9    A    Yes.

10    Q    Other than the child with you?

11    A    Correct.  He had two with Jade.

12    Q    You said that you guys had a fight over your pregnancy

13    with Z?

14    A    Correct.

15    Q    How long, approximately, did you stop talking for, if you

16    know?

17    A    We had this argument when I first found out I was

18    pregnant and I stopped talking to him, and when he came back

19    around it was time for me to have the baby shower and he paid

20    for everything for the baby shower.

21    Q    The defendant did?

22    A    Yes, Cory did.

23    Q    Did you guys continue to argue about Z?

24    A    Yes.

25    Q    How was it that you and the defendant started talking

1  again, such that he ended up paying for your baby shower?

2  A    His mother had died.

3  Q    When was that?

4  A    February of 2015.

5  Q    Did your sexual relationship resume?

6  A    Yes.

7  Q    When Z was born, you said that was May 2015?

8  A    Correct.

9  Q    When Z was born, what was the defendant's reaction?

10 A    He was mad, but he was acting like he was okay with it.

11 Q    Did there come a time when things got more serious

12 between you and the defendant?

13 A    Yes.  On the end of me breaking up with Z's father.

14 Q    And around when was that?

15 A    The end of the summer of 2016.

16 Q    Did there come a time when you even moved in with the

17 defendant?

18 A    I did.

19 Q    When was that?

20 A    The end of 2016.

21 Q    And did you and the defendant take another step in your

22 relationship?

23 A    Yes, we did.  He gave me a ring and proposed to me.

24 Q    What did you say?

25 A    I said yes.

1  Q    Was he still physically abusive toward you?

2  A    A little bit, yes.

3  Q    And did that escalate or no?

4  A    It did when I moved in.

5  Q    Can you describe what the defendant did to you after you

6  moved in when he physically abused you?

7  A    We was arguing about my kids, and he tried to throw my

8  son out the window.

9  Q    Which son, T or Z?

10 A    Z.

11 Q    Can you tell us a little more about that argument?

12 A    He was saying how my son shouldn't be here, I shouldn't

13 have moved in with my kids because now he has to look at the

14 mistake that I made that I shouldn't even have had, and he was

15 very upset about it.

16 Q    And were you and he physically fighting before he tried

17 to throw Z out the window?

18 A    We was.  We was fighting upstairs and he ran downstairs

19 and ran towards my son, picked him up by his shoulders, and

20 started walking toward the window.

21 Q    What happened when he tried to throw Z out the window?

22 A    T threw a clock at him and distracted him.  He dropped Z

23 and he started assaulting T.  I grabbed Z and ran out the

24 house and told T to run out the house with me.  And me, both

25 of my kids, and Brandy left that night and I dropped my kids

1   off at their fathers' house.

2   Q    How old was Z when this happened?

3   A    A year and a half, or so.

4   Q    You said that he started assaulting T during this

5   incident.  How old was T?

6   A    Maybe six.

7   Q    What do you mean he started assaulting T, what did he do

8   to T?

9   A    He punched him in his face and he grabbed him.  As he was

10  doing that, I grabbed T running out the door with Brandy and

11  my other son.

12  Q    Were there other times that he was physically abusive to

13  T?

14  A    Yes.

15  Q    How so?

16  A    He felt like he talked too much when T used to try and

17  defend me.

18  Q    When you say he was physically abusive to T, what would

19  the defendant do to T?

20  A    Punch him in his face and punch him in his chest and call

21  him a pussy.

22  Q    You said that this happened sometimes when T tried to

23  defend you?

24  A    Yes.

25  Q    Defend you from what?

1   A      From getting beat by Cory.

2   Q      When you say that Cory would beat you, can you describe

3   to us what actions Cory would take toward you?

4   A      Choked me, bang my head against the wall, punch me in my

5   face, grab me, slam me against the wall and on the floor, kick

6   me.

7   Q      Was there damage to the home that you shared with the

8   defendant as a result of this violence you've just described?

9   A      Yes.  There was holes all in the walls throughout the

10  house.

11  Q      Why were there holes in the walls?

12  A      From me dodging his hits.

13  Q      And just can you explain, you would dodge his hits and

14  then what would happen?

15  A      Move to the side and he would make contact with the wall.

16  Q      Was the defendant trained in fighting?

17  A      Yes.  Boxing.

18          MR. CECUTTI:  Objection.

19          THE COURT:  Don't lead.

20  Q      What, if any, sports did the defendant involve himself

21  in?

22  A      He boxed.

23  Q      Was there boxing equipment in the house?

24  A      Yes.  There was a punching bag and gloves and training

25  equipment in the basement.

1  Q    What, if any, objects or weapons did the defendant use to

2  hit you?

3  A    He had a knife and guns in the house.

4  Q    Would he hit you with those?

5  A    Yes, he would.  He gun butted me in front of my son.

6  Q    What happened -- when you say gun butted, could you just

7  describe what you mean by that?

8  A    He would take the back end of the gun and hit me with it.

9  Q    Do you remember what that argument was about?

10  A    No.

11  Q    Would you ever punch him back?

12  A    Yes.

13  Q    How tall are you?

14  A    Five feet.

15  Q    How tall is he, approximately?

16  A    5-11, 6 feet.

17  Q    Was the defendant ever injured during these fights you

18  described?

19  A    No.

20  Q    Did you ever go to the hospital as a result of the

21  violence that you've just described to us?

22  A    I did.  I went to the hospital in early 2017.  We had got

23  into an argument.  Me, my son, and Brandy was on Brandy's bed

24  in her room, and I said something at the end of the argument.

25  He turned back around and punched me in my face so hard it

1  busted my eye.

2  Q    What hospital did you go to?

3  A    Jamaica Hospital.

4  Q    You said this was 2017?

5  A    Yes.

6  Q    Do you remember the month?

7  A    January, February.

8  Q    Did you keep medical records from the trip to the

9  hospital?

10 A    I did.

11 Q    Did you go to the hospital alone or with anyone else?

12 A    I went with Brandy and Cory.

13 Q    If you know, why did the defendant go with you?

14            MR. CECUTTI:  Objection.

15            THE COURT:  Sustained.

16 A    Because he wanted --

17            THE COURT:  That means you can't answer.  Put

18 another question to the witness, please.

19 Q    Did you tell the treating doctor how you got your injury?

20 A    No.

21 Q    What did you tell them?

22 A    I told them I got into a fight with some girls.

23 Q    Why didn't you tell them how it really happened?

24 A    Because I wasn't going to implement Cory in a domestic

25 violence dispute.

1   Q    You told us about the name Sincere earlier.  Who is

2   Sincere Anderson?

3   A    That's the name that I put in the hospital as my spouse.

4   Q    Why?

5   A    Because Cory was there and I couldn't use his real name.

6   Q    Why couldn't you use his real name?

7   A    Because he didn't want to be associated with my injury.

8   Q    Did you ever live on Paerdegat Road?

9   A    Briefly.

10  Q    Were you living there in 2017?

11  A    No.

12  Q    Did you provide an address on Paerdegat Road when you

13  went to the hospital?

14  A    I did, because Cory didn't want me to use the Rosedale

15  address we were staying at.

16       MS. DEAN:  Your Honor, I now offer Government 63,

17  which are certified medical records from Jamaica Hospital

18  pursuant to 902(11) and 902(13).

19       THE COURT:  Any objection?

20       MR. CECUTTI:  No objection.

21       THE COURT:  Those will be in evidence.

22       (Government's Exhibit 63 was received in evidence.)

23  BY MS. DEAN:

24  Q    Were there any other times that you went to the hospital

25  as a result of the violence you've described from the

1   defendant?

2   A    I did.  I went in 2017, that summer, as well.  He had

3   broke my leg.

4   Q    You said he had broken your leg?

5   A    Correct.

6   Q    Could you explain to the jury what the argument was about

7   that led to the defendant breaking your leg?

8              MR. CECUTTI:  Objection.  Leading.

9              THE COURT:  It's not leading.  Overruled.

10  A    We were arguing all day and fighting throughout the

11  house.  As the night started to wind down, it started

12  escalating.  He grabbed me and threw me against the wall.  And

13  it was something, like a ladder there, and the impact of how

14  hard he slammed me against the wall, the whole back of my leg

15  just went numb.

16             And we was still fighting and I fell on the floor

17  and he fell on top of me.  When he fell on top of me, I was

18  screaming and that's how he got off.  I was walking around the

19  house for maybe three, four days before I even went to the

20  hospital because he didn't think that the injury was that

21  serious.

22  Q    Why didn't you go to the hospital right away?

23  A    I thought it was going to get better but it didn't.  It

24  got worse.

25  Q    What hospital did you end up going to?

1   A    Jamaica Hospital.

2   Q    What were you treated for there?

3   A    With a fracture.

4   Q    What part of your body?

5   A    My leg, my right leg.

6   Q    And do you remember, approximately, what month this was

7   of 2017?

8   A    I don't.

9   Q    Did you go to the hospital alone or with others?

10  A    I went with Cory and Brandy.

11  Q    What, if any, other medical news did you get when you

12  went to the hospital with the broken leg?

13  A    That day I found out I was pregnant with his daughter.

14  Q    When you say his, you mean?

15  A    Cory.

16  Q    When you went to the hospital in 2017 with the leg

17  injury, were you truthful about how you got that injury?

18  A    No.  I said that I fell.  I made up some excuse of what

19  happened.

20  Q    Why did you do that?

21  A    Because I didn't want to implement him in that, as well.

22       MS. DEAN:  I now offer Government's 53, which are

23  certified medical records from Jamaica Hospital pursuant to

24  902(11) and 902(13).

25       THE COURT:  Any objection?

1    MR. CECUTTI:  No objection.

2    THE COURT:  Those are in evidence.

3    (Government's Exhibit 53 was received in evidence.)

4  Q    Ms. Anderson, I want to talk -- I want to direct you to

5  January 27th of 2018.  On that date did you place a 911 call?

6  A    I did.

7  Q    Could you tell us about what happened that led you to

8  call 911 on that date?

9  A    Me and Brandy was in the house.  He pulled up in the

10 driveway blasting rap music.  He came in drunk.  As soon as he

11 came in he just started arguing with me about how I'm a whore,

12 I'm a lying stupid bitch, and we started fighting.

13    He pulled out a knife on me and tried to put it

14 through my throat while I was against the door.  And as he's

15 doing that, I'm opening the door from behind me and I was able

16 to get out the room.  I ran down the stairs.  I slid down the

17 stairs because the stairs is carpet, and I ran out the front

18 door with just my robe on.

19 Q    Do you recall what the defendant was angry about with

20 you?

21 A    I don't know.  He was always angry about something with

22 me.

23 Q    During this incident, what, if any, threats did he make?

24 A    He threatened to slit T's throat.

25 Q    Was T home at the time?

1    A    No.

2              MS. DEAN:   Your Honor, may I approach the witness to

3    show her what's been marked as Government's 326?

4              THE COURT:   Yes.

5    Q    Ms. Anderson, have you reviewed your 911 call from that

6    night?

7    A    Yes, once.

8    Q    Can you take a look at this?

9    A    That's my signature.

10   Q    What is on Government's 326?

11   A    That's the 911 recording of me.

12             MS. DEAN:   Your Honor, I ask that 326 be received in

13   evidence and played for the jury.

14             THE COURT:   Any objection?

15             MR. CECUTTI:   No objection.

16             THE COURT:   All right.   That will be in evidence.

17             (Government's Exhibit 326 was received in evidence.)

18             (Audio played.)

19             MS. DEAN:   Is it possible to raise the volume at all

20   or is that as loud as it goes?

21             THE COURTROOM DEPUTY:   That's as loud as it goes.

22             (Audio played.)

23   Q    Ms. Anderson, why didn't you want to tell the 911

24   operator about the weapons the defendant had when she asked

25   you?

1  A    Because I already knew I fucked up by calling the police

2  on him.  So I did not want him to catch another charge, a

3  weapons charge, and he was going to blame that on me.

4  Q    When you say you F'd up by calling the police on him,

5  what do you mean by that?

6  A    I shouldn't have called on him.

7  Q    Why do you say that?

8  A    Because I wasn't supposed to.  It was not good for me to

9  do that.  It was forbidden talking to the police.

10 Q    Who forbid that?

11 A    Cory.

12 Q    Did the police respond that night to the call we just

13 heard?

14 A    They did.

15 Q    Where did they meet you?

16 A    In front of the house.

17 Q    What was your emotional state like when they arrived?

18 A    I was hysterical and scared.

19 Q    Did you speak to them?

20 A    I did.

21 Q    Did you tell them what happened to you?

22 A    I did.

23 Q    Was anyone arrested that night?

24 A    Cory was arrested that night.

25 Q    Where did the police find him, if you know?

1   A    In the attic.

2   Q    The attic to your home?

3   A    The house we shared, correct.

4   Q    Did you fill out police paperwork that night?

5   A    I did.

6   Q    Did Brandy speak to the police when they came that night?

7   A    No.  She said she wasn't going to make a report.

8   Q    Did you see Brandy again that night?

9   A    Yes.

10  Q    What, if any, injuries did Brandy have?

11  A    She had a busted lip.

12  Q    Was she bleeding?

13  A    Yes.

14  Q    Had you ever seen the defendant be violent with Brandy on

15  other occasions?

16  A    I have.  One day we came back too late from a strip spot,

17  and he was sitting on the steps in the dark and he beat us

18  both up that night, and raped me that night.

19          MR. CECUTTI:  Objection.  Could we have a time

20  frame, please?

21          THE COURT:  Do you know when this happened?

22          THE WITNESS:  This was 2017.

23          THE COURT:  Do you remember what time of year?

24          THE WITNESS:  I do not.

25          THE COURT:  Next question.

BY MS. DEAN:

Q    Did you see the defendant put his hands on Brandy on
other occasions?

A    Yes.

Q    How so?

A    When she wasn't performing the way that she should.

Q    What do you mean by that?

A    We had quotes that we had to make, a certain amount of
money that we had to bring in.  So when she wasn't performing
right he would get aggressive and abusive.

Q    How much money was Brandy expected to bring in from sex
work?

A    At least $2,000 a week.

Q    How frequently did you and the defendant fight about your
sons?

A    Seems like every day, but it was often.

Q    What topics caused fights between you and the defendant
when you were living with him?

A    Doing things for my children, spending time with my
children, spending time with my family; I couldn't do those
things.

Q    You mentioned that the defendant had a gun.  How many
guns have you seen the defendant with?

A    Two.

Q    Did he carry a gun?

1    A    He did.

2    Q    Where did he get the second gun?

3    A    He got it from Samson.

4    Q    Do you know Samson's last name?

5    A    I don't know.

6    Q    Do you remember anything about the gun that he got from

7    Samson?

8    A    Anything, like what?

9    Q    What kind, or the color?

10   A    It was black.

11   Q    Did the defendant threaten either of your children with a

12   gun?

13   A    He threatened T often.

14   Q    Can you describe that to the jury?

15   A    What do you mean describe it?

16   Q    How would he threaten T with a gun?

17   A    He would threaten him and put it in his mouth and tell

18   him he would blow his fucking brains out if he kept running

19   his mouth.

20         In one particular incident, he had called -- T had

21   called my cousin and told my cousin to try and call Cory to

22   try and get Cory to calm down so we would stop fighting.  So

23   my son came with the phone and like handed it to Cory, and my

24   cousin was like, yo, bro, just calm down, chill out, don't be

25   fighting with her in front of little man.  Cory spoke to him

1   like yeah, all right, cool.  He hung up and as soon as he hung

2   up, he went and beat up my son.  He put a gun in his mouth,

3   told him to stop running his fucking mouth, and what happens

4   in this house stays in this house.

5           MR. CECUTTI:  Your Honor, could we have a time

6   frame, please?

7           THE COURT:  Do you recall when this happened?

8           THE WITNESS:  It was the summertime.

9           THE COURT:  Do you remember what year?

10          THE WITNESS:  2017.

11  Q    Was the defendant sexually abusive to you when you and

12  Brandy lived with him?

13  A    Yes, he was.

14  Q    How so?

15  A    He would rape me with objects, random objects, brooms,

16  hammers, liquor bottles.

17  Q    Did he cause you any injuries from what you've just

18  described to us?

19  A    Yes.  I was sore and sometimes I would be bleeding.

20  Q    Specifically, where would you be bleeding from as a

21  result of his behavior?

22  A    From my anal.

23  Q    I want to go back now in time to before you moved in with

24  the defendant.  When your second son Z was born, who were you

25  living with?

1    A    I was living with his father, A.

2    Q    And that's who you've called Alex before, right?

3    A    Correct.

4    Q    Why did you call him Alex?

5    A    Because that was his middle name.

6    Q    When did you meet Alex?

7    A    I met Alex in 2013.

8    Q    How did you guys meet?

9    A    He was working at a restaurant.  My son, T, was doing

10   something at a restaurant and he was commenting on what my son

11   was doing.  And off of that, we struck up a conversation and

12   we was together from there.

13   Q    Around when did you and Alex first move in together?

14   A    In 2014, the spring of 2014.

15   Q    When did you guys move to that apartment at 2204 Fulton

16   Street that you mentioned before?

17   A    April of 2014.

18   Q    Did you have a job during this time period?

19   A    I was doing home care.

20   Q    What is home care?

21   A    Taking care of the elderly, taking them to their

22   appointments, giving them baths, personal care, medication

23   reminder, basic stuff for the elderly.

24   Q    Did you enjoy that job?

25   A    I did.

1  Q    Were you doing sex work at that time, as well?

2  A    Yes, partially.

3  Q    Did you call it sex work or did you call it something

4  else?

5  A    We called it trapping or getting money.

6          THE COURT:  Say it again.  I'm so sorry.

7          THE WITNESS:  Trapping or getting money.

8  Q    Could you tell the jury about how you got into trapping

9  or sex work?

10  A    All the guys would try to approach me and talk to me, and

11  when I seen that they would offer me things for what I was

12  doing, what they wanted, I started getting into it because I

13  seen that as a way to make money.

14  Q    And did that evolve over time into something more

15  organized?

16  A    No, just me loosely doing it on my own.

17  Q    When you were doing it on your own, what kind of places

18  would you go to to find dates or clients?

19  A    I would go to their place.  It's called outcalls.

20  Q    How would you find the clients or the people that wanted

21  to pay you for sex?

22  A    Bars or on the streets, dressed up to make people look at

23  you.

24  Q    Could you please explain to us more specifically the

25  things that you did sexually in exchange for money?

1  A    I did oral sex, vaginal sex, and happy endings.

2  Q    What is that?

3  A    A hand job.

4  Q    Would you have anal sex for money?

5  A    Depending.

6  Q    Depending on what?

7  A    Depending on the guy, if he was nice and if he had the

8  money that I was requesting.

9  Q    What does the term fetishes mean?

10 A    A fetish is when you like something in particular.

11 Q    Did you allow clients to pay you for what you would

12 consider fetishes?

13 A    Yes.

14 Q    What kind of things were those?

15 A    Feet fetish, titty fetish, just different fetishes.

16 Q    Did you also have threesomes with clients for money?

17 A    Yes, if need be.

18 Q    When you were working on your own, like you've just

19 described to us, what did you charge clients?

20 A    A hundred dollars.

21 Q    Sorry?

22 A    A hundred dollars for an hour.

23 Q    Would that change if the clients wanted certain things?

24 A    Yes, fetishes was $50 more.

25 Q    Who decided your rates?

1   A     I did.

2   Q     How often would you say you would do sex work?

3   A     Whenever I felt like it.  It wasn't nothing that I did on

4   a schedule.  It was in between me working and being a mom.

5   Q     Did you ever have sex with more than one client in a

6   single day?

7   A     I would.

8   Q     When you were involved with Alex, Z's father, did he know

9   that you did sex work?

10  A     He did.

11  Q     Did you do it at the home you shared with him on Fulton?

12  A     No.

13  Q     Who kept the money that you made at the time?

14  A     I did.

15  Q     And during the same time period were you intimate with

16  the defendant?

17  A     I was.

18  Q     How was your relationship with Alex around the time that

19  Z was born?

20  A     It wasn't good.  We was on the end of our relationship.

21  He didn't like the things that I was doing, I didn't like the

22  things he was doing, and he was getting very disrespectful in

23  front of the kids.

24  Q     Did Alex know that you were messing around with the

25  defendant?

1  A    He did.

2  Q    Did Alex ever catch you cheating on him with the

3  defendant?

4  A    Yes.  One night Cory was dropping me off and Alex was

5  around the corner, and he was watching me make out with Cory

6  in the car.  And I know this because when I got back in the

7  house, that's what he started arguing with me about.

8  Q    Would you fight with Alex about your relationship with

9  the defendant?

10  A    I would.

11  Q    Did you fight with the defendant about your relationship

12  with Alex?

13  A    Yes.

14  Q    What kinds of things did the defendant say about Alex?

15  A    That he shouldn't be here.  He's a Haitian Sak Pase.

16  He's Haitian and Jamaicans, he did not fuck with Haitians.  So

17  he was calling my baby a Haiti Sak Pase baby.

18  Q    What does that term mean that you're using?

19  A    It means hey, what's up, something like that.

20  Q    Hey, what's up?

21  A    Yeah.

22  Q    Did the defendant and Alex ever have any confrontations?

23  A    Yes.  Alex would call Cory's phone and just tell him keep

24  that whore, I know you're fucking with her, you know, just

25  being real nasty.

1  Q    I want to talk to you now about how you met Brandy Odom.

2  Can you tell the jury about how you first met her?

3  A    I met her -- she used to come downstairs with her sister,

4  Aisha, because me and Aisha was friends.

5  Q    Downstairs where?

6  A    I lived on the second floor and Aisha lived on the third

7  floor.

8  Q    What address was this, just to be clear?

9  A    2204 Fulton Street.

10 Q    Did you know Brandy's sister Aisha?

11 A    Yes.

12 Q    Who did you meet first, Aisha or Brandy?

13 A    Aisha.

14 Q    Were you friend with Aisha?

15 A    Yeah.

16 Q    Did you and Brandy become friends?

17 A    Yes.

18 Q    How did you and Brandy become friends?

19 A    We became friends because we were -- I found out she was

20 into the same stuff that I was into, which is sex work.

21 Q    And so just to be clear, Brandy was doing sex work before

22 she met you?

23 A    Correct.

24 Q    Did you meet other people in Brandy's family?

25 A    Yes, her mother.

1  Q    What is her name?

2  A    Nicole Odom.

3  Q    How did you meet her mother?

4  A    When we had just moved in with Cory, she brought me over

5  to meet her family at her mom's house.

6  Q    Brandy did?

7  A    Yes.

8  Q    How did you find out that you and Brandy shared that in

9  common that you did sex work?

10  A    We was outside going to the store, something like that,

11  one day.  Somebody was trying to holler at her, and we turned

12  that into like a proposition and we started soliciting.

13  That's how we both started doing it together.

14  Q    Did there come a time when Brandy moved out of Aisha's

15  and moved in with you?

16  A    Yes.

17  Q    Do you know why?

18  A    No.

19  Q    When Brandy first moved in with you, was that on Fulton

20  Street?

21  A    Correct.

22  Q    Who was living in your Fulton Street apartment when

23  Brandy first moved in with you?

24  A    Me and Alex.

25  Q    What was Brandy like as a person?

1   A     She was chill, fun, outgoing, and laid back.

2   Q     And you said it was you, Brandy, and Alex.  Was it T and

3   Z, as well?

4   A     Correct.

5   Q     Why did you and Brandy decide to start I think you said

6   soliciting together, like doing sex work together, is that

7   what you mean?

8   A     Correct.

9   Q     Why did you guys start doing it together?

10  A     Because most girls did it by themselves, so when you

11  found a friend that would do it with you it was comfortable,

12  more comfortable.

13  Q     What kind of places would you go together to do sex work?

14  A     We would go to the guy's house.

15  Q     When you started working with Brandy, did you and she

16  engage in threesomes with clients?

17  A     Yes.

18  Q     Would you have sexual contact with Brandy during those

19  threesomes?

20  A     No.

21  Q     What would you do?

22  A     We would both please the guy, and play around with each

23  other.

24  Q     Did you have any sexual relationship with Brandy outside

25  of your business?

1  A     No.

2  Q     Did there come a time when you wanted a new location to

3  see clients?

4  A     Yes.

5  Q     What location did you want to use?

6  A     Cory's house in Queens.

7  Q     Why did you want to use his house?

8  A     Because it was just him there by himself.

9  Q     And why use his house instead of what you had been doing

10 all along?

11 A     Because it's more money when the clients come to you.

12 Q     Around when was this when you started wanting to use the

13 defendant's home?

14 A     This is when I was still living on Fulton.

15                (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

 1 | BY MS. DEAN:  (Continuing.)
 2 | Q    And roughly what year?
 3 | A    2016.
 4 | Q    Could you describe the defendant's home in Queens?
 5 | A    It had a basement, a first floor, a second floor and an
 6 | attic.  And the entrance to the house is the side door and it
 7 | has a back glass door that leads to the patio.
 8 |         MS. DEAN:  May I please show the witness only
 9 | Government's 15 for identification.
10 | Q    Do you recognize what's shown in Government's 15?
11 | A    I do.
12 | Q    What do you recognize?
13 | A    That's the house that I shared with Cory in Rosedale.
14 | Q    And does it fairly and accurately show that house?
15 | A    Yes, it does.
16 |         MS. DEAN:  I ask that Government's 15 be received in
17 | evidence and published.
18 |         THE COURT:  Any objection?
19 |         MR. CECUTTI:  No objection.
20 |         THE COURT:  All right.  It's in evidence.
21 |         (Government's Exhibit 15 so marked.)
22 | Q    Okay.  Now we have it up on the screen, Ms. Anderson.
23 | That touchscreen in front of you will let you actually circle
24 | on it.  Could you circle the house that you shared with the
25 | defendant?

1    A    (Witness complies.)

2         MS. DEAN:  The witness has circled a home that's

3    just slightly to the center left, right to the left of the

4    driveway that's shown in Government's 15.

5         THE COURT:  Is that an attached house?

6         THE WITNESS:  Yes.

7         THE COURT:  Okay.

8    Q    And you mentioned the location of the entrance.  Could

9    you possibly just show us with a dot or a circle where the

10   entrance is?

11   A    It's this.  (Indicating.)

12        MS. DEAN:  The witness has drawn in pink over the

13   entrance of the entrance which is the right center inside of

14   the circle that she drew prior.

15   Q    Now, the driveway that your circle kind of overlaps, were

16   either of the sides of that driveway in use by the defendant

17   when you lived with him?

18   A    Yes, the side on the house, the left side where the black

19   car is.

20   Q    And the right side of the driveway, was that also his or

21   was that someone else's?

22   A    No, that was the people in the white house on the right

23   side.

24   Q    When you lived in that house with the defendant, did he

25   keep a car in the driveway?

1  A    Yes.

2  Q    What kind of car?

3  A    A 2005 Nissan Maxima.

4  Q    Do you know approximately when the defendant first moved

5  into this home that we're looking at?

6  A    Yes.  It was the end of my high school.

7  Q    That's around what year, if you can?

8  A    This is around 2008.

9  Q    So in 2015 to 2016, did he live in that home alone or

10 with other people?

11 A    This house?

12 Q    Yes.

13 A    In 2015, after his mother died, he was there alone.

14 Q    Did the home belong to him?

15 A    No, the home was still in his mother's name.

16 Q    Was the defendant's father alive in 2015?

17 A    No.

18 Q    When did he pass, if you know?

19 A    In 2012.

20 Q    Did the defendant have any living grandfathers?

21 A    No.

22 Q    Did the defendant have family that came to visit or stay

23 in this Queens home that we're looking at while you lived with

24 him?

25 A    No.

1  Q    Did the defendant have any brothers?

2  A    He does.

3  Q    When -- at the time you lived with him, where were his

4  brothers?

5  A    One brother lived in Springfield Gardens not far from

6  where we lived and the other one lives in Virginia.

7  Q    The one that lived out of state, did he ever come to

8  visit while you lived with the defendant?

9  A    No.

10  Q    And the one that lived in Springfield Gardens, would he

11  come to the house and stay there?

12  A    No.

13  Q    Did the defendant have any uncles that you knew?

14  A    No.

15  Q    If you know, what was the defendant's financial situation

16  after his mother passed away in February of 2015?

17  A    He was financially stressed.  He didn't have a job and

18  whatever he was doing wasn't working out.

19  Q    Did he tell you about his financial situation?

20  A    Yes.

21  Q    What would he tell you?

22  A    About what in particular?

23  Q    What did he say to you about his financial situation?

24  A    He told me that he needed money, that one of his friends

25  fucked up a job and that it messed with his money and he

1    needed another source of income.

2    Q    Did he ever ask you for help with bills for this house?

3    A    Yes.

4    Q    Was that before you moved in with him or after?

5    A    That's how I end up moving in with him.  Me and Brandy

6    was using his house for out calls and we were doing dates

7    there in between us working at our regular jobs, and the

8    electricity had got cut off and this was, like, in

9    August 2016.  The electricity had got cut off and me and

10   Brandy used the money from working and hustling and we put our

11   money together and went to Con Edison and paid for the lights

12   to come back on because he was in there with no lights.  He

13   was coming over to my mother's house with a battery pack, a

14   generator, charging it so when he left my mom's house, he can

15   go back home and charge his phone and use whatever lights off

16   of this generator pack.

17   Q    So you and Brandy did pay to get the lights back on?

18   A    We did.

19   Q    So then the defendant allowed you and Brandy to use his

20   home for sex work?

21   A    Yes.

22   Q    How did he meet Brandy originally?

23   A    He met her through me, introducing him to her because he

24   had a place that she could have used.

25   Q    How, if at all, did the defendant benefit from you and

1  Brandy using his home for sex work?

2           MR. CECUTTI:  Objection.  Leading.

3           THE COURT:  Overruled.

4  A    Can I answer?

5           THE COURT:  Oh, yes.  Go ahead.  Go ahead.

6  A    What was the question?

7  Q    How, if at all, did the defendant benefit from you and

8  Brandy using his home for sex work?

9  A    He benefited because the lights were kept on after that

10 point and he was taking our money.

11 Q    Were you and the defendant planning a life together?

12 A    Yes.

13 Q    Were you planning to leave Alex and be with him?

14 A    Yes.

15 Q    During this time period when you were using the

16 defendant's home for sex work, was your relationship with Alex

17 still causing problems between you and the defendant?

18 A    Yes.  And so one day, we were supposed to go -- I had got

19 tickets to go see Nicki Minaj, and the day I was supposed to

20 go see Nicki Minaj, I had spent the last three days prior to

21 the concert in Rosedale with Cory.  And Alex had, he knew

22 where I was and he started texting me and calling me, you

23 know, calling me all kind of bitches and saying, you know, he

24 knew where I was and he texted me a picture of my vagina with

25 cum stains, you know, like cum all over my vagina.  And Cory

1  was sitting right there next to me in the bed and I was pissed

2  off, he was pissed off, and he started saying this is why that

3  motherfucker shouldn't be here, he shouldn't even fucking be

4  here.

5  Q    That's what the defendant was saying about Alex?

6  A    Yes.

7  Q    What were you saying about Alex?

8  A    I was agreeing with him.

9  Q    And when you say you guys were saying, he, the defendant,

10 that Alex shouldn't even be here, could you be clear about

11 what you guys were saying?

12 A    Yes, that I was agreeing with Cory that Alex should die.

13 Q    And at that time, did you want Alex to die?

14 A    Yes.

15 Q    As far as you knew, did the defendant want Alex to die?

16 A    Yes.

17 Q    Did you and the defendant discuss a plan related to Alex

18 dying?

19 A    Yes.  Cory advised me to get all of Alex information and

20 bring it back to him, and when I did, he made me fill out

21 matching policies, one for me and one for Alex.

22 Q    So let's talk about the day you filled out the policies

23 for Alex.

24         First of all, what kind of policies are you talking

25 about?

1  A    It was life insurance policy.

2  Q    Where were you when you filled out what you called the

3  matching policies for you and Alex?

4  A    I was in Rosedale with Cory.

5  Q    And what did you bring to Rosedale that day?

6  A    I brought Alex date of birth, his signature and the

7  correct spelling of his name.

8  Q    Why did you bring those things?

9  A    Because it was needed to fill out for the life insurance

10 paperwork.

11 Q    Did you and the defendant discuss the point of filling

12 out life insurance paperwork for Alex?

13 A    Yes, because he was not going to get rid of Alex who was

14 my problem and he not get paid for it or benefit some way from

15 it.

16 Q    And when you say "he," who do you mean?

17 A    Cory.

18 Q    Did you understand what he meant about he wasn't going to

19 get rid of Alex without benefiting from it?

20 A    I did.

21 Q    What did he mean?

22 A    That he needed these policies in order to be able to kill

23 Alex and benefit from it.

24 Q    Did you agree to this?

25 A    I did.

1  Q    Were you still living with Alex at the time?

2  A    I was.

3  Q    When you brought Alex's Social Security number and his

4  personal information over to Rosedale the day you filled out

5  the policies, did you do any drugs with the defendant that

6  day?

7  A    I did.  Me and him was doing lines of coke.

8  Q    And so by that time, you were using hard drugs?

9  A    When I was with him, he would give it to me, yes.

10 Q    Tell us about the policy paperwork that you filled out

11 that day.

12 A    I don't understand the question.

13 Q    What kind of paperwork did you fill out?

14 A    I filled out an application.

15 Q    For what?

16 A    For life insurance just based on my information.

17 Q    So did you and the defendant talk about what was the next

18 step after you filled out the application that you're

19 describing to us?

20 A    So the next step was him scoping out my apartment.

21 Q    Who?  When you say "him," who?

22 A    Cory.

23 Q    And what was the purpose of the defendant scoping out

24 your apartment?

25 A    So when he planned his attack, he would have no

 1    witnesses.

 2    Q    And what did you understand the next step after that to

 3    be?

 4    A    To plan to kill Alex.

 5    Q    And were you and the defendant planning to kill Alex?

 6    A    Yes.

 7    Q    And so what was supposed to be the next step after that,

 8    after Alex is killed?

 9    A    To call the insurance company, claim the money and

10    collect it, and give it to him.

11    Q    Who was supposed to call the insurance company, claim the

12    money and collect it?

13    A    I was.

14    Q    And when you say "give it to him," what are you talking

15    about?

16    A    Give the proceeds from the life insurance to Cory.

17    Q    Did you guys discuss that?

18    A    Yes.

19    Q    Did you agree to that?

20    A    Yes.

21    Q    How much of the policy money were you going to give the

22    defendant after this was done?

23    A    All.

24    Q    Sorry?

25    A    All of it.

1  Q    Why all of it?

2  A    Because this was his killing.  This was what he wanted.

3  Q    Whose words are those?

4  A    Cory's.

5  Q    Why didn't you just leave Alex and move out?

6  A    I was still trying to see what was going to be the

7  situation with kids and the apartment and we were actively

8  arguing about him leaving, but he kept saying he didn't have

9  anywhere else to go and I wasn't just going to kick him out.

10 So I let him stay and I left and moved in with my mother.

11 Q    Who came up with the life insurance policy portion of

12 this plan that you've just described to us?

13 A    Cory.

14 Q    Was Alex the only person that the defendant wanted to get

15 rid of?

16 A    No.

17 Q    Who else did he speak to you about getting rid of?

18 A    His friend Gary, my son Z and my son T.

19 Q    Let's talk first about T and Z.

20      What did the defendant say to you about getting rid

21 of T and Z?

22 A    What do you mean?

23 Q    Well, did the defendant speak -- you said you spoke to

24 the defendant about this?

25 A    Yes.  He was -- he wanted to get rid of them.  Well, I

1   end up having to send my son Z away to Georgia just so I can

2   figure out what I was going to do because he was not safe

3   living in that house with me and Cory.

4   Q     Did you want the defendant to kill T or Z?

5   A     Not at all.

6   Q     Did you, however, agree to take out a life insurance

7   policy on Alex for the purpose of collecting money after he

8   was killed?

9   A     Yes.

10  Q     Do you know if payments were made on the policy that you

11  took out on Alex?

12  A     Payments were made.

13  Q     Do you know how many payments?

14  A     I don't.

15  Q     Do you remember who made the payments, you or the

16  defendant?

17  A     I don't.

18        MS. DEAN:  I'm going to ask now that the witness be

19  shown Government's Exhibit 128A and B for identification, just

20  for the witness only first.

21  Q     If you can just take a look at A, 128A first.

22        MS. DEAN:  Then if we can just turn to 128B so the

23  witness can see that as well.

24        (Pause.)

25  Q     Is 128A still in front of you or can you see B?

 1  A     Yes, ma'am.  I can see A.

 2         MS. DEAN:  Can we please turn to B.

 3         (Pause.)

 4  Q     Do you recognize Government's 128A and B?

 5  A     I do.  A is the policy in Alex name and I'm the

 6  beneficiary, and B is I am the insured and Alex is my

 7  beneficiary.

 8  Q     Do you see your own handwriting on those documents?

 9  A     This is my handwriting.

10  Q     Are these the documents you filled out in 2016 after you

11  and the defendant planned to kill Alex?

12  A     Yes, these are the exact documents.

13         MS. DEAN:  I'll ask that 128A and B be received in

14  evidence, Your Honor.

15         THE COURT:  Any objection?

16         MR. CECUTTI:  No objection.

17         THE COURT:  All right.  These will be in evidence.

18         (Government Exhibits 128A and 128B so marked.)

19         MS. DEAN:  May I first publish Government's 128A?

20         THE COURT:  Yes.

21  Q     So, Ms. Anderson, now that we're all looking at the

22  document together, could you again tell us what we're looking

23  at in 128A?

24  A     A is a policy where Alex is the insured and I'm his

25  beneficiary.

1        MS. DEAN:  And Mr. Rader, if you wouldn't mind --

2   Q    Well, first, before we do that, if you can tell us, on

3   the bottom left, what is the date you filled out this policy?

4   A    August 18, 2016.

5        MS. DEAN:  So, Mr. Rader, if you wouldn't mind

6   zooming in on the top half with the handwriting.

7   Q    What did you put under "Proposed Insured Name"?

8   A    "Proposed Insured:  Villardouin A. Villard."

9   Q    Is that Alex's true name?

10  A    Yes.

11  Q    Next to that, under "Date of Birth," what did you put?

12  A    His date of birth.

13  Q    Is that his real date of birth?

14  A    Yes.

15  Q    And to the right of that, under "Amount of Insurance,"

16  what was the amount of this policy that you and the defendant

17  took out?

18  A    $100,000.

19  Q    Next to "Address," what address did you put for Alex?

20  A    The Fulton Street address that I shared with him.

21  Q    Was that his real address at the time?

22  A    Correct.

23  Q    Below that, next to "Telephone Number," what did you put

24  for Alex's phone number?

25  A    My telephone number.

1  Q    And now in August of 2016, was 718-600-1072 your number

2  yet?

3  A    No.

4  Q    Whose number was it at that time?

5  A    That was Cory's phone number.

6  Q    Did it later become your number?

7  A    It did.

8  Q    Around when?

9  A    Around the time I moved in.

10 Q    With the defendant?

11 A    Yes.

12 Q    To the right of that, next to "E-Mail Address," what did

13 you put for Alex's e-mail?

14 A    Villardavillard@gmail.

15 Q    Was that Alex's actual e-mail?

16 A    No.

17 Q    What was the purpose of putting a different e-mail there?

18 A    What was the purpose of putting a fake e-mail?

19 Q    Yes.

20 A    So that he couldn't get this to his real e-mail.

21 Q    And so to be clear, Alex had no idea you were doing this?

22 A    No, he didn't.

23       MR. CECUTTI:  Objection.

24       THE COURT:  Overruled.

25 Q    Under "Beneficiary Name," who did you put?

1  A    I put my name.

2  Q    And next to that, where it says "Relationship"?

3  A    "Fiance."

4  Q    Were you Alex's fiancee?

5  A    I was.

6           MS. DEAN:  And, Mr. Rader, if you wouldn't mind just

7  blowing up the bottom half now of 128A.

8  Q    The signature we see to the right of the date, who signed

9  that?

10  A    I did.

11  Q    And what did you use to sign that for Alex?

12  A    I used Alex's signature that I took from the house to put

13  on the life insurance paper and I went over it.

14  Q    And this policy for Alex, this was the one that you said

15  payments were made?

16  A    Correct.

17  Q    If we can turn now to Government's 128B.

18           Ms. Anderson, which -- now that we're all looking at

19  this together, can you tell us which policy this is?

20  A    This is the policy for me, and Alex is the beneficiary.

21  Q    What was the purpose of doing this policy application?

22  A    The purpose of my own was to make it look legit, like if

23  me and Alex were taking out meaningful policies on each other

24  as a couple.

25  Q    Was it legit?

1  A    Not at all.

2  Q    And what date did you fill this out?

3  A    August 18, 2016.

4  Q    Is that your signature next to the date at the bottom?

5  A    It is.

6         MS. DEAN:  Mr. Rader, if you wouldn't mind blowing

7  up the top half of 128B.

8  Q    Do you know why your name and address is typed into this

9  form rather than handwritten?

10  A    I do not know.

11  Q    Next to "Date of Birth," is that your real date of birth?

12  A    It is.

13  Q    What was the amount you chose for this policy?

14  A    100,000.

15  Q    The phone number next to "Telephone Number," could you

16  read that out loud to us, please?

17  A    646-399-7637.

18  Q    Whose number was that in August of 2016?

19  A    That was my number at the time.

20  Q    What is the e-mail that you put down?

21  A    Anderson20089@aol.com.

22  Q    Was that your e-mail?

23  A    It was.

24  Q    And under the "Beneficiary Name" and "Relationship," just

25  please tell us what you filled out?

1    A    Villardouin A. Villard.

2    Q    Now, did you or the defendant ever bother to make

3    payments on this policy where you were the insured and

4    Mr. Villard was the beneficiary?

5    A    I don't know.

6    Q    Who decided what life insurance company to use for this

7    plan?

8    A    Cory picked them.

9    Q    Do you know how?

10   A    No, I don't.

11   Q    And the address that you put on these policies, this was

12   the address that you were still living at in August of 2016?

13   A    Correct.

14            MS. DEAN:  We can take that down, Mr. Rader.

15            THE COURT:  Do you think this might be a convenient

16   time to break?

17            MS. DEAN:  Yes, Your Honor.

18            THE COURT:  All right.  I think we'll just take

19   15 minutes to stretch your legs and all of that.  Please don't

20   talk about the case.  See you in a few minutes.

21            (Jury exits.)

22            THE COURT:  Okay.  Everybody can sit down.

23            You can step down.

24            (Witness steps down.)

25            THE COURT:  Okay.  Everybody have a seat.  So we'll

1   convene in about 15 minutes.

2              (Recess taken.)

3              (In open court; outside the presence of the jury.)

4              THE COURT:  Are we ready for the jury?

5              MS. DEAN:  Yes, Your Honor.

6              THE COURT:  Let's have the witness back on the

7   stand.

8              (The witness resumes the stand.)

9              (Jury enters.)

10             THE COURT:  All right, everybody.  We're ready to

11  continue.

12             Go ahead, Ms. Dean.

13             MS. DEAN:  Thank you, Your Honor.

14             THE CLERK:  The witness is reminded she is still

15  under oath.

16             THE WITNESS:  Yes.

17  DIRECT EXAMINATION

18  BY MS. DEAN:  (Continuing)

19  Q    Ms. Anderson, did you and the defendant discuss how he

20  was going to kill Alex, Z's father?

21  A    Yes, that it was going to look like a robbery at my

22  apartment that I shared with Alex at 2204 Fulton Street.

23  Q    Was this supposed to happen while you were still living

24  there or once you moved out?

25  A    While I was still living there and once after I moved

1   out, both.

2   Q    And did there come a time when you did move out?

3   A    Yes.

4   Q    Around when was that that you finally moved out?

5   A    After Labor Day, so September, like, 20th, 2016.

6   Q    Where did you go when you first moved out of Alex's?

7   A    I moved to my mother's house.

8   Q    Did Brandy go with you to your mother's house or did she

9   stay with Alex?

10  A    She stayed with Alex.

11  Q    You talked to us earlier about part of the plan to kill

12  Alex being scoping, do you remember that?

13  A    Yes, casing out at the area and the scene, yes.

14  Q    Did you or the defendant actually take steps to scope out

15  Alex and the scene?

16  A    Yes.  When I would have things to talk about with Alex or

17  I would have to meet up to get things from him, Cory would try

18  to use those situations from me to want to set up Alex but I

19  wouldn't do so.

20  Q    What do you mean?

21  A    I kept getting cold feet every time he got close to

22  killing Alex.

23  Q    And when you say "he got close," what do you mean?

24  A    One of the situations was I was supposed to go upstairs

25  and have sex with Alex and then he'd come in after I put Alex

1   to sleep and kill him.  I didn't do that.

2   Q    Okay.  When you say he was supposed to come in, who is

3   "he" in that sentence?

4   A    Cory.

5   Q    And can you just explain to us what was the purpose of

6   part of the plan being that you would go and have sex with

7   Alex?

8   A    Because that was my son's father.  That was my fiance.

9   Q    How did that help with the plan to kill Alex though?

10  A    To make it look good because I was living there.  That

11  was his idea.

12  Q    And when you said you got cold feet, what do you mean?

13  A    Every time there came a time to do something on scope, I

14  would just not do it.

15  Q    Did you and the defendant have any arguments about that?

16  A    Yes.  It would get -- it really upset him.

17  Q    When did you leave your mother's house and move in with

18  the defendant?

19  A    In December of 2016.

20  Q    Once you moved in with the defendant, how frequent was

21  the physical and sexual abuse that you've described to us

22  already?

23  A    It was daily because he couldn't stand looking at my

24  children because they were not his.

25  Q    Why did you move your sons in with the defendant when he

1  had spoken to you about killing them?

2  A    Because I thought I could change his mind and that he was

3  being unreasonable because he had kids as well so I thought we

4  could have been a blended family.

5  Q    And you mentioned to us before the break that there was a

6  point where you sent Z away?

7  A    Yes.  I sent him to Atlanta to go live with one of my

8  close friends at the time because I felt he was unsafe in the

9  house with me and Cory.

10 Q    Why did you feel like Z was unsafe in the house with you

11 and the defendant?

12 A    Because I knew that Cory hated his father, and that he

13 kept mentioning that Z should not even be here so he wanted

14 him gone.

15 Q    How long was he gone for?

16 A    A month and a half or so.

17 Q    When he came -- when Z came back to New York, were you

18 still having the same issues with the defendant over Z?

19 A    Yes.

20 Q    Was the defendant more focused on one of your children or

21 was it equal on both?

22 A    It was equal but it was more so Z because he was younger.

23 Q    And did the defendant continue to speak to you about

24 getting rid of your children?

25 A    Yes.  He wanted me to make my son disappear or have a

1  really bad accident that resulted in his death.

2  Q    And did he talk to you about theories of how this would

3  happen?

4  A    Yes.  One of them would be that I, I was supposed to go

5  and get him and he got hit by a car or just like real crazy

6  things that I just, I was not okay with.

7  Q    Did the plan that the defendant discussed with you

8  regarding your children involve life insurance policies?

9  A    It did, for both children.

10 Q    Ms. Anderson, did you ever fill out life insurance policy

11 applications against either of your own children?

12 A    Yes.

13 Q    Did you ever want either of your children to be killed?

14 A    No.

15         MS. DEAN:  At this time, I ask that Government's

16 128E and 128E-REDACTED be admitted into evidence as certified

17 business records from Gerber Life Insurance pursuant to

18 902(11) and 902(13).

19         MR. CECUTTI:  No objection.

20         (Government Exhibits 128E and 128E-R so marked.)

21 Q    Before we publish, Ms. Anderson, what is Gerber Life

22 Insurance if you know?

23 A    It's a life insurance company that let's you insure

24 childrens (sic).

25 Q    How did you hear about that?

1  A     Through Cory.

2  Q     Do you remember when the defendant first spoke to you

3  about Gerber Life Insurance?

4  A     I don't.

5        MS. DEAN:  If we can publish Government's

6  128E-REDACTED, and just moving past the certification page, if

7  we can look at, yes, we can look at page 1.  And, Mr. Rader,

8  if you could blow up the top part.

9  Q     Ms. Anderson, please take a look at page 1 and to be

10 clear, have you seen the unredacted version of this document?

11 A     Yes.

12 Q     And where the redaction is next to the "T," does that

13 have the rest of your older son's first name on it?

14 A     It does.

15 Q     Okay.  If we can look at the name T, the middle initial

16 P, Anderson, is that your oldest son's name?

17 A     Correct.

18 Q     What is the amount of insurance above that associated

19 with this Gerber Life Insurance application?

20 A     $50,000.

21 Q     If you can look to the right of T's name, under "Date of

22 Birth," what does it say for date of birth?

23 A     2/12/2012.

24 Q     Is that T's date of birth?

25 A     Not at all.

1  Q    What is T's correct date of birth?

2  A    February 12, 2010.

3  Q    Now, under the parent name, do you see your own first and

4  last name?

5  A    I do.

6  Q    What is the address that's there?

7  A    The Fulton Street address, 2204 Fulton Street.

8  Q    Below that, do you see the phone number that starts with

9  646?

10  A    Yes.

11  Q    Was that your phone number in 2016?

12  A    399, yes.

13  Q    Below that, could you take a look at what it says next to

14  "E-Mail."

15  A    Safireb12054@aol.

16  Q    Was that your e-mail?

17  A    No.

18  Q    What was your e-mail address?

19  A    The beginning portion before the "at" sign is correct.

20  After the "at" sign, is not correct.  It's supposed to be

21  "@gmail."

22  Q    And if you can look down to where it says "Signature" and

23  "Date on File," what is the date you see to the right of that?

24  A    July 18, 2016.

25           MS. DEAN:  And now, Mr. Rader, if you can just blow

1  up the bottom portion of this page so we can take a look at

2  that.

3  Q    What does it say under "Beneficiary" for this policy in

4  T's name?

5  A    "Information not provided."

6          MS. DEAN:  Mr. Rader, if we can now turn to the next

7  page of Government's 128E-REDACTED, and can we blow up again

8  that top portion.

9  Q    Ms. Anderson, have you also scene the unredacted version

10 of this document?

11 A    I have.

12 Q    And under the redaction, is it the rest of Z's true first

13 name?

14 A    Yes, but that's not his correct middle initial.

15 Q    The "P" that we see here?

16 A    Correct.  It's supposed to be a "G."

17 Q    And if you can just go ahead and look all the way to the

18 right, next to "Date of Birth," what does it say for Z's date

19 of birth?

20 A    May 4, 2016.

21 Q    Is that Z's date of birth?

22 A    It's not.  His date of birth is 5/4/2015.

23 Q    And above that, what is the amount of insurance

24 associated with this application in Z's name?

25 A    For $50,000.

1   Q    Is Z's last name Villard?

2   A    It is.

3   Q    Now, again, below that, under the "Parent Name," do you

4   see your own name, the Fulton Street address and your own

5   phone number?

6   A    I do.

7   Q    Below the phone number, is your e-mail address again

8   written incorrectly?

9   A    Yes, it is.

10  Q    What is wrong with it?

11  A    It's "@gmail," not "@AOL."

12  Q    And if I can just now direct you to the date next to

13  where it says, "Signature" and "Date on File," what is the

14  date?

15  A    July 18, 2016.

16  Q    Ms. Anderson, did you give this information with the

17  incorrect dates of birth, e-mail and the incorrect middle

18  initial for Z to Gerber regarding your children?

19  A    No.

20  Q    I now want to talk about the next page of this exhibit --

21  actually, before we move on, if we can look at the bottom of

22  this page for the Z application.

23         Under "Beneficiary" for the Z application from 2016,

24  what does it say?

25  A    "Information not provided."

1  Q    Okay.

2          MS. DEAN:  Now if we can turn to the next page of

3  this exhibit which is page 4, and I want to just blow up,

4  Mr. Rader, if you can, the top portion of this exhibit.

5  Q    Ms. Anderson, please take a look at page 4.  I want to

6  talk to you about this page.

7          What is the date on it?

8  A    The date is June 19th of 2017.

9  Q    And at the top, what is the amount of insurance

10 associated with this application?

11 A    $50,000.

12 Q    And what is the name under "Parent"?

13 A    My name.

14 Q    What is the address underneath your name?

15 A    1 Paerdegat Third Street.

16 Q    Is that where you were living in 2017?

17 A    No.

18 Q    Where were you living?

19 A    I was living in Rosedale with Cory.

20 Q    Next to the phone number on this policy, what does it

21 say?

22 A    718-600-1072.

23 Q    Was that your phone number in 2017?

24 A    Yes.

25 Q    And the e-mail on this policy, what does it say?

1   A    Safireb12054@gmail.

2   Q    Was that your correct e-mail?

3   A    Yes, it was.

4   Q    Do the numbers in your e-mail address mean anything?

5   A    Yes.  The "12" is for T's birthday because it's the 12th,

6   and "05" is the month of Z and the "4" is the date he was

7   born.  So in my e-mail, I got both of the boys' birthdays put

8   together in the "12054."

9   Q    This June 19, 2017 application for Z, did you fill this

10  out, Ms. Anderson?

11  A    Yes.

12  Q    Why did you do this?

13  A    Because Cory made me.  He told me he would kill me if I

14  didn't.

15  Q    Did you want the defendant to kill Z?

16  A    No.

17  Q    Do you remember if you made payments on this policy?

18  A    I do not know if I did.

19  Q    Do you know if the defendant did?

20  A    I do not know.

21  Q    Were you concerned about what would happen after you

22  filled out this policy?

23  A    Yes.

24  Q    How was your mental health at this time?

25  A    I was very depressed and I wanted to kill myself because

1   Cory had total control of my life.  I couldn't do anything.

2        MS. DEAN:  And Mr. Rader, if you could just minimize

3   this, please, and just enlarge the bottom portion of this

4   June 2017 policy.

5   Q    Is there a beneficiary listed on this policy?

6   A    It is and I am.

7   Q    And did you have any discussions with the defendant about

8   what you were supposed to do with respect to collecting

9   insurance on this policy?

10  A    Yes, that in the event that my son died, that I would

11  collect it.

12  Q    And how was your son supposed to die?

13  A    What do you mean by how?

14  Q    Were there any conversations with the defendant about how

15  your son would die?

16  A    Yes, but it wasn't not for nothing finalized because I

17  couldn't continue having these conversations with him about my

18  son.  It made me feel like shit.

19  Q    What would the defendant say to you about how your son

20  was supposed to die?

21  A    That it was supposed to look like an accident.

22  Q    Did you argue with the defendant over this plan with your

23  son?

24  A    A lot.

25  Q    Sorry?

1  A    A lot.

2  Q    Tell us about that.

3  A    We were arguing about it because he felt like I loved my

4  kids more than him and that I did more for my kids than I did

5  for, for my kids, and he, he didn't like it.  He felt like I'm

6  doing all this for children that's not supposed to be here and

7  they were not his children.

8         MS. DEAN:  We can take down Government's

9  128E-REDACTED now.

10 Q    I want to talk to you about when Brandy Odom moved in

11 with you and the defendant.

12         How did she end up actually moving in to the

13 defendant's home in Queens?

14 A    She moved in after we paid for the lights to get turned

15 on.

16 Q    Approximately when did she move in?

17 A    November, December of 2016.

18 Q    Did you want her to move in?

19 A    Yes.

20 Q    Why?

21 A    Because we would get money together and this was a better

22 place to do it.

23 Q    Why was it better?

24 A    Because we had the whole house to ourself.

25 Q    Did any other adults live in that home with you, Brandy

1    and the defendant?

2    A    No, just me, Brandy and Cory.

3    Q    You told us earlier about sending Z away.  When Z came

4    back to New York, was he able to live with you in Queens?

5    A    I did bring him back to the house.  It caused more fights

6    and then his father end up filing family court papers against

7    me.  So we was actively in a custody battle and I was having

8    visitations on the weekend, weekends, and there was always

9    fighting.  I just had to keep my son out of Cory's, like, the

10   same vicinity that he used to be in because he would flip out

11   looking at my son and he would call him Alex fucking baby.

12   Q    Who got full custody of Z?

13   A    Alex end up getting full custody because I was no longer

14   attending and picking him up for visitations.

15   Q    Was T able to live with you in Queens full time?

16   A    No.  He was back and forth between the house that I lived

17   in in Rosedale, my mother's house and my sister's house

18   because I felt unsafe for him being in the house as well.

19   Q    New, you told us earlier this morning that the defendant

20   became your pimp.  Did that happen at once or over time?

21   A    It happened over time.

22   Q    Can you explain how the defendant started to take on that

23   role?

24   A    First, I couldn't, I couldn't work no more after a

25   certain point.  I was only able to deal with customers, get

1    money in the door or drive Brandy to spots.

2    Q    And when you say you couldn't work anymore, what do you

3    mean by that?

4    A    I couldn't do sex work once I moved in with my kids.

5    That was no longer my role.  My role was to help bring money

6    into the house.

7    Q    Who decided that?

8    A    Cory.

9    Q    And so who at that point was doing sex work?

10   A    Just Brandy.

11   Q    And you were doing what?

12   A    I would participate in threesomes if they paid for that

13   or I was just strictly making posts, running the telephone

14   line and dealing with the online services.

15   Q    And when you say -- let's talk about the telephone line

16   first.  What do you mean, "the telephone line"?

17   A    I would put up posts and put a number so these guys could

18   call and I would talk to them, feel them out, make sure

19   they're not the police, make sure they know what they want,

20   and if the location was good enough for them to travel to.  I

21   had to let them know that it was a discrete location because a

22   lot of guys were nervous about coming to houses for the same

23   reason of pimps being in the house.  So I had to make sure

24   they didn't expect a pimp being there or else they wouldn't

25   come.

1  Q    You also mentioned something about an online portion of

2  the business?

3  A    Yes, posting ads and getting her brought into webcamming.

4  Q    Where did you post ads for Brandy?

5  A    Backpage.

6  Q    What is that?

7  A    It's an online website.

8  Q    For what?

9  A    All kinds of stuff but you can put up an ad for sex work

10 on it.

11 Q    Did you also use other sites beyond Backpage?

12 A    Yes.

13 Q    Do you remember them?

14 A    No, not really.

15 Q    And then you also said that you were doing, that she was

16 doing some other kind of work online with, with webcamming?

17 A    Yes, webcamming.

18 Q    What is that?

19 A    You put on shows online and the guys give you tokens for

20 what you're doing.  You could set your own rates, state what

21 you're going to do, and you have to be, like, more creative

22 because it's a lot more people online.

23 Q    And to be clear, what kind of shows?

24 A    Sex shows, fetish shows.

25 Q    Did Brandy do that too?

1   A    Yes.

2   Q    And who ran her account online?

3   A    I did.

4   Q    Why did you allow the defendant to take on the role as

5   your pimp?

6   A    Because he made us feel like we were safe and we trusted

7   him.

8   Q    How so?

9   A    He never gave us no reason to not believe that he wasn't

10  sincere or honest or trustworthy.  He was kind, for the most

11  part, and charming.  He knew all the right things to say.

12            (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. DEAN:

2   Q    Did the defendant also take on a role as Brandy's pimp?

3   A    He did.  Once I could no longer go outside, he was her

4   driver.

5   Q    When you say you couldn't go outside any longer, what do

6   you mean?

7   A    I could not go to clubs with her and spots with her no

8   more.

9   Q    Why not?

10  A    I wasn't allowed to.

11  Q    Who did not allow you to?

12  A    Cory.

13  Q    Did you speak to Brandy about her decision to allow Cory

14  to be her pimp.

15  A    Yes.

16  Q    Did you sell her on that?

17  A    Yes.

18  Q    Why did you sell Brandy on that?

19  A    That's what Cory wanted, another girl.  It was a good

20  proposition.  And she was there with me already doing sex

21  work.  So I sold her the good points of coming to Queens and

22  why she should, and she decided to do so.

23  Q    What did you think the good points were?

24  A    That we could have free roam of the house, nobody knew

25  where it was, it was discreet, we could make money there.

1   Q    Did Brandy agree that the defendant would be her pimp as
2   well?
3   A    Yes.
4   Q    Did the defendant ever ask you to recruit other women
5   besides Brandy?
6   A    He did.  He wanted to recruit two of my other friends,
7   and my sisters and her friends.
8   Q    While you and Brandy were living with the defendant what,
9   if anything, changed with respect to the money you two were
10  making from sex work?
11  A    We had to meet a quota every time.  And we had to set
12  certain amount of rates and the rates started at 200.
13  Q    Was that an increase from your prior rates?
14  A    Yes.
15  Q    Who set your rates?
16  A    Cory did.  And 200 was just standard just to come and
17  just to be for the time.  Because we had to, you know, she had
18  to wear costumes and wear clothing, so that was factored into
19  the prices.
20  Q    How much of the money that you and Brandy made from the
21  activities you described to us were you required to give the
22  defendant?
23  A    He got it all.  He said he would take care of us.
24  Q    Were you still working at home healthcare during this
25  time?

1  A    Off and on I was.

2  Q    What happened to the money that you made from that job

3  when you did work?

4  A    He would take that as well.

5  Q    Could you tell us how the money would generally be spent

6  that Brandy was making from sex work?

7  A    If we needed something, he would buy it for us; but it

8  had to be pertaining to work.  And the money that we was

9  making, he would buy drugs with and give it to us.

10 Q    Are those the drugs that you described earlier?

11 A    Yes, the Ecstasy and the cocaine, the pills, yes.

12 Q    Was the defendant involved in finding dates or clients

13 for you guys?

14 A    As far as what?

15 Q    Was it only you who went out to find clients or dates or

16 did he do that too?

17 A    Yes, because it was online but when he had friends who

18 was around, yes.

19 Q    Tell us what you mean by that, when he had friends that

20 were around?

21 A    One thing in particular that comes to my mind is the gun

22 transaction with Samson.  He used Brandy as the payment for

23 that gun.

24 Q    What do you mean by that?

25 A    She had sex with him, and Cory got the gun.

1   Q    How do you know that?

2   A    Because I was there.

3   Q    How, if at all, did the defendant indicate that you and

4   Brandy -- let me ask you this first.  Were you also for sale

5   to the defendant's friends?

6   A    Yes.

7   Q    So how, if at all, did the defendant indicate that you

8   and Brandy had services that were for sale?

9   A    He broadcasted it to his friends that he was a pimp and

10  he had girls.  And so whenever someone would look for a girl

11  he would be mad at them for not calling him first.

12  Q    Did the defendant ever pay you for sex?

13  A    Prior to.

14  Q    What do you mean?

15  A    When I was living with Alex and we used to have sex and

16  mess around I would tell him, I'm not taking off from work

17  like to just have sex with you for nothing.  And so he was, he

18  did have money around that time, so he would pay me to take

19  the day off for work so I could come over.

20  Q    Did the defendant ever allow a client or his friends to

21  pay for you or Brandy in something other than money?

22  A    Drugs.

23  Q    To your knowledge did the defendant and Brandy have a

24  sexual relationship?

25  A    No.

1  Q    Did you ever personally see them engaging in sexual acts?
2  A    No.
3  Q    Could you tell us about what rules, if any, you and
4  Brandy had to follow while you lived in the defendant's house?
5  A    We could not take personal permanent calls, that was
6  forbidden.  We had to walk around butt-naked.  He always had
7  to know where we was and what was we was doing.  We could not
8  take showers.  We could only -- me, I could not take showers.
9  Brandy only took bird baths or showers when a date, it was a
10 certain amount of money or certain person; outside of that she
11 couldn't.
12 Q    You said you had to walk around naked?
13 A    Yes, that was our uniform in the house.
14 Q    Who's?
15 A    Mine and Brandy's.
16 Q    When did you have to walk around naked?
17 A    All day.
18 Q    What if someone came over or came to the door?
19 A    That was okay.
20 Q    You said that you were not allowed to shower.  Who didn't
21 allow you to shower?
22 A    Cory because he liked us to smell in our natural state as
23 women.  He called it a strong odor.  He liked it, that was one
24 of his fetishes.
25 Q    How long would you go without being permitted to shower?

1  A      Weeks.

2  Q      You said that Brandy, though, was permitted to take bird

3  baths?

4  A      Yes, where you just wash the important parts.

5  Q      To be clear, what do you mean by that?

6  A      Armpits, rear and front, just so it doesn't have a smell.

7  Q      Why was Brandy permitted to take bird baths and you were

8  not?

9  A      Because she was, she had dates.  I wasn't working at this

10 point.

11 Q      Was Brandy still working an on-the-books job when she

12 moved in with you and the defendant?

13 A      She was, and she was going to school.  And the defendant

14 stopped her from doing both.  He said she doesn't trust her

15 what she was doing when she wasn't around him.  So she stopped

16 going.

17 Q      What school was she going to or what was the schooling?

18 A      Empire Beauty School to do cosmetology.

19 Q      You said she had to stop going, why did she have to stop

20 going?

21 A      He did not want her to travel into the city every day no

22 more.

23 Q      Did she stop?

24 A      Yes.

25 Q      What, if any, rules were in place about how you had to

1  behave when other men were around?

2  A    We couldn't talk, we only answered when we were spoken

3  to.  And we could not make eye contact.  I did that one day

4  with his friends, he punched me dead in my mouth.

5  Q    Where would the defendant be if you or Brandy had a date

6  at the house?

7  A    If I was in the room with Brandy, he would be in the

8  closet.

9  Q    Like hiding in the closet?

10 A    Yes.

11 Q    And did dates know that he was in the closet?

12 A    No.  One person in particular did because he felt like we

13 was playing games.  He told her that her voice didn't sound

14 like the person on the phone.  And so in that instant I had to

15 come out the next room and say, hey, you know -- we had to BS

16 the guy why it was a different voice.  At that time he was

17 getting crazy trying to not pay.  And Cory came out of closet

18 and backed the guy down, and told him to get the fuck out of

19 the house.  I never see that guy again.

20 Q    You said he would be in the closet if you were in the

21 room with Brandy doing something with the client?

22 A    Yes.

23 Q    What if it was just Brandy and the client, where he would

24 be?

25 A    In the room with me sometimes.  If he felt like the

1  person that I was speaking with was a little reluctant or

2  suspicious, then he would go in the closet when it was just

3  her.  But if it was a regular day, everything was moving as

4  planned, he would be in the room with me.

5          He would either make sure they came upstairs

6  properly and stand there by the door with the gun peeking to

7  make sure everything went well.

8  Q    When clients were in the room alone with Brandy, were

9  there efforts made to make sure that -- were there efforts to

10 make sure they didn't know the defendant was present in the

11 house?

12 A    We always had to make it seem like it was only a house of

13 females.

14 Q    Why?

15 A    Because he didn't want anybody knowing there was a male

16 in the house.  He didn't know want anybody knowing what we was

17 really doing in the house.

18 Q    Did you use your real name when you did sex work?

19 A    No, neither one of us did.

20 Q    What names would you use for the advertisements for you?

21 A    RiRi, Jazzy.

22 Q    Brandy, what name does Brandy use?

23 A    Foxy Fulls, Chocolate.

24 Q    When you and the defendant were living together did

25 Brandy use drugs as well?

1  A    Yes, under his instructions, under Cory's instructions
2  yes.
3  Q    What drugs did Brandy use?
4  A    Cocaine and pills, because he said that it was a upper
5  and it would help her do her job better.
6  Q    Did Brandy use those drugs when you first met her?
7  A    No, she only smoked like me.
8  Q    When you say smoked, what do you mean?
9  A    Marijuana.
10  Q    Do you know how of Brandy first got into cocaine and
11  other drugs?
12  A    Yes, it was because of Cory.
13  Q    Did you ever know Brandy to use fentanyl?
14  A    No.
15  Q    Did you ever use fentanyl?
16  A    No.
17  Q    Can you remind us when you found out you were pregnant
18  with the defendant's child?
19  A    Summer of 2017.
20  Q    When you got pregnant with his child did you continue to
21  use drugs?
22  A    I did.
23  Q    Why?
24  A    Because he was giving them to me.
25  Q    How was your health during your pregnancy?

1    A    It was poor.  I couldn't eat.  I was sick my whole

2    pregnancy, in and out of the hospital.

3    Q    I want to turn now to the life insurance policy scheme

4    that you previously described to us.  You mentioned someone

5    earlier named Darry.  Who is Darry?

6    A    So dairy is one of Cory's homeboys that he used to scam

7    with.

8    Q    How did Darry come up with the reference to the life

9    insurance policy scheme?

10   A    So one day we was cleaning and there was a stack of

11   papers on the dresser and it had names on it that it was

12   nobody in the house.  So I ripped it up and threw it out.

13   Later on that day he was looking for those documents.  I'm

14   like, okay, what do you need the documents for, it didn't have

15   your name on it, it's not my name on it.  He's like, you

16   fucking bitch, like you was touching shit.  Why the fuck you

17   always touching shit.  You always touching shit and not

18   looking at it.  That's what I was supposed to use to get rid

19   of this nigger Darry.

20             What are you talking about?  He was going to get rid

21   of Darry and I threw out the paperwork.

22   Q    When you say "he" in that story, who is he is?

23   A    Cory.

24   Q    What, if anything, did the defendant tell you about

25   getting rid of Darry?

1  A    He told me that he fucked up some money and that Darry is

2  going to pay and that he's going to get a bag, meaning money,

3  out of Darry being gone since Darry fucked up the money.

4  Q    Did the defendant tell you how he was going to get a bag

5  from Darry being gone?

6  A    He was going to use his information for a life insurance

7  policy; but I fucked it up by throwing out the stuff with all

8  his information on it.

9            MR. CECUTTI:  Can we have a time frame.

10           THE COURT:  Do you know when this happened?

11           THE WITNESS:  2017.

12           THE COURT:  What time of year?

13           MR. CECUTTI:  The early part of the year.

14           THE COURT:  So winter time, January/February?

15           THE WITNESS:  Yes.

16 BY MS. DEAN:

17 Q    What happened after you threw out the papers with Darry's

18 personal information on them?

19 A    He argued.  He beat me.  And we fought the whole day.

20 Because now he said I was on the hook to replace this money

21 that he was going to get off of Darry.

22 Q    Did he come up with -- did the defendant come up with any

23 plan to get Darry's personal information again?

24 A    He did.

25 Q    Can you explain that to the jury?

1  A    So Cory wanted Brandy to have sex and get close to Darry

2  so she can get the information back that I had previously

3  threw away, date of birth, social, and telephone number.

4          Brandy messed around with Darry a few times.  She

5  was unable to get it.  He was telling Cory that just something

6  about her he didn't like, so she was unable to do it.

7  Q    Do you know if Brandy knew why the defendant wanted

8  Darry's personal information?

9  A    No.

10 Q    No, you don't know; or no --

11 A    No, she did not.

12 Q    During this time period where the defendant was talking

13 to you about killing Darry, had he stopped talking about

14 killing Alex and your kids?

15 A    No.

16 Q    Do you know if the policy that you and he took out on

17 Alex was still in effect in early 2017?

18 A    I don't know.

19 Q    In early 2017, did you still want Alex dead?

20 A    No.

21 Q    Why not?

22 A    That's my son's father.  We was trying to see what was

23 going to work out with the situation with me leaving but we

24 still co-parenting.

25 Q    Did there come a point after you threw out the paperwork

1  with Darry's personal information when you and the defendant

2  discussed another potential target of the life insurance

3  policy scheme?

4  A    Yes.  That's when at that point it became Brandy as the

5  policy holder scheme.

6  Q    Who brought up Brandy as the -- you said the policy

7  holder?

8  A    Yes.  Cory proposed that she be the insured and I be the

9  beneficiary.

10 Q    What do you mean that he proposed that she be the

11 insured, what was he proposing that you guys do to Brandy?

12 A    He was proposing that she be the one that would take out

13 the policies on, and I'm on it.

14 Q    Take out the policies on and do what to?

15 A    And kill her.

16 Q    Did you agree to going through with this scheme with

17 Brandy as the target?

18 A    I did because it stopped him from talking about my son.

19 Q    Do you remember approximately when the defendant

20 suggested Brandy as the target of this scheme?

21 A    In the beginning part of the year of 2017.

22 Q    What did he say, if anything, about why Brandy?

23 A    She was nothing but a whore, nobody loved her.  And she

24 wanted to be famous, so he was going to make her famous.

25 Q    When you say you that nobody loved her, what did you

1  understand that to mean?

2  A    That he said that her family didn't fuck with her the way

3  he felt like mine didn't mess with me either.

4  Q    What do you mean about that?

5  A    He didn't want our families to love us.  He didn't want

6  us to have a relationship with our families.

7  Q    Did Brandy have a relationship with her family?

8  A    Yes.

9  Q    Did the defendant say at that point how he would kill

10  Brandy Odom?

11  A    He didn't say, but he planned over the next few months.

12  Q    Did you and he discuss your role in the plan?

13  A    My role was to do the paperwork and fill out the

14  paperwork and act like Brandy taking out a policy on her

15  stuff.

16  Q    Did you agree to do that?

17  A    I did.

18  Q    Tell the jury about what steps you took to assist the

19  defendant in the plan to kill Brandy and get life insurance

20  money?

21  A    I called the insurance company acting like Brandy.  I

22  gave the information.  And I told them that I wanted to fill

23  out an application for life insurance.

24  Q    Did you fill out applications for her?

25  A    I did.

1  Q    After Brandy was dead, did you also assist the defendant
2  in this plan?
3  A    I did.
4  Q    What did you do after her murder to assist in this plan?
5  A    I called the life insurance company and tried to put in a
6  claim saying that she was deceased.
7  Q    How many policies total during the course of this scheme
8  did you take out in Brandy's name?
9  A    Two.
10 Q    From what companies?
11 A    Global (sic) Life and American National.
12 Q    If you know, is Globe the same company that you used to
13 take out the policy on Alex?
14 A    I don't know.
15 Q    Who picked Globe?
16 A    Cory did.
17 Q    Do you know how the defendant close Globe Life?
18 A    Globe was a random cold call.  They had come in the mail
19 the application came in the mail, filled it out, sent it back.
20 Q    Do you know why it came in the mail?
21 A    No.
22 Q    If I can show for the witness only Government's Exhibit
23 128C for identification.  Take a look at Government's Exhibit
24 128C and tell us if you recognize this?
25 A    I do.  This is Global (sic) Life insurance company policy

1   where Brandy is the proposed insured and I am the beneficiary.

2   Q    Do you recognize your own handwriting on this?

3   A    I do, at the top.

4   Q    Is this the same life insurance application for Brandy

5   Odom that you filled out with associated with Global Life?

6   A    Yes, this is.

7           MS. DEAN:  I ask that Government Exhibits 128C be

8   received in evidence.

9           MR. CECUTTI:  No objection.

10          THE COURT:  In evidence.

11          (Government's Exhibit 128C was received in

12   evidence.)

13          MS. DEAN:  Your Honor, may I publish this to the

14   jury?

15          THE COURT:  Yes.

16   BY MS. DEAN:

17   Q    Now that we all can see 128C together.  Mr. Rader, blow

18   up the top half of this policy.

19          Looking under where it says application for five

20   year renewable term life insurance.  Do you see the name of

21   the proposed insured?

22   A    I do, it's Brandy Odom.

23   Q    What address is typed under Brandy Odom?

24   A    The address that we shared with Cory, 249-45 148th Road.

25   Q    Do you know why this is typed as opposed to handwritten?

1  A    I don't know.

2  Q    Did you use Brandy Odom's date of birth to fill out this

3  policy?

4  A    I did.

5  Q    Under amount of insurance, what did you check?

6  A    50,000.

7  Q    What is the index to telephone number for Brandy Odom?

8  A    (718)600-1017.

9  Q    Whose phone number was that in 2017?

10 A    Mine.

11 Q    What is written next to email address for Brandy Odom?

12 A    MerryDestiny191@Yahoo.

13 Q    Whose email was that?

14 A    Our work email.

15 Q    When you say our, who do you mean?

16 A    Mine and Brandy.

17 Q    Who is the beneficiary on this policy?

18 A    I am.

19 Q    What did you put down as relationship to proposed

20 insured?

21 A    I put that I was the sister.

22 Q    Are you brandy Odom's sister?

23 A    No.

24 Q    Are you Brandy Odom's blood family in any way?

25 A    No.

1  Q    You mentioned it was your handwriting at the top, is what

2  we just looked at your handwriting?

3  A    Correct.

4  Q    If we can now enlarge the bottom portion of the policy.

5  Who signed Brandy Odom's name to this policy?

6  A    I did.

7  Q    What is the date to the left of that signature?

8  A    3/28/2017.

9  Q    Is the date your handwriting?

10  A    Not at all; I don't write my sevens or threes like that.

11  Q    Why were you the beneficiary on the policy rather than

12  the defendant?

13  A    Because we were friends and he didn't know her prior to

14  meeting her, so he felt it would have been suspicious if he

15  was the beneficiary.

16  Q    What discussions, if any, did you have with the defendant

17  about that?

18  A    About what?

19  Q    You said he felt it would have been suspicious, you said.

20  Did he tell you what he meant by that?

21  A    No, he just said it was supposed to look good and look

22  legit.

23  Q    What did you understand that to mean, it was supposed to

24  look good or legit?

25  A    That it was supposed to look good enough for law

1   enforcement, that it looks legit.

2   Q    What do you mean for law enforcement?

3   A    For when they started sniffing around in the future that

4   this looked legit.

5   Q    If the future meaning after what?

6   A    After she was killed.

7   Q    You can take down 128C.

8        What did you understand the plan to be for after you

9   filled out this application in Brandy Odom's name?

10  A    Repeat that.

11  Q    What was the plan?  What was the next step after you did

12  this application?

13  A    The next step was for him to find someone to help him do

14  it and plan how he was going to do it.

15  Q    If you know, why did the defendant want to find someone

16  to help him kill Brandy?

17  A    Because he did not want it to look like he did it.

18  Q    Did the defendant discuss with you theories on how he

19  would have this done?

20  A    Yes.  Ross or Samson or John was supposed to help him.

21  And it was not supposed to trace back to him because.  The

22  plan was for her to be having a date and the theory was it was

23  supposed to be a date or a john that killed her and left her

24  at the back door, the back patio door.

25  Q    Was there any other theories that he described to you

1   other than the date-gone-wrong?

2   A    A robbery, everybody get shot.

3   Q    You said a few different names of people that he talked

4   to you about bringing into the plan.

5   A    Yes.  Seeing him conversation with Ross, and in the house

6   one day he was asked telling Ross he had a plan and he was

7   going to catch a body and he wanted him to be part of it.  And

8   Ross was asking him, what part do you want me to play?  Cory

9   was going into the robbery thing.  They was throwing out

10  ideas.  When Ross seen me, he said:  You good?  You want to

11  keep talking?  She good?  He was like, she good, she ain't

12  gonna say shit.

13  Q    Who is Ross?

14  A    One of his friends.

15  Q    To the best of your knowledge, did Ross accept the offer

16  to be part of the plan or did he decline?

17  A    I'm not sure.  I know he end up not using Ross

18  officially.  Because when I was pregnant I was at my mother's

19  house and his niece called me telling me that something

20  happened to him, and he had gotten into an accident with Ross,

21  and Ross crashed into somebody's house.  And he woke up in the

22  middle of these people's living room with a headache.  He had

23  to run out the house before the cops came because they was

24  both drunk.  And Ross crashed the car into these people's

25  house.  I left my mother's house.  I found him.  And that's

1    how I ended up back at the house in Rosedale.

2           But up until that point, it was supposed to be Ross,

3    until he ended up crashing that car into the house.

4    Q    To be clear, did Ross help in any way with the plan to

5    kill Brandy for life insurance money?

6    A    No.

7    Q    You mentioned Samson was another person that he wanted to

8    help?

9    A    Yes, because Samson actively committed crimes.  He was

10   known as a wild boy, a person that put in work, meaning he got

11   things done.  He did the job and executed things when he was

12   told to execute it.

13          So that summer Samson was around the whole summer.

14   He that was one of his friends actually who ate at the house.

15   Because he didn't allow us to give people food.  When I seen

16   Samson eating, I knew something was up.

17   Q    You just told us that Samson was known to commit crimes

18   and get things done.  Is that information you had about Samson

19   or were you told that?

20   A    He told me that.

21   Q    Who is he?

22   A    Cory.

23   Q    Did you have a personal relationship with Samson?

24   A    No.

25   Q    Whose friend was Samson?

1   A    Cory's.

2   Q    How did you know Samson?

3   A    I know him from him coming to the house, chilling with

4   Cory.

5   Q    Have you spoken to Samson since Brandy was killed?

6   A    No.  I barely spoke to Samson when she was alive.

7   Q    Did Samson end up helping you and the defendant in the

8   scheme to kill Brandy for life insurance money?

9   A    No.

10  Q    You mentioned a third person that the defendant talked

11  about bringing into the plan, John Hector.  Who is John

12  Hector?

13  A    His best friend that went to high school with us, that's

14  how we met.

15  Q    So you've known John Hector since high school?

16  A    Correct.

17  Q    What conversations did you and the defendant have about

18  bringing John Hector into the plan?

19  A    John was supposed to leave Florida and come to the house.

20  And this was supposed to be at a time where Cory's plan was to

21  not be in the house, so there is no proof of them being in the

22  same place at the same time.

23  Q    Whose words are those?

24  A    Cory's words.  He was actively talking to John about it.

25  He was going to take a trip down there to see John and speak

1    about it.  But John was in the middle of going through a

2    divorce.  So mentally he wasn't there.  He was emotional, he

3    was distraught.  And John was really missed up behind this

4    divorce.  As time went on, it just didn't become John.

5    Q    So did John Hector help you and the defendant kill Brandy

6    Odom for life insurance money?

7    A    Not at all.

8    Q    Did you place phone calls to Globe Life Insurance prior

9    to Brandy's murder?

10   A    I did, acting like her, taking out a policy.

11   Q    When you say acting like her, what do you mean?

12   A    User her information to the company, to say that I'm her.

13   Q    After Brandy's murder did you call Globe again?

14   A    I did, to try and collect and put in a claim on the

15   policy.

16   Q    What did you say?  Who did you say you were when you

17   spoke to Globe after Brandy's murder?

18   A    I said I was her sister.

19   Q    But every time you called Globe it was you speaking?

20   A    Correct.

21   Q    Did Brandy Odom have any knowledge that you took out a

22   life insurance policy in her name from Globe Life?

23   A    No.

24   Q    You showed us on Government's Exhibit 128C that you used

25   as Brandy's address that address that you shared in Rosedale,

1  Queens.  Were you and the defendant concerned that Brandy

2  would see documents in the mail?

3  A    No.  Because neither one of us was allowed to check the

4  mail, only Cory was.

5  Q    If I can show the witness Government's Exhibit 128D and

6  128D redacted for identification.  Take a look at 128D and

7  then 128D redacted.

8         THE COURT:  Could I see the parties at the side; no

9  court reporter necessary.

10  BY MS. DEAN:

11  Q    If I can show the witness 128D redacted.  Do you

12  recognize 128 and 128D redacted?

13  A    I do.  This is a Globe Life insurance application life

14  insurance, and Cory is the insured.  And T is the beneficiary.

15  Q    Other than the redaction of the rest of T's first name,

16  are these the same documents?

17  A    The exact same document.

18  Q    Is your handwriting on this document?

19  A    It is.  I filled out this document minus the signature.

20         MS. DEAN:  At this point, your Honor, may I move

21  128D and D redacted into evidence?

22         THE COURT:  Any objection.

23         MR. CECUTTI:  No objection.

24         THE COURT:  Those are in evidence.

25         (Government's Exhibits 128D and 128D redacted were

1  received in evidence.)

2  BY MS. DEAN:

3  Q    If we can publish 128D redacted.  Why don't we first,

4  zoom in on the top portion under application offer term of

5  life insurance.  You said you filled out this document other

6  than the signature?

7  A    I did.

8  Q    Who is the insured on this policy?

9  A    Cory is.

10  Q    Who is the beneficiary?

11  A    My son.

12  Q    Why did you fill out this policy application?

13  A    To make it look like he loved T and that this was legit.

14  Q    Why?  What was the purpose of that, of making it look

15  like he loved T?

16  A    To make this look like it's real.

17  Q    Whose idea was that?

18  A    Cory's.

19  Q    Sorry?

20  A    He said right there.

21  Q    You said to make this policy was to make it like look it

22  was real.  Was it real?

23  A    No.

24  Q    What do you mean by that?

25  A    Because he was not going to die.  And if he did die, my

1  son was not going to be no beneficiary.

2  Q    Who was not going to die?

3  A    Him, Cory.

4  Q    Is the date of birth that you filled out for the

5  defendant the real date of birth?

6  A    Yes.

7  Q    What was the amount of insurance?

8  A    50,000.

9  Q    What was address that you filled out under that?

10  A    The address that I shared with him 249-45 148th Road.

11  Q    Can you read us the phone number that you put down for

12  the defendant on this policy?

13  A    (347)799-6108.

14  Q    Was this the defendant's phone number at the time you

15  filled out this policy?

16  A    It was.

17  Q    What was the email address for the defendant?

18  A    Wayne11422@gmail.

19  Q    If we can zoom in on the bottom half of the application

20  page.  Did you write the date that you filled this out?

21  A    Yes.

22  Q    What was the date?

23  A    May 30, 2017.

24  Q    Who signed this document?

25  A    Cory did.

1  Q    Can you explain to us why the defendant having a policy

2  in his name made this look legit, as you put it?

3  A    Because this would go to his theory of him saying that we

4  all had policies, so it was nothing wrong with everybody

5  having a policy.

6  Q    Was that part of the plan?

7  A    Yes.

8  Q    If you know, did anyone ever make a single payment on

9  this Cory Martin Policy?

10  A    I don't know.

11  Q    To be clear, were you and the defendant making payments

12  on the Brandy Odom policy for March 2017?

13  A    Yes.

14  Q    Did the arguments between you and the defendant about

15  killing Z stop or continue after you filled out the policy in

16  March 2017 in Brandy's name?

17  A    It still continued.  Because he would catch me crying and

18  being upset about not seeing my child.

19  Q    If I can go back to Government's Exhibit 128E redacted.

20  And I'm going to ask you to look again at Government's Exhibit

21  128E redacted.  If I can have the last page of this exhibit,

22  please, zoom in.

23         Looking again at 128E redacted, the date June 19,

24  2017, can you explain to us how you ended up filling out this

25  application for Z?

1  A    Because he tied me up in the basement for three days

2  until I agreed to do it.  He was raping me with all kinds of

3  different objects.

4  Q    Was Z living with you in the house with you and the

5  defendant at that time?

6  A    No.

7  Q    When you filled this policy out, did you intend for the

8  defendant or anyone to actually kill Z?

9  A    No.

10 Q    What did you think would happen after you filled this

11 out?

12 A    I don't know.  I just felt like I was going to do

13 whatever he wanted me to do so I could stop getting my ass

14 beat, and figure out how I was going to save my son.  And he

15 ended up with his father, because that ended up being the best

16 place for him.

17 Q    Did there come a time after this when you and the

18 defendant came to an agreement about who was going to be

19 killed for life insurance money?

20 A    Yes, it was agreed upon to be Brandy.

21 Q    How did you and the defendant decide that?

22 A    He decided on that because she was the easiest person to

23 access, and get access to.

24 Q    What do you mean by that?

25 A    He didn't felt like anybody cared about her.  And she

1  lived in the house for us to get all of her information to be

2  able to put on these policies.

3  Q    How did you feel about the decision that the person who

4  was going to be killed was Brandy?

5  A    I did not like it.  But it was an easier option than one

6  of my children.

7  Q    Was it also an easier option than Alex?

8  A    Yes.

9  Q    Why?

10 A    Because that's my son's father.

11 Q    Did there come a time when you and the defendant took out

12 a second life insurance policy on Brandy Odom?

13 A    Yes.

14 Q    Why was the second life insurance policy taken out?

15 A    He wanted more money.  Because he knew someone else was

16 going to help him, he would have to pay them as well, he

17 didn't want it to come out of his cut.

18 Q    What do you mean he didn't want it to come out of his

19 cut?

20 A    He wanted to keep the whole amount of the policies.  So

21 he would keep the first one, he would keep the one for the

22 higher amount, and use the lower amount to pay the person who

23 helped him.

24 Q    What company was the second policy taken out with?

25 A    It was American National.

1    Q    Who chose that company?

2    A    Cory chose it from going and doing a search online.  And

3    it was one of these like agents that match you with the right

4    company.  So we called the hotline, that's how he got American

5    National.  He did the demographic information that they was

6    asking him for, and this is how he was able to find out what

7    are the requirements and what life insurance companies look

8    for when they approve policies.

9    Q    Do you remember the name of the agent that he talked with

10   about this?

11   A    No.  But it was a company name started with the B.

12   Q    Do you remember part of that company's name?

13   A    No.

14   Q    If I can show the witness only what is marked as

15   Government's Exhibit 128F for identification.  If we can flip

16   through the pages of 128F for the witness.  Do you recognize

17   this, Ms. Anderson?

18   A    This is the American National application for life

19   insurance.

20   Q    Who filled this out?

21   A    I did.

22   Q    Did you do that in handwriting or did you do it online?

23   A    Online.

24            MS. DEAN:  I'm going to ask that Government's

25   Exhibit 128F be received in evidence, your Honor.

1                MR. CECUTTI:  No objection.

2                THE COURT:  That's in evidence.

3                (Government's Exhibit 128F was received in

4    evidence.)

5                MS. DEAN:  May we publish it for the jury?

6                THE COURT:  Yes.

7    BY MS. DEAN:

8    Q    If we can zoom in on the top half of 128F.  Who was under

9    primary proposed insured on the American National policy?

10   A    Brandy Odom.

11   Q    What is the date of birth that you used for her?

12   A    January 8, 1992.

13   Q    Is that her date of birth?

14   A    Correct.

15   Q    Did you fill-in her height and weight as well?

16   A    Yes.

17   Q    Is the social security number that you see under social

18   security her real social security number?

19   A    Yes.

20   Q    How did you have that?

21   A    Cory gave, brought her card in the room one day.

22   Q    Brought her card into what room?

23   A    The room that I shared with him.

24   Q    Do you know if Brandy knew that you guys had her social

25   security card?

1  A    I do not know.

2  Q    What address did you use for Brandy Odom on this policy?

3  A    249-45 148th Road.

4  Q    Under personal telephone, what did you put for Brandy's

5  telephone number?

6  A    (718)712-8767.

7  Q    What number was that actually to?

8  A    That was the house phone that we had in the house.

9  Q    By house phone, like a landline?

10 A    Correct.

11 Q    What did you put under years at the residence?

12 A    Ten years.

13 Q    Was that true?

14 A    No.

15 Q    Why did you put that Brandy had live there for ten years?

16 A    The false information on this was for the purposes of

17 getting the application approved.  Because he had already done

18 the preliminary so he knew what companies were looking for so

19 we could get approved right away.  He wanted to make sure that

20 it was going to get approved and not denied, that's why he

21 called the agent and questioned the preliminaries before

22 calling back the company.

23 Q    What do you mean when you said he already did the

24 preliminaries?

25 A    He already called and asked the questions of what is

1    needed and what the company is looking for based on the

2    demographics, the age, the zip code, whether children, if you

3    work, if you smoke.  He did a preliminary on himself first.

4    Q    By "he," you mean who?

5    A    Cory.

6    Q    What do you mean he did a preliminary on himself?

7    A    He called the insurance company and acted like he wanted,

8    he was interested in taking out a policy on himself.  So he

9    asked questions like if he was a concerned person looking to

10   take out policy.  That's how he was able to find out what they

11   need to open up a policy.

12   Q    Under annual income what did you put?

13   A    70,000.

14   Q    Under net worth, what did you put?

15   A    10,000.

16   Q    Was that true?

17   A    No.

18   Q    What about under type of business, what did you put

19   there?

20   A    Tax and accountant.

21   Q    Under employer name?

22   A    Encore Services.

23   Q    Were those things true?

24   A    No.

25   Q    Under occupation, what did you put?

1   A   Dispatcher.

2   Q   Date of employment, what did you put there?

3   A   February 2,002.

4   Q   Was any of that true?

5   A   No.

6   Q   Move to the next page.  Blow up the section five,

7   beneficiary for primary proposed insured.  Who did you put as

8   at beneficiary on this American National policy?

9   A   I put myself as Brandy's sibling.

10  Q   Why did you do that?

11  A   Because I was instructed to, to make it look more legit.

12  Q   Instructed by whom?

13  A   Mr. Martin.

14  Q   What did you put under percent payable?

15  A   100 percent.

16  Q   What does that mean?

17  A   It means that in the event that she passes away, I would

18  get the full pay out.

19  Q   What was the plan?  What were you going to do with the

20  full pay out for this policy?

21  A   Give it all to Cory.

22  Q   Why?

23  A   Because that's what he said I was supposed to do.  I

24  shouldn't even have any of these kids.  I messed up the plan

25  with Darry.  I didn't want to help him with my kids.

1  Q    Can we turn now to page three under family history.

2  Primary proposed insured of family history, on the bottom of

3  the page.  Did you fill out this family history for Brandy's

4  American National policy?

5  A    I did.

6  Q    Is any of this true?

7  A    I don't think so.

8  Q    Under siblings where it says number of living, what did

9  you put?

10  A    One.

11  Q    Why did you put one living sibling?

12  A    To go along the theory that I was her only sibling.

13  Q    If we can turn to page four under physician.  Was this

14  actually Brandy's physician?

15  A    It was.

16              (Continued on next page.)

17

18

19

20

21

22

23

24

25

BY MS. DEAN: (Continuing.)

Q    How did you have that information?

A    We both went to him.

Q    We both being who?

A    Brandy and myself both went to see this doctor.

Q    Did you continue to see this doctor?

A    I did not because Cory stopped me from going to him, because he felt like I was too friendly with a male doctor and I shouldn't have a male doctor seeing me in the first place.

          MS. DEAN:  Can we turn now to page 7?  Under payment information, if we could just enlarge the other section, Mr. Rader, if you don't mind, just under electronic fund transfer.

Q    What did you put for payment information for this policy payment?

A    I put her Capital One information.

Q    Why did you put Brandy's Capital One information?

A    On what is this, the application?

Q    Yes.  Why did you put Capital One Bank?

A    Because I was acting like her taking out a policy on herself, and this is what they was asking for to take out payments to pay on the policy.

Q    Did Brandy have a Capital One account?

A    She did.

Q    Was this her actual Capital One account information?

A    It is.

1  Q    Who had access to Brandy's Capital One account?

2  A    Cory and I both did.

3  Q    How did you know -- well, how did you know that Cory also

4  had access to the account?

5  A    Because he used the card.

6  Q    And you said you had access, as well?

7  A    Yes, because I needed it to hook up the information for

8  the web cam.

9  Q    What did Cory Martin use Brandy's Capital One account

10 card for?

11 A    To pay bills, buy drugs, and to pay on her policy.

12 Q    What bills did the defendant pay with Brandy Odom's

13 Capital One account?

14 A    I think it was the Verizon and the electrical.

15 Q    And what was the electric company?

16 A    Con Ed.

17 Q    Did you also call American National Life Insurance?

18 A    I did.

19 Q    Did you do that both before and after Brandy was

20 murdered?

21 A    I did.

22 Q    Why?

23 A    Initially to take out the policy and act like her, and

24 after to say I was her sister and to claim.

25 Q    If we could just look at the bottom right of page 7 on

1  128F.  What was the date that you E-signed this policy on

2  behalf of Brandy Odom?

3  A     December 18, 2017.

4  Q     Did Brandy know that you took out this life insurance

5  policy for her with American National?

6  A     No.

7  Q     What was the total money that you and the defendant --

8          MS. DEAN:  Actually, if we could go back to the

9  first page.  Can you enlarge the top portion?

10 Q     Do you remember -- you told us earlier, do you remember

11 the amount of this other policy, this American National

12 policy?

13 A     The American National should be 150.

14 Q     And the Globe was what?

15 A     50,000.

16 Q     What was the total money that you and the defendant

17 expected to get from the life insurance policies when Brandy

18 was killed?

19 A     $200,000.

20 Q     Did you and the defendant discuss what you two would do

21 with the money once you collected it from the life insurance

22 companies after Brandy's death?

23 A     Yes.  He was planning on buying real estate and moving to

24 El Paso.

25 Q     Why El Paso, if you know?

1  A    He had people there, already.

2  Q    Do you know who those people were?

3  A    It was Hakeem and his wife.

4  Q    Who is Hakeem?

5  A    That was his best friend, as well.

6  Q    Did you want to go to El Paso?

7  A    No.

8  Q    Why not?

9  A    I don't have any family there, and I didn't want to move

10 so far somewhere with someone who I was in a toxic

11 relationship with when I had no family.

12 Q    You told us that you were supposed to give 100 percent of

13 the life insurance proceeds to the defendant.

14 A    Yes.

15 Q    Was that actually something you intended to do?

16 A    Yes.

17 Q    Why would you participate in this if you were not

18 expecting to keep any of the money for yourself?

19 A    So he could stop saying that I owed him for everything

20 that he claims I did to him over my lifetime.

21 Q    Who decided on the amounts of each life insurance policy

22 that was taken out in Brandy's name?

23 A    Cory decided on the amounts because he didn't want

24 something too little, which wasn't enough and he couldn't

25 start over, and he didn't want something too high to where the

1  payments would be high, like monthly, and it would send off

2  red flags of why a regular person is taking out such a large

3  insurance policy.

4  Q    Send off red flags to who?

5  A    The authorities.

6  Q    Were these discussions you guys had?

7  A    Yes.

8         MS. DEAN:  If I could have one minute, Your Honor.

9         THE COURT:  Sure.

10        MS. DEAN:  Your Honor, would you consider stopping

11  for the lunch break now?

12        THE COURT:  I will, yes.  I think we'll break for

13  lunch now.  We'll come back at 2:00.  Please don't talk about

14  the case at all or look anything up on the internet.  But do

15  have a good lunch, and we'll see you in a little bit.

16        (Jury not present.)

17        THE COURT:  Ms. Anderson, you can step down.

18  Anything before we break for lunch?

19        MR. CECUTTI:  No, Your Honor.

20        MS. DEAN:  No, Your Honor.

21        THE COURT:  See you at 2:00.

22        (Lunch recess taken.)

23        (Continued on next page.)

24

25

1                    AFTERNOON SESSION

2    BY MS. DEAN: (Continuing.)

3            THE COURT:  Can we get the witness back on the

4    stand, unless there is something you want to raise.

5            MS. DEAN:  No, Your Honor.

6            THE COURT:  Anything, Mr. Cecutti?

7            MR. CECUTTI:  No, Your Honor.

8            (Jury present.)

9            THE COURT:  All right, ladies and gentlemen, we're

10   ready to resume the direct examination of Ms. Anderson.

11           THE COURTROOM DEPUTY:  The witness is reminded she's

12   still under oath.

13           THE WITNESS:  Yes.

14   Q    Ms. Anderson, before we broke for lunch we were speaking

15   about the American National Life Insurance policy for Brandy.

16   Do you remember that?

17   A    Yes.

18   Q    I want to talk to you a little bit more about the Brandy

19   Odom Capital One account that you and the defendant used to

20   pay that policy.

21   A    Yes.

22   Q    Do you know if Brandy saw the payments to American

23   National Life Insurance being made from her account?

24   A    She did not.

25   Q    How do you know that?

1  A     He had the -- Cory had the online information for

2  Brandy's account.

3  Q     And how do you know -- what do you mean he had the online

4  information?

5  A     He changed the user name and password, so he had access

6  to it.

7  Q     Did you ever see the defendant access Brandy's Capital

8  One account online?

9  A     Yes, on the computer to check on the payments for the

10 policy.

11 Q     How did Brandy Odom get paid for webcamming?

12 A     ACH direct deposits.

13        THE COURT:  What is that again?

14        THE WITNESS:  ACH.

15        THE COURT:  ACH?

16        THE WITNESS:  Correct.

17 Q     Who made deposits into Brandy's Capital One account?

18 A     The webcam services.

19 Q     And did you ever make deposits of cash into her ATM?

20 A     Yes.

21 Q     Did the defendant?

22 A     Yes.

23 Q     And did Brandy?

24 A     Yes.

25 Q     Who controlled Brandy Odom's Capital One debit card?

1   A    Cory controlled it.

2   Q    Did she sometimes receive it from him to use it?

3   A    Yes, on a need be basis, if it was approved.

4   Q    Approved by whom?

5   A    Approved by Cory.

6   Q    Were payments made to either of the Brandy Odom life

7   insurance policies in a second way?

8   A    Yes, Western Union.

9            THE COURT:  By what, Western Union?

10           THE WITNESS:  Correct.

11  Q    What does that mean, Western Union?

12  A    You go and get a money order for the amount that you

13  need, and then you mail off the money order to whatever

14  company you're paying.

15  Q    Who did that?

16  A    I did and Cory did.

17           THE COURT:  Just make sure you keep your voice up.

18           MS. DEAN:  If I may have for the witness only

19  Government's 997 for identification.

20  Q    Do you recognize that?

21  A    Yes.  That's Cory.

22  Q    Does that fairly and accurately depict the way that the

23  defendant looked at or near the time of the life insurance

24  policy scheme?

25  A    It is.

1        MS. DEAN:  I ask that Government's 997 be received

2   in evidence.

3            THE COURT:  Any objection?

4            MR. CECUTTI:  No objection.

5            (Government's Exhibit 997 was received in evidence.)

6   Q    If we could please publish it.  In addition to

7   recognizing the defendant, did you recognize anything he was

8   wearing when you first saw this image?

9   A    Yes.  His sweater, because that was his favorite sweater

10  with Biggie on it.

11           THE COURT:  With Biggie on it did you say?

12           THE WITNESS:  Correct.

13  Q    Did you provide the government with an additional photo

14  after you saw this still image?

15  A    Yes.  After I was shown this image, I went back to a

16  photo that him and I took when he took me out one day.

17           MS. DEAN:  Could the witness only be shown

18  Government's 998 for identification?

19  Q    Do you recognize Government's 998?

20  A    I do.

21  Q    What is that?

22  A    That's Cory and I.

23  Q    Is that the photo you provided to the government?

24  A    It is.

25           MS. DEAN:  I'd ask that Government's 998 be

1   received.

2            THE COURT:  Any objection?

3            MR. CECUTTI:  No objection.

4            (Government's Exhibit 998 was received in evidence.)

5            MS. DEAN:  May we publish it, please?

6            THE COURT:  Yes.

7   Q    Ms. Anderson, is this the photograph that you provided to

8   the government?

9   A    It is.

10  Q    And, again, what did you notice about this shirt of the

11  defendant's?

12  A    I recognize the shirt immediately because he wore it

13  often.

14           MS. DEAN:  You can take 998 down, please.

15  Q    I want to talk to you now about the state of your and the

16  defendant's finances during the time period of the life

17  insurance scheme.

18           Did the defendant work a legitimate job at any point

19  during the scheme?

20  A    No.

21  Q    Did the defendant have a savings or a checking account,

22  if you know?

23  A    He didn't have either.

24  Q    You mentioned that his parents had passed.  Did the

25  defendant have any inheritance, if you know?

1   A    No.

2   Q    As far as you knew from living with him, did the

3   defendant have support from any family member?

4   A    No.

5   Q    Where did the money for bills, household needs, and

6   entertainment come from?

7   A    Me and Brandy.

8   Q    Did you ever see, during the time you lived with the

9   defendant, the defendant use his own money on things?  And by

10  that I mean not money earned by you and Brandy.

11  A    No.

12  Q    You told us earlier about the amount that you and Brandy

13  were expected to bring in from sex work.  Was the defendant

14  satisfied by what you were bringing in?

15  A    No, he was never satisfied.

16  Q    Where did the money go that you and she were bringing in

17  from sex work?

18  A    Drugs and bills.

19  Q    You told us earlier that you were living in the

20  defendant's deceased mother's home.  Did the defendant inherit

21  that home?

22  A    No.

23  Q    During the time of the life insurance policy scheme, what

24  was your understanding about whether or not you and the

25  defendant would be able to stay in that home?

1    A    I knew I couldn't stay in that home with him because the

2    house was under foreclosure, and he was actively arguing with

3    his brother about the short sale of the house.

4    Q    Did you have cooking gas in the home when you lived

5    there?

6    A    At the beginning we did.  Months later the gas was cut

7    off and he suggested that we don't pay it because it was too

8    much, and so we went without gas.  Then we started grilling

9    food on the grill on the back patio.

10   Q    You told us earlier about the car that the defendant

11   drove.  Could you remind us what kind of car it was?

12   A    It was a black Maxima Nissan.

13   Q    Was the black Nissan in his name or in your name?

14   A    It was in my name.

15   Q    Can you explain that to us?

16   A    That was his car from high school, and so when I was

17   pregnant with Z, he was teaching me with that car how to drive

18   so I can get my license.

19          So that's the car that he let me use to get my

20   license because he had another car.  So when I moved in, his

21   other car had gotten repossessed prior to me moving in.  So

22   when I moved in, he started fixing the car and days later he

23   sold me the car and he took me to the DMV and showed me how to

24   do the bill of sale.  And from that moment on, it was my car,

25   and that was in January after I moved in.

1  Q    What year is that?

2  A    2017.

3  Q    Now, you said that at one point he had a car that was

4  repossessed?

5  A    Yes.  He had an Infiniti two door coupe.

6  Q    If you remember, in what year was it repossessed?

7  A    The summer of 2016, because I was on a break from Alex

8  and I was staying at my mother's house.  And I was on the

9  phone talking to him, and he was telling me how he was looking

10 out the window and he can't believe that they're repossessing

11 his car right out of the driveway.

12 Q    After the repossession did he go back to driving the

13 Nissan?

14 A    Yes.

15 Q    While you were living with the defendant did you two

16 share the car?

17 A    Yes, but the registration and everything else was in my

18 name, even though it's his car, and that's something we would

19 argue about.

20 Q    Do you know why he put it in your name?

21 A    I don't know.

22 Q    Before it was in your name was it in his name?

23 A    Yes, it was.

24 Q    Can you describe to us the black Nissan that you and he

25 shared while you were living with him?

1    A     It had discoloration on the sides and on the top of it,

2    like fading.

3    Q     Did anyone drive the Nissan, other than you and the

4    defendant?

5    A     No one else.

6    Q     Where did you and he typically park that car?

7    A     In the driveway.

8          MS. DEAN:  If I could show the witness only

9    Government's 908 through 913, and also 915 for identification.

10   Q     Do you recognize those photographs?

11   A     I recognize all of them, yes.  That's the vehicle that I

12   was driving at the time.

13   Q     Specifically, the Nissan you just described to us?

14   A     Yes, the Maxima with the fading on it, correct.

15         MS. DEAN:  I ask that Government's 908 through 913,

16   and also 915 be received in evidence.

17         THE COURT:  Any objection?

18         MR. CECUTTI:  No objection.

19         THE COURT:  Those will be in evidence.

20         (Government's Exhibits 908 through 913 and 915 were

21   received in evidence.)

22   Q     If we could start by publishing Government's 908, please.

23   Is this the vehicle that you talked about just a moment ago?

24   A     Yes.  That's the vehicle that he had in high school.

25         THE COURT:  Let's move the microphone just a little

1  closer.

2  A    He had it in high school and gave it to me when I moved

3  in.

4  Q    What was the license plate?

5  A    HLC-7182.

6         MS. DEAN:  Mr. Rader, could you zoom in on the roof

7  of this car.

8  Q    Looking at the close up of the roof of the car, are you

9  able to see what you were describing to us before about the

10 car?

11 A    Yes.  The top looks like somebody took an eraser and was

12 trying to erase the color off the roof of the car.

13        MS. DEAN:  If I could have the next photo,

14 Government's 909.  Again, can we zoom in on the roof and

15 windshield area of the car.

16 Q    Do we also see that, like you described, eraser marks on

17 the car in this picture?

18 A    Correct.

19 Q    Could you just circle that on the screen in front of you,

20 Ms. Anderson.  If you could -- I think at the bottom of the

21 screen there's a button on the bottom that will clear.  You

22 can clear the mark and I'll move on to the next exhibit.  If

23 you could look at 910.

24        Can you, again, zoom in?  Do you see the marks on

25 the roof of the car in this photo, as well, Ms. Anderson?

1  A    I do.

2  Q    Can you circle them?

3        MS. DEAN:  The witness has circled the entire roof

4  of the car that is shown in this photograph.

5  Q    Can you hit the clear button again for us?  And we'll

6  turn to 911.  Could I have 912, please, actually?  Do you see

7  the marks in 912, as well?

8  A    I do.

9        MS. DEAN:  Mr. Rader, could you enlarge the roof

10 area?

11 A    It's on the roof of the back of the trunk, yes.

12 Q    Could you circle both of the areas that you just

13 described to us?  The witness has placed two circles on the

14 car, one over the roof and one over the trunk.

15       And you can go ahead and move on to 912, please.

16 913, I'm sorry.  Does 913 also show the marks that you've been

17 describing to us?

18 A    Yes, it does.  On the hood, at the top on the roof, and

19 the trunk on the back of the car.

20 Q    We can take those down.  Thank you.  Prior to committing

21 Brandy's murder, what, if anything, did the defendant purchase

22 for this car?

23 A    He was in the middle of fixing up the car because he

24 wanted to make sure that everything was working on the car.

25 He fixed the ABS sensors, he did oil change, he fixed the

1  bumper, some other stuff on the car.

2  Q   And did he tell you -- did the defendant tell you why he

3  wanted to make sure everything was working on the car, as you

4  put it?

5  A   Yes.  Because he didn't want to have any issues, and he

6  didn't want to stick out -- the car to stick out in any way if

7  we were legit like we were supposed to be.

8  Q   When you say he didn't want the car to stick out, what

9  did you understand that to mean?

10 A   He wanted everything to look like it was a good car.

11 Q   You mentioned that the defendant was fixing the bumper of

12 the car.  What was wrong with the bumper?

13 A   I had got into a fender bender.  I was in Canarsie

14 getting some food.  He took me to go get some food.  As I'm

15 making a U-turn, a lady is coming from around the corner and

16 she's speeding.  She hits me in the middle of my U-turn.  So

17 the bumper was dragging and hanging.  So he fixed that, as

18 well.

19 Q   And did he do that himself or did he hire someone to do

20 it?

21 A   All work on the car he did himself.

22 Q   Do you remember which bumper had the damage that he had

23 fixed before -- I'm sorry.  Let me rephrase that.  Do you

24 remember which bumper had the damage?

25 A   What do you mean which bumper?

1   Q     The front or the rear.

2   A     It was the front.

3   Q     And that was fixed before -- strike that.  During 2017

4   did the defendant approach you about another scheme involving

5   scamming money from a bank?

6   A     Yes.  When my taxes came he wanted me to tell the bank

7   that someone had stole my information and used my card at an

8   ATM machine so I can get back that money, so we can have

9   double the money.  It was 800.  So instead of getting 800

10  back, you get back 1600.

11  Q     Can we break that down.  You said you had received your

12  tax returns?

13  A     Correct.

14  Q     And could you explain to us how were you supposed to get

15  back the money?  What was supposed to happen?

16  A     I was supposed to put in a claim and say that this

17  happened, and dispute with the bank to get my proceeds back

18  saying that I didn't know nothing about it.

19  Q     Had anyone actually stolen the money from you?

20  A     No.

21  Q     Who had withdrawn money from your account?

22  A     Cory went to the ATM and withdrew money from my account.

23  Q     And that was part of the plan?

24  A     Correct.

25  Q     What was your bank at the time?

1    A    MCU.

2    Q    Did you report this as fraud?

3    A    I did.

4    Q    And do you remember, approximately, how much money you

5    withdrew?  Do you remember the amount?

6    A    $800.

7    Q    Do you remember what happened as a result of you making

8    the report?

9    A    Nothing happened.  He wanted me to keep following up on

10   this claim, and I had refused to.

11   Q    Did you ever get the double the money back?

12   A    No.

13        MS. DEAN:  If I could have the witness only shown

14   Government's 134, please.

15   Q    Do you recognize the person in Government's 134?

16   A    I do.

17   Q    Who is that?

18   A    That's Cory.

19   Q    Does that fairly and accurately depict the way that the

20   defendant looked in 2017?

21   A    It does.

22        MS. DEAN:  May I ask that Government's 134 be

23   received in evidence?

24        THE COURT:  Any objection?

25        MR. CECUTTI:  No objection.

1          THE COURT:  It's in evidence.

2          (Government's Exhibit 134 was received in evidence.)

3   Q    Do you know where this photograph came from?

4   A    I do not.

5          MS. DEAN:  You can take down 134.  Thank you, Mr.

6   Rader.

7   Q    Ms. Anderson, did Brandy Odom ever get married?

8   A    She did.

9   Q    When was that?

10  A    In 2017, the summertime.  Yes, 2017, the summer.

11  Q    Was that a real marriage or was that another way to make

12  money?

13  A    It was another way to make money because she wasn't

14  performing as well online, and I wasn't doing that good with

15  bringing in clients.  Because at this point the house was hot,

16  meaning that it was attracting too much attention; police,

17  people in the neighborhood, so it was hot at this point.

18          So he wanted to cool down a little bit and stop the

19  foot traffic.  So getting her married was another way of

20  keeping the money coming in without us hotting up the house.

21  Q    Why was someone willing to pay Brandy to marry her?

22  A    So he can get his papers.

23  Q    What do you mean by his papers?

24  A    Citizenship because he was a foreigner.

25  Q    What, if anything, happened to you on the day that Brandy

1  got married into this fake marriage?

2  A    We were arguing all day because he was -- he kept

3  pressing me on issues that I felt like he shouldn't have

4  because he was still married, and he was engaged to me but he

5  was still married and he's making issues about it.

6            So we argued all day, we fought all day, and this

7  was the day in particular when he slammed me against the wall

8  and I fractured my leg.

9  Q    That's the incident you told us about this morning?

10  A    Correct.

11  Q    Prior to Brandy's murder, what, if any, television was

12  the defendant watching?

13  A    He was watching the First 48 and Dexter.

14  Q    What is the First 48?

15  A    It's a true crime show where the police got 48 hours to

16  investigate a crime and collect as much evidence.

17  Q    Did you watch it with him?

18  A    Daily.

19  Q    Why?

20  A    He was prepping me for when Brandy died.

21  Q    Prepping you how?  What do you mean?

22  A    So I could build up enough bones and courage to see and

23  to witness all these things that I was about to.

24  Q    What did you learn from watching the First 48?

25  A    I learned the police tactics and how they first come in

1    and investigate a crime scene, and I learned about the blue

2    light which is the light that they use to look for blood.

3    Q    The light that who uses to look for blood?

4    A    Police.

5    Q    What, if anything, else -- you said you learned about

6    police tactics.  What do you mean?

7    A    Just how they come and what they do and the type of

8    questions they ask when they come.

9    Q    Why was that important?

10   A    Because up until this point I haven't had much contact

11   with the police before this.

12   Q    Did you and the defendant have discussions about things

13   you saw during this show?

14   A    Yes.

15   Q    What kind of things did you discuss with the defendant?

16   A    He would discuss crime scenes and what not to do, and

17   what things to do to avoid being caught by the police.

18   Q    Do you remember what things he said to do to avoid being

19   caught?

20   A    Lying is one of them.

21   Q    And do you remember what were on the things not to do

22   list?

23   A    Not that I can think of off the top of my head.

24   Q    You also said that you guys were watching Dexter?

25   A    Correct.

1    Q    What is Dexter?

2    A    It's a fictional show, I guess, where a police officer

3    jails and chops up his victims.

4    Q    Chops them up?

5    A    Correct.

6    Q    What was the point of you and the defendant watching

7    Dexter?

8    A    He was into it and he was looking for ways to commit the

9    crime when he got rid of Brandy.

10   Q    Could you describe what you remember about the way Dexter

11   would kill a victim?

12   A    Dexter would choose his victims based on if he felt like

13   they got away from being arrested or getting punished for

14   crimes they actually committed.

15        So Dexter would take it upon himself to stalk his

16   victims and torture them before he initially takes them in

17   like a room, like a metal table, and a bunch of weapons, like

18   saws and knives hanging on the wall where he can choose from.

19   Q    What happened in that room on Dexter?

20   A    He would cut up bodies.

21   Q    Do you remember how, if at all, Dexter would get rid of

22   the cut up bodies?

23   A    I don't, but in one scene in particular he was in a boat

24   getting rid of body parts in the ocean.

25   Q    Did you and the defendant have any discussions -- strike

1   that.  You mentioned that you in the First 48 saw the blue

2   light you described it as?

3   A    Correct.

4   Q    Did you and the defendant have any conversations about

5   forensics?

6   A    Yes, because he didn't want the house after he committed

7   the crime to be an active crime scene.  So he focused a lot on

8   getting rid of or concealing evidence.

9   Q    What do you understand that to mean when you say an

10  active crime scene?

11  A    Meaning that the police are there and they're looking at

12  the place as a crime scene, and he didn't want that because he

13  was still living in that house and if they took the house and

14  it was an active crime scene, he would have nowhere to live.

15  Q    During the time that you and the defendant were preparing

16  for Brandy's murder, was that when the arrest happened that

17  you testified about earlier today, where you called 911?

18  A    Repeat the question.

19  Q    Sorry.  You testified earlier today about calling 911.

20  A    Yes.

21  Q    Do you remember when that was?

22  A    January or February of 2018, because I was like 7,

23  8 months.

24  Q    And after the defendant was arrested that day, did you

25  and he argue about it?

1   A    We did, because he said I knew what he was planning to do

2   with Brandy.  And me calling the police on him would make them

3   look at him as a suspect because he has a domestic violence

4   case out.

5   Q    And did he, in fact, have an open case from that?

6   A    He did.

7   Q    Do you know what an order of protection is?

8   A    Yes.  It's when someone is supposed to stay away from

9   you.

10  Q    As a result of his arrest and that open case, did you

11  receive an order of protection for the defendant to stay away

12  from you?

13  A    I did, and I ignored it.

14  Q    You still were with the defendant?

15  A    Yes, because he was crying to me and telling me he was

16  sorry and where would he go if he had to leave because I

17  wasn't going to leave.

18  Q    As in his house?

19  A    Correct.

20       MS. DEAN:  Your Honor, at this time we offer

21  Government's 45 and 46, which are certified orders of

22  protection from Queens County Criminal Court, pursuant to

23  902(11) and (13).

24       THE COURT:  Any objection?

25       MR. CECUTTI:  No objection.

1          THE COURT:  Those are in evidence.

2          (Government's Exhibits 45 and 46 were received in

3   evidence.)

4   Q    What, if anything, did the defendant get rid of after he

5   was arrested on this case?

6   A    When he came out of jail he came back to the house and

7   the first thing he did was go under the bed and get the gun,

8   and he put it in a cereal box and he left the house.

9   Q    I want to talk to you now about the days leading up to

10  Brandy's murder.

11         When is the last time that you remember making a

12  date for Brandy?

13  A    A week before I went to my mother's house.

14  Q    I'm sorry.  When was the last time -- what was the last

15  -- when was the last day you made a date for Brandy?

16  A    The day I went to my mother's house I made a date for

17  Brandy.  And me and Cory got into an argument because I wasn't

18  supposed to make that date because he was trying to stop the

19  foot traffic so he can have the notion to say like she wasn't

20  in the house.

21         So he wanted to stop her coming and going, or

22  anybody coming and going in and out of the house.

23  Q    When you say that the last date you made for her was the

24  day you went to your mother's house, why did you go to your

25  mother's house that day?

1  A    Because he wanted me to stay somewhere until he killed
2  her, and then I could come back to the house.
3  Q    Why?
4  A    Because he didn't want me there.
5  Q    Do you know why?
6  A    Because I had my daughter.
7  Q    What address did your mother live at at this time?
8  A    134-29 157th Street.
9  Q    Is that where you went on the last day you made a date
10 for Brandy?
11 A    That is.
12 Q    Do you know what that date was, like the month and the
13 day?
14 A    I do not.
15 Q    Do you remember what time of day you made that final date
16 for Brandy before going to your mother's?
17 A    Afternoon time.
18 Q    And where were you when you made the date for Brandy?
19 A    I was still at the house in Rosedale, so this was before
20 I left to go to my mother's house.
21 Q    Where was Brandy?
22 A    Brandy was in her room.
23 Q    And where did the client come for that date?
24 A    He came to the house in Rosedale.
25 Q    Do you remember who the client was?

1    A    I do not.

2    Q    What is Text Now?

3    A    It's an app that you can make calls and texts on if you

4    don't have a phone, as long as you're hooked up to the wifi.

5    Q    Did you have a Text Now app number at that time?

6    A    I did.

7    Q    Why would you use an app number, as opposed to your

8    regular cell phone number?

9    A    Because I was forbidden from texting Brandy from my

10   number.  I had to download a Text Now number to speak to her,

11   like a month prior to her passing.

12   Q    Was that related to business?

13   A    That, yes, and for personal reasons, because he had cut

14   off her main line, her main phone that I used to communicate

15   with her on.

16   Q    So Brandy had a regular phone number at one point?

17   A    Yes.

18   Q    Why did the defendant -- when you say cut off her regular

19   number, why did that happen?

20   A    He didn't want nobody to have access to her or her to

21   speak to anybody and tell anybody anything that was going on

22   in her life.

23   Q    Did Brandy also have an app number?

24   A    She did.

25   Q    Was Brandy using her regular number or her app number

1   around the time of her death?

2   A     The app number.

3   Q     Could you explain to us generally how you would make a

4   date for Brandy?

5   A     I would post an ad, someone would call, I would screen

6   them, make sure they're not police.  After I do that, I see

7   what they want, tell them the rates.

8           If it's okay, then I let them know where to come.

9   I'll give them a bogus address, an address where I can see

10  them out the window.  Once I make visual with them, I'm

11  speaking to them on the phone and directing them to the house.

12  While I'm doing that, the closer they get to the house, Brandy

13  is in the room getting ready and she's opening the door.

14  Q     If you and Brandy were both home, how did you let Brandy

15  know that you had made a date for her?

16  A     I would go in her room and tell her if she wasn't on

17  webcam, and if she was on webcam or doing something I would

18  text her on her regular phone.

19  Q     And why would you give Brandy the heads up that a date

20  was coming?

21  A     So she could prepare and get ready.  If she was doing

22  something, she could stop doing it, just to give her enough

23  time to prepare.

24  Q     When you made that final date for Brandy on the day that

25  you went to your mother's house, what, if any, issue did you

1  have with the defendant?

2  A    He was mad because I wasn't supposed to make a date that

3  day.

4  Q    Who made the decision that you would go to your mother's

5  house on that day?

6  A    Cory did.

7  Q    Did you understand what was going to happen?

8  A    I did.  He didn't tell me when or what he was going to

9  do, but he let me know that this is the week that it's going

10  to happen.

11  Q    And you understood that to mean what?

12  A    That he was going to kill her.

13  Q    And by her, you mean who?

14  A    Brandy.

15  Q    How did you get to your mother's house that day?

16  A    Cory drove me.

17  Q    Was anyone with you and Cory?

18  A    My daughter.

19  Q    Approximately, how old was your baby at that point?

20  A    When he was dropping me to my mother's house?

21  Q    Yes.

22  A    She was 30 days.

23  Q    You testified earlier about Brandy's webcamming.  Was

24  Brandy still webcamming at the time she was killed?

25  A    She was instructed to slow down, but she was.

1  Q    Why was she told to slow down?

2  A    Because he wanted to slowly start making her disappear.

3  People would say they didn't see her, they can't say when she

4  died.

5  Q    Sitting here today, do you remember that app number that

6  you said Brandy was using closest in time to when she was

7  killed?

8  A    No.

9  Q    Where was Brandy when you left to go to your mother's

10 house, the day that you made her last date?

11 A    In her room.

12 Q    Did you and the defendant discuss how long you would be

13 at your mother's?

14 A    No.

15 Q    What did you discuss?

16 A    He discussed to wait for further instructions, and he

17 told me not to communicate with him during this time period

18 but I still did, because I was a new mom and that was his

19 baby, and that's the baby he said I had to have.  So it was

20 appropriate for me to at least speak to him regarding the baby

21 or send pictures and say what she's doing, just being a mom.

22 Q    What was the defendant's cell phone number at the time

23 that he killed Brandy?

24 A    347-729, I think.

25 Q    Did you previously provide us with a notebook page that

1   you wrote with that number on it?

2   A    I did.  I found it.

3   Q    I'm going to ask that the witness be shown 3500 AA-97.

4   Would it refresh your memory to see that notebook page?

5   A    Yes, please.

6             (Continued on next page.)

1    (Continuing.)

2         MS. DEAN:  Just for the witness only, please.  And

3    if you could just zoom in on the top of the page for the

4    witness.

5    BY MS. DEAN:

6    Q    Does this refresh your memory about the last four

7    digits of the defendant's number at the time that he killed

8    Brandy?

9    A    Yes, this was his phone number.

10   Q    And what is the full number?

11   A    (347) 729-4723.

12        MS. DEAN:  You can take that down.  Thank you.

13   Q    Did there come a time, while you were at your mother's

14   house, that you understood that Brandy had been murdered?

15   A    Yes.  He had text me, "I got the pair of black UGGs for

16   you."

17   Q    What did that mean to you?

18   A    The black UGGs?  That it was done, because he told me

19   that he was going to reference the UGGs after it -- after he

20   killed her, when we was discussing a code word, and that is

21   what he chose to say.  So I knew that he had killed her.

22   Q    Why black UGGs?

23   A    Because one Christmas in particular, I had two pairs

24   and he made me give her one.  And I was like, well, why

25   can't she just buy her own fucking pair?  You buy one for

1  her.  He was just like, no, you're gonna give her yours;
2  don't worry, you're gonna get it back.
3  Q    When you received that text from him, what did you
4  understand that to mean?
5  A    That she was dead.
6  Q    Now, during the days that you had been at your mother's
7  house before you got that text, were you coming and going
8  from your mother's, or were you just staying put at your
9  mother's?
10  A    I was staying put.  I was just enjoying being in the
11  house with my daughter.  My family was coming to my mom's
12  house to see me, I was introducing my baby to the family.
13  So I was enjoying being there.  I didn't want to leave.
14  Q    How did you feel when you got the black UGGs text from
15  the defendant?
16  A    My heart dropped and I said, oh, shit, he really did
17  it.
18  Q    After you received that text from him, did there come a
19  time when you left your mother's?
20  A    Yes.  I left because he called me and told me to come
21  the fuck outside.  I argued with him and told him that me
22  and my sister had plans to go to Red Lobsters, and he said,
23  "Bitch, if you don't fucking come outside, I'm coming to
24  that door, and you know what happens if I come to the door."
25  So I just got me and my daughter dressed and went outside.

1   Q    And the day that he picked you and your daughter up at

2   your mother's, was that the same day as you got the black

3   UGGs text from him or no?

4   A    No.

5   Q    What happened when you went outside and got into the

6   defendant's car with your daughter?

7   A    He was mad that I took too long, and he had the gun

8   sitting on the visor in the middle, and he just basically

9   told me, like, we got some shit to do, you fucking playing

10  me, you taking too long.  You know, just like let's go, we

11  got shit to do, because I was arguing with him because I

12  wanted to spend time with my sister.

13  Q    What was his demeanor like when you got in the car?

14  A    He was jumpy.  He had a lot of energy.  He was just

15  ready to -- ready to go, like get work done.

16        MS. DEAN:  Let the record reflect that the witness

17  was rubbing her two hands together when she answered that

18  question.

19  Q    Where did he drive you then?

20  A    We went to Green Acres Mall.

21  Q    For what?

22  A    And we went to Walmart and Red Lobsters.

23  Q    Why did you go to Red Lobster?

24  A    Because I kept complaining to him why I didn't want to

25  leave, because me and my sisters was going in particular to

1  Red Lobsters for the biscuits because I wanted the biscuits.

2  So we was planning to make it, like, a date with all of us

3  to go.  So when he called me in the middle of that, I was

4  waiting for my sister to come home.  So when we were at Red

5  Lobsters and we was in the parking lot waiting for the food,

6  my sister calls me like, where the hell did you go?  And I

7  told her I just had to go.

8  Q    So you and the defendant got food at Red Lobster?

9  A    Yes.  He ordered me the food that I would normally get,

10 and then after that we went to Walmart.

11 Q    What did you and the defendant get at Walmart?

12 A    We bought cleaning supplies, some eggs, a little bit of

13 food, and a Shark vacuum.

14 Q    Do you remember what the cleaning supplies were?

15 A    I don't exactly.

16 Q    You said a what vacuum?

17 A    A Shark vacuum.  It was a half vacuum, half, like,

18 shampoo vacuum.  It shampooed and, like, steamed the carpet.

19 Q    What was your understanding of why you were buying a

20 vacuum and cleaning supplies?

21 A    So we could clean the house to get rid of whatever

22 evidence from Brandy's murder.

23 Q    Do you remember who paid for the purchase at Walmart?

24 A    It was on my card, my MCU card.

25 Q    Do you know the date that this happened, when the

1    defendant picked you up at your mother's and took you to Red

2    Lobster and Walmart?

3    A    It was April 5th.

4    Q    How do you know that date?

5    A    Because I went back and looked at the transaction on my

6    bank statement.

7    Q    Did you provide a copy of your bank statement with the

8    transaction to the Government?

9    A    I did.

10            MS. DEAN:  I ask that Government's 132, which is a

11   certified record from MCU, be received in evidence pursuant

12   to 902(11) and (13).

13            THE COURT:  Any objection?

14            MR. CECUTTI:  One moment, Your Honor.

15            (Pause in proceedings.)

16            MR. CECUTTI:  No objection.

17            THE COURT:  All right.  What's the number?

18            MS. DEAN:  132, Your Honor.

19            THE COURT:  132 is in evidence.

20            (Government Exhibit 132 received in evidence.)

21            MS. DEAN:  Mr. Rader, can you please publish 132

22   for the jury?

23            (Exhibit published.)

24   BY MS. DEAN:

25   Q    First we'll flip through the pages, Ms. Anderson, so we

1    can make sure you recognize the statement.

2         MS. DEAN:  Could you just flip the pages?

3    Q    Other than the certification pages from the bank, is

4    this the same as the document that you provided to the

5    Government?

6    A    It is.

7         MS. DEAN:  And can we show the page with the

8    highlighting?

9    Q    Does this show the transaction that you described

10   looking into your bank statement to find?

11   A    Yes.  It is a withdrawal at Walmart Supercenter for

12   April 5th.

13   Q    And that's Walmart Supercenter at what location?

14   A    Valley Stream.

15   Q    Is that where the Green Acres Mall is?

16   A    Yes.

17   Q    How close to that -- how close is that Walmart to the

18   home that you shared with the defendant and Brandy?

19   A    It's walking distance.  It's less than a mile.

20        MS. DEAN:  You can remove Government's 132.  Thank

21   you.

22   Q    After you went to Red Lobster and Walmart with the

23   defendant, where did you guys go next?

24   A    We went back to the house.

25   Q    Describe for us what happened when you and he first got

1  back to the house.

2  A    When we first got back to the house, he told me and the

3  baby to head upstairs, and we went into our bedroom.

4  Q    Why?

5  A    To eat.

6  Q    Did you eat?

7  A    Yes.

8  Q    What were you wearing at that time?

9  A    Nothing.

10  Q    Why?

11  A    Because that was the uniform.

12  Q    What happened after you ate the meal?

13  A    After I ate and then fed my baby and I was comfortable,

14  he said come here, and he directed me towards where Brandy

15  room was, and he opened the door and showed me her.  She was

16  on the floor, butt naked, laying there, and blood coming out

17  her nose.

18  Q    Was she face up or face down?

19  A    Up.

20  Q    You said he directed you to her room.  Which was her

21  room upstairs?

22  A    Her room, if you're coming from outside, it's to the

23  right.  It's a room there and the bathroom.

24  Q    When you saw Brandy laying on the floor like that, what

25  did the room around her look like?

1  A    It looked like it was a fight.

2  Q    What, if anything, did the defendant tell you about how

3  he killed her?

4  A    He said this is the first time he's ever felt

5  somebody's life leave their body.  It's easier to shoot

6  somebody, and this is the first time --

7            MR. CECUTTI:  Objection.

8            THE COURT:  Overruled.

9  A    -- he's experienced seeing and feeling the life leave

10 someone's body.

11 Q    And did he tell you how he actually killed her?

12 A    He told me that he choked her until she wasn't

13 breathing no more.

14 Q    Did he tell you about anything else he did to her body

15 during the process of killing her?

16 A    He said that he used a toy to fuck her with it to make

17 it look like a client did it.

18 Q    And when you say "a toy," what do you mean?

19 A    A sex toy.

20 Q    Did he tell you why -- I'm sorry, you answered that.

21           Did he tell you where in the room he did this to

22 Brandy?

23 A    Where what?

24 Q    Where in her room?

25 A    Where he did what?

1  Q    Choked her.

2  A    She was standing up.  It was in the center of the room.

3  Q    Did he tell you whether or not he wore anything

4  specific when he choked her to death?

5  A    He wore his all black jogging suit, and he wore rubber

6  gloves that came up to his elbows.

7  Q    Did he tell you why he wore those gloves?

8  A    Yes.  Because if she tried to scratch or anything, she

9  wouldn't get any of his DNA and he didn't want to leave any

10  prints around her neck.

11  Q    Do you know where he learned that?

12  A    No --

13         MR. CECUTTI:  Objection.

14         THE COURT:  I'm sorry.  That was an objection?

15         MR. CECUTTI:  Yes.

16         THE COURT:  She said "no," so...

17  Q    What, if anything, did you notice about the temperature

18  in Brandy's room when you saw her body?

19  A    It was warm in there, and when he was speaking to me,

20  he told me that he's opening the window so it can slow down,

21  like, the blood flow rate and it can throw off her time of

22  death.

23  Q    Did he tell you what the point of doing that was?

24  A    So law enforcement wouldn't be able to pinpoint when

25  exactly she died.

1  Q    When he first showed you her body, did the defendant

2  tell you what, if any, plan he had for getting rid of it?

3  A    He didn't say in that moment.  He was trying to figure

4  it out.

5  Q    What was it like for you when you saw her body?

6  A    I knew that he was serious and that it could have been

7  me or my kids.

8  Q    What did the defendant do with Brandy's body to dispose

9  of it?

10 A    He cut it up.

11 Q    Where did he do that?

12 A    In the bathroom of the house, the upstairs bathroom.

13 Q    Please explain to the jury what you and he did to the

14 bathroom before he began that process.

15 A    He made me tape heavy duty garbage bags to the

16 ceilings, the window in the bathroom, the floors, the door,

17 and the sink.  The whole bathroom was covered in black

18 garbage bags.

19 Q    You said the floors, the windows, the sink --

20 A    The toilet, everything.

21 Q    What about the bathtub?

22 A    The bathtub too.

23 Q    What about the ceiling?

24 A    The ceiling too.

25 Q    Why were you guys doing that?

1   A    Because he didn't want any blood in that bathroom for

2   when he was done.  He wanted to make sure there was gonna be

3   no blood.  So that's what the taping of the black bags with

4   the Gorilla Tape was for.

5   Q    Do you know where that idea came from?

6   A    No.

7   Q    Did you wear anything specific when you were helping

8   him in the bathroom with the garbage bags?

9   A    I don't know.

10   Q    Was he wearing anything?

11   A    He was wearing his black jogger suit and his Timberland

12   boots.

13   Q    At what point did you find out that the defendant

14   planned to cut up Brandy's body?

15   A    When I was sleeping with my daughter, it was in the

16   middle of the night, like 2:00 in the morning, and I just

17   heard (indicating ), something like a machine, like,

18   something.  So I woke up and stormed in the bathroom like

19   what the fuck are you doing, you're making a lot of noise.

20   And when I opened the door, I saw Brandy laid up in the tub,

21   and her arms were already cut off and it was sitting in a

22   bag on the floor, a garbage bag, a black garbage bag on the

23   floor.

24          And so when I walked in, he was right, like, under

25   the butt area by where the thighs is.  He was telling me,

1   this shit is hard, I never chopped up a body before, but

2   this is, like, a meaty area and it's giving me some trouble.

3   Q    So I want to back up to -- well, you said that the

4   sound that woke you up was -- you made the noise that you

5   made.  Was it a motorized instrument that he was using at

6   that time?

7   A    Yes.

8   Q    Did you know where he had gotten that?

9   A    He said he was going to Home Depot earlier that day.

10  Q    And why was he -- if you know, why was he going to Home

11  Depot to get the saw?

12  A    I thought he was only going for cleaning products.

13  Q    When he got back, when was the first time that you

14  realized that he had purchased something else?

15  A    When I seen the bags that he came in with.

16  Q    What bags are you talking about?

17  A    The bags of stuff from Home Depot.

18  Q    I see.

19           And did you see what was inside the bags?

20  A    I did.  It was bleach, rubber gloves, and the saw.

21  Q    To be clear, were you with him on that trip out?

22  A    No.

23  Q    You stayed at home?

24  A    Yes, I was with my daughter.

25  Q    So I want to back up now to after you hung up the

1    plastic garbage bags in the bathroom.

2              When you and the defendant hung up the garbage

3    bags in the bathroom, where was Brandy's body at that time?

4    A    Her body was in her room.

5    Q    How did her body get from her room into the second

6    floor bathroom?

7    A    Her -- the bathroom was next door to her room, so he

8    dragged her.

9    Q    Did you see that or did he tell you that?

10   A    I saw it.

11   Q    And where did he put her in the bathroom?

12   A    He put her right into the bathtub.

13   Q    What happened once he put her into the bathtub?

14   A    He started dousing her with bleach.

15   Q    Do you know why he was doing that?

16   A    He said it was to get rid of any DNA.

17   Q    Did you assist the defendant in chopping up Brandy's

18   body?

19   A    No.

20   Q    Do you remember how long it took him?

21   A    It took him two days.

22   Q    Do you know why it took so long?

23   A    I do not.

24   Q    You said that when you came into the bathroom after you

25   heard that noise, he made a comment to you about it being

1  challenging in a certain part of the body?

2  A    Yes, because it have more flesh.

3  Q    Had the defendant set --

4        Had you seen the defendant with any other tool

5  prior to seeing him with that motorized tool in the

6  bathroom?

7  A    I saw the first saw that he had initially used before

8  he used the motorized one, went out and got the motorized

9  one.

10 Q    Okay.  So if we could just talk about that.

11       You saw -- what kind of a -- what was that?  Can

12 you just tell us what that was?

13 A    That was a regular manual saw that you cut, like, wood

14 with, and it was in the shed in the backyard.  It was a tool

15 shed in the backyard.

16 Q    Was that manual saw something you had ever seen the

17 defendant use before?

18 A    Not before she was killed, no.

19 Q    Did the defendant do any construction projects that you

20 ever saw?

21 A    No.

22 Q    If you know, why did the defendant go out and get a

23 different saw?

24 A    Because the first one wasn't working.

25 Q    What do you mean?

1    A    It wasn't strong enough.

2    Q    Who told you that?

3    A    Cory told me that.

4    Q    Were you in the bathroom with the defendant the entire

5    time that he was cutting up Brandy's body?

6    A    No.  After he told me he was having trouble, I told him

7    to keep it down because we got neighbors, and I went back to

8    lay with my daughter.

9    Q    I want to go back now to when you walked into the

10   bathroom the night when the sound of the saw woke you up.

11         What were you wearing when you went to the

12   bathroom to see what was happening?

13   A    Nothing.

14   Q    And what was the defendant wearing?

15   A    In the bathroom?

16   Q    Yes.

17   A    The black jogger suit and his Timberland boots and

18   rubber gloves.

19   Q    During the time that the defendant was cutting up

20   Brandy's body over that period of time you described to us,

21   what would he do with that outfit that he was wearing to cut

22   her up?

23   A    That was one of the things that he got rid of on our

24   drive on Snake Road.

25   Q    But if I can focus you now on during the time that the

1    defendant was actually cutting up Brandy's body.  Would he

2    wear that outfit the entire time?

3    A    No, he would leave it -- he would get undressed in the

4    bathroom, leave it there, and then come into the room.

5    Q    Did you have an understanding of why he was doing that?

6    A    Yes.  So he wouldn't track anything from the bathroom

7    into the rest of the house because the baby was there.

8    Q    When you saw the defendant the night that the sound of

9    the saw woke you up in the bathroom, was the bathroom still

10   wrapped in the plastic bags as you previously described?

11   A    Yes.  It was dark in the bathroom.  The only thing that

12   was on was the light.

13   Q    Could you explain how Brandy's body was positioned?

14   Was it still in the bathtub?

15   A    When?

16   Q    When you came in --

17   A    Yes.

18   Q    -- when you heard the sound of the saw.

19   A    Yes.  When I walked in, the saw was on the thighs.

20   Q    And how was her body positioned in the bathtub?

21   A    It was positioned in, like, a sitting up kind of

22   position.  It was taller than him.  So he's tall; the

23   bathtub was low.  He had to, like, put it up on, like, the

24   edge, like the corners of the tub in order for him to do

25   that because she didn't have any arms when I walked in.  It

1   was only thighs and legs left.

2   Q    Did you stay in the bathroom while he finished up with

3   her body?

4   A    No.

5   Q    During the time that the defendant was dismembering

6   Brandy's body, where did he sleep?

7   A    Where did he sleep?  He slept in the chair in the room.

8   It was a recliner chair in the room because before I moved

9   in, that used to be his parents' room.  So he would sleep in

10  the recliner chair that was in the room.

11  Q    If you know, where did the defendant put Brandy's body

12  parts after they were cut up?

13  A    In the garbage bags.

14  Q    Do you know how many pieces that he cut her arms into?

15  A    No.

16  Q    Do you know how many pieces he cut her legs into?

17  A    No.

18  Q    To the best of your knowledge, did all of this take

19  place in the second floor bathroom?

20  A    It did all take place in the second floor bathroom.

21  Q    Were any of your children in your home during this

22  process?

23  A    No.  Z had -- the father had got custody of him, and T

24  was still bouncing around between my mother and my sister's

25  house.

1    Q    And what about the daughter you shared with the

2    defendant?

3    A    She was with me.

4    Q    In the house?

5    A    Yup.

6    Q    Did you assist the defendant in getting rid of Brandy's

7    body parts?

8    A    I did.

9    Q    How did you assist him?

10   A    I drove.

11   Q    Where did you drive him?

12   A    To Seaview Park.

13   Q    What area is that in?

14   A    In Canarsie.

15   Q    Were you familiar with that park?

16   A    Yes.

17   Q    How?

18   A    I grew up in the area.

19   Q    Was the defendant familiar with it?

20   A    Yes.  He grew up in the area, as well.

21   Q    Did you and the defendant have discussions about where

22   to leave Brandy's body parts?

23   A    Initially he was supposed to leave her in the suitcase

24   in the alley in the 80s around the corner from where he grew

25   up at.

1   Q    Do you know why that changed?

2   A    No, I don't.

3   Q    Did you and the defendant discuss why leave her body in

4   a park as opposed to somewhere else?

5   A    No, he didn't discuss that with me.

6   Q    Did you and the defendant have any conversations about

7   leaving her body in a park versus hiding the body?

8   A    He did not want to hide the body because he said you

9   cannot collect on an insurance policy if a person is

10  missing.  If a person is missing, you have to wait ten years

11  before an insurance company pays out.  So he wanted the body

12  to be found.

13  Q    Did you know whether or not that was true, that if

14  someone goes missing, you have to wait ten years to collect

15  the money?

16  A    I do not know.

17  Q    How many trips did you make to Seaview Park with the

18  defendant to get rid of Brandy's body parts?

19  A    Two.

20  Q    Over how many nights?

21  A    Two nights.

22  Q    What car did you guys driveway?

23  A    The black Nissan Maxima.

24  Q    Who was the driver and who was the passenger?

25  A    I was the driver; Cory was the passenger.

1  Q    Approximately how long did it take to get from your

2  house to the park?

3  A    20 minutes.

4  Q    And did you make these trips on back-to-back nights or

5  were there nights in between?

6  A    They were back-to-back nights.  It was a Saturday night

7  going into Sunday morning, and it was a Sunday night going

8  into Monday morning.

9  Q    So let's start by talking about the first trip, the one

10 that you've described as a Saturday night going into a

11 Sunday morning.

12        How did you end up driving the defendant to

13 Seaview or Canarsie Park that night?

14 A    I was having a rough day with my daughter because I was

15 still breastfeeding, and so I fell asleep kind of late.

16 Maybe 30 minutes after I was sleeping, he woke me up with a

17 gun and was like, get the fuck up.  Okay, all right, you

18 don't gotta point the gun at me, all right.  And I started

19 to get dressed.  I was going to throw on regular clothes,

20 and he slapped me and said, what the fuck are you doing, put

21 on all black.

22        So I put on all black.  I dressed the baby.  Going

23 to grab my phone -- after I put her in the car seat, I go to

24 grab my phone, so he punches me in my back and he says, what

25 the fuck are you doing, why are you bringing your phone?  I

1  said, what you mean?  We leaving the house.  He was like,

2  yeah, but you know what we going to do, and when shit get

3  hot, I don't want to be pinpointed in that area.

4  Q    Did you understand what that meant as far as the

5  defendant not wanting to be pinpointed in that area?

6  A    Meaning he was saying that he didn't want his phone to

7  be used to locate him.

8  Q    Now, did there come a time that Saturday into Sunday

9  that you did drive the defendant to the park?

10  A    I did.  So after this encounter that I was speaking on,

11  I put my daughter in the car seat, I put her in the car, and

12  he told me to head towards the Belt Parkway, which is the

13  highway that leads to Brooklyn.

14  Q    Let me just back you up.

15        Did you load anything into the car before this

16  drive?

17  A    No, only my daughter.

18  Q    Did you end up leaving your phone behind at home after

19  the defendant told you that?

20  A    I did.

21  Q    Do you know if the defendant left his phone, as well?

22  A    He did also.

23  Q    How do you know that?

24  A    Because his phone was right next to my phone on the

25  dresser when we left.

1    Q    You said that he told you to head toward the Belt
2    Parkway?
3    A    Correct.
4    Q    At that point, did you know where you were driving him
5    to?
6    A    No.
7    Q    Could you describe the route that you drove?
8    A    So I got on the Belt.  As I was approaching Canarsie,
9    that's exit 13, he said get off here, so I got off, I made
10   the right at the light.  When we got to the grocery store,
11   Key Food, he told me to make the left.  I made the left and
12   I took it all the way to the end into the cul-de-sac, which
13   is a dead end.  That dead end is an entrance to the park,
14   and that's where I park up, and I stayed right there with my
15   daughter in the car and he got out.
16   Q    And what did he do when he got out?
17   A    He told me to pop the trunk, and he took the little
18   shopping cart out of the trunk and he loaded it with two
19   garbage bags.
20   Q    Did you have an understanding of what was in the
21   garbage bags?
22   A    Yes.
23   Q    What?
24   A    Brandy's body parts.
25   Q    And do you know what body parts?

1  A    It was her limbs; arms and legs.

2  Q    Where did the defendant go after he took out this

3  shopping cart and the garbage bags with her limbs?

4  A    He headed towards the baseball fields.

5        MS. DEAN:  I'm going to ask that the witness only

6  be shown Government's 17 for identification.

7  Q    Ms. Anderson, do you recognize Government's 17?

8  A    I do.

9  Q    What does that show?

10  A    This is a map of the park.

11  Q    And does that fairly and accurately depict a portion of

12  the area by Canarsie Park or Seaview Park?

13  A    It does.

14        MS. DEAN:  I'll ask that Government's 17 be

15  received in evidence.

16        THE COURT:  Any objection?

17        MR. CECUTTI:  No objection.

18        THE COURT:  That will be in evidence.

19        (Government Exhibit 27 received in evidence.)

20        MS. DEAN:  Mr. Rader, can we publish that, please?

21        (Exhibit published.)

22  Q    Ms. Anderson, looking at Government's 17, can you draw

23  a circle around the area where you stopped so that the

24  defendant could get out?

25  A    With the shopping cart?

1   Q    Yes.

2   A    (Witness complying.)

3        MS. DEAN:  The witness has drawn a circle around

4   the area that forms a U-shape to the upper right portion of

5   Government's 17.  The roads say Skidmore Av and Schenck

6   Street.

7   Q    Ms. Anderson, can you draw a line in the direction

8   where you saw the defendant walk off with the shopping cart?

9   A    (Witness complying.)

10       MS. DEAN:  Indicating an arrow over the baseball

11  field that is right at the point of the U where Skidmore Av

12  and Schenck Street meet.

13  Q    What were you doing while the defendant was gone?

14  A    I was sitting in the car waiting for him.

15  Q    Was he gone for long?

16  A    No.

17  Q    What happened when the defendant returned?

18  A    He came back with just the shopping cart.

19  Q    No bags?

20  A    No.

21  Q    What did you do then?

22  A    I drove back home.

23  Q    Do you remember if it was light out or dark out when

24  you were driving home?

25  A    The sun was coming up.  It was, like, early morning,

1  like dawn.

2  Q    What did you do when you got home?

3  A    I went upstairs.

4  Q    You said that Brandy's arms and legs were in the bags.

5  Did you have any conversation with the defendant about why

6  you guys didn't take her entire body on that first trip?

7  A    He wanted to separate the body parts and make it be

8  found separately.

9  Q    Now let's talk about the second trip to the park.  You

10  said that was the next night?

11  A    Correct.

12  Q    And that's, you said, a Sunday into a Monday?

13  A    Correct.

14  Q    Do you remember how you found out that you were going

15  to drive somewhere again that second night?

16  A    Repeat the question.

17  Q    How did you find out that you were going to be driving

18  on a second trip?

19  A    He told me, let's go.  And so when I did, he told me

20  which way to drive.  I backed out and I went the opposite

21  direction of where he said to go, and he told me, what the

22  fuck are you doing?  Cursing me out.  And then I went the

23  other way.  But he was mad that I did that because he said,

24  this is the wee hours of the morning and me just, like,

25  backing up and just doing more than necessary at that time

1   was, like, making him hot and suspicious.

2   Q    So the second night when you were driving again, did

3   you have your baby with you again?

4   A    I did.

5   Q    Did you bring your phone with you on the second trip or

6   no?

7   A    No.

8   Q    Did the defendant bring his phone with him?

9   A    No.

10  Q    When you left the house, was there anything that

11  happened before you left your neighborhood?

12  A    He had went back in the house because he had forgot the

13  gloves.

14  Q    And then what happened?

15  A    And then I proceeded to take the same route that we had

16  took the night before.

17  Q    You took the Belt Parkway?

18  A    Correct.

19  Q    And what exit did you get off?

20  A    13.

21  Q    And where did you go this time on the second trip?

22  A    This time I made the left on Seaview -- yes -- and when

23  we were driving, he's telling me he's going to get out, and

24  when he does, I need to wait for him on Remsen and Seaview

25  Avenue.  It's a stoplight there.

1      And so I let him out by the Jewish school, and he
2  got out.  I drove off.  And I wasn't supposed to drive off
3  because then I end up having to look for him for five to ten
4  minutes because we didn't have no phones, so I didn't know
5  where he was.  I was driving around looking for him, he was
6  driving around looking for me, and he was mad because I
7  wasn't supposed to drive off because the suitcase was still
8  in the trunk.
9  Q    Okay.  So let me just stop you right there.
10      You said you were driving around looking for him,
11 he was driving around looking for you --
12 A    No, he was walking around looking for me.
13 Q    You mentioned the suitcase that was in the trunk.
14 A    Yes.  When I found him again, he knocked on the trunk,
15 I opened it, and he pulled the suitcase out the trunk and he
16 carried it across the street to the park.
17 Q    What suitcase was this?
18 A    This was his mother's suitcase.
19 Q    What did it look like?
20 A    It was, like, brownish, beige-ish, and tan, and it was
21 a small suitcase.
22 Q    What was in the suitcase?
23 A    Brandy's torso.
24 Q    Who loaded the suitcase into the Nissan?
25 A    Cory did.

1   Q    So you had said at one point you were driving around

2   looking for him and you guys couldn't find each other?

3   A    Right, because I was doing the same thing that I did

4   the night before; dropping him off and then drive off.  But

5   I drove off too fast because I drove off before he could

6   take whatever out the trunk that he needed to take out the

7   trunk.

8   Q    So let me just -- let me just clarify something.

9        The night before, that was the trip to the park

10  that you described when you stopped around where that arrow

11  is on Government's 17?

12  A    Correct.

13  Q    So that night when you stopped where that arrow is on

14  Government's 17, did you wait there for him to come back?

15  A    On the second night?

16  Q    No, the first night.  I just want to clarify what you

17  said.

18  A    On the first night, yes, that's the area that I dropped

19  him and waited for him to come back at.

20  Q    Okay.

21       Getting back to the second night when you dropped

22  him on Seaview Avenue, that was the night that you guys kind

23  of lost each other?

24  A    Yes.

25  Q    Were you able to call him to see where he was at?

1  A     No.  I just kept driving around until I found him.  I

2  seen him walking, like, down the block.  I couldn't go down

3  that block, so I made it in a way to where he was walking

4  down the block, I caught him on the end of the block of him

5  coming down, and that's how we was able to meet back by the

6  Jewish school.

7  Q     And why couldn't you just call each other?

8  A     Because I was instructed to leave my phones home.

9  Q     Where do you recall meeting back up with him?

10 A     On Seaview and Remsen, where he had initially

11 instructed me to meet him.

12 Q     Did there come a point where you left the area of

13 Canarsie Park?

14 A     Yes, after he came back to the car, yes.

15 Q     Where did you head?  Where did you drive to at that

16 point?

17 A     At that point we drove back to the house.

18 Q     Did you and the defendant bring that suitcase you just

19 described to us back to Queens, or did you leave it in --

20 A     He did; he brought it back to Queens.

21 Q     And who put it back in the Nissan, you or the

22 defendant?

23 A     Cory did, and he had on the gloves that he had left in

24 the house, he had those gloves on, and that's what he used

25 to put the suitcase into the trunk, because when he came

1  back in the car, he had that death stench on them gloves and

2  I was complaining about it.  He got out the car, he threw

3  them in the garbage pail in front of the park, on the

4  outside of the park, and he came back in the car and we

5  drove off.

6  Q    You were talking about a smell that you smelled on his

7  gloves?

8  A    Yes.

9  Q    Had you smelled that before?

10 A    Yes.  I had smelled it in the house.

11 Q    Where in the house?

12 A    Where?  In the bathroom.

13 Q    During what?

14 A    When he was disassembling her body.

15 Q    What happened after you and the defendant got back from

16 that second trip to the park on night two?

17 A    On night two, after we were already back in the house

18 from the second trip, he was like, oh, shit, I forgot the

19 garbage bag.  And he left, took the car, went outside by

20 himself.  And he told me he had to get rid of the garbage

21 bag because he said he had dumped the body out and he threw

22 the garbage bag somewhere and he didn't want, for when the

23 body was found, a plastic bag with his prints on it was

24 there because then he would not be able to say he had

25 nothing to do with it.

1  Q    That's what he said to you?

2  A    Yes.

3  Q    When the defendant said that to you, did he, in fact,

4  go back to the park?

5  A    He did.

6  Q    Did you go with him on this next trip?

7  A    No.

8  Q    What did you do?

9  A    I was home with the baby.

10 Q    Now, a little bit earlier in your testimony you

11 mentioned a trip to Snake Road.

12 A    Yes.  One of these nights that we were doing these

13 trips to the park --

14      MR. CECUTTI:  Objection.  There's no question.

15 Q    Could you describe to us what you mean when you said

16 you took a trip to Snake Road?

17 A    We had went back outside one of these days and we was

18 disposing of the body, and he -- I didn't know we were going

19 to Snake Road.  He told me to drive.  I made the right at

20 the corner when we come out the house, I made the right,

21 followed his directions, and we ended up at Snake Road.

22 Snake Road is, like, the road that leads you from the

23 neighborhood we lived in to Five Towns.  It's like a

24 shopping area or whatever.

25      And so as I'm driving, he's throwing everything

1    out the window; the boots he was wearing, the saw.  He's

2    throwing stuff out the window.  The outfit, the Nike outfit

3    he wore, he's throwing everything out the window.  And he

4    says that no one's coming over here in no swamps to look for

5    any evidence, that the NYPD don't have the manpower to sit

6    there and sift through a swamp.

7    Q    Is it a swampy area?

8    A    It is.

9    Q    Is Snake Road the actual name of the road?

10   A    It is.

11   Q    And do you know why it's called that?

12   A    It has a lot of curves.  You have to drive very slow.

13   And it's the marsh.  It's like grassy and muddy and just

14   wet.

15   Q    Do you know if you guys went to Snake Road the night of

16   the first trip or the night of the second trip?

17   A    I don't know, but it was one of those nights.

18   Q    I want to get back now --

19          MS. DEAN:  We can take down Government's 17.

20   Q    I want to get back now to after you and the defendant

21   get back from the second night of going down to the park,

22   could you tell me about what happened that next morning?

23   Where did the defendant go in the morning?

24   A    The morning after the bodies were -- we got rid of the

25   bodies?

1  Q    Yes.

2  A    He had court that day, the next day, like that next

3  morning.

4  Q    And where were you when the --

5           Did he go to court?

6  A    He did.

7  Q    Did you go to court with him?

8  A    No.

9  Q    Where were you when the defendant went to court?

10 A    I was home with the baby.

11 Q    Did there come a time when he returned home?

12 A    Yes, he did, and he returned home with ice cream for

13 me.  I think it was Carvel.

14 Q    Did there come a time when either you or the defendant

15 went back to Canarsie Park?

16 A    Yes, Cory did, to see if the body was found, and when

17 he did, the body had not been found yet.

18 Q    And who told you that?

19 A    He told me that himself because he was laughing, and he

20 went back to see if there was any cameras because he wasn't

21 sure if there was cameras on Seaview or surrounding the

22 park.

23 Q    You testified earlier that the defendant bought

24 cleaning supplies, including a vacuum.

25           Can you describe to us what, if any, cleaning was

1   done in your home after Brandy's murder?

2   A    We shampooed all of the carpet in the house, shampooed

3   and vacuumed it, and then at that time was I able to shower

4   twice a day.

5   Q    Why at that time were you able to shower twice a day?

6   A    Because he wanted the water to rinse out the drains

7   just in case any residue from dismembering Brandy in the

8   bathroom was in the pipes.

9   Q    Did you shower twice a day?

10  A    I did.

11  Q    Did the defendant take showers?

12  A    Before this, barely.  After this, he was taking it

13  twice like myself also.

14  Q    You said that you guys shampooed the carpet?

15  A    Yes.

16  Q    In what rooms of the house?

17  A    Her room and in the hallway, the second floor hallway.

18  Q    When you say "her room," what do you mean?

19  A    Brandy's room that was next to the bathroom.

20  Q    Who shampooed the carpet?

21  A    Cory did.

22  Q    Did he tell you why he was shampooing the carpet?

23  A    Yes, because he knew that her nose was bleeding, and he

24  didn't want any of her blood to be found on the carpet and

25  then they could say -- they could question him about that.

1  Q    Going back to when you said you saw her and her nose

2  was bleeding, where was the blood?

3  A    It was coming from her nose.

4  Q    Just dried on her face?

5  A    It was dry.

6  Q    What happened to the plastic garbage bags that you and

7  the defendant had used to cover the bathroom?

8  A    Those bags were disposed of in the cleaning phase, when

9  we were cleaning, and I'm not sure if that was in the trash

10 that we dumped in the dumpster.

11 Q    Was there a dumpster that you and he used to get rid of

12 evidence?

13 A    Yes.  It was a few blocks from the house on the Conduit

14 and Francis Lewis, I think that is, and there's a Popeye's

15 there.

16        And so we went behind the Popeye's and there was a

17 dumpster there, and that's the dumpster that we threw a lot

18 of stuff in.

19 Q    Do you remember what else you and the defendant threw

20 into that dumpster besides the plastic garbage bags that had

21 lined the bathroom?

22 A    Random stuff.  Stuff from her room, stuff from just the

23 house that he wanted to always get rid of.

24        He was just trying to de-clutter because he was

25 still actively trying to see what money he can get from the

1   house.

2   Q    And you said things from -- random things from her

3   room, you said?

4   A    Yes.  Her cosmetology stuff from school, some of the

5   toys and work clothes.

6   Q    What cosmetology things did Brandy have for school?

7   A    She had flatirons, hot combs.  She had all kind of

8   stuff that the school had gave her, and she had a bunch of

9   mannequin heads on the sticks.

10  Q    Did you and the defendant get rid of all of that?

11  A    Everything was gotten rid of, yes.

12  Q    Why did you guys get rid of those items that belonged

13  to Brandy?

14  A    Didn't want to make it seem like that she was living

15  there, but that she was kind of just renting a room and

16  working there.

17  Q    What else did you and the defendant do to clean out the

18  house after her murder?

19  A    As far as what?

20  Q    Did anyone assist in cleaning out the house?

21  A    No.  But we did call two cleaning companies to assist

22  in taking her bed and some other things out the house.

23  Q    You said two cleaning companies.  Let's talk first

24  about the first company you called.

25        What do you remember about the first cleaning crew

1   that came to the house?

2   A    It was a white cleaning crew.  There was two guys, they

3   was Russian, they barely spoke English, and they were there

4   for maybe a hour.

5            (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q     Who found that cleaning crew?

2  A     Cory did.  He was looking online for a cleaning crew.  He

3  had called Junk Luggers and a few other places, but they were

4  too expensive.

5          He called the non-name brand guys and was able to

6  work with them.  The first cleaning crew came.  They got rid

7  of whatever they got rid of.  And then later on that day

8  another cleaning crew came.

9  Q     Let me still stick with the first cleaning crew.

10         When the first cleaning crew came, was Brandy's body

11 still in the house?

12 A     Yes.

13 Q     Do you remember what the first cleaning crew drove when

14 they came to the house?

15 A     I don't.

16         THE COURT:  Ms. Dean, is this a good time to take a

17 break?

18         MS. DEAN:  Yes.

19         THE COURT:  Ladies and gentlemen, we're going to

20 take our afternoon break, 15 minutes.  Please don't talk about

21 the case at all.  See you in a little bit.

22         THE COURTROOM DEPUTY:  All rise.

23         (Jury exits the courtroom.)

24         THE COURT:  Everybody can sit down.

25         Anything before we break?

1         MR. CECUTTI:  No.

2         MS. DEAN:  No.

3         THE COURT:  Okay.

4              (Brief recess.)

5         THE COURTROOM DEPUTY:  All rise.

6         THE COURT:  Everybody can have a seat.

7         (Jury enters the courtroom.)

8         THE COURTROOM DEPUTY:  You may be seated.

9         THE COURT:  We're ready to continue with the direct

10   examination of Ms. Anderson.

11        THE COURTROOM DEPUTY:  The witness is reminded she's

12   still under oath.

13        THE WITNESS:  Yes.

14        MS. DEAN:  Thank you, your Honor.

15   BY MS. DEAN:

16   Q    Ms. Anderson, when we broke we were talking about the

17   first cleaning crew that came to your home that you shared

18   with the defendant.

19        Do you remember that?

20   A    Yes.

21   Q    What do you remember that cleaning crew taking from the

22   home?

23   A    Brandy's bed.

24   Q    Why did you and the defendant get rid of Brandy's bed.

25   A    We wanted to make her room differently to what it was

1   known to be like, so when the police came it had a different

2   set up.

3   Q    Was there any bed in the room after that?

4   A    Yes.  She had a full-size bed; so this bed was a twin

5   size.

6   Q    Where did the bed that you put into her room come from?

7   A    That was the bed that was in T's room, that was his

8   father's hospital bed.

9   Q    Do you remember what else cleaning crew took, that first

10  cleaning crew?

11  A    I don't remember.

12  Q    If you remember, where was my Brandy's body when that

13  cleaning crew was there?

14  A    It was still in her room.  He had just took the bed out

15  of the room; he put it to the side and took the bed out of the

16  room.  So neither one of the cleaning crew came upstairs.

17  Q    Let me ask you about the second cleaning crew.  Do you

18  remember when the second cleaning crew came?

19  A    Yes, the same day.

20  Q    Are you sure of that?

21  A    No.

22  Q    You said that there was a second cleaning crew.  Who

23  found the second cleaning crew, you or the defendant?

24  A    We both did.

25  Q    You mentioned to us earlier the extra showers that you

1   were taking after Brandy's murder?

2   A    Correct.

3   Q    Was the bathroom cleaned in any way?

4   A    Yes, it was bleached out, scrubbed down.  We also got rid

5   of the thing that was over the toilet.

6   Q    What was over the toilet?

7   A    You know, the shelves, the shelves that go over the

8   toilet, it had cabinet; that was thrown out and the bathroom

9   was bleached out.

10  Q    Why did you guys get rid of the shelves that go over the

11  toilet?

12  A    Just to make the bathroom look differently than what it

13  was before.

14  Q    Did the defendant typically clean the home like this?

15  A    No.

16  Q    What happened to Brandy's cellphone?

17  A    He got rid of it after she was killed and he throw it

18  down the sewer.

19  Q    Were you with him when he did that?

20  A    No.

21  Q    How did you know that's what he did?

22  A    He told me that's what he did just before he got to me.

23  Q    When you say just before he got to you, what do you mean

24  got to you?

25  A    This is the day that he picked me up and told me to come

1  outside when I was at my mother's house.

2  Q    What happened to the computer, the house computer?

3  A    He got rid of that computer as well.  I can't remember

4  where, but he got rid of it.

5  Q    Were there other electronics, other computers in the

6  house?

7  A    Yes.

8  Q    Do you know why the defendant got rid of that one

9  computer?

10 A    Because that is the computer that he used to open up the

11 policies and had all the information on.

12 Q    Was anything done to clean the Nissan that you all drove

13 to the park?

14 A    Yes, he took it to the car wash and got a full car

15 detailing with the trunk included.

16 Q    Were you with him when he did that?

17 A    No.

18 Q    How did you know that he did that?

19 A    I was in the house with the baby and he came back and

20 said that's what he had did.

21 Q    Did he tell you why he got the car fully cleaned and

22 detailed?

23 A    Yes.  Because he didn't want any of her DNA in the trunk

24 for when they did take the car.

25 Q    When you say they, who are you talking about?

1   A    The police officers.

2   Q    How did you find out that Brandy's body was found?

3   A    On the news.

4   Q    Do you know how the defendant found out?

5   A    He was watching the news also.  He's like, it's lit.

6   Q    He said what?

7   A    It's lit.

8   Q    What does that mean?

9   A    Lit, meaning the body is found and that everything is

10  about to start getting relevant.  He was anticipating the

11  police coming to the house.

12  Q    What was his demeanor like?

13  A    He was excited.

14  Q    Excited for what?

15  A    Excited because he said that he was going to cash out.

16  Q    Did you understand what that meant?

17  A    Yes.

18  Q    How was he going to cash out?

19  A    By making me call and putting in a claim for these

20  policies.

21  Q    Were you present with the defendant when he received a

22  phone call about Brandy's murder?

23              MR. CECUTTI:  Objection.

24              THE COURT:  Overruled.

25  A    Can I answer?

1    Q    You may.

2    A    What was the question?

3    Q    Were you present with the defendant when he received a

4    phone call about Brandy's murder?

5    A    Yes.

6    Q    What happened?

7    A    I was in the room when the story broke.  He answered the

8    phone.  And I heard somebody on the other line say, you a wild

9    boy.  Cory started laughing, saying, I don't know what you're

10   talking about, man.  Don't hot up my line.  Hotting up my line

11   means you're talking too much on my phone.

12          Cory was laughing.  He laughed about it for a little

13   bit and they hung up.  I'm like, who is that?  He said it was

14   Samson.

15          MR. CECUTTI:  Objection, your Honor.

16          THE COURT:  Said it was who?

17          THE WITNESS:  Samson.

18          THE COURT:  Overruled.

19   Q    What, if anything, did you and the defendant do during

20   the time you were getting rid of Brandy's body to cover up

21   your involvement in the crime?

22   A    What do you mean?

23   Q    Did you do anything during the time you guys were getting

24   rid of Brandy's body parts to try to make your lives look

25   normal?

1          MR. CECUTTI:  Objection.

2          THE COURT:  Overruled.

3   A    I don't understand.

4   Q    Did you do anything during the time that you and the

5   defendant were getting rid of Brandy's body to develop an

6   alibi?

7   A    The days leading up to, so the days he was dismembering

8   the body is the days we were creating the alibi.

9   Q    What did that mean to you, creating the alibi?

10  A    Doing things to corroborate what we were saying was true.

11  Q    What were you -- what do you mean doing things to

12  corroborate what you're saying is true?  What did you mean by

13  that?

14  A    As far as when the investigation started and the

15  questions of where were you the night of such and such started

16  happening, he already wanted to have alibi.

17          And so on those two nights that he was getting rid

18  of the body, one night it was we ordered pizza.  And the

19  second night it was, we ordered a movie on Verizon, Corky

20  Romano.

21  Q    What, if any, conversation did you and the defendant have

22  before if the police came to the house to speak to you?

23  A    That that's the alibi.

24  Q    Did you have any discussions about what your story would

25  be?

1  A     Yes.  Just to say that we was home.  Just had a baby.

2  And that she was wild and that she was in charge of her own

3  life.

4  Q     Who was wild?

5  A     Brandy.

6  Q     Why was that the story, that she was wild and in charge

7  of her own life?

8  A     Because then it would lead doubt, they would have more

9  suspects as opposed to just only looking at me and Cory.

10 Q     Did you and the defendant talk about who the suspects

11 could be?

12 A     No.

13 Q     Did you and the defendant get new physical phones after

14 Brandy's murder?

15 A     Yes.

16 Q     Do you know why?

17 A     No.

18 Q     Did the defendant -- do you know what happened to the

19 physical devices that you and he had at the time of the murder

20 or do you not know?

21 A     No, I don't know.

22 Q     What was your phone number at the time that Brandy was

23 murdered?

24 A     (718)600-1072.

25 Q     What, if any, contact do you remember having with

1  Brandy's family after her murder?

2  A    I spoke to her sister Aisha on Facebook.

3  Q    Did you post anything to social media about Brandy's

4  death?

5  A    Yes, because Cory kept telling me I had to because she

6  lived with us.

7  Q    Have did end up posting?

8  A    I posted something that sounded stupid, and it wasn't

9  true, and I took it down because it didn't sound like me.

10 Q    Can you describe what you mean by that?

11 A    Basically insinuating that I told her not to leave the

12 house that day.

13 Q    Did you go to Brandy's funeral?

14 A    No.

15 Q    Did you attempt to collect money from Brandy's life

16 insurance policies?

17 A    I did.

18 Q    When approximately did you start trying to collect the

19 money from the Brandy Odom life insurance policies?

20 A    I'm not sure, maybe a month.

21 Q    A month what?

22 A    Possibly a month after she was killed.

23 Q    Did you try to collect from both Globe and American

24 National?

25 A    Yes.

1  Q    Can you tell us about what you did to try to collect the
2  money?
3  A    I put in a claim and started to try and give them
4  whatever documentation or whatever was needed to claim it.
5  Q    Did you speak to them on the phone?
6  A    I did.
7  Q    When you said you put in a claim, is that paperwork?
8  A    Yes.
9  Q    Did you fill out paperwork for both companies?
10 A    I did.
11 Q    Did you order anything that you needed?
12 A    As far as -- what do you mean?
13 Q    Did you have to get any documentation for the companies?
14 A    I did.  I had to email them whatever documents they was
15 requesting, that I was corresponding back and forth with them
16 about.
17 Q    Do you remember what document they requested?
18 A    It was something that I had to write basically saying
19 that I'm inquiring about this.
20 Q    Did you ever get Brandy's death certificate?
21 A    I did.
22 Q    Why did you do that?
23 A    Because it was needed for the claim.
24 Q    How did you get Brandy's death certificate?
25 A    I went down to the records department, vital records.

1  Q     Where is that?

2  A     By Brooklyn, end of the bridge by Bowling Green.

3  Q     By Bowling Green?

4  A     Correct.

5  Q     What borough is that in?

6  A     Manhattan.

7  Q     Were there any problems between you and the defendant

8  over your attempts to collect money from the life insurance

9  policies?

10 A     Yes.  Because I didn't want to, but he kept putting

11 pressure to do so.  I didn't want to.  I was tying to get back

12 to work and take care of my daughter.

13 Q     Did you continue to try to collect the money?

14 A     I did.

15 Q     Did you actually successfully collect any money from

16 either life insurance company?

17 A     No.

18 Q     If you know, was the defendant still hoping to collect

19 the life insurance money at the time that you and he got

20 arrested?

21        MR. CECUTTI:  Objection.

22        THE COURT:  Sustained as to form.

23 Q     Were you and the defendant still discussing the

24 collecting the life insurance money at the time you and he got

25 arrested?

1   A    Yes, he was actively speaking about it, yes.

2   Q    What did he want you to do?

3   A    He wanted me to reach out to her mother and get her

4   signature.

5   Q    What did you need Brandy's mother's signature for?

6   A    Because the insurance company was saying it had to be a

7   next of kin if it was still a living parent.

8   Q    Did you want to reach out to Brandy's mother to get her

9   signature?

10  A    No.

11  Q    To the best of your knowledge, did her mother know that

12  you had taken out these life insurance policies on her

13  daughter?

14  A    No.

15  Q    Were you afraid of being caught by law enforcement?

16  A    Yes.

17            MR. CECUTTI:  Objection.

18            THE COURT:  Don't lead.

19  Q    Did you reach out to Brandy's mother?

20  A    No.

21  Q    What, if any, arguments did you and the defendant have

22  about that?

23  A    We got into more fights about it because he wanted me to

24  collect this money, that's what he wanted.

25  Q    Did you still have life insurance policy documents in the

 1  home that you shared with the defendant at the time you were

 2  arrested in this case?

 3  A    There was.

 4  Q    Why did you still have them?

 5  A    I still had them because Cory was still trying to

 6  collect.

 7  Q    I would now like for the witness only Government's

 8  Exhibit 128G.

 9          Do you recognize 128G?

10  A    I do.  The proof of death claimant's statement.

11  Q    Is this a form you filled out?

12  A    It is.

13          MS. DEAN:  I'm going to ask that Government's

14  Exhibit 128G be received in evidence.

15          THE COURT:  Any objection?

16          MR. CECUTTI:  No objection.

17          THE COURT:  That will be in evidence.

18          (Government's Exhibit 128G was received in

19  evidence.)

20          MS. DEAN:  Can we please publish this for the jury.

21  BY MS. DEAN:

22  Q    Take a look at 128G.  Ms. Anderson, what company is this

23  related to?

24  A    Globe Life.

25  Q    Why did you fill this particular document out?

1  A   Because this is what they was requesting.

2  Q   If we can zoom in on the top half of the document.  When

3  you say this is what they requested, they requested this for

4  what?

5  A   For claiming purposes.

6  Q   What did you put for the deceased name?

7  A   Brandy Keyshawn Odom.

8  Q   Is the policy number you see, number two, the policy you

9  took out on Brandy Odom?

10  A   Yes.

11  Q   Did you sign this document?

12  A   I did.

13  Q   The address that's below your signature, what is that?

14  A   That was my address at the time.

15  Q   Did the defendant live with you there?

16  A   He did.

17  Q   The phone number that you put, next to home phone under

18  your name and address, was that your phone number at the time?

19  A   It was.

20  Q   Can you read that to us?

21  A   (917)294-0105.

22  Q   That's your correct social security number and date of

23  birth as well?

24  A   Correct.

25  Q   By the time you filled out this document your phone

1  number was no longer (347)600-1072?

2  A    No.

3  Q    If you could take a look at number six where it says:  Is

4  this policy less than two years old.

5       Did you check yes or no?

6  A    No.

7  Q    Why did you check no?

8  A    Because it looked bad if you're claiming on a policy, from

9  what Cory said, if it's less than two years old.

10 Q    Do you understand what that means, why does it look bad?

11 A    Because people don't take out policies and then die after

12 they take out policies.

13 Q    I'm going to ask that this be taken down and the witness

14 shown what is marked for identification Government's Exhibit

15 128H.

16      Do you recognize 128H?

17 A    Yes.  That is the document that American National was

18 requesting at the time of me filing the claim.

19 Q    Did you sign this document?

20 A    I did.

21      MS. DEAN:  I ask that 128H be received into

22 evidence.

23      MR. CECUTTI:  No objection.

24      THE COURT:  That is in evidence.

25      (Government's Exhibit 128H was received in

1    evidence.)

2           MS. DEAN:  May we display it to the jury.

3    BY MS. DEAN:

4    Q    Can we enlarge that.

5           Ms. Anderson, can you read this?

6    A    I'm writing to American National to inquire about

7    providing information that I'm the sole beneficiary of Brandy

8    K. Odom policy.  I can be reached at (917)294--

9           THE COURT:  Don't go quite so fast.

10   A    --05 or my email Samireb12054@gmail.  Please get back to

11   me regarding this matter.

12   Q    Why did you send this to American National?

13   A    Because I needed confirmation that I was asking to put in

14   a claim.

15   Q    This can be taken down.

16          I'll ask now that the witness be shown Government's

17   Exhibit 128I for identification.  Do you recognize 128I,

18   Ms. Anderson?

19   A    Yes.  And this is the same, just that I'm writing to them

20   to tell them why my information doesn't match and that I

21   relocated.

22   Q    Did you sign 128I?

23   A    I did.

24          MS. DEAN:  I ask that 128I be received in evidence.

25          THE COURT:  Any objection?

1            MR. CECUTTI:  No objection.

2            THE COURT:  That's in evidence.

3            (Government's Exhibit 128I was received in

4    evidence.)

5            MS. DEAN:  Can we please publish this.  And,

6    Mr. Rader, enlarge it for us.

7    BY MS. DEAN:

8    Q    Ms. Anderson, will you read slowly please what you wrote

9    on Government's Exhibit 128I?

10   A    I, Adelle G. Anderson, am writing American National in

11   regarding to providing information that I am the sole

12   beneficiary of policy number belonging to Brandy K. Odom.  I

13   no longer reside at the address on my license.  I now reside

14   at 349 Massachusetts Avenue.  Please get back to me regarding

15   this matter.

16   Q    You skipped over the actual policy number, but was that

17   Brandy Odom's American National number you included?

18   A    It was, yes.

19   Q    Was that also Brandy Odom's date of birth next to her

20   name?

21   A    Yes.

22   Q    Why did you send this document to American National?  You

23   were trying to do what?

24   A    Collect on a policy.

25   Q    You can take down Government's Exhibit 128I, please.

1          How soon it was after Brandy's body was found that
2     the police made contact with you?
3     A     A few days.
4     Q     What was the first thing you remember about the police
5     making contact with you?  Where did that happen?
6     A     That happened at the house on Rosedale.
7     Q     What happened when they came to your home?
8     A     They wanted to see where she stayed in the home and take
9     a look around and see when is the last time we saw her.
10    Q     What did you tell the police that day?
11    A     I told them everything that Cory told me to tell them,
12    that I haven't seen her prior to, and that she had left and I
13    didn't know where she went.  And when they started to ask me
14    the kind of person she was, I started to tell them about how
15    she partied, drank, and how me and her used to fight.
16    Q     Fair to say you were not honest with them?
17    A     Not at all.
18    Q     One of the things you said is you told them you haven't
19    seen her prior to.  Do you remember sitting here today the
20    date you gave them as the last day of seeing her?
21    A     I don't.
22    Q     You mentioned they asked to see where she stayed?
23    A     Yes, her room.
24    Q     Did you show them her room?
25    A     I did.  When I showed them her room, Cory left a plate

1   with cocaine on it underneath the bed.  And they advised Cory

2   that they were going to be nice and not report this

3   considering that we just had a baby.  They took pictures of it

4   and told us to move it.

5   Q    Was the defendant -- so the defendant was home when you

6   guys showed the detectives her room?

7   A    Yes.  I was speaking to them, and when I mentioned that

8   he was home upstairs with the baby, they asked for him to come

9   downstairs.  And he spoke to them and I went up stairs with

10  the baby.

11  Q    At this point had you already gotten rid of Brandy's real

12  bed?

13  A    The house looked completely different by the time the

14  police came to the house.

15  Q    Had the defendant already cleaned the carpets as you

16  described to us earlier?

17  A    Yes.

18  Q    What bed was in Brandy's room when the police came to the

19  room?

20  A    The hospital bed.

21  Q    That's the one you said was T's?

22  A    Correct.

23  Q    Was there a date in late April of 2018 the detectives

24  picked you up from your mother's home?

25  A    Yes.

1 Q    Could you tell us what you remember about the police

2 making contact with you on that day?

3 A    They told me they wanted me to come down to the station

4 for some questioning.  I did.  And they began to grill me

5 about Brandy's murder and what I knew.

6 Q    Let me back up.  Was there -- did detectives pick you up

7 from your mother's that day?

8 A    Yes.  They asked if they could speak to me.  I said yes.

9 They asked where I was.  I told them where I was, gave them

10 the address, they came and picked me and my sister up.

11 Q    That day in late April 2018 when you talked to them, were

12 you truthful with them?

13 A    No.

14 Q    What do you remember telling them?

15 A    I told them I didn't know anything and I don't know what

16 happened.

17 Q    What, if anything, did they show you that day?

18 A    They showed me a video of me and Cory in the driveway.

19 And they showed me a picture of Brandy's torso.

20 Q    You said they showed you a video of you and Cory in the

21 driveway.  What driveway?

22 A    The driveway of the house that I shared with him.

23 Q    What did you see you and Cory doing on the video they

24 showed you?

25 A    Putting bags into the car.

1    Q    What you were feeling when you they showed you that

2    video.

3    A    I was scared.

4    Q    Was this just a clip of a video?

5    A    Yes.

6    Q    Why were you scared?

7    A    Because I know that I was dealing with the police.  I

8    never had no type of encounters like this with no police.

9    Q    Did you continue to lie to them throughout that

10   interview?

11   A    I did.

12   Q    Where did you go after that interview ended?

13   A    Back home to my mother's.

14   Q    After that interview, were you able to go to your and the

15   defendant's home in Rosedale?

16   A    No.

17   Q    Why not?

18   A    Because when I was at the precinct speaking to the

19   police, so was he.  And in that time they confiscated the

20   house and it was now seized under the NYPD's control.

21   Q    When you say when you were at the precinct speaking to

22   the police so was he, who is "he" in the sentence?

23   A    Cory was also getting interrogated by the police for

24   Brandy's murder.

25   Q    You said that the home in Queens was seized by the

1  police.  Do you remember how long it was before you were able

2  to go back to the home?

3  A    A month, November.

4  Q    Were there phones, cellphones, removed from your home by

5  law enforcement?

6  A    Yes, it was cellphones that belonged to Cory and I.

7  Q    What, if anything, did you delete from your phone after

8  Brandy's murder?

9  A    Pictures, any pictures of Brandy.

10 Q    Why?

11 A    Because he didn't want me to be able to show any pictures

12 that I have of her from my phone so I could say that we

13 weren't friends.

14 Q    You mentioned that the defendant also went to the

15 precinct and spoke to police.  How did you know that?

16 A    Because he told me.  He asked me what was I doing that

17 day.  I told him, I was with the police.  He said, yeah, so I

18 was I.  He started to tell me how was cocky, putting his foot

19 up on the table.  They were doing a good-cop/bad-cop routine

20 with him.  One minute it's the good cop, the next minute the

21 bad cop going into the room.  He was explaining it to me like

22 that.

23 Q    How did you feel about how things went for you in your

24 interview with the police?

25 A    I did not like it because I wanted to say something but I

1   was more scared of Cory than I was of the police.

2   Q    Did you tell that to the defendant?

3   A    Yes.

4   Q    You told the defendant you wanted to say something?

5   A    No, I did not tell him that.

6   Q    I'm sorry, what did you tell him.

7   A    I told him I was talking to the police.  He was asking

8   me, what did you tell them?  I told him what I told them.  I

9   didn't him that I was scared.

10  Q    Why not?

11  A    I couldn't tell him that I was scared.

12  Q    I want to talk now about your life after Brandy's murder.

13           You testified earlier today that the defendant's

14  home was in foreclosure.  Was the house foreclosed on?

15  A    It was.

16  Q    How did you find out that the house in Queens was gone?

17  A    Six months after living in Jersey I finally got my own

18  place and I went back I was going to try and salvage some of

19  my stuff.  And when we went back, there was a for sale sign in

20  front of the house.

21  Q    Were you able to get your personal items that you left

22  behind?

23  A    No.

24  Q    What happened to the Nissan Maxima that you and the

25  defendant shared after the police seized the house?

1   A   We were still driving it until it just stopped working

2   and broke down, and I just got rid of it.

3   Q   Going back in time.  When the police seized the house,

4   did they take the Maxima as well?

5   A   Yes.

6   Q   Am I understanding you to say there came a time you got

7   it back from the police?

8   A   Correct.

9   Q   After you got it back from the police, what ended up

10  happening it to?

11  A   It wasn't working that well.  And since that was his car

12  initially, I financed my own car after that.

13  Q   You mentioned that you had moved to New Jersey.  Where

14  did you move?

15  A   I moved in with my cousin.

16  Q   What town was that?

17  A   Trenton.

18  Q   Did the defendant go with you?

19  A   Yes.

20  Q   Approximately when did the defendant move in with you and

21  your cousin in New Jersey?

22  A   Around after Labor Day time because I picked him up from

23  the airport coming from Florida from John's house.

24  Q   Labor Day of what year?

25  A   2018.

1  Q    You were working when you lived in New Jersey at this

2  time?

3  A    Yes.

4  Q    What were you doing?

5  A    I was doing DSP work, Uber and HHA.

6  Q    What was your -- what is HHA?

7  A    Home health aid.

8  Q    What was your relationship like with the defendant when

9  he moved in with you and your cousin in New Jersey?

10  A    The relationship remained the same.  He was still abusive

11  verbally and physically, just not as much.

12  Q    What was the fighting about during this time period

13  between you and the defendant?

14  A    Collecting the policy.  Because I wanted him to get a job

15  but he wanted me to keep collecting this money.

16  Q    What was the status of the life insurance policy

17  collection during the fall of 2018?

18  A    I don't understand the question.

19  Q    I'll rephrase that.

20        How were things going with collecting the policy

21  money in fall of 2018?

22  A    It wasn't going good.  They were asking for a lot.  They

23  wanted signatures.  I wasn't willing to keep trying to get

24  information for this policy.

25  Q    You testified that they wanted you to come get a document

1    signed by Brandy's mother; is that right?

2    A    Yes.

3    Q    To the best of your knowledge, did Brandy's family know

4    that you had pretended to be her sister on any document or

5    paperwork?

6    A    No.

7              MR. CECUTTI:  Objection.

8              THE COURT:  Sustained.

9    Q    Did anyone in Brandy's family know that you were

10   pretending to be her sister?

11             MR. CECUTTI:  Objection.

12             THE COURT:  Rephrase.

13   Q    Who, if anyone, knew that you were pretending to be

14   Brandy's sister?

15             MR. CECUTTI:  Objection.

16             THE COURT:  Overruled.

17   A    Nobody.

18   Q    Did the defendant know?

19   A    Yes.

20   Q    Did you and the defendant discuss any plans for your

21   future?

22   A    As far as what?  Once we got to Jersey?

23   Q    Yes.

24   A    He kept wanting to move to El Paso.

25   Q    Did you have any discussions about what line of work he

1  planned to get into?

2  A    He was planning to get into real estate, because prior to

3  her murder he was taking classes.

4  Q    How did you know that he was taking real estate classes?

5  A    He used to take his classes downstairs on the computer

6  that was in the living room.

7  Q    Did he keep any notes on those classes?

8  A    He did, in a notebook.

9  Q    Do you know if he used notebooks for anything else?

10 A    Yes.  He was in the middle of writing like a novel and so

11 he had a book for that.

12 Q    What was the novel about?

13 A    It was about, from what I read, about two teenagers that

14 was in love with each other, two tough guys and both like to

15 fight, something like that.  It was just like a high school

16 drama, two kids madly in love with each over.

17 Q    Did you read the story from front to back or just

18 excerpts?

19           MR. CECUTTI:  Your Honor, objection.  Sidebar.

20           THE COURT:  Yes.

21           (Continued on the next page.)

22

23

24

25

1          (Sidebar conference.)

2          THE COURT:  What are we talking about.

3          MS. DEAN:  The Government has marked exhibits that

4     we anticipate putting in through the agent who executed the

5     search warrant in the Jersey home.  They are the defendant's

6     notebooks in which he writes a story based on his and

7     Ms. Anderson's life where the details that are significantly

8     similar to things that were going on in his life during the

9     time of the crime, such as the financial hardship, such as the

10    fantasy of the rapes that he perpetrated on Ms. Anderson and

11    other details that are remarkably similar, that this witness

12    will describe, that corroborates this witness.

13         THE COURT:  I feel like this is something I might

14    have been asked to look at before the witness testifies about

15    it.

16         What is your objection?

17         MR. CECUTTI:  Based on relevance, 401 and 403.  It

18    is unclear what the basis for this is.

19         We've just learned this now.  I think this was

20    something that should have been raised before.  But our

21    objection is --

22         THE COURT:  You never heard of this before?

23         MR. CECUTTI:  We have the notebooks, but --

24         THE COURT:  You didn't look at them.

25         MR. CECUTTI:  We did.

1          MS. DEAN:  Your Honor, these were marked as

2    Government Exhibits and provided on February 2.  The defense

3    also came and looked at the notebooks in-person and

4    photographed the notebooks, in addition to us providing a

5    copy.  So this is not a surprise whatsoever.  They've been

6    marked and the defense has not moved to preclude the

7    notebooks.

8          MR. CECUTTI:  We didn't understand the relevance.

9    These are fictional stories.

10          THE COURT:  The only thing is, look, they are marked

11    as exhibits; I take it that means they are going to be

12    introduced.  I'm happy to look at them.  It's just not

13    something I can do on the fly.  You read them, you know what

14    is in them.  You agree this is a story that of appears to

15    share some similarities with his life?

16          MR. CECUTTI:  I disagree with there being

17    similarities.  It's a fictional story.  That I agree with.

18          THE COURT:  I'm the last person who knows what the

19    answer is because I haven't seen them.

20          How long are they?

21          MS. DEAN:  They are a decent length.  There are two

22    spiral bound notebooks, handwritten, single-spaced.  I'd say

23    it took approximately maybe two hours to read them.

24          We're not actually introducing them through this

25    witness.  We're just establishing a basis of knowledge.  We're

1   also going to show her her own notebook and ask her to

2   describe the defendant's handwriting.  We're not even showing

3   her the defendant's notebooks.

4           THE COURT:  You should have moved to preclude them,

5   they are marked as exhibits.  I'm hearing about this now.

6   I'll take a look at them, I guess.

7           But at this point she can say he kept notebooks and

8   he wrote -- describe what is written in them in general way.

9   And then I guess I can read them or someone can tell me what

10  is in them.

11          MS. DEAN:  Your Honor, I think we can describe them

12  to you, provide them to you, and we can highlight the relevant

13  portions.  I certainly don't anticipate reading them to the

14  jury in full, but there are portions that are strikingly

15  similar to things this witness has testified about and the

16  defendant's motive for the crime, his financial hardship.

17  They are certainly relevant.  I can provide them in a

18  digestible way.

19          THE COURT:  To be clear, there is no question when

20  you say this is the first time you're hearing about it, that's

21  not what you meant to say because you had them and you know

22  what the content is.  Correct?

23          MR. CECUTTI:  Correct.  First time I'm understanding

24  the Government's position as to the relevance of the

25  notebooks.

1          THE COURT:  Okay.  If it bears similarity in a

2    particular way, it is clearly relevant, if that is the case.

3    The question then is, is there something unfairly prejudicial

4    or some other reason to keep it out.  But I'm taking shots in

5    the dark here because I don't know what is in it.

6          She can talk about it in a general way.  You're not

7    moving to introduce it now.  And then you're going to ask her

8    about her own notebooks.

9          How much more do you have?

10          MS. DEAN:  I'll finish today.

11          THE COURT:  You don't mind starting tomorrow?

12          MR. CECUTTI:  That's fine.

13          (End of sidebar conference.)

14          (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

 1                    (In open court.)

 2          THE COURT:  You can continue along the lines we

 3   discussed at sidebar.

 4   BY MS. DEAN:

 5   Q    Ms. Anderson, who are the characters in the defendant's

 6   story based on, if you know?

 7   A    Me and him.

 8               MR. CECUTTI:  Objection, your Honor.

 9               THE COURT:  Did you ever discuss what he wrote with

10   him?

11               THE WITNESS:  Yes.  He told me how he wanted to

12   reenact our high school love.

13               THE COURT:  Next question.

14   Q    Did you read the story front to back, or did you just

15   read bits and pieces?

16   A    Skimmed through bits and pieces at the beginning of it.

17   Q    Was it typed or handwritten?

18   A    It was handwritten.

19   Q    Can you describe for us what the defendant's handwriting

20   looks like?

21               THE COURT:  Would you recognize it if you saw it

22   again?

23               THE WITNESS:  I would.

24   Q    Could you also describe it to us?

25   A    Small and straight.  He was a lefty so he wrote with his

1   left hand.

2          MS. DEAN:  I'm going to ask permission to hand the

3   witness what is marked as Government Exhibit 349B.

4          THE COURT:  Okay.

5   Q    Could you take a look through 349B and tell us if you

6   recognize that notebook?

7   A    This is mine.

8          THE COURT:  It's yours?

9          THE WITNESS:  Correct.  This is my handwritten, this

10  is mine.

11  Q    How are you able to recognize that red notebook as yours?

12  A    It has all of my handwriting.

13         MS. DEAN:  I ask that Government Exhibit 349B be

14  received in evidence.

15         THE COURT:  Any objection?

16         MR. CECUTTI:  One moment, your Honor.

17         No objection.

18         THE COURT:  That will be in evidence.

19         (Government's Exhibit 349B was received in

20  evidence.)

21         MS. DEAN:  May I publish it with the Elmo, one page?

22         THE COURT:  Yes.

23  BY MS. DEAN:

24  Q    Turning to the first page of Government Exhibit 349B,

25  whose handwriting do we see here?

1  A    That's my handwriting.

2  Q    In the fall of 2020 were you still living with the

3  defendant?

4  A    Yes.

5  Q    Where were you two living in the fall of 2020?

6  A    The fall of 2020, on Rosedale Avenue.

7  Q    In what state?

8  A    New Jersey.

9  Q    How was your relationship with him, with the defendant,

10  at this time?

11  A    It was the same, always been.

12  Q    Why were you still living with him?

13  A    Because I had a child and I did love him.

14  Q    I want to direct your attention now to October 29 of

15  2020.

16       On that date did you speak to law enforcement again

17  about Brandy's murder?

18  A    I did.

19  Q    How did you end up speaking to law enforcement on that

20  day?

21  A    I had a friend Maggie and she had a police officer

22  friend.  And I was in the hotel messing around with one her

23  friends.

24       He asked me about my bruises on my arm.  I started

25  crying.  I basically told him I can't tell you.

1    Q    Let me just ask you a couple of questions there.  The

2    friend that you were messing around with in the hotel, was

3    that Maggie's police officer friend or someone else?

4    A    Someone else.

5    Q    Who was his name?

6    A    D.

7    Q    How did you know him?

8    A    I met him through her.

9    Q    Through Maggie?

10   A    Correct.

11   Q    Were you messing around with D while you were living in

12   New Jersey with the defendant?

13   A    Correct.

14   Q    When D -- you said you were in the hotel, why were you

15   guys in the hotel?

16   A    Because we was having sex.

17   Q    You said he saw bruises on your arm?

18   A    Yes.  He started to question me about it, I started

19   crying.  And I started crying.  I said, I can't tell you, I

20   can't tell you.  And so he knew what that meant because Maggie

21   had said --

22            MR. CECUTTI:  Objection.

23            THE COURT:  Sustained.

24   Q    I'll stop you there.

25            Who were the bruises from?

1   A    The bruises was from Cory.

2   Q    Why did you feel like you could not tell D?

3   A    Because I did not want to tell anybody about the things

4   Cory was doing to me.  Nobody knew what he was doing.  Maggie

5   was suspicious of it, because she's --

6                MR. CECUTTI:  Objection.

7                THE COURT:  Sustained.

8                Don't tell us anything that anything Maggie said.

9                Next question.

10  Q    How did you end up going from being in the hotel room

11  with D to speaking to law enforcement that day?  Just talk us

12  through that specifically?

13  A    D called Maggie and said, I think she's ready to talk.

14                MR. CECUTTI:  Objection.

15                THE COURT:  Sustained as to that.

16                Don't tell us about what anybody else said.

17                So D made a telephone call, correct?

18                THE WITNESS:  Yes.

19                THE COURT:  After that telephone call, what

20  happened?

21                THE WITNESS:  The detective was outside with Maggie.

22  Q    The detective that was outside with Maggie, was that

23  someone you had ever met before?

24  A    I never saw him a day in my life.

25  Q    When the detective and Maggie met you at the hotel, did

1  you go with them somewhere?

2  A    I went with them to the precinct.  The detective friend

3  was asking me if I'm comfortable, if I'm sure I want to talk.

4  I said yes.

5            MR. CECUTTI:  Objection.

6            THE COURT:  Overruled.

7            (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MS. DEAN: (Continuing.)

2  Q    And did you go into the precinct and speak to police that

3  day?

4  A    I did.

5  Q    What did you want to speak to the police about that day?

6  A    About Brandy's murder.

7  Q    When you spoke to the police that day, did you speak

8  about Brandy's murder?

9  A    I did, but I wasn't all the way honest with them.  I

10  underplayed my role in everything.

11  Q    And when you say you underplayed your role, what does

12  that mean?

13  A    I was not acknowledging any questions about any type of

14  policies.

15  Q    Were you acknowledging that you had a role at all, or

16  were you denying that still?

17  A    I was denying it.

18          MR. CECUTTI:  Objection.

19          THE COURT:  Overruled.

20  Q    You can answer.

21  A    I was denying it.  I was going over their questions and

22  not answering them.

23  Q    With regard to your own conduct?

24  A    Correct.

25  Q    Did you review portions of that statement you made to the

1   police in October of 2020 prior to testifying today?

2   A    I did.

3   Q    Was that statement video recorded?

4   A    It was.

5   Q    How did you feel after you left the precinct on that day?

6   A    I was scared.  I didn't know if I wanted to go home

7   because I had to explain where I was.

8   Q    What were you scared of?

9   A    Of Cory finding out where I was and that I was talking,

10  and I couldn't answer for where I was.

11  Q    I want to talk to you now about November 4, 2020, just a

12  few days after you met with police.

13          What happened on that day?

14  A    I woke up to red laser beams going through my window and

15  my children's window.  I went into my children's room.  I told

16  them to lay down, it's going to be okay.  And as I'm doing

17  that, I'm hearing them on the jumbotron saying Adelle and Cory

18  come out with your hands up.

19          I run back in the room, started tapping him.  I said

20  Cory, get up, answer, go to the door, I think that's the

21  police.  He lay back down and was like you go.  So I started

22  heading down the stairs with my hands up.

23          As I'm talking down with hands up, I'm seeing the

24  smoke.  They threw the smoke in the window and started busting

25  through doors.  When I'm coming down the stairs, they're

1  busting the front door and I'm hearing them bust in the back

2  door and they have guns drawn.

3  Q    Were you arrested that day?

4  A    Cory and I was both arrested.

5  Q    And were any of your children home when you were

6  arrested?

7  A    His daughter and my son, T, was home and they was taken

8  by ACS.

9  Q    What address were you at when you were arrested?

10  A    My apartment on Roselle Street.

11  Q    Again, what state is that in?

12  A    New Jersey.

13  Q    When law enforcement came into your home, like you've

14  described, did they end up asking your permission for

15  something?

16  A    To search my house and I granted them permission.

17  Q    Did you sign anything?

18  A    Yes.

19  Q    Did you also speak to law enforcement that day?

20  A    I did later on that day.

21  Q    Do you remember what agencies you were speaking to?

22  A    The FBI.

23  Q    And on the day that you were arrested, November 4, 2020,

24  were you honest about your role in this scheme on that day?

25  A    No, I was still minimizing my role.

1  Q    Why were you doing that?

2  A    Because I was scared.

3  Q    Did you review certain portions of your statement to

4  law enforcement on November 4, 2020, prior to testifying here

5  today?

6  A    Yes.

7  Q    Was that also a videotaped statement?

8  A    It was.

9  Q    Did you go to court on the day of your arrest?

10 A    Yes.

11 Q    Did you end up going to jail or were you released?

12 A    I was released on bond.

13 Q    Did you have conditions associated with your release?

14 A    Yes.  That I couldn't commit any new crimes, I had to

15 stay out of trouble, a curfew, and submit drug tests.

16 Q    Did you later meet with people from the FBI and the

17 United States Attorney's Office for the Eastern District of

18 New York?

19 A    Yes.

20 Q    During those meetings, were you represented by a lawyer?

21 A    I was.

22 Q    Do you remember when you began meeting with the FBI and

23 the U.S. Attorney's Office?

24 A    Sometime in 2021.

25 Q    And did you meet with both agents and prosecutors?

1   A     I did.

2   Q     Do you know how many times?

3   A     I don't.

4   Q     What types of things did you talk about in these

5   meetings?

6   A     I talked about my conduct, the things that I've done and

7   said, and things that I've witnessed.

8   Q     Did you talk about Brandy Odom's murder?

9   A     I did.

10  Q     Did you talk about all the details you could remember

11  about her murder?

12  A     I did.

13  Q     Did you tell the government about other crimes you had

14  committed?

15  A     I did.

16  Q     Even the things like the shoplifting that we talked about

17  this morning?

18  A     Yes.

19  Q     Did it include talking about crimes that, as far as you

20  know, the government did not know about?

21  A     Yes.

22  Q     Did there come a time when you pled guilty in this case?

23  A     Yes.

24  Q     In what year did you plead guilty?

25  A     Which guilty plea are you referring to?

1    Q    The guilty plea with respect to Brandy Odom's murder.

2    A    I pleaded guilty to that in 2021.

3    Q    Was your guilty plea before a judge?

4    A    It was.

5    Q    What judge was that?

6    A    Judge Donnelly, to my left.

7    Q    What crimes did you plead guilty to in 2021?

8    A    Wire fraud and identity theft.

9    Q    Did you also plead guilty to another crime?

10   A    Yes.  After the fact I pled guilty to --

11   Q    I'm just going to talk to you first about the 2021 plea.

12   Did you also plead guilty to something else besides wire

13   fraud, conspiracy, and the identity theft crime?

14   A    I did.  I also pled guilty to murder for hire.

15   Q    Could you explain to the jurors what you did that made

16   you guilty of those three crimes?

17   A    I fraudulently used Brandy's information to take out a

18   policy on her with the expectation of her dying.

19   Q    And why did you expect that she would die?

20   A    What do you mean?

21   Q    You said you used her information to take out a life

22   insurance policy with the expectation of her dying.

23        What do you mean by that?

24   A    Yes.  That was the reason why the policy was taken out,

25   using that as the payment.

1   Q    Why did you expect that Brandy would die?

2   A    Because I knew that Cory was going to kill her.

3   Q    Was that part of the plan?

4   A    Yes.

5   Q    And what did you and the defendant expect to get as part

6   of that plan?

7   A    A cash payment pay out from the life insurance company.

8   Q    You said that you used Brandy's information to take these

9   insurance policies out.

10          What information did you use?

11   A    Name, social, date of birth.

12   Q    How did you communicate with the life insurance

13   companies, what methods?

14   A    Through telephone and email.

15   Q    When you pled guilty to these crimes that you've just

16   described to us, did you do so as part of a written agreement

17   with the government?

18   A    Yes.

19   Q    What kind of an agreement was that?

20   A    A cooperation agreement.

21         MS. DEAN:  May the witness only be shown

22   Government's 57 for ID.  If you could turn to the last page of

23   Government's 57 for the witness.

24   Q    Ms. Anderson, do you recognize Government's 57?

25   A    Yes.  This is the cooperation agreement from 2021.

1  Q    Do you see your signature on that document?

2  A    I do.

3         MS. DEAN:  Your Honor, I ask that Government's 57 be

4  received in evidence.

5         THE COURT:  Any objection?

6         MR. CECUTTI:  No objection.

7         THE COURT:  That's in evidence.

8         (Government's Exhibit 57 was received in evidence.)

9  Q    Was part of this agreement -- if we could just put up the

10  first page now.  While we're getting there, Ms. Anderson, was

11  part of this agreement with the government that you would

12  plead guilty to and admit your role in the murder for hire of

13  Brandy Odom?

14  A    Yes, that was part of my plea.

15  Q    Prior to entering into this agreement with the

16  government, had you been charged with murder for hire?

17  A    No.

18  Q    Did you plead guilty to that crime because you were

19  guilty of that crime?

20  A    I did.

21  Q    Do you have certain obligations under this agreement?

22  A    I do.

23  Q    What are the obligations?

24  A    I have to give accurate and honest information to the

25  government.

1    Q    What are the other obligations?

2    A    That I'm going to show up on time.

3    Q    Show up on time for what?

4    A    To the meetings.

5    Q    And what else did you have to do under the agreement?

6    A    Not commit any more crimes.

7    Q    Did you also have an obligation to get permission from

8    the government before you revealed your cooperation with the

9    government to anyone, other than law enforcement?

10   A    Yes.

11   Q    Did there come a time when you did reveal your

12   cooperation to someone else?

13   A    I did.

14   Q    Who whom?

15   A    To Maggie Jones.

16   Q    And remind us who she is.

17   A    My best friend.

18   Q    And just remind us, was she involved in the day where you

19   went to the precinct in October of 2020?

20   A    She was there with me.

21   Q    What do you hope to get in return for your cooperation

22   with the government?

23   A    A 5K letter.

24   Q    What is that?

25   A    It's a letter that details how I assisted the government

1  with honest and accurate information.

2  Q    Is that all it says or does it include more?

3  A    That it's written on my behalf, so that the judge can

4  consider my crimes.

5  Q    When you say consider your crimes, does it include

6  information about your crimes?

7  A    Yes.

8  Q    Including the role you played?

9  A    Yes.

10 Q    Who writes a 5K letter?

11 A    The prosecutor.

12 Q    I want to take a look just at a few of the things in

13 Government's 57.  At the bottom of page 1, where it says

14 Count 1, what is the name of that first charge that you pled

15 guilty to?

16 A    Count 1, wire fraud conspiracy, maximum term 20 years.

17         MS. DEAN:  You can minimize that.  And I'll ask you

18 to turn now Mr. Rader to page 2.  If you could just zoom in

19 where it says Count 3, please.

20 Q    What is the name of the crime you pled guilty to in

21 Count 3?

22 A    Count 3, fraudulent use of identification.

23 Q    Is that the identity theft count you were talking about

24 earlier?

25 A    Yes, ma'am.

1        MS. DEAN:  If you could minimize that, Mr. Rader,

2   I'll ask you to turn to page 3 of the cooperation agreement.

3        If you could zoom in on the top, just up to A and B,

4   please.  You can enlarge through A and B.  Thank you.

5   Q    What is the name of the third crime you pled guilty to?

6   A    Murder for hire.

7   Q    Now, does this agreement state and do you understand what

8   sentence you face?

9   A    I do, a max term of life in prison.

10  Q    Is that also the minimum term?

11  A    Correct.

12  Q    Who decides what sentence you get in this case?

13  A    The judge.

14  Q    If you get a 5K letter from the government, is the judge

15  permitted to sentence you to something less than life in jail?

16  A    Yes.

17  Q    Whose decision is that?

18  A    The judge.

19  Q    Will the government recommend a specific sentence to the

20  judge?

21  A    No.

22  Q    Has the government made any promises to you about what

23  your sentence will be?

24  A    No.

25  Q    Now, you can take that down, please.  You stated that one

1  of the provisions of your agreement was that you have to be

2  honest, testify truthfully, right?

3  A    Yes.

4  Q    During the time you were cooperating with the government

5  and having meetings with the government, did you lie about

6  something specific?

7  A    I did.

8  Q    Can you please explain to the jurors what you lied about?

9  A    I had lied about the policies and my name and Alex's name

10 and Z's name.

11           THE COURT:  Say it again.  Just repeat it again.

12 You lied about Alex's name and the policy.

13           MS. DEAN:  I'm sorry to interrupt.  I'm just going

14 to ask Ms. Anderson when she answers you to not use the name

15 of her child.

16           THE COURT:  Okay.  The court reporter can't hear

17 you.  Give your answer, again, into the microphone.

18 A    Repeat the question.

19 Q    I had asked you to -- if you don't mind just keeping with

20 the initials that we were using to describe your children.

21           My question was just to explain to the jurors what

22 you lied about, the specific lie.

23 A    I wasn't honest about agreeing and conspiring with Cory

24 with wanting to get rid of A.  I did not tell them about that.

25 I was hoping that it did not come out because it was too

1  painful for me to acknowledge that I would even conspire with
2  Cory with these things.
3  Q    When you say A, are you talking about Alex?
4  A    Correct.
5  Q    You didn't tell the government that you were part of the
6  plan to kill Alex?
7  A    No.
8  Q    Whose plan did you tell the government it was?
9  A    Cory's.
10 Q    And you did not originally tell the government that it
11 was also your plan?
12 A    I did not.
13 Q    Did you originally tell the government about filling out
14 a policy related to either of your children?
15 A    You said did I?
16 Q    Did you?
17 A    No.
18 Q    How did you end up telling the truth about these specific
19 things that you had withheld?
20 A    From the government?
21 Q    Yes.
22 A    You said how did I?
23 Q    How did you end up telling the truth about them?
24 A    I was confronted with the paperwork, the policies.  I was
25 confronted with the policies.

1   Q      What policies?

2   A      The policies on Alex and Z.

3   Q      What happened when you were shown the policies on A and

4   Z?

5   A      I admitted to them.

6   Q      Did you provide the government with any information about

7   what other policies might exist?

8   A      Yes.  I told the government that it's a high possibility

9   that there was other policies out there.

10  Q      For who?

11  A      T and Z.

12  Q      Why did you believe that there was a high possibility

13  there were other policies out there on T and Z?

14  A      Because I knew how Cory felt about my children and where

15  he really wanted them to be.

16  Q      Was it a violation of your cooperation agreement with the

17  government to not tell them that you took out the policies on

18  Alex and Z?

19  A      It was a violation.

20  Q      When did this happen that you told the truth about these

21  things to the government?

22  A      A few weeks ago.

23  Q      Why didn't you just tell the government this from the

24  beginning?

25  A      Because I felt like a piece of shit.

1  Q     Why?

2  A     I did.  Because I was conspiring to do things that I knew

3  I wasn't going to do in the first place, and I was wrong.

4  Q     Were you conspiring with the defendant to kill Alex?

5  A     At a time I was.

6  Q     Were you ever conspiring with the defendant to kill your

7  kids?

8  A     No.

9  Q     Why not?

10 A     Because those are my kids.  I would never -- I wouldn't

11 have kids to kill them.  Just have an abortion.

12 Q     What happened as a result of you violating your agreement

13 with the government?

14 A     I had to plead guilty to more charges.

15 Q     Specifically, what did you plead guilty to?

16 A     Conspiracy for murder for hire.

17 Q     Where the victim was who?

18 A     Alex.

19 Q     What did you do that made you guilty of the conspiracy to

20 commit murder for hire where the victim was Alex?

21 A     I used his information to open up policies with the

22 expectation of cashing out once he was dead.

23 Q     What is the maximum sentence for that crime?

24 A     Ten years.

25 Q     And can time you're sentenced to on the second guilty

1  plea be run consecutive or back to back from the time you were

2  already facing?

3  A    Yes.

4  Q    And you were already facing what sentence?

5  A    Life.

6  Q    Were you permitted to continue cooperating with the

7  government?

8  A    I was.

9  Q    Did you plead guilty to this murder for hire conspiracy

10 involving Alex pursuant to a second cooperation agreement with

11 the government?

12 A    I did.

13        MS. DEAN:  I'm going to ask now that the witness be

14 shown Government's 62 for identification.  If you could just

15 turn to the last page of that.

16 Q    Do you see your signature on that?

17 A    I do.

18 Q    And what is this document?

19 A    This is the superseding cooperation agreement.

20 Q    What date was it entered into?

21 A    February 9, 2024.

22 Q    Was that the day of your second guilty plea?

23 A    Yes.

24        MS. DEAN:  I ask that Government 62 be received in

25 evidence, Your Honor.

1       THE COURT:  Any objection?

2       MR. CECUTTI:  No objection.

3       THE COURT:  That will be in evidence.

4       (Government's Exhibit 62 was received in evidence.)

5   BY MS. DEAN:

6   Q    Was this plea on February 9, 2024, also before Judge

7   Donnelly?

8   A    Yes, it was.

9   Q    Do you have the same obligations under the February 2024

10  cooperation agreement with the government that you described

11  to us just a few minutes ago?

12  A    Yes.  I have to be truthful and honest and give accurate

13  information.

14  Q    What about the other requirements?

15  A    I still have to not commit new crimes.

16  Q    Do you still hope that you get a 5K letter as a result of

17  your cooperation?

18  A    I do.

19  Q    What information would that now contain?

20  A    It would contain this additional information in the

21  second charges that I just pled to.

22  Q    Do you know if the judge will take all of this

23  information into account when she sentences you?

24  A    Yes.

25  Q    Sitting here today, do you know what your sentence will

1  be?

2  A    No.

3  Q    Does your sentence depend on the outcome of this trial?

4  A    No.

5  Q    What is your understanding, Ms. Anderson, of what happens

6  if you fail to tell the truth when you're testifying here

7  today, or any day that you're testifying?

8  A    I go to jail.  My agreement is ripped up.

9  Q    If you lie do you get a 5K letter?

10 A    No.

11 Q    If you lie do you get to take either of your guilty pleas

12 back?

13 A    No.

14 Q    What would your sentence be if that happened?

15 A    Life.

16 Q    What do you hope will happen when you get sentenced?

17 A    I'll get time served.

18 Q    Do you know what will happen?

19 A    I don't.

20 Q    Do you know when you'll be sentenced?

21 A    I don't.

22 Q    I'm going to ask you now to define some terms for us and

23 review some nicknames.  Okay?

24 A    Okay.

25 Q    Did Brandy have any nicknames that you knew?

1   A    Foxy and Chocolate.

2   Q    I'm sorry?

3   A    Foxy and Chocolate.

4   Q    What is BB Trap Selfie?

5   A    That was a Tracfone.

6   Q    What is BB?

7   A    It stands for Brandy.

8            THE COURT:  Could you just take your hand away from

9   your mouth?

10  A    I'm sorry.  It was an abbreviation that Cory called

11  Brandy.

12  Q    Do you have any nicknames?

13  A    Yes.

14  Q    What are they?

15  A    Jazzy, Jasmine, RiRi.

16  Q    What is Jellz or Jelly?

17  A    That's a nickname that my family calls me.

18  Q    What did the defendant call you?

19  A    He called me Baby Girl.

20  Q    What is hubby and wifey?

21  A    Husband and wife.

22  Q    Did you use those terms?

23  A    I did.

24  Q    With whom?

25  A    Cory.

1   Q    What is Zaddy?

2   A    It's a playful word for daddy.

3   Q    Did you use that term?

4   A    I did.

5   Q    For who?

6   A    Cory.

7   Q    What does white girl mean?

8   A    Cocaine.

9   Q    What about girl?

10  A    Same thing, cocaine.

11  Q    What is corn?

12  A    Marijuana.

13  Q    What is bang piece mean?

14  A    To swipe.

15  Q    What do you mean to swipe?

16  A    When you're scamming and swiping cards, it's a piece.

17  Q    What does dub mean?

18  A    Not fucking with it, you dubbing it.

19  Q    So are dub and dubbing the same thing?

20  A    Correct.

21  Q    What is paper?

22  A    Money.

23  Q    What is bread?

24  A    Money.

25  Q    What is thot, T-H-O-T?

1    A    A ho.

2    Q    Does it have a second meaning to you?

3    A    We called margaritas thotties.

4    Q    T-H-O-T-T-I-E-S?

5    A    Yes.

6    Q    What does it mean if you said you pulled out your toy on

7    me?

8    A    I was referring to a gun.  A toy is another word for gun.

9    Q    What is custy?

10   A    A client.

11   Q    What happened after Brandy's murder when her regular

12   customers reach out for dates?

13   A    I told them she wasn't here.  She was gone.

14   Q    What is kissietory?

15   A    That was a name we made up and it was also an email, that

16   we came up with once we was running out -- once our regular

17   email and our regular phone got hotted up.

18   Q    Is that K-I-S-S-I-E-T-O-R-Y?

19   A    Correct.

20   Q    What is BKOdom718@gmail.com?

21   A    That was Brandy's email.

22   Q    Real or fake?

23   A    Real.

24            (Continued on next page.)

25

1    (Continuing.)

2    BY MS. DEAN:

3    Q    Do you remember which was Brandy's fake email?

4    A    No, but it wasn't with her real name in it.

5    Q    Do you know what bkodom718@gmail.com was used for?  If

6    you know.

7    A    Not at the moment, I don't know.

8         MS. DEAN:  If the witness only can be shown

9    Government's 28.

10   Q    Ms. Anderson, before we show you Government's 28, while

11   we're getting that up, sitting here today, do you remember

12   what emails you and the defendant used for Brandy for the

13   life insurance policies?

14   A    Not sitting here today.  Unless you would show it to

15   me, I'm not sure.

16        MS. DEAN:  Can we show the witness only

17   Government's 128 [sic], please.

18   Q    Ms. Anderson, does Government's 28 -- does

19   Government's 28 correctly capture all the phone numbers that

20   you have testified about here today and the user that you

21   attributed to each phone number?

22   A    Yes, this looks accurate.

23        MS. DEAN:  May I ask that Government's 28 be

24   received in evidence?

25        THE COURT:  Any objection?

1           MR. CECUTTI:  No objection.

2           THE COURT:  Okay.

3           (Government's Exhibit 28 received in evidence.)

4           MS. DEAN:  Can we just publish that briefly?

5           (Exhibit published.)

6           MS. DEAN:  Thank you, Mr. Rader.  You can take

7    that down.

8           If you could put up Government's 3, but for the

9    witness only, please.

10   Q    Do you recognize Government's 3?

11   A    I do.

12   Q    Who is that?

13   A    That's Cory Martin.

14   Q    Does that fairly and accurately depict the defendant?

15   A    It does.

16          MS. DEAN:  May I ask that Government's 3 be

17   received in evidence.

18          MR. CECUTTI:  No objection.

19          THE COURT:  That's in evidence.

20          (Government's Exhibit 3 received in evidence.)

21   Q    Can you describe to us, Ms. Anderson, what stores were

22   in walking distance of the defendant's Queens home?

23   A    The Bank of America, two corner stores; one was more

24   like a grocery store.  The Western Union, a library, a hair

25   salon.  It was a small strip.  Walgreens and a bar.

1      MS. DEAN:  If I can have, please, for the witness

2  only Government's 329, please.  And, Mr. Rader, if you can

3  please play that without sound for the witness to recognize

4  it.

5  Q    Ms. Anderson, do you recognize what you're seeing in

6  Government's 329?

7  A    Yes.

8  Q    Have you seen this video before?

9  A    Once, yes.

10  Q    Who took it?

11  A    I took it in the bathroom.

12  Q    In what bathroom?

13  A    Upstairs -- no, that's -- that looks like downstairs

14  bathroom.  One of the bathrooms in the house.

15      MS. DEAN:  Mr. Rader, if you can just pause for a

16  moment.

17  Q    One of the bathrooms in what house?

18  A    In Rosedale.

19  Q    That was taken during the time period that you were

20  living with the defendant?

21  A    Yes, ma'am.

22  Q    How can you tell?

23  A    Because I have a head wrap on, because I was not

24  allowed to get my hair done or to do -- like, be pretty

25  unless I was going out with him.

1      MS. DEAN:  I'm going to ask that Government's 329

2   be received in evidence.

3            MR. CECUTTI:  No objection.

4            THE COURT:  That's in evidence.

5            (Government's Exhibit 329 received in evidence.)

6            MS. DEAN:  Mr. Rader, can you start that from the

7   beginning with volume, please, once it's published.

8            (Exhibit published.)

9            (Video is played.)

10  Q    What were you videoing in that video, Ms. Anderson?

11  A    Some of the bruises that I had suffered at the hands of

12  Cory.

13  Q    Why did you say the things that we just heard you say

14  at the end of the video?

15  A    Because that's how he made me feel, that I was nothing

16  but a whore.

17  Q    Is that how you felt?

18  A    Yes, in that moment, I did.

19  Q    Have you suffered from mental health issues associated

20  with some of what you've testified here today about?

21  A    Yes, while I was living with him.  I didn't want to be

22  here.

23  Q    Have you been diagnosed with anything?

24  A    Depression, PTSD, and anxiety after living with him.

25  Q    Did you begin therapy at some point?

1    A    Yes, immediately after I was arrested.

2    Q    Was that something you've continued with?

3    A    Yes.  I'm still in therapy.

4    Q    How are you doing today compared to when you were

5    living with the defendant?

6    A    I feel free today, that I can be my own woman.

7    Q    How did you feel at the time when you got arrested in

8    this case?

9    A    I felt horrible because I didn't know what was going to

10   happen to my kids, because I feel like I put them in this

11   situation.  I told my son I was going to come forward, and

12   he looked at me and said, mommy, please don't, he's gonna

13   kill us.

14              MR. CECUTTI:  Objection.

15              THE COURT:  Sustained.

16   Q    Have you heard of the term marital privilege?

17   A    Yes.  Cory --

18   Q    Why have you heard of that term?

19   A    Cory explained that to me when it came time for us to

20   be in court against one another.  So his plan was if we ever

21   both got apprehended, I would not be able to speak of his

22   crimes or testify against him because I would have had

23   spousal privileges.  I couldn't testify against him.

24   Q    That's something you heard from him?

25   A    Yes, that he explained to me.

1   Q    Do you know if that's true or not?

2   A    I don't know.

3   Q    Did you ever marry the defendant?

4   A    No.

5   Q    Have you met with the Government to prepare for your

6   testimony here today?

7   A    I have.

8   Q    And during a meeting just a handful of days ago, did

9   you review three recorded telephone calls?

10  A    I did.

11  Q    Did you recognize the voice that you heard on those

12  calls?

13  A    I did.

14  Q    And whose voice did you recognize?

15  A    Cory's.

16       MS. DEAN:  Your Honor, may I approach the witness?

17       THE COURT:  Yes.

18  Q    Do you recognize that, Ms. Anderson, what's been marked

19  as Government's 116-A, B, and C?

20  A    Yes.

21  Q    What is that?

22  A    This is -- it has my signature on it.  It's a voice

23  recording.

24       THE COURT:  Into the microphone.

25  A    Sorry.  It's a recording that I listened to.

1    Q    Is this the recording where you recognized the

2    defendant's voice, as you just said?

3    A    The correct.

4             MS. DEAN:  I offer Government's 116-A, B, and C

5    into evidence, Your Honor.

6             THE COURT:  Any objection?

7             MR. CECUTTI:  One moment, Your Honor.

8             (Pause in proceedings.)

9             MR. CECUTTI:  No objection.

10            THE COURT:  All right.

11            (Government's Exhibit 116-A, B, and C, received in

12   evidence.)

13            MS. DEAN:  Your Honor, may we play these for the

14   jurors?

15            THE COURT:  Yes.

16            MS. DEAN:  May we start, please, with Government's

17   Exhibit 116-A.

18            (Audio is played.)

19            MS. DEAN:  Can we please now play Government's 116-B.

20            (Audio is played.)

21            MS. DEAN:  And can we please now play Government's

22   116-C.

23            (Audio is played.)

24   Q    Ms. Anderson, whose voice was that on those calls?

25   A    On the calls, it was Cory.

1    MS. DEAN:  Your Honor, I have probably no more

2    than five minutes left, if Your Honor would want me to

3    finish.

4          THE COURT:  Yes, might as well finish.

5          MS. DEAN:  Okay.

6    Q    During a meeting that you had with the Government, was

7    there a time that you went somewhere with prosecutors and

8    law enforcement?

9    A    Yes, to Seaview Park.

10   Q    Were you asked to show prosecutors and law enforcement

11   anything during that trip?

12   A    Yes; where I dropped him off on those two trips to the

13   park.

14   Q    Were photographs taken during that trip of some of the

15   spots that you pointed out?

16   A    Yes, ma'am.

17         MS. DEAN:  For the witness only, please,

18   Mr. Rader, could you pull up Government's 992-A through G.

19         Your Honor, if you don't mind, I'll use a paper

20   copy.

21         THE COURT:  Sure.

22   Q    Ms. Anderson, can you flip through these, please.

23         Do you recognize Government's 992-A through G?

24   A    I do.

25   Q    And what are they?

1  A    These are the areas where I dropped Cory on the trips

2  to the park.

3        MS. DEAN:  Your Honor, I ask that Government's

4  992-A through G be received in evidence.

5        MR. CECUTTI:  No objection.

6        THE COURT:  Okay.  Those are in evidence.

7        (Government's Exhibit 992-A through G received in

8  evidence.)

9        MS. DEAN:  If we could please publish them for the

10 juror, starting with 992-A.

11       (Exhibit published.)

12 Q    Ms. Anderson, could you explain to the juror what is we

13 see in 992-As?

14 A    This is the spot that I circled on the map of the park

15 where I had pulled up and park the night he went into the

16 park with the shopping cart.

17 Q    And what do you see just back beyond the curb in the

18 park there?

19 A    That is the beginning of the baseball fields.

20 Q    And was this the first or second trip to the park?

21 A    This was the first trip.

22       MS. DEAN:  Could we flip to Government's 992-B,

23 please.

24       (Exhibit published.)

25 Q    What does Government's 992-B show?

1   A     This is the same area.  This is just the view of you

2   looking out the park.  The first one was you standing on the

3   outside of the park looking into park.  This is now

4   you're in the park looking outside.

5           MS. DEAN:  And can we turn, please, to

6   Government's 992-C.

7           (Exhibit published.)

8   Q     What do we see in 992-C?

9   A     This is the Jewish school that I was referring to that

10  I dropped him off at when we had lost each other.

11  Q     Is this something that you pointed out to the

12  Government on that trip to the park?

13  A     Yes, it is.

14  Q     Which is the Jewish school?  Just to be clear.

15  A     (Witness indicating.)

16          MS. DEAN:  Indicating the beige building on the

17  left of the picture by a circle.

18          If you could clear that now, Ms. Anderson.

19          Mr. Rader, if you could turn to 992-D, please.

20          (Exhibit published.)

21  Q     What does Government's 992-D show?

22  A     This is the same block of the Jewish school.  This is

23  just standing across the street from the school on the

24  opposite side.

25  Q     And what happened here?

1    A    This is where I dropped him off and we had got lost and

2    we met back here, and he took the suitcase out the trunk and

3    walked across the street to the park.

4            MS. DEAN:  Can we see Government's 992-E, please.

5            (Exhibit published.)

6    Q    And what is 992-E?

7    A    This is the same school that we were just speaking on.

8    The this is just the Seaview Avenue view of the school.

9    Q    What is 992-F?

10           MS. DEAN:  Can we see 992-F?

11           (Exhibit published.)

12   Q    What do we see in 992-F?

13   A    This is across the street from the Jewish school, but

14   inside of the park.

15           MS. DEAN:  If we could see 992-G, please.

16           (Exhibit published.)

17   Q    What do we see in 992-G?

18   A    This is the location that he told me to meet him at

19   after he came back -- after he came back out the park with

20   the suitcase.  This is where I met him when I spoke of him

21   coming back into the car with the gloves on and had that

22   stench on it, and he got back out the car and threw it in

23   the garbage can that was in front of the park.

24   Q    What road is this that we see that the cars are on in

25   this photograph?

1    A    This is on Seaview Avenue.

2         MS. DEAN:  We can take those down.  Thank you.

3    Q    Did you ever view any video surveillance with the

4    Government, Ms. Anderson?

5    A    Regarding what?

6    Q    Have you ever seen any video surveillance with the

7    Government?

8    A    No.

9    Q    Have you ever seen any video surveillance of the area

10   by Seaview Park in Canarsie?

11   A    No.

12   Q    Do you know if any exists?

13   A    I don't know.

14   Q    Other than that clip that you described to us earlier

15   that was shown to you in the precinct of you and the

16   defendant loading bags into the Nissan, have you seen any

17   video surveillance related to this case whatsoever?

18   A    None.

19        MS. DEAN:  Your Honor, may I just have one minute?

20        THE COURT:  Sure.

21        (Pause in proceedings.)

22        MS. DEAN:  Your Honor, I have nothing further.

23        THE COURT:  Just given the hour, we're going to

24   adjourn for the day.

25        Just a reminder, we're going to stop early

1    tomorrow.  That means we'll work probably until about 1:45,

2    which means your lunch will be later.  I don't know if

3    that's good news or bad news, but you'll have the rest of

4    the afternoon free.  We're moving along at a good pace, so I

5    don't think that the early end tomorrow should be a problem

6    for us.

7             So I'll excuse you for the night.  Please don't

8    talk about the case at all with anyone.  Do not look

9    anything up at all about the case on the internet, not

10   anything having to do with anything you've heard today.

11            But do have a relaxing evening.  Don't get sick.

12   I'll see you tomorrow, 9:30.  Thanks so much.

13            THE COURTROOM DEPUTY:  All rise.

14            (Jury exits.)

15            THE COURT:  All right.  Everybody with sit down.

16            The witness can step down.

17            (Witness exits the stand.)

18            THE COURT:  I know it's probably a little hard to

19   predict how long cross will be tomorrow.  Do you have a

20   ballpark?

21            MR. CECUTTI:  Several hours.

22            THE COURT:  Okay.  It might not hurt to have

23   somebody on board just in case we finish early.

24            Then my next question is about Friday.  Do you

25   have a sense of how many witnesses you may call?

1        MS. DEAN:  So that is a little hard to say because

2   just not knowing when she would finish.

3        THE COURT:  Right.

4        MS. DEAN:  We do have a fairly lengthy witness,

5   the cell site witness who we would try to get on on Friday

6   if we're done.  He just can't come back on Monday.  He's out

7   all week next week.

8        THE COURT:  Oh.

9        MS. DEAN:  That's who I'd like to get to just

10  because --

11       THE COURT:  Maybe we can start him tomorrow if

12  cross finishes and then on Friday.

13       Do you know how long he'll take?

14       MS. DEAN:  Maybe two to two and a half hours.

15       THE COURT:  All right.

16       MS. DEAN:  But that's who we'd like to get to.

17       THE COURT:  We just want to make sure he gets

18  finished.

19       MS. DEAN:  Yes.  So we will call him to see if he

20  can be on deck for tomorrow.  That will be worthwhile.

21       THE COURT:  Let me see the parties at the side

22  just about scheduling.  It doesn't have to be on the record.

23       (Sidebar discussion held off the record and

24  outside the presence of the audience.)

25       THE COURT:  Did you want to put something on the

1   record?

2          MS. DEAN:  Thank you, Your Honor.

3          Just want to request to seal -- I don't think

4   there's an objection, but the witness at one point was

5   saying the nickname of her youngest child who was going by

6   Z.  I guess -- should I say it?  I don't know if I should

7   say it.

8          THE COURT:  You can say it and then we'll -- well,

9   they have to know what to look for.

10         Why don't we come over to the side and say it with

11  the court reporter.

12         (Sidebar conference.)

13         (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference held outside the presence of

2     the jury and audience.)

3          THE COURT:  So what's the name she kept saying?

4          MS. DEAN:  She was saying Gabriel, which is Z's

5     nickname.

6          THE COURT:  Okay.

7          MS. DEAN:  And she said it a few times.  So we

8     just want to seal that or strike it, whatever is

9     appropriate.

10          THE COURT:  I think what we have done before, when

11     she said it, is just substitute Z for Gabriel.

12          MS. DEAN:  Yes.  Thank you.

13          (Sidebar ends.)

14          (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present.)

2          THE COURT:  Anything else that anybody wants to

3     put on the record?

4              MS. DEAN:  I'm sorry, Your Honor.  May I just

5     consult with my colleague?

6              THE COURT:  Sure.

7              (Pause in proceedings.)

8              MS. DEAN:  Your Honor, the Government's plan with

9     respect to the notebooks that came up is to provide the

10    Court with the notebooks, a copy of the notebooks.  However,

11    we'd just ask if the defense is moving to preclude, that

12    they specify what their grounds are and make the motion.

13             THE COURT:  I think it does make it easier for me.

14    I'm not going to ask them to make the motion now.  We can do

15    it orally.  I'd like to budget my time, so I have to know

16    what I'm looking for.  So if you want to formulate what your

17    objection is to that piece of evidence, let me know.

18             MR. CECUTTI:  I think -- we've obviously gone over

19    the notebooks.

20             THE COURT:  Yes.

21             MR. CECUTTI:  We don't see the similarity that the

22    Government is describing.

23             THE COURT:  It's going to be a relevance

24    objection.

25             MR. CECUTTI:  Relevance, yes.

1          THE COURT:  Okay.

2          MR. CECUTTI:  And we don't even know what sections

3    the Government is pointing to.  So I think it would be

4    helpful out of -- these notebooks are quite voluminous.

5          THE COURT:  So what I'm going to suggest, then, is

6    that the Government direct the defense to the portions of

7    the notebooks that you wanted to highlight, and then they'll

8    be able to make more targeted response.  I mean, like I

9    said, you all have had these; I don't know what we're

10   talking about.  So it will be easier for me to make a

11   decision, and then once you see what they say, you may

12   decide you don't want to object.  I don't know.

13         But that's something that we can handle once

14   you've resolved those things.  So show them what you're

15   talking about.

16         MS. DEAN:  We will.  And the notebooks, we

17   wouldn't be offering them until next week, so we have time.

18         THE COURT:  Sounds good.  Thank you.

19         Anything else from the defense?

20         MR. CECUTTI:  No.

21         THE COURT:  Okay.  Thanks so much.

22         And thanks to the marshals.

23         (Trial adjourned to Thursday, February 22, 2024,

24   at 9:30 a.m.)

25

I N D E X

WITNESS                                                PAGE

ADELLE ANDERSON

     DIRECT EXAMINATION BY MS. DEAN                    229


E X H I B I T S


Government's Exhibit 63                                 252


Government's Exhibit 53                                 255


Government's Exhibit 326                                256


Government's Exhibit 15                                 271


Government Exhibits 128A and 128B                       283


Government Exhibits 128E and 128E-R                     293


Government's Exhibit 128C                               321


Government's Exhibits 128D and 128D redacted            329

1

2          Government's Exhibit 128F                      336

3

4          Government's Exhibit 997                       349

5

6          Government's Exhibit 998                       350

7

8          Government's Exhibits 908 through 913 and

9          915                                            354

10

11         Government's Exhibit 134                       360

12

13         Government's Exhibits 45 and 46                366

14

15         Government Exhibit 132                         377

16

17         Government Exhibit 27                          395

18

19         Government's Exhibit 128G                      423

20

21         Government's Exhibit 128H                      425

22

23         Government's Exhibit 128I                      427

24

25         Government's Exhibit 349B                      443

1

2      Government's Exhibit 57                        455

3

4      Government's Exhibit 62                        464

5

6      Government's Exhibit 28                        470

7

8      Government's Exhibit 3                         470

9

10     Government's Exhibit 329                       472

11

12     Government's Exhibit 116-A, B, and C           475

13

14     Government's Exhibit 992-A through G           477

15

16

17

18

19

20

21

22

23

24

25