631

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,            : 20-CR-549(AMD)
                                     :
                                     :
        -against-                    : United States Courthouse
                                     : Brooklyn, New York
                                     :
                                     :
                                     : Friday, February 23, 2024
CORY MARTIN,                         : 9:45 a.m.
                                     :
            Defendant.               :
                                     :
- - - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BREON S. PEACE, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY:  EMILY J. DEAN, ESQ.
                    TANYA HAJJAR, ESQ.
                    ANDRES PALACIO, ESQ.
                    Assistant United States Attorneys


For the Defendant:    THE LAW OFFICE OF ANTHONY CECUTTI
                    217 Broadway
                    Suite 707
                    New York, New York 10007
                BY: ANTHONY CECUTTI, ESQ.


Court Reporter:  Nicole J. Sesta, RMR, CRR, RPR
                Official Court Reporter
                E-mail:  NSestaRMR@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

*Proceedings*                                                    632

                    APPEARANCES - CONTINUED


For the Defendant:

                    THE LAW OFFICE OF KESTINE M. THIELE
                    305 Broadway
                    Suite 700
                    New York, New York 10007
                    BY:  KESTINE M. THIELE, ESQ.

*Proceedings*                                                   633

1              THE COURTROOM DEPUTY:  All rise.

2              THE COURT:  Do we have anything before we bring in

3     the jurors?

4              MS. DEAN:  Nothing from the government.

5              MR. CECUTTI:  No, Your Honor.

6              THE COURT:  Okay.

7              (Jury present.)

8              THE COURT:  Good morning, everybody.  I hope you had

9     a good night.  We're ready to resume.

10             Are you ready to call your next witness?

11             MS. DEAN:  Your Honor, before the government calls

12    its next witness, we request permission to read in a

13    stipulation between the parties.

14             THE COURT:  Sure.

15             MS. DEAN:  May I approach?

16             THE COURT:  Yes.

17             MS. DEAN:  This is Government Exhibit 1203, a

18    stipulation between the parties.  It is hereby stipulated and

19    agreed by and between the United States of America, by the

20    undersigned assistant United States attorneys and the

21    defendant, Cory Martin by his undersigned attorneys as

22    follows:

23             1.  Government's 340 is a Coolpad cellular phone

24    (FBI 1B39) with IMEI 861325030866544 and assigned number

25    (347)779-6108.

*Proceedings*                                                              634

1          Government's 340 was seized by law enforcement and

2   vouchered under Invoice 3000960296, Item 1.

3          Government's Exhibit 340A is a forensic copy of

4   Government Exhibit 340.

5          2.   Government Exhibit 341 is an LG cellular phone

6   (FBI 1B23) with MEID 35726908438603, and assigned numbers

7   (347)729-4723, and (347)779-6108.

8          Government Exhibit 341 was seized by law enforcement

9   and vouchered under invoice 3000960318, Item 4.  Government

10  Exhibit 341A is a forensic copy of Government Exhibit 341.

11         3.   Government Exhibit 342 is an LG Stylo cellular

12  phone (FBI 1B24) with IMEI 356567070877152, and assigned

13  number (347)779-6108.  Government Exhibit 342 was seized by

14  law enforcement and vouchered under invoice 3,000960318,

15  Item 5.

16         Government Exhibit 342A is a forensic copy of

17  Government Exhibit 342.

18         4.   Government Exhibit 343 is a Samsung Galaxy J7

19  Prime 2017 cellular phone (FBI 1B17) with IMIE

20  355620085404545, and assigned number (718)600-1072.

21  Government Exhibit 343 was seized by law enforcement and

22  vouchered under Invoice 3000960634, Item 1.

23         Government 343A is a forensic copy of Government

24  Exhibit 343.

25         5.   Government Exhibit 344 is an LG Tribute HD

*Proceedings* 635

1  cellular phone (FBI 1B26) with MEID 35726908437174, and

2  assigned number (718)600-1072.  Government Exhibit 344 was

3  seized by law enforcement and vouchered under Invoice

4  3000960318, Item 7.

5        Government 344A is forensic copy of Government

6  Exhibit 344.

7        6.  Government Exhibit 345 is a Samsung Galaxy J7

8  Prime 2017 cellular phone (FBI 1B16) IMEI 355620084601133 and

9  assigned number (347)729-4723.  Government Exhibit 345 was

10  seized by law enforcement and vouchered under invoice

11  3000960344, Item 1.

12        Government's Exhibit 345A is a forensic copy of

13  Government Exhibit 345.

14        7.  In each of the above referenced exhibits the

15  term UTC-5 refers to eastern standard time.  The term UTC-4

16  refers to eastern daylight time.  The term party refers to the

17  users of cell phones identified in the exhibit.

18        The terms incoming and outgoing refer to the

19  direction of a message from a user.  The term deleted where

20  followed by a yes indicates that the item was deleted by the

21  user of the applicable device.

22        The stipulation is admissible in evidence as

23  Government Exhibit 1203 and is signed by the parties with

24  today's date.

25        Your Honor, I offer 1203 into evidence.

*Proceedings* 636

1          THE COURT:  All right.  It's a stipulation.  It's in
2     evidence.
3          (Government's Exhibit 1203 was received in
4     evidence.)
5          MS. DEAN:  At this time, the government calls
6     Sergeant Junaid Saeed.
7          (Witness sworn.)
8          THE COURTROOM DEPUTY:  State your name for the
9     record.
10          THE WITNESS:  Junaid Saeed.
11          THE COURTROOM DEPUTY:  Thank you.  Have a seat.
12          THE COURT:  All right, Sergeant, just a few things
13     before we begin.  The chair doesn't move but the microphone
14     does.  I want to make sure everybody hears you, including the
15     jury and the parties at both tables.  Make sure you're making
16     use of the microphone.
17          Don't speak too fast.  Our court reporter takes down
18     everything that you say, and it's harder for her to do her job
19     if we talk too fast.
20          If there's a question that you want to have repeated
21     or clarified, just let me know.  Go ahead.
22          (Continued on the following page.)
23
24
25

1  **JUNAID SAEED**,

2       called as a witness by the Government, having been first

3  duly sworn/affirmed by the Courtroom Deputy, was examined and

4  testified as follows:

5  DIRECT EXAMINATION

6  BY MS. DEAN:

7  Q    Good morning, Sergeant Saeed.

8  A    Good morning.

9  Q    How long have you worked with NYPD?

10 A    Approximately seven years.

11 Q    As a sergeant, what are your current duties?

12 A    Currently, I'm assigned to the 71st Precinct.  I'm

13 assigned to the NST team, responding to major incidents and

14 patrol high crime areas.

15 Q    What is the NST team?

16 A    Neighborhood Safety Team.

17 Q    Where did you work in 2018?

18 A    The 69th Precinct.

19 Q    What was your job there at the time?

20 A    At that time I was assigned to patrol.

21 Q    Were you working on April 29th of 2018?

22 A    Yes.

23 Q    What were your hours on that day?

24 A    From 3:00 p.m. to 11:35 p.m.

25 Q    Did there come a time when you were asked to assist

1    detectives who were working on an investigation into the

2    homicide of Brandy Odom?

3    A    Yes.

4    Q    How were you asked to assist?

5    A    I was assigned to stationhouse security.  The desk

6    officer asked me to assist the precinct detective squads and

7    Brooklyn south homicide regarding invoicing of property.

8    Q    What does it mean to invoice property?

9    A    Essentially, invoicing property in the New York City

10   Police Department, you would take the property and place it

11   into an NYPD property bag.  That property is then entered into

12   the NYPD PETS tracking system, and then once all that is

13   finalized, the NYPD property tracking system generates an

14   invoice number.

15   Q    Is that a unique invoice number for the pieces of

16   property?

17   A    Correct.

18   Q    What type of property were you given by detectives

19   working on the homicide case to invoice on April 29th, 2018?

20   A    Cell phones and other electronic devices.

21   Q    And starting with cell phones, how many were you given?

22   A    23.

23   Q    What kind of other electronic devices were you given?

24   A    Computers, a tablet, from what I remember.

25   Q    What did you do with all this property?

1  A    It was invoiced using the NYPD property application

2  system.

3  Q    Did you record the voucher numbers that you used?

4  A    Yes.

5  Q    Is there something that could refresh your memory on the

6  voucher numbers you used?

7  A    Yes, my memo book.

8         MS. DEAN:  If the witness only could be shown

9  3500-JS-21.

10  Q    Can you take a look at the screen in front of you and

11  tell us if that refreshes your memory of the voucher numbers

12  you used?

13  A    Yes.

14  Q    What voucher numbers did you use on April 29th of that

15  year?

16  A    Starting with invoice number 3000960296, 3000960369, 66,

17  I'm sorry.  Invoice number three would be 3000960371.  Invoice

18  number seven would be 3000960360.  And invoice number five

19  would be 3000960334.  Invoice number six, 3000960318, and

20  invoice number seven, 3000960344.

21         MS. DEAN:  Your Honor, may I hand the witness

22  several exhibits that were moved into evidence and two that

23  have not yet been?

24         THE COURT:  Yes.

25  Q    Sergeant, can you take a look at the exhibits in front of

1   you?  Let me start with Government's 340, 341, 342, 344, and

2   345.

3              Have you looked, before you testified here today, at

4   the contents of each of those government exhibits?

5   A    Yes.

6   Q    Are these five of those cell phones that you vouchered on

7   April 29th, 2018?

8   A    Yes.

9   Q    Can you please take a look also at Government's 353 and

10  354?

11  A    Yes.

12  Q    Have you looked at the contents of Government's 353 and

13  354?

14  A    Yes.

15  Q    Does that contain the original NYPD packaging that you

16  used to voucher these exhibits?

17  A    Yes.

18             MS. DEAN:  I ask that Government's 353 and 354 be

19  received in evidence?

20             THE COURT:  Any objection?

21             MS. THIELE:  No objection.

22             THE COURT:  Those will be in evidence.

23             (Government's Exhibit 353 and 354 were received in

24  evidence.)

25             MS. DEAN:  No other questions for this witness.

*Proceedings*                                                    641

1          THE COURT:  Any cross-examination?

2          MS. THIELE:  No questions for this witness.

3          THE COURT:  Thank you, Sergeant.  You can step down.

4          Ms. Dean, do you want to get the property up here?

5          Are you ready to call your next witness?

6          MS. DEAN:  Yes, Your Honor.  The government calls

7    Special Agent Richard Busick.

8          THE COURTROOM DEPUTY:  Raise your right hand,

9    please.

10          (Witness sworn.)

11          THE COURTROOM DEPUTY:  State your name for the

12    record.

13          THE WITNESS:  Richard Busick, R-I-C-H-A-R-D

14    B-U-S-I-C-K.

15          THE COURT:  Agent Busick, if you could do a couple

16    of things.  Make sure you're doing that, using the microphone,

17    and just make sure you don't speak too quickly so it's not too

18    hard for the court reporter.  If there is a question you want

19    to have repeated or clarified, let me know.

20          THE WITNESS:  Will do.  Thank you, Your Honor.

21          MS. DEAN:  Thank you, Your Honor.  Before I inquire,

22    at this time I request that Government's 300, 301, 303, 305

23    and 308 be received in evidence as certified telephone records

24    pursuant to 902(11) and 902(13).

25          THE COURT:  Any objection?

*Proceedings*                                                             642

1          MS. THIELE:  No objection.

2          THE COURT:  Those are in evidence.

3          (Government's Exhibits 300, 301, 303, 305, and 308

4    were received in evidence.)

5          (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **RICHARD BUSICK**,

2        called as a witness by the Government, having been first

3   duly sworn/affirmed by the Courtroom Deputy, was examined and

4   testified as follows:

5   DIRECT EXAMINATION

6   BY MS. DEAN:

7   Q    Good morning, Agent Busick.

8   A    Good morning.

9   Q    Where do you work?

10  A    I'm a special agent with the Federal Bureau of

11  Investigation, also known as the FBI.

12  Q    How long have you been a special agent for?

13  A    I've been a special agent for over 21 years.

14  Q    Are you part of a specific unit with the FBI?

15  A    Yes.  I'm a member of the Cellular Analysis Survey Team,

16  also known as CAST.

17  Q    How long have you been with the CAST unit?

18  A    Since September of 2021, so coming up on two and a half

19  years.

20  Q    What unit or units were you with before joining CAST?

21  A    I've been a part of several units during my time in the

22  bureau.  I began in 2002 on the joint terrorism task force for

23  about two years.  From approximately 2004 to 2009 I was a

24  member of the New York Organized Crime Drug Enforcement Strike

25  Force, working international narcotics trafficking and money

1    laundering here in New York City.

2              From 2009 until 2011 I worked on our Hudson Valley

3    safe streets and gang task force out of one of our upstate

4    offices just north of the city, and then from 2011 to 2021 I

5    was assigned to the joint bank robbery and violent crime task

6    force in New York City.

7    Q    Can you tell us what your duties and responsibilities are

8    with the CAST unit?

9    A    Sure.  So in CAST we analyze cellular phone records to

10   determine the approximate location of various phones and

11   mobile devices in the context of investigations.

12             We do this by determining whether the records

13   indicate that a phone was at or in the vicinity of certain

14   locations of interest at certain times.  We also use the

15   records to assist in locating people in realtime, such as

16   kidnap victims, missing persons, and fugitives.

17             In our unit we also provide education to other

18   law enforcement in how to conduct what's historical cell site

19   analysis, which is where we do the things I just described.

20   Q    Can you please describe what, if any, training you

21   received when you joined CAST?

22   A    Sure.  There's a fairly extensive training pipeline to

23   become a member of the CAST unit.  It starts with what's

24   called a basic historical cell site analysis course.  This is

25   usually between two and three days where we learn the basics

1    of how cell phones and cellular networks operate.  We learn

2    about each of the major service providers, including T-Mobile,

3    AT&T, Verizon and others, and then how we can utilize the

4    records from those providers to determine the approximate

5    location of a cell phone or mobile device when it connected to

6    the network.  Then we create maps and visually represent that

7    on a map.

8             After completing the basic course, I attended an

9    advanced historical cell site analysis course, which is more

10   of the same but in greater detail spending a bit more time on

11   the unique records available from each of the particular

12   service providers, a lot more practical hands on exercises in

13   mapping out those records and producing reports.  Those

14   reports were all evaluated by the training cadre and really

15   just becoming more competent in conducting that type of

16   analysis.

17            From the advanced course forward, it's a competitive

18   process where you have to successfully complete the course,

19   and your performance relative to your peers is evaluated in

20   determining who is going to move on to the subsequent phases

21   of the training.

22   Q    Who teaches that advanced course?

23   A    That's taught by members of the CAST unit training cadre,

24   which are experienced CAST agents stationed around the country

25   who have been involved in the CAST unit for a long time and

1   developed a curriculum, much of which is based on historical

2   cases and real cases that have actually been worked over time.

3   Q    You mentioned the term historical cell site analysis.

4   Can you tell us what you mean by that?

5   A    Sure.  By historical, I mean things that have already

6   occurred.  So the records that we obtain from any of the

7   service providers, this is typically through legal process,

8   such as a search warrant, unless it's an emergency or exigent

9   matter.

10        These are records of connections between a phone and

11   a network at various times, so when calls were placed or

12   received, perhaps text messages sent or received, and so

13   forth.  You almost think of a billing statement, where it's

14   itemized out by the particular connection with certain

15   information about that connection, and it includes information

16   about the cell site that the phone connected to during that

17   connection.

18        The cell site is nothing more than a place on the

19   earth where the service provider, say AT&T, placed antennas

20   for the purpose of communicating with nearby cell phones,

21   which we've all seen these large towers with the triangular

22   structures on the top.  Sometimes you see the antennas on the

23   sides of buildings in dense environments, like New York City,

24   and it could really be anywhere.  But each of those particular

25   cell sites is identified in a database for that cellular

1    provider as to the location of that cell site, the direction

2    the antenna may be facing, as well as some other information.

3              So using the information in the records from the

4    service provider, and in correlating that with information

5    about the cell site, we can determine the approximate location

6    that the phone was when it connected to the network by which

7    cell site that it used.

8    Q    Were you one of the people that was chosen to move

9    forward from that advanced course you described to us?

10   A    Yes, I was.

11   Q    What was the next step of your training?

12   A    So the last step prior to our certification course is

13   what's called a critical incident readiness assessment.  This

14   is basically an evaluation phase that lasts for several days

15   in which we're given problems, which were real life cases

16   worked by members of the CAST unit; thinking kidnapping where

17   a child was abducted and the identity of the kidnapper is

18   unknown and the location of the kidnapper and victim are

19   unknown.

20             Given the information at the beginning of that case,

21   we're required to work through the logical investigative

22   techniques to develop phone numbers of interest, obtain the

23   records for those phone numbers, and then produce maps,

24   written reports, and verbally brief our findings as to where,

25   for instance, we believe that kidnap victim would be located.

1      These are cases where there was, in fact, a real

2  world answer and our performance throughout those, those are

3  time sensitive.  We have a limited amount of time to work

4  through those processes.  Upon completion of that course and

5  working through all those problems, final evaluations are made

6  and I was selected to move on from that course into our

7  certification process.

8  Q    Can you tell us what the certification process was that

9  you went through?

10 A    Sure.  So the final step is a four-week certification

11 process where we spend a week, or 40 hours, receiving

12 instruction on radio frequency theory, cellular networks and

13 cellular architecture, just really getting a more in-depth

14 understanding of how cell phones operate and how they work.

15      We meet directly with representatives from each of

16 the service providers.  So we met with representatives from

17 AT&T, T-Mobile, Verizon, and US Cellular.  We met with

18 custodians of records, who explained to us the types in detail

19 the records they maintain, how long they retain them for, how

20 we request them, and other details about the records.  And we

21 also met with the cellular network engineers, who are the

22 people who actually design the networks and manage coverage

23 areas, locations of cell sites, and so forth, to understand

24 how each network operates their own network of cell sites.

25      We also spent time, again, on evaluated practical

1    exercises.  We took written exams.  We spent a lot of time

2    learning the software that we utilize during our analysis,

3    which is called ESPA.  This is a tool that allows us to

4    visualize the records on a map and create the written reports

5    that you will see later.

6              And then we also spent time doing what's called

7    cellular network surveys, or drive tests.  This is where we

8    use a very fancy scanner.  Typically we'll load it up in our

9    car, drive all around the area of interest, typically a cell

10   site where we're trying to measure the precise boundaries of

11   the coverage area as precisely as possible to determine the

12   actual footprint of that coverage.

13             And so it gives us a better understanding of really

14   what the coverage areas of the various cell sites look like,

15   and just a better overall understanding of how these networks

16   operate.

17             At the conclusion of that certification process, I

18   successfully completed it and I was certified to be a member

19   of the CAST unit.

20   Q    You mentioned the major cell phone providers that

21   instructed during that certification process.  Is Sprint now a

22   part of one of those major cell phone providers?

23   A    Sprint merged with T-Mobile.  So at the time that I went

24   through the course, T-Mobile briefed us on Sprint because

25   Sprint was no longer an independent entity.

1          So now anything that we would request pertaining to

2    Sprint now would come from T-Mobile.  But Sprint no longer

3    exists on its own.

4    Q    If you have cell phone service through AT&T, T-Mobile, or

5    Verizon, or formerly Sprint, and you're placing a call using

6    that cell phone service, are you able to place a call from

7    state to state?

8    A    Yes.

9    Q    Does CAST require an annual recertification?

10   A    It does, yes.

11   Q    Can you tell us what that consists of?

12   A    Sure.  There are several requirements, one of which is

13   that we attend our annual recertification course, which is

14   typically 3 to 5 days long, held once a year, where we, again,

15   meet with representatives of each of the providers, other

16   members of the cellular industry.

17          We receive updated instruction from the Florida

18   Institute of Technology on radio frequency theory.  We meet

19   with other representatives of our unit from throughout the

20   country just to go over case studies, see what's happening in

21   different market areas, and if there are any differences or

22   other things that are of interest and of note.  I last

23   attended that in February and March of last year, and I'll be

24   attending that again, actually, this upcoming week.

25   Q    Have you maintained your certification every time an

K. Busick - Direct - Ms. Dean                                                651

1  annual recertification has been required?

2  A    I have, yes.  And I neglected to mention just some

3  additional requirements to maintain that certification is to

4  analyze a certain number of records every year, conduct

5  cellular network surveys, or drive tests, peer review the work

6  of other members of the CAST unit, and a few other

7  administrative checkbox to make sure we're maintaining our

8  proficiency and competence in conducting cellular analysis.

9  Q    Did you also work with historical cell sites and cell

10 site analysis prior to joining CAST?

11 A    I did, yes.

12 Q    Can you tell us what you did?

13 A    Sure.  Prior to having expertise to examine and conduct

14 the analysis myself, I regularly utilized members of the CAST

15 unit to analyze records, which I had obtained in regards to

16 cases I was investigating, to determine whether they were

17 consistent with a particular phone of interest being at or at

18 a crime scene.

19        Prior to becoming a member of the CAST unit, I

20 regularly requested records as part of my cases to determine

21 whether those records were consistent with phones of interest

22 being located at or near crime scenes of crimes I was

23 investigating, when those crimes were committed.

24        I also regularly use those records to assist me in

25 locating fugitives, missing persons, kidnap victims.  As I

1  began the process to become a member of the CAST unit, I

2  started to spend more time looking at the records myself.  But

3  I would usually pretty much always rely on a member of the

4  CAST unit who had the expertise to assist me in doing that

5  analysis.

6  Q    Do you also teach in the field of cell site analysis?

7  A    I do, yes.

8  Q    Can you explain?

9  A    Sure.  Another requirement to maintain our certification

10 is that we provide an instruction to other law enforcement

11 historical cell site analysis.  So I assist in teaching the

12 basic historical cell site analysis course to other members of

13 the FBI, and to other state and local law enforcement where we

14 help them to understand how to conduct cellular analysis on a

15 basic level.

16 Q    Throughout your career approximately how many -- well,

17 since becoming a member of CAST, approximately, how many cases

18 have you worked on?

19 A    I would say it's well over 100, probably closer to

20 200 cases.

21 Q    And throughout your career how many sets of cell site

22 records from phone companies have you analyzed?

23 A    Definitely a few thousand.

24 Q    Approximately, how many sets of cell site records have

25 you mapped?

K. Busick - Direct - Ms. Dean                                      653

1   A    About the same, a couple thousand.

2   Q    Have you testified in court with regard to cell site

3   analysis and mapping?

4   A    Yes, I have.

5   Q    Approximately, how many times?

6   A    Over 20 times.

7   Q    Can you tell us what courts and jurisdictions you've

8   testified in?

9   A    Yes.  I've testified here in the Eastern District of New

10  York several times; testified also in the federal court in the

11  Southern District of New York, across the river; testified in

12  the federal court for the Northern District of New York in

13  Albany.

14          I've testified in Bronx County Criminal Court, as

15  well as Queens County Criminal Court, and also at the criminal

16  court in St. Paul, Minnesota.

17  Q    Have you previously been qualified as an expert in cell

18  site analysis and mapping when you've testified?

19  A    Yes, I have.

20  Q    Have you ever been denied qualification as an expert in

21  those fields?

22  A    No, I have not.

23          MS. DEAN:  Your Honor, at this time the government

24  offers Special Agent Busick as an expert pursuant to Rule 702

25  in cell site analysis and mapping.

1          THE COURT:  Any objection?

2          MS. THIELE:  No objection.

3          THE COURT:  When a witness possesses knowledge and

4   expertise that most of us don't possess, the witness is

5   permitted to testify as an expert.  I'll give you some further

6   instructions about that in my final charge.  Go ahead.

7   Q    Is there any difference between what you've described to

8   us before and called a cell site and the term cell tower?

9   A    No.  Often I will use those terms interchangeably.  But

10  the more precise term would be cell site.  When I think of a

11  cell tower, I'll often think of a standalone structure, large

12  steel girders with that triangular shaped structure at the

13  top.

14          Those are still out there.  But in a dense --

15  especially in a dense urban environment like New York City,

16  there's not a lot of real estate for that type of thing.  So

17  oftentimes times these antennas will be mounted on the tops or

18  the sides of buildings.  They may be on light posts or street

19  lamps.  They may even be inside buildings or in subways.

20          The more precise term is cell site, although I do

21  find myself still sometimes using the term cell tower but

22  we're talking about the same thing.

23  Q    How do cell phones communicate with a cell site?

24  A    So a cell phone, your cell phone is on and it's not

25  connected to the network.  It's going to be scanning the

1  signal from the various cell sites in the vicinity looking for

2  the one which is providing it with the best serving signal.

3          It does this for a couple of reasons.  One, so that

4  when you pick up your phone to place a call it already knows

5  where it's going to route that call through so your call can

6  be completed quickly.

7          It's also alerting the network to its location, or

8  at least to which cell site it's connected to, so that when

9  somebody tries to contact you via text message or phone call,

10  the network can route that call through to your phone.

11          So when it's what we would call idle mode, scanning

12  the network -- and to be clear, if you have a T-Mobile phone,

13  your phone is scanning for T-Mobile cell sites.  If you have a

14  Verizon phone it's scanning for Verizon cell sites.

15          When your phone is on and powered on it's scanning,

16  looking for that cell site providing it with that best serving

17  signal.  And when you pick up your phone and place a call, or

18  a call is placed to you and you pick up and connect, your

19  phone is connecting to that cell site and a record is

20  generated by the service provider.

21  Q    What is a coverage area in the context of cell sites?

22  A    So coverage area is the area that each particular cell

23  site or antenna is tuned to provide coverage to.  So we could

24  think of a cellular network and say a large parking lot in

25  perhaps an suburban shopping mall, where there are light posts

1    spaced around the parking lot.  In a parking lot they're

2    typically fairly evenly spaced, not necessarily so with cell

3    sites, but it works the same way where each light is

4    providing -- is illuminating an area in its immediate vicinity

5    and as you're very close to that light, it would be very

6    bright, and as you get further away that light would be a

7    little dimmer but you're going to pick up light from another

8    light post.

9             So you should have overlapping coverage of light in

10   the parking lot, so wherever you walk or drive you're never in

11   the dark.  The cellular network works pretty much the same

12   way, where each cell site is providing coverage generally in

13   its immediate area or an area it was specifically tuned to

14   provide coverage to, and it's going to have some overlap with

15   adjacent cell sites so that if you're moving and you're on the

16   phone you don't drop a call or lose your connection.

17            But that cell site is designed to provide coverage

18   in the area in which it is, for instance, if I'm on one side

19   of the parking lot and I wanted to pull my keys out of my

20   pocket to find my car key, I'm going to use the light from the

21   light that's right where I am.  I'm not going to be using the

22   light that's across the parking lot so that I can see my keys.

23   Roughly works the same way with cellular networks.

24   Q    Do you know how cell phone service providers situate

25   their cell sites in order to provide their customers with the

1    best service?

2    A     Yes.  It will vary.  How they set up the network is going

3    to vary by a number factors, from the density of users, how

4    many customers they have in a particular area.

5           It's going to depend on the terrain or geography,

6    are there mountains or hills.  Is there a large water

7    features, things like that.

8           Large buildings, other structures that we have in an

9    urban environment, subways, things like that.  But they will

10   do an analysis to determine where they need cell sites to

11   provide coverage.

12          Now that all these networks are very mature and well

13   established, they'll continually monitor them to determine

14   where they might need to establish additional cell sites to

15   provide additional coverage, or as the technology improves and

16   more bandwidth is required, they will also utilize that

17   information to determine how and where to set up those

18   particular sites.

19   Q     Generally, what cell site does a cell phone connect to

20   when it interacts with a network?

21   A     It will always connect to a cell site in which the phone

22   is in -- when the phone is in the coverage area, it has to be

23   in the coverage area of a cell site to connect to that site.

24          All things being equal, the closer you are to a cell

25   site, the stronger that radio signal will be and you would be

1  very likely to connect to the nearest cell site.  That is

2  often the case.

3          But particularly here in a dense environment where

4  there are all kinds of cell sites providing all types of

5  sometimes very targeted coverage, again, think things like

6  subways, or there might be other features like large buildings

7  that are affecting which site is providing the best signal, it

8  could be a cell site that's slightly further away.

9          So to explain this, I'll give you an example.  If we

10  were standing out front of the Empire State Building, and just

11  on the back side of the building was a cell site, it's one

12  block away, it's the closest cell site to where I'm standing.

13          But on the same side of the building where I am

14  three blocks away, so a bit further is another cell site, but

15  I can actually see that one with my own eyes, there's nothing

16  obstructing it but the closer one behind me has the Empire

17  State Building, a very large building between me and that cell

18  site, I might connect to that one three blocks away because

19  it's providing me with a better signal than the one that's

20  right behind me.

21          That being said, I have to be within the designed

22  coverage area of that cell site.  So when the networks are

23  established, all these factors are taken into account.

24          But the important thing to know is I'm going to

25  connect to a nearby cell site.  I'm not going to connect to

1    one that's out by say JFK airport if I'm standing near the

2    Empire State Building.  There's going to be hundreds, if not

3    more, if not thousands of cell sites between me and there.

4    Q    Are there any other factors besides distance or

5    obstructions that go into determining which cell site will

6    provide that strongest, clearest signal for a phone to connect

7    to?

8    A    Sure.  So in addition to terrain, I mentioned a cell site

9    is designed to provide particular coverage.  So, again, if we

10   think Manhattan where the network is the densest, although it

11   would apply elsewhere, as well, you know there will be cell

12   sites located in the subway.

13          So I may be standing right on top of the subway

14   station that has a cell site in it designed to provide

15   coverage underground, and that's the closes cell site, even

16   though when I'm above ground I'm going to receive a signal and

17   a better signal from a cell site that may be several blocks

18   away just because that cell site is designed to provide

19   coverage above ground.

20          Likewise, large office buildings, sports stadiums,

21   will often have small cell sites located inside of them to

22   help address the number of customers and users within those

23   areas.

24          But if I'm right outside of that building, I may

25   still connect to a cell site that's a bit further away because

1    those cell sites are designed to provide coverage inside the

2    building.

3             Again, I still have to be within the coverage area

4    that's designed for a particular cell site, but it's not

5    always going to be the very closest cell site for those

6    reasons.

7    Q    So does the density of cell sites in New York City, for

8    example, affect the range of the cell phone user from the cell

9    site itself at the time it connects with the network?

10   A    It will affect -- it will affect the coverage area of

11   each cell site.  So if we think of a rural area, we go out

12   west into the mountains somewhere, where there's not a lot of

13   people, cell sites may be placed miles and miles apart because

14   there's not a lot of users.

15            There's not a lot of obstruction and you can be much

16   further from the cell site and still get a good signal.

17            So those coverage areas are going to be very large.

18   So the precision with which we can locate the phone, because

19   in my analysis what I'm basically going to say is the records

20   are consistent with the phone being at or in a certain area

21   based on the coverage area that we would expect from a

22   particular cell site.

23            So if the cell towers are say ten miles apart, it's

24   going to be a gigantic coverage area relative to somewhere

25   like New York City where cell sites might be blocks apart, a

1    quarter mile apart.

2              They're much closer, the coverage areas are going to

3    be smaller so we can more precisely locate the phone because

4    those coverage areas are smaller.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MS. DEAN:

3    Q    So in an area like New York City like how you've just

4    described, how precisely are you able to determine the

5    location of the user of a phone at the time the phone

6    connects to a network?

7    A    It will -- it will vary.  You know, it varies based on

8    the exact location of the surrounding cell sites and any

9    particular area, but typically, we can be what I would

10   consider fairly precise.  We may be looking at an area of

11   several blocks.  Sometimes it may extend out, you know, a

12   quarter mile or a little bit more from a particular cell

13   site.  It varies.  And it won't be the same for every cell

14   site across the board because every area is different.  But

15   it's -- it's fairly precise information.

16            And again, I cannot look at the records and tell

17   you based solely on the records this means a phone was at

18   this particular address or this particular intersection.

19   What I'm looking at is trying to determine are the records

20   consistent with a phone being at or in those vicinities or

21   are they not.

22   Q    Did you conduct historical cell site analysis related

23   to the investigation into the homicide of Brandy Odom?

24   A    Yes, I did.

25   Q    What information did you use to perform historical cell

1   site analysis?

2   A    I used cellular records that were obtained from the

3   actual service providers by the Government through legal

4   process.  So those are the records of the connections

5   between the phone and the network.  And then I also received

6   information regarding pertinent locations and dates and

7   times during the investigation in order to conduct my

8   analysis of those records within those pertinent dates,

9   times, and locations.

10  Q    Have you reviewed Government Exhibits 300, 301, and

11  303?

12  A    Yes, I have.

13  Q    And were those all phone records that you reviewed and

14  analyzed in this case?

15  A    Yes.

16  Q    And what were you asked to do specifically?

17  A    I was asked to analyze those records for particular

18  phones and determine, based on those records, the

19  approximate locations of those phones when they connected to

20  the network based on the pertinent times, dates, and

21  locations of the case.

22         MS. DEAN:  If I can pull up now for the witness

23  and the jurors Government's 301, the file that begins with

24  Report Crick, and if we could look at page 1.

25         (Exhibit published.)

1  Q    Agent Busick, what does it say under User Information

2  next to Name at the bottom there?

3  A    Next to Name it says Cory Martin.

4  Q    And what does it say for Service Start Date on these

5  phone records?

6  A    It's March 8, 2018.

7  Q    Is there any termination date on these phone records?

8  A    At the time that the records were requested, this phone

9  number was listed as an active account.

10        MS. DEAN:  If we can scroll to the top of page 1

11  so that we can look at the date that the records were

12  produced.

13  Q    Do you see that date in the top left-hand corner?

14  A    Yes.  That's May 6, 2018.

15  Q    If we can look back at User Information, what is

16  MSISDN?

17  A    That is essentially the phone number of the cell phone.

18  Q    And what number is listed here?

19  A    It's (347) 729-4723.

20  Q    To the right, what is IMSI?

21  A    That's the International Mobile Subscriber Identifier.

22  That's the number that is linked to the account, typically

23  to the SIM card that is in the phone.

24  Q    If we can turn to page 3 here, is there a second number

25  listed for this Cory Martin account?

1    A    Yes.  At the bottom under User Information, that number

2    is (718) 600-1072.

3            MS. DEAN:  Can we please now pull up, from

4    Government's 300, the file called Report AU.

5            (Exhibit published.)

6    Q    Agent Busick, did you create maps related to both of

7    the numbers that we just looked at, the number ending in

8    4723 and the number ending in 1072?

9    A    Yes, I did.

10   Q    What company produced the records that you used to make

11   the maps?

12   A    AT&T.

13   Q    If we can now look, now that we've got 300 up, the file

14   Report AU, are these the records associated with the

15   accounts that we just looked at the subscriber information

16   for?

17   A    Yes.

18   Q    Both phone numbers?

19   A    Yes.  AT&T produces the records for both phone numbers

20   on the same report.

21   Q    What is the date range for these AT&T records?

22   A    The date range is April 1, 2018 through April 11, 2018.

23           MS. DEAN:  If we can scroll through the pages to

24   the last page.

25   Q    And on the last page, are there additional items for

1    April 12th, as well?

2    A    Yes.  However, the records are produced in what's

3    called Universal Coordinated Time, or UTC time.  That time

4    is either four or five hours ahead of eastern time.  During

5    this particular time frame, we were in Eastern Daylight

6    Time, which means that UTC time was four hours ahead of

7    eastern time.

8              So at the top of the page, when it lists the date

9    and times for which the records were queried, that's in

10   eastern time.  But because they're produced -- always

11   produced in Universal Coordinated Time, we would expect to

12   see records that may be up to four hours into April 12th.

13   Q    So, for instance, if we look at that last line, line

14   2716, and it says April 12th, '18, that the timestamp is

15   0241, you have to subtract the amount of hours to adjust

16   from UTC into Eastern Standard Time?

17   A    Correct.  So 0241, that would be 2:41 a.m.  But the

18   Eastern Daylight Time which corresponds to that time would

19   be 10:41 p.m. on the night of the 11th.

20             MS. DEAN:  Can we scroll back up now to the first

21   page of these records.

22   Q    I'll ask you to just go through the columns in the

23   record so you can explain to the jurors what kind of

24   information is in these AT&T records.

25   A    Sure.

1          So it starts on the left side; we have an item

2    number.  It's just a sequential numbering of each of the

3    particular interactions starting with number 1 on the first

4    page.

5          The next two columns, we have Connection Date and

6    Connection Time, and you can see the little note there UTC.

7    Again, these are in Universal Coordinated Time and need to

8    be converted to local time when I'm conducting my analysis.

9          AT&T includes something called seizure time,

10   that's the next column to the right.  That just has to do

11   with how long does it take, say, between when the number was

12   dialled or the phone is ringing and the person actually

13   picks up or connects to the phone.

14         ET is elapsed time.  That is the duration of a

15   call, and it's given in minutes and seconds; in other words,

16   how long did that call last.

17         Originating Number is the number which placed the

18   call.  So what we're looking at here are just voice calls

19   right now.  So we can see under Originating Number that

20   phone number ends in 2479.  That means that's the phone

21   number that called the target phone, in this case we're

22   looking at records for the 4723 phone which we can see under

23   terminating number.  So this is what we would call an

24   incoming call, because it's an incoming call to the 4723

25   phone, which is the number that we're interested in and

1    we're looking at the records for.

2           The next two columns just pertain to identifiers

3    for the actual phone or device itself, as well as a

4    subscriber.  That's the IMEI and IMSI.

5           Next column is CT, call type.  That, again, lets

6    us know what type of call we're looking at.  That MT means

7    mobile terminating.  So it terminated with our phone of

8    interest or it was an incoming call.

9           Feature would tell us if there were any particular

10   features of interest used.  A common one we'll see is if a

11   call was forwarded to voicemail because it wasn't answered,

12   and there are other codes, as well.

13          And then finally, of interest to us is this last

14   column that says Cell Location.  This will provide the

15   information about the particular cell site the phone

16   connected to at the time that it connected.

17          On the first line we can see under Cell Location

18   basically a bunch of zeros and a couple of ones.  That's

19   indicative of a wifi call where the target phone, the 4723

20   phone, was not actually using the cellular network.  It may

21   have been connected via wifi.  So the information about the

22   call is recorded, but there's no location information

23   available for that wifi connection, so we can't say where

24   the phone was during that connection.

25          If we go down to the next line under Cell

1   Location, we see a lot more numbers, and this is that

2   information about the particular cell site.  So it's in

3   brackets, there's a first long number.  That corresponds to

4   the identifier of the particular antenna on the cell site

5   that the phone connected to.  Then there's a colon and

6   another number that's 110833, and that's the unique

7   identifier of the cell site.  We'll get into a little more

8   detail with this later, but a particular cell site or tower

9   very likely has multiple antennas on it, so we can know

10  which antenna on that site the phone connected to.

11          Next, we have geographical coordinates of the

12  precise location of the cell site.  So not the phone, but

13  the cell site the phone connected to.

14          And then after that we have what's called the

15  azimuth, or directional facing of the particular antenna

16  that the phone connected to during that connection.  So if

17  an antenna is broadcasting a signal in a certain direction,

18  think of a pole with a few floodlight on it.  One is facing

19  north at, say, zero degrees, one is facing 120 degrees, one

20  is facing 240 degrees, and each one is sending a beam in a

21  specific direction.  That's basically what this corresponds

22  to, except with a radio signal, and that aids in our

23  analysis of the approximate location of the phone when it

24  was connected.

25  Q    One thing you mentioned was that we were looking at a

1    page that shows all voice calls; is that right?

2    A    That is correct.

3    Q    Do these records for the Cory Martin account with AT&T

4    also have text message data?

5    A    Yes.  AT&T also records information on text messages

6    sent and received by the phone along with cellular location

7    of the phone during those records.  However, it separates

8    them out in the actual records they send.  So they list

9    first just the voice calls and then just the text messages

10   all together.

11   Q    Are calls that are made over wifi or iMessages or calls

12   that are made on chat apps like WhatsApp reflected in call

13   detail records like the one we're looking at here?

14   A    No.

15         So what we'll see on the call detail records are

16   only calls or text messages made or received in what I would

17   say is, like, the traditional manner; a traditional cellular

18   voice call.  Other things that we have now, we have wifi,

19   which I explained.  So if you're connected to wifi and using

20   that wifi signal, it's not using the normal cellular network

21   architecture.  So while they may record information about

22   the calls or text messages, there won't be location

23   information.

24         However, if you use something like iMessage or

25   FaceTime, which are both Apple apps, or Facebook Messenger,

1  WhatsApp, think any type of messaging app, or a voice over

2  IP type app and connection, you may still be using the

3  cellular network, but there you're using cellular data.

4  You're probably all familiar with data, a data plan on your

5  phone.  Usually I think they're unlimited now or maybe you

6  pay by data.  It's still using the cellular network, but

7  it's not recording the information in the same manner.  So

8  if you're using iMessage or FaceTime, we're not going to see

9  a reflection of those particular connections in the records

10  even though you're using the cellular network.

11  Q    What is Pinger?

12  A    So Pinger is one of those types of communication apps

13  where you can send and receive text messages, say, using

14  data services.  So messages sent or received.  I don't

15  recall if you can also make voice calls on Pinger or not,

16  but regardless, any communications sent or received using

17  Pinger, for example, will not be reflected in the call

18  detail records.

19  Q    And is it correct that through Pinger you can have an

20  app-based phone number?

21  A    Yes.

22  Q    Is it possible to get cell site location information

23  from the company Pinger using an app-based phone number?

24  A    No.

25            MS. DEAN:  I'm now going to ask that we pull up,

R. Busick - Direct - Ms. Dean                      672

1   for the witness only, Government Exhibit 26.

2   Q    Do you recognize this?

3   A    I do, yes.

4   Q    What is Government's 26?

5   A    This is a report that I produced for this case.

6   Q    Is the content of this report drawn entirely from the

7   records marked Government's 300 that we just opened and

8   looked at together?

9   A    Yes, it is.

10  Q    Does this report highlight some of the information that

11  is contained in those phone records at Government's 300?

12  A    Yes.

13  Q    What information?

14  A    So it contains the information for two particular

15  phones for which we had received records, and it contains

16  information about the connections, both voice calls and SMS

17  messages sent or received by those phones during a

18  particular time period for which cellular location or cell

19  site information was provided by AT&T.

20  Q    What is the time period that your report spans?

21  A    It is roughly April 2nd through April 10th of 2018.

22       MS. DEAN:  Your Honor, the Government moves to

23  admit Government's 26 into evidence.

24       THE COURT:  Any objection?

25       MS. THIELE:  No objection.

1      THE COURT:  All right.  That will be in evidence.

2      (Government's Exhibit 26 received in evidence.)

3      (Exhibit published.)

4  Q    Now, you said that the date range spans April 2nd to

5  April 10th of 2018.  Does this report show the location of

6  the cell sites used by both the 4723 phone number and the

7  1072 phone number throughout that entire period?

8  A    Yes.

9  Q    So if the cell phone company, in this case AT&T,

10  provided location information for either of these two

11  numbers in that date range, you mapped it here?

12  A    That's correct.

13  Q    And does this include voice calls and text messages?

14  A    Yes, it does.

15  Q    Looking at page 1, what date did you prepare this

16  report?

17  A    January 4, 2024.

18      MS. DEAN:  Can we pull up for the witness and

19  jurors Government's 28.

20      (Exhibit published.)

21  Q    Can you please read from Government's 28 the name of

22  the person associated with phone number (347) 729-4723?

23  A    Cory Martin.

24  Q    And can you also read the name of the person associated

25  with number (718) 600-1072?

1   A    Adelle Anderson.

2   Q    If we can return now to Government's 26, I'll show you

3   page 2 of your report.

4         (Exhibit published.)

5   Q    Please explain the information on page 2.

6   A    So this is just an explanation of the methodology I

7   used to prepare the report.

8         So again, I take the records, the cellular records

9   from AT&T which were provided to me by the Government, as

10  well as the list of pertinent locations, dates, and times.

11  I import all of that information into that mapping software

12  we use that I mentioned before called ESPA.  This just

13  facilitates visualizing that data on a map and visualizing

14  large amounts of records.

15        Then I conduct an analysis based on those dates,

16  times, and locations, and I create maps based on the

17  connections of each of the phones during these particular

18  time frames, and I prepare them into a report based on that

19  information.

20  Q    And does this page contain information about the time

21  zone of your maps?

22  A    Yes.  So this report, everything that's depicted in

23  this report is in Eastern Daylight Time.  If you recall, I

24  said that was four hours behind UTC time, which is the time

25  that's displayed in the original records.

1    Q    So you've converted the time zone for us in your maps?

2    A    Correct.

3    Q    Was this report peer reviewed?

4    A    Yes, it was.

5    Q    What does that mean?

6    A    Any report that we prepare in the CAST Unit for trial

7    is peer reviewed by another member of the CAST Unit.  What

8    that means is I provide them with my report, all of the

9    records and any other pertinent information I used to

10   conduct my analysis, and they go through and just verify

11   that everything that's reflected in my report is a fair and

12   accurate representation of what is -- what is in the

13   records.

14        MS. DEAN:  Can we turn to page 3, please.

15   Q    What does Sectors and Orientation mean?

16   A    I kind of talked about this, but this is an

17   illustration which will hopefully help lend some clarity to

18   it.

19        What we're looking at in the illustration on the

20   right side of the screen is a bird's eye view if we were

21   standing directly over the top of what I call a traditional

22   cell tower.  So that's that triangular structure that we

23   would see on the top of a tower.  On each side of that

24   triangle, we can see that there are antennas.  That's what

25   those little white things are that are kind of hanging off

1    the sides of each of these.  Those are the antennas that are

2    broadcasting signal in particular directions.

3            And as I mentioned, in the records it identifies

4    not just which cell site which would encompass this whole

5    tower we're looking at that a phone connected to, but which

6    antenna on that cell site the phone connected to, as well as

7    which direction that that antenna is broadcasting its

8    signal.

9            So, for instance, the antennas associated with

10   Sector 1 would be located on the top side of this tower and

11   would be broadcasting signal into the red area here.  We

12   would see that identified as an azimuth of zero degrees in

13   the records, and we would basically divide up the circle

14   into three roughly equal sides, pie wedges.  So an azimuth

15   of zero degrees you would display with a wedge that's sort

16   of facing to the north, as I'm indicating here on the

17   screen.

18           So if we were standing in the red area relative to

19   the cell tower, we would generally expect to connect to

20   Sector 1 on this tower.  If we were to move clockwise around

21   the tower into the blue area, we would eventually expect to

22   connect to Sector 2, and so on as we continued around into

23   the green area of Sector 3.

24           So this gives us additional information as to the

25   approximate location of the phone, because the coverage

1    areas of each of those sectors is directly related to which

2    direction the antenna is broadcasting signal.  So if we

3    identified that a phone was connecting to this cell site in

4    Sector 2, we would expect to find the phone somewhere in

5    this area right here indicated by Sector 2.

6              MS. DEAN:  Can I turn to page 4, please.

7    Q    Starting with the left side, what is the three-sector

8    illustration?  Is this just more detail on what you've been

9    describing to us?

10   A    Yes.  So this just shows how we would illustrate this

11   on a map.

12             On the left side we can see in the map a black

13   wedge, and where the arms of that wedge means is a blue dot.

14   That's an AT&T cell site, and that's the cell site that was

15   used by the phone during this particular connection.  We can

16   see some other dots on the map, as well.  That just

17   indicates the location of surrounding AT&T cell sites.  And

18   we can see, because that wedge is facing up towards the top

19   of the screen, that the radio signal is being broadcast in

20   that area, and we would expect to see the phone somewhere in

21   the area that I indicated on the screen.

22             It's important to understand that the little black

23   shaded circle doesn't mean that the phone is in that circle,

24   although it might be.  That's just a visual aid, especially

25   when there are a lot of sectors on the screen, to help show

1    which direction that that particular sector is facing.

2           And then the information from the records which

3    corresponds to that call are displayed in that event box on

4    the right, which include the date and time of the call or

5    message, the type of interaction, whether it's a phone call,

6    SMS, incoming, outgoing, how long that call lasted, if it

7    was a voice call.  The one we're looking at here was 1,598

8    seconds, which is over 26 minutes.  And then the phone

9    that our target number was in contact with.  So in this

10   case, our target was in contact with a number ending in

11   5027.

12          Now, throughout this report there are two phones,

13   and I've color coded the wedges displayed on the map and the

14   text in the box with the particular phone that we're

15   mapping.  So anytime we see that black text or black wedge,

16   that corresponds to the 4723 phone, which is what we're

17   looking at.  The other phone, which ends in the number 1072,

18   will always be displayed with a blue wedge and blue text, so

19   when they're both appearing on the screen at the same time,

20   we can discern which ones correspond to which phone.

21   Q    So in your illustration here, the cell phone that this

22   target phone is connecting -- the cell site the target phone

23   is connecting to, is that the blue dot that's at that tip of

24   the V, just right under the V, the black V?

25   A    Correct.  It's right -- it's kind of hard for me to

*R. Busick - Direct - Ms. Dean*                    679

1    precisely point it out, but where I've indicated with the

2    pink, right where those 2 arms come together.

3             MS. DEAN:  If we can turn to page 5, please.

4    Q    What does page 5 indicate?

5    A    So this is just a general geographic overview of the

6    areas that I mapped in preparing my report.  I've indicated

7    a few of the locations of interest, as well as the AT&T

8    network that was in place during April of 2018, the time of

9    interest in this case.

10             Each of those blue dots represents a specific

11   location of an AT&T cell site.  And as I discussed earlier,

12   we can see in the upper left portion of the map, in

13   Manhattan, it's extremely dense.  Those cell sites are

14   practically on top of each other just because of that

15   density of usage and the density of customers in that area.

16             And then as we get further out from the city,

17   whether it's west into New Jersey or out east through

18   Brooklyn and Queens and into Long Island, they eventually

19   become separated a bit further apart, having larger coverage

20   areas, because less infrastructure is needed to provide the

21   same level of coverage.

22             As I mentioned, the further apart those cell sites

23   are, the larger the coverage area is, and the less precisely

24   we can locate the phone when it made a connection, versus

25   when those cell sites are almost on top of each other, we

1   know that those coverage areas are smaller, and the phone

2   would had to have been closer to the cell site when it

3   connected.

4           MS. DEAN:  Mr. Rader, would you zoom in on the

5   bottom portion of the map from the CP reference point all

6   the way to the legend?

7   Q   What is the legend in the bottom right corner?

8   A   So the legend just indicates the locations of interest

9   that are marked out on the map.

10          The top one with the red marker located roughly in

11  the center of the screen is the Martin residence at

12  249-45 148th Road in Rosedale, New York.  Just to the west

13  or northwest of that red marker we'll see a purple marker,

14  also roughly in the center of the screen.  That's the

15  residence of Anderson's mother, that's 134-29 157th Street

16  in Jamaica, New York.  And then to the far left on the lower

17  portion of the screen is a green marker that says CP in

18  white, and that's Canarsie Park located in the area of

19  Seaview and Remsen Avenues in Brooklyn.

20          MS. DEAN:  Can we turn to Slide 6.

21  Q   Did you map location information for the Martin and

22  Anderson phone numbers on April 2, 2018?

23  A   Yes, I did.

24  Q   What reference point did you place on this map at

25  page 6?

1    A    So we see at the center -- roughly center left portion

2    of the screen the red marker denoting the Martin residence.

3    Q    And what is the time period that you mapped on this

4    slide?

5    A    This is 7:08 a.m. through 8:21 p.m. on April 2, 2018.

6    Q    Could you please talk us through what this slide shows.

7    A    Sure.

8         So we can see the two phones are both depicted on

9    this map.  The 4723 phone is depicted in black, and the 1072

10   phone depicted in blue.  There are three cell sites used

11   during this time period by either one or both of the phones.

12   We can see tower reference number 1, which is located in the

13   vicinity of the Martin residence.  Both phones utilized that

14   cell site up through roughly 7:20, 7:30 in the evening.

15   Q    So all day, the Martin and Anderson phones are using

16   the cell site in the vicinity of the Martin residence until

17   about 7:30 p.m.?

18   A    Yes.  That's the only cell site indicated that either

19   of those phones used during that time.

20   Q    Can you describe what if any movement of the Martin and

21   Anderson phones you see after 7:30 p.m. on April 2, 2018?

22   A    Yes.

23        So after that time, roughly at 8 p.m. we can see

24   that the phone -- the 1072 phone is using two cell sites,

25   tower references 2 and 3, which are located roughly to the

1  northwest of the Martin residence, and that the 4723 phone

2  in black is utilizing that tower reference number 2.  And

3  this is roughly between 8:00 and 8:20 p.m.

4  Q    I want to zero in for a moment on that tower you

5  labelled 2.

6           What, if anything, does it signify that both

7  phones hit on the tower 2 between 8:04 and 8:19 p.m.?

8  A    That would be consistent with both phones being located

9  together or in the general vicinity.  They both went from

10 utilizing the same cell site and sector up until roughly

11 7:30 p.m., and are now using a different cell site and

12 sector facing a different direction.  But they're both on

13 that same cell site during that period.

14 Q    During the time period on April 2nd from 7 a.m. through

15 approximately 8 p.m., do the Martin and Anderson phones

16 contact each other at all?

17 A    I would just need to refresh my recollection.

18           MS. DEAN:  And if the witness only could have

19 3500-RB-11.

20 A    I believe there was some limited communication between

21 the phones.

22 Q    And do you know if that was before or after 8 p.m. on

23 April 2nd?

24 A    Prior to 8 p.m.

25           MS. DEAN:  If we can go back to Government's 26,

1  please.

2           Can I have Government's 300?

3           (Exhibit published.)

4           MS. DEAN:  If we can scroll down to April 2nd,

5  please.

6  Q    Are you able to look at these records -- I know these

7  are the records in UTC, but can you look at these records

8  and show us where on April 2nd the Martin and Anderson

9  phones have contact with each other for those calls that you

10 just described to us?

11 A    So -- and this is only looking at the voice calls here

12 for the Martin phone.  So it's actually -- and I may have

13 misspoke, I think I said 8:00.

14          On line 27, which actually shows April 3rd of 2018

15 at 0004, which would correspond to 8:04 p.m. on the 2nd, we

16 can see a call between 4723, which placed a call to the 1072

17 phone.  So that's item 27.  We can see again, at item 28, a

18 similar call.  We can see that at -- so I think what we're

19 seeing there is actually the same call.  AT&T is showing

20 what we call legs of a call, where it's showing both sides

21 of the transaction.  So it's showing it from the originating

22 call and the terminating call, because they're both AT&T.

23 So it's really just showing kind of one connection there.

24          And we can see that there's a call forwarded to

25 voicemail.  So that call was not answered by the 1072 phone;

1    it was forwarded to voicemail.

2              And then we can see, at 8:07, actually a call in

3    the other direction from the 1072 phone to the 4723 phone.

4    That call lasted for about a minute and a half.

5    Q    And that activity is all -- it's just a hair after

6    8 p.m.?

7    A    Yes.  So I apologize, I believe I misspoke on that.

8              MS. DEAN:  If we can just turn back to

9    Government's 26, and we'll go to page 7.

10             (Exhibit published.)

11   Q    Did you map the rest of the activity for the phones on

12   April 2nd of 2018?

13   A    I did, yes.

14   Q    What is the time range for your slide on page 7?

15   A    So this covers all connections between either of the

16   two phones between 8:40 p.m. and 11:33 p.m. on April 2nd.

17   Q    Proceeding chronologically, can you explain what

18   slide 7 shows about the movements of the Martin and the

19   Anderson phone on the night of April 2nd?

20   A    Yes.

21             So the Anderson phone in blue, beginning with

22   tower reference 1 in the upper right, so between -- and I

23   believe it's -- it's a little hard for me to read at this

24   level, but I believe that's between 8:40 and 8:52 p.m.  The

25   Anderson phone utilized cell site number 1 before then using

*R. Busick - Direct - Ms. Dean*                    685

1   cell site number 2, tower reference 2 in the far left, at

2   9:00 and 9:01 p.m., and then settling in at tower reference

3   number 3 between 9:04 and 11:33 p.m.  That's in the vicinity

4   of that purple marker which is the residence of Anderson's

5   mother.

6           And the only -- the only network usage for the

7   4723 phone in black that we have is back in the vicinity of

8   the Martin residence in red in the lower right portion of

9   the screen, and that's a 10:04 p.m. incoming text message

10  from the Anderson phone in blue.

11  Q    And so what is the first time that the Anderson phone

12  connects to the cell site in the vicinity of the Anderson

13  mother residence on April 2nd?

14  A    9:04 p.m.

15  Q    And according to your map, by 10:04 p.m., is the Martin

16  phone back in the vicinity of the Martin residence?

17  A    Yes.

18           MS. DEAN:  Can we turn to the next slide, please.

19  Q    Did you map the cell site activity and the movement of

20  the Anderson and Martin phones for April 3rd of 2018?

21  A    Yes, I did.

22  Q    What is the time frame of your map on slide 8?

23  A    So this is 8:37 a.m., the time of the first call or

24  text message during that date, and 2:53 p.m. again on

25  April 3rd.

1  Q    What are the reference points that we see on this

2  slide?

3  A    So starting on the far right, we have the Martin

4  residence in red.  In the center right portion of the

5  screen, we have the residence of Anderson's mother in

6  purple.  And in the left center portion of the screen, in

7  green with the CP, is Canarsie Park.

8  Q    So this map covers areas of Queens and Brooklyn?

9  A    Yes.

10  Q    During this time frame, 8:37 a.m. to 2:53 p.m., how

11  many cell sites does the Anderson phone use?

12  A    One.

13  Q    Near what reference point?

14  A    Near the residence of Anderson's mother.

15  Q    So for that entire time frame, every time the Anderson

16  phone connects to the network, it's in the vicinity of the

17  Anderson mother house?

18  A    That's correct.

19  Q    Did you map the location information for the Martin

20  phone during this same time frame?

21  A    I did, yes.

22  Q    Describe to us the movement of the Martin phone on this

23  map.

24  A    So the Martin phone begins at tower reference 1 on the

25  right side of this screen, which again is in the vicinity of

1    the Martin residence.  It utilizes that cell site between

2    10:02 a.m. and 10:29 a.m.

3            We next see it using tower reference number 2 to

4    the west of Anderson's mother residence along the Belt

5    Parkway at 11:05 a.m.  It continues on to tower reference 3

6    located just north of Canarsie Park on the left center

7    portion of the screen, where it connects at 11:19 a.m.  And

8    then finally, we see it at tower reference 4 between 12:18

9    and 12:22 p.m.

10   Q    And this whole time frame, the Anderson phone is in the

11   vicinity of the Anderson mother residence?

12   A    Yes, that's correct.

13   Q    Did you continue to map these phones throughout the

14   rest of April 3rd of 2018?

15   A    Yes, I did.

16           MS. DEAN:  Can we move to the next slide, slide 9.

17   Q    What is the time range reflected for your map on

18   slide 9?

19   A    So this is continuing on April 3rd, and this is between

20   3:33 p.m. and 11:28 p.m.

21   Q    And again, is the Anderson phone using one cell site

22   this entire time frame, too?

23   A    Yes, it is, the very same cell site as in the previous

24   map.

25   Q    Near what reference point?

1   A    Located in the vicinity of the residence of Anderson's

2   mother.

3   Q    What does the Martin phone do between 3:33 and

4   11:29 p.m. on April 3rd?

5   A    So the Martin phone travels back towards the direction

6   of the Martin residence.  The first usage we have is at

7   3:33 p.m., tower reference number 1, and then tower

8   reference number 2.  So tower reference 1, that was at

9   3:33 p.m.  The next usage was tower reference 2, just to the

10  east of that first cell site, and that is at 5:33 p.m.  And

11  then we next see the Martin phone just after 10 p.m. at

12  tower reference 3 in the vicinity of the Martin residence.

13  Q    And what time is the Martin phone back in the vicinity

14  of the Martin residence?

15  A    It's just after 10:00.  I believe that says 10:08.

16  It's a little difficult for me to discern with the

17  resolution.  But it is after 10 p.m.

18  Q    Is there any data that suggests that the Anderson and

19  Martin phones are together on April 3rd of 2018?

20  A    No.

21  Q    What does the data suggest about these two phones?

22  A    The data would suggest -- would be consistent with the

23  Anderson phone being at or in the vicinity of Anderson's

24  mother's residence throughout the day, and with the 4723, or

25  Martin phone, traveling in the morning from the vicinity of

R. Busick - Direct - Ms. Dean                    689

1   the Martin residence into Brooklyn and then returning back

2   to the vicinity of the Martin residence.

3   Q    Is there contact between the Anderson and Martin phones

4   on April 3rd?

5   A    I would have to refresh my recollection on that again.

6          MS. DEAN:  Can the witness only be shown

7   3500-RB-11.

8

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Busick - Direct - Ms. Dean                690

1   A    So during the entirety of the day there was in fact some

2   contact between the two phones.  I think there were four text

3   messages sent between the phones.

4                 DIRECT EXAMINATION (Continued)

5            MS. DEAN:  We can return to 26, please, for

6   everyone.  I'd like to turn to slide 10 now.

7   Q    Did you map location information for April 4th, 2018 for

8   both of these phones?

9   A    Yes, I did.

10  Q    Does this slide 10 depict the entire day of April 4th?

11  A    It does.

12  Q    Starting with the Anderson phone, what does your map

13  show?

14  A    So the Anderson phone depicted in blue again shows that

15  phone using the same cell site we've seen in the last two

16  slides, located in the vicinity of the residence of

17  Anderson's mother.  It's using that cell site between

18  12:18 a.m., its first connection during the day and

19  11:34 p.m. that night.

20            And the Martin phone, in black, is seen using the

21  cell site in two separate sectors located in the vicinity of

22  the Martin residence and this is between 8 a.m. and 11 p.m.

23  Q    Did you break out the Anderson phone and Martin phone

24  into separate slides for this day?

25  A    I did, yes.

1          MS. DEAN:  Can we turn to slide 11.

2     Q    What does slide 11 show?

3     A    This is just closer in view of what we saw on the last

4     slide which shows the cell site and sector used by the

5     Anderson phone in blue.  You can see that cell site is

6     located roughly two blocks south of the residence of

7     Anderson's mother, which is denoted in purple, that antenna,

8     and it is broadcasting to the north and the residence of

9     Anderson's mother will be located within the expected

10    coverage area of that cell site.

11    Q    And you told us earlier but when you say that the

12    Anderson phone is located, you know, in the vicinity of the

13    Anderson mother reference point, that there is a range of an

14    area that it can be located in, could you just circle for us

15    the approximate range that you would expect to find the

16    Anderson phone?

17    A    Sure.  So I can't say precisely what the boundaries of

18    that coverage area would be, but I would expect to see it

19    somewhere generally in this rough area.

20         MS. DEAN:  The witness has indicated by drawing a

21    pink circle in the center of the map ranging from the blue

22    pie wedge up to --

23    A    Roughly Baisley Boulevard, you know, roughly where

24    Baisley and Guy Brewer Boulevard meet.  We're going to --

25    that's just an eyeball estimation, it's not a precise

1    boundary of the coverage area.

2            MS. DEAN:  If you can clear that, thank you.

3    Q    You also said you broke out the location information for

4    the Martin phone on the same day, right?

5    A    Yes, I did.

6    Q    Could you turn to slide 12.

7            Talk us through what you mapped in slide 12.

8    A    So I basically just broke this map up into three time

9    periods just to illustrate when the different sectors on that

10   cell site were used.

11           So in the far left portion of the map, between

12   8 a.m. and 3:18 p.m., the Martin phone is using that cell

13   site, which is located just to the west of the Martin

14   residence and that signal is being broadcast to the lower

15   right portion of the screen, I believe that's 120 degrees.

16   So that takes us up through 3:18 p.m.

17           The next time that the phone connected to the AT&T

18   network was at 5:18 p.m.  We can see utilizing the same cell

19   site, however, this time the antenna is facing zero degrees

20   north and broadcasting up towards the top of the map.

21           And then from 5:35 p.m. through 11:05 p.m. the

22   phone again returns to using that sector facing the lower

23   right-hand portion of the map approximately 120 degrees.

24   Q    And that first and last sector is the one where the

25   Martin residence is in that black shaded area?

Busick - Direct - Ms. Dean                    693

1    A    Yes.

2    Q    Tell us what, if anything, does the change in sector

3    during the incoming call at 5:18 p.m. indicate to you about

4    the location of the Martin phone?

5    A    So it is quite possibly indicative of movement of the

6    phone.  Where the Martin residence is located is very close

7    to the boundary of those coverage areas.  There could

8    potentially be overlapping coverage area there, however, we

9    consistently see that phone utilizing the sector that's

10   facing the lower right portion of the screen here.  This is

11   the most commonly used cell site sector for this phone which

12   would indicate to me it's most likely the sector providing

13   coverage to Martin residence and its immediate area.

14             So the sector facing to the north is also providing

15   coverage in the area but likely the phone used a different

16   sector because there was some movement of the phone from

17   where it was for the rest of the day.

18   Q    Now you noted something at the top of this slide about

19   the amount of contact between the Martin and Anderson phones,

20   tell us about that.

21   A    So throughout the entirety of the day there were 15 SMS

22   messages between the 4723 phone and the 1072 phone.

23   Q    If we can zoom in on the right-hand side, do you -- you

24   break out those contacts into the call out box on the right?

25   A    I do, yes.

1            MS. DEAN:  If we can zoom in just so that you can
2  see the timestamps.
3  Q    When does those text messages between the Martin and the
4  Anderson phones start on April 4th?
5  A    So I see the first one is roughly at 10:32 p.m.
6  Q    They continue from there?
7  A    Yes.  Up through 11:05 p.m.
8  Q    Is there any data from the cell phone company on
9  April 4th that suggests that the Anderson and Martin phones
10 are together on April 4th?
11 A    No.
12 Q    In fact, what does all of the data from the phone
13 company suggest about these two phones?
14 A    That throughout the day each of the phones are using
15 different cell sites separated by some distance that would
16 not be consistent with those phones being together throughout
17 the day.
18 Q    So let's take a look at your next slide and what happens
19 on April 5th.
20            Did you map the locations of the Anderson and the
21 Martin phones on April 5th?
22 A    Yes, I did.
23 Q    What is the time range for this map we're looking at on
24 slide 13?
25 A    So on April 5th, this begins at 12:13 a.m., which is the

Busick - Direct - Ms. Dean                    695

1  first time that the Anderson phone connected to the network

2  on that date and goes through 7:30 p.m.

3  Q    Starting with the Anderson phone, what can you tell us

4  about the approximate location of the Anderson phone from the

5  beginning of that day all the way up until 7:30 p.m. on

6  April 5th?

7  A    So that phone is, again, continuing to use the same cell

8  site and sector we've seen depicted on previous slides in the

9  vicinity of the residence of Anderson's mother, and the

10 Martin phone continues to use the cell site that's located in

11 the vicinity of the Martin residence and that's between

12 4:23 a.m., the time of its first connection on this date, and

13 approximately 7:15 p.m.

14 Q    During this time period where the Martin phone is in the

15 vicinity of the Martin residence, does it use all three

16 sectors of that one cell site?

17 A    It does, yes.

18 Q    What does that suggest to you about the movement of the

19 Martin phone between 12:13 a.m. and 7:30 p.m. on April 5th?

20 A    It would suggest that there is some movement on that

21 phone in that general area which is causing it to use sectors

22 on all three sides of that tower beginning at 4:23 a.m.

23 during its first connection.

24 Q    On April 5th, during this time frame, was there contact

25 between the Anderson and Martin phones?

1    A    Yes.   Approximately 17 contacts between the two phones.

2    Q    If we can look at your next slide.  Did you map the rest

3    of the day from 7:30 p.m. on for the Anderson and Martin

4    phones on April 5th?

5    A    I did, yes.

6    Q    What does slide 14 show us about the location of the

7    Anderson and Martin phones at 7:34 p.m.?

8    A    So at 7:34 p.m. both phones are using the same tower and

9    sector in the vicinity of the residence of Anderson's mother.

10   During this time there is an eight-second call from the

11   Martin phone to the Anderson phone.

12   Q    So at 7:34 p.m. the Martin phone has traveled from the

13   vicinity of his residence to the vicinity of Anderson

14   mother's residence on April 5th?

15   A    Yes.

16   Q    And you said there was an outgoing call from the Martin

17   phone to what phone at 7:34 p.m.?

18   A    To the Anderson phone.

19            MS. DEAN:  If I can now publish Government's 132

20   please.

21            Can we move to page three -- page 4.  Can you zoom

22   in please on the highlighted portion.

23            (Exhibit published.)

24   Q    Agent Busick, can you read the date that is highlighted?

25   A    April 5th.

1   Q    And can you read what it says right after the pound or

2   number sign in the highlighted portion?

3   A    011766.

4   Q    I'm sorry, just below that I guess there is another

5   pound sign, it's my mistake.

6   A    Walmart Supercenter, Valley Stream, New York.

7   Q    I'll turn back now to Government's 26 and if we can look

8   at the next slide that you mapped for April 5th.

9        What is the time frame reflected in your next slide

10  for April 5th?

11  A    7:56 p.m. through 9:10 p.m. on the 5th.

12  Q    What are the reference points that you placed on this

13  map?

14  A    Again, starting with the Martin residence in red in the

15  center, the lower left portion of the map and just above

16  tower reference 1 is a blue marker with a WM on it, which

17  denotes the location of Walmart 77 Green Acres Road West in

18  Valley Stream, New York.

19  Q    Where do the Martin and Anderson phones next connect to,

20  cell site-wise after they connected to the cell tower at

21  7:34 p.m. in the vicinity of Anderson's mother's home?

22  A    Both cell phones use that tower reference 1 located in

23  the vicinity of the Walmart.  The Anderson phone connecting

24  between 7:56 p.m. and -- sorry, I'm having a hard time

25  reading it, and I believe that's 9 p.m. and the -- I'm sorry,

1    8:50 p.m. so between 7:56 and 8:50 p.m. the Anderson phone is

2    utilizing tower reference 1 in the vicinity of the Walmart,

3    and during this time frame the Martin phone connects only one

4    time, that's at 8:44 p.m. on that same cell site and sector.

5    Q    And after that time period, that 7:56 to 8:50 p.m. time

6    period, tell us -- and Mr. Rader, if you could zoom out just

7    a little bit, tell us what activity for either phone --

8    sorry, what activity for either phone do you see then?

9    A    The only activity after that time up through 9:10 p.m.

10   is from the Anderson phone.  You can see it's using tower

11   reference number 2 to the east of the Walmart at 8:59 p.m.

12   and then tower reference 3, which is north of the Walmart,

13   between 9:06 and 9:10 p.m.

14   Q    Did you finish mapping April 5th on your next slide?

15   A    Yes, I did.

16        MS. DEAN:  Can we turn to slide 16, please.

17        (Exhibit published.)

18   Q    Was there any additional cell site data for the Martin

19   phone after that 8:44 p.m. call in the vicinity of the

20   Walmart?

21   A    No, there was not.

22   Q    What about the Anderson phone?

23   A    Yes, there was activity for the Anderson phone between

24   9:20 p.m. and 11:48 p.m.

25   Q    And where is the Anderson phone approximately during

Busick - Direct - Ms. Dean                    699

1   that time period?

2   A    That phone is using the cell site in the vicinity of the

3   Martin residence, which would be consistent with it being

4   located at or in the vicinity of the Martin residence during

5   that time.

6            THE COURT:  Ms. Dean, I wonder if this is a good

7   time for a break and, well, I'm going to tell you this,

8   because I have another matter I have to handle.

9            So, ladies and gentlemen, this is going to probably

10  take us about 25 minutes.  I just have a couple of other

11  cases that I have to deal with.  So we'll be in recess until

12  about maybe five to noon and I'll see you then.

13           Don't talk about the case, but take the time to

14  relax a little bit.

15           THE COURTROOM DEPUTY:  All rise.

16           (Jury exits the courtroom.)

17           THE COURT:  The witness can step down.

18           THE WITNESS:  Thank you.

19           (The witness stepped down.)

20           THE COURT:  Everybody can sit down.  We're going to

21  break for 20 minutes or so, I have a few other things I have

22  to handle.

23           (Recess.)

24           THE COURTROOM DEPUTY:  All rise.

25           THE COURT:  Hi, everybody can sit down.  I know

Busick - Direct - Ms. Dean                700

1   Mr. Martin is being brought out, let's get the witness back

2   on the stand and we'll go get the jury.

3          (The witness resumed the stand.)

4          THE COURTROOM DEPUTY:  All rise.

5          (Jury enters the courtroom.)

6          THE COURTROOM DEPUTY:  You may be seated.

7          THE COURT:  All right, ladies and gentlemen, sorry

8   about that people are little chattier than I thought they

9   would be.

10         We're ready to resume with the direct examination

11  of the special agent.  Go ahead.

12         THE COURTROOM DEPUTY:  The witness is reminded he's

13  still under oath.

14         THE WITNESS:  Yes, thank you.

15         MS. DEAN:  If I could please have Government's 26

16  back up for everyone.

17               DIRECT EXAMINATION (Continued)

18  BY MS. DEAN:

19  Q    So Agent, just to finish off our conversation about your

20  maps for April 5th of 2018, is it correct that the last

21  communication between the Anderson and Martin phones on

22  April 5th is at 7:34 p.m. when they were both in the vicinity

23  of the Anderson mother's house?

24  A    Yes, that's correct.

25         MS. DEAN:  We can move on now to the next slide,

1  slide 17.

2           (Exhibit published.)

3  Q    Did you map the location information for the Martin and

4  Anderson phone numbers on April 6th, 2018?

5  A    Yes, I did.

6  Q    What is the time frame for this slide?

7  A    The slide depicts all calls and text messages between

8  12:03 a.m. on the 6th and 5:39 p.m.

9  Q    Where do both the Anderson and Martin phones connect to

10  during that entire time frame on April 6th all the way up

11  until 5:39 p.m.?

12  A    During that time frame the only cell site connected to

13  by either of those phones is the one depicted on the map

14  located in the vicinity of the Martin residence.

15  Q    I want to direct you to this pop out box down at the

16  bottom left of your slide, what does the pop out box signify?

17  A    This signifies that during this time period the Martin

18  phone, ending in 4723, was in contact with a phone number

19  (646)571-7520 five times during the period to include two

20  phones calls and three text messages.

21  Q    And for all of those communications with the number

22  ending in 7520, it was in the vicinity of where?

23  A    The Martin phone, the 4723 phone, was located in the

24  vicinity of the Martin residence.

25           MS. DEAN:  Can we turn now to slide 18.

Busick - Direct - Ms. Dean                702

1          (Exhibit published.)

2    Q    Did you continue to map location information for both

3    the Anderson and Martin phones on April 6th?

4    A    Yes, I did.

5    Q    Does slide 18 show the rest of the day of April 6th,

6    specifically 6:04 p.m. to 11:37 p.m.?

7    A    It does, yes.

8    Q    Did you place reference points on this slide?

9    A    I did.  Again, the Martin residence depicted in the red

10   marker in the center portion of the screen and just to the

11   northeast or upper right of that in an orange marker with an

12   HD on it in the vicinity of tower reference 1, that denotes

13   the Home Depot at 101 Green Acres Road West in Valley Stream,

14   New York.

15   Q    So let's start with the Anderson phone during this time

16   frame.  Where does it connect to during the entire time frame

17   on this slide?

18   A    It remains on the same cell site sector we saw on the

19   previous slide from earlier in the day, which is located in

20   the vicinity of the Martin residence.

21   Q    Let's turn now to the Martin phone.  Can you describe

22   the location information that you mapped on this slide for

23   that phone?

24   A    So during this time the Martin phone is using three

25   other cell sites between 6:04 p.m. and 6:45 p.m. beginning

1  with tower reference number 1, which is located in the

2  vicinity of the Home Depot at 6:04 p.m.  It uses tower

3  reference number 2, which is just to the northwest of the

4  Home Depot but facing in that direction at 6:38 and

5  6:45 p.m., and tower reference number 3, which is the

6  northern most tower utilized by the Martin phone during this

7  period at 6:42 p.m.

8  Q    So let's talk about the activity at 6:04 p.m.  Does the

9  outgoing call made by the Martin phone at 6:04 p.m., is the

10  phone at or near the Home Depot at that time?

11  A    This record will be consistent with that phone, the

12  Martin phone being at or in the vicinity of Home Depot, yes.

13  Q    What is the number, if you can read it, what is the

14  number that the Martin phone calls at 6:04 p.m.?

15  A    (240)483-5027.

16       MS. DEAN:  If we can open Government's Exhibit 308.

17  I'm going to ask to publish the last document in the file for

18  Government's 308.

19       (Exhibit published.)

20       MS. DEAN:  If we can just scroll down to page two

21  please.

22  Q    Agent Busick, what company's records are these?

23  A    These records are from Sprint.

24  Q    If we can just scroll down to account details.  Can you

25  read the name under account billing address right under the

1    effective date, what is the first and last name?

2    A    Diane Chandler Hector.

3    Q    If you can just scroll up on these records.  What is the

4    subject number?

5    A    Subject number is (240)483-5027.

6    Q    If we can scroll down one more time.  What is the city

7    and state for Chandler Hector?

8    A    Orlando, Florida.

9         MS. DEAN:  We can just go back now to Government's

10    26, slide 18, the slide we were on.

11    Q    While the Martin phone is traveling in the vicinity of

12    towers 1, 2 and 3 on this slide, does it connect with the

13    Anderson number at all?

14    A    It does, yes.

15    Q    At what time?

16    A    6:38 p.m.

17    Q    And is that the only connection on April 6th for the

18    Anderson and Martin phones?

19    A    Yes.  Certainly during this time period.

20         MS. DEAN:  We can now turn to slide 19.

21         (Exhibit published.)

22    Q    Did you map the location information for both of these

23    phones on April 7th of 2018?

24    A    Yes, I did.

25    Q    What is the time frame you mapped on slide 19?

Busick - Direct - Ms. Dean                705

1   A    2:50 a.m. and 2:03 p.m.

2   Q    What does slide 19 show about the locations of the two

3   phones?

4   A    This shows that between 2:50 a.m. and 11:25 a.m., the

5   Anderson phone was utilizing sector reference 1 at the center

6   of the screen just to the left of the Martin residence.  This

7   is the sector that is facing towards the lower right portion

8   of the screen approximately 120 degrees.  At 1:32 and

9   1:35 p.m. there are two calls between the Martin and Anderson

10  phone.  The Martin phone is using that same sector reference

11  number 1 in the vicinity of the Martin residence and during

12  these calls the Anderson phone is using tower reference

13  number 2, which is located just to the north of the Martin

14  residence at 1:47 p.m.

15          THE COURT:  P.m.?

16          THE WITNESS:  Yes, p.m.

17          At 1:47 p.m. the Anderson and Martin phones are

18  again in contact.  The Martin phone is still on the same

19  sector, sector reference number 1 that it was on earlier, and

20  the Anderson phone is using the same tower but sector

21  reference number 3 which is facing approximately 240 degrees

22  or the lower left portion of the map.

23          And then at 1:53 p.m., again both phones are

24  utilizing sector reference 1, which is facing towards the

25  Martin residence, and between 1:53 and 2:03 p.m., the

Busick - Direct - Ms. Dean                    706

1   Anderson phone has a couple of more usages of that tower.

2   Q    And so when -- actually, I'll go to the next slide now.

3   Did you continue to map the location information for these

4   phones on April 7th of 2018?

5   A    Yes, I did.

6   Q    What is the time frame that we see in slide 20?

7   A    2:42 to 4:46 p.m.

8   Q    And what are the reference points on this map?

9   A    So again, on the far right we have the Martin residence

10  in red.  In the center right portion of the screen we have

11  the residence of Anderson's mother in purple, and on the

12  lower left portion of the map we have Canarsie Park marked

13  with green flag with a CP on it.

14  Q    Could you describe to us the movement that you mapped,

15  just moving chronologically please.

16  A    Sure.  So we last saw both the Martin and Anderson

17  phones using that cell site in the vicinity of the Martin

18  residence.  And at 2:42 p.m. we see the Anderson phone using

19  tower reference A from 2:42 to 2:43 p.m.  We see that the

20  Anderson phone then uses tower reference B, which is located

21  in the vicinity of Anderson's mother's residence from 3:07 to

22  4:46 p.m., and at 2:51 p.m. marked in red with a red 1 is the

23  same cell site but that's the first communication for the

24  Martin phone during this time period.

25          So at 2:51 p.m. the Martin phone is using the cell

Busick - Direct - Ms. Dean                707

1    site in the vicinity of Anderson's mother residence, and then

2    from 3:07 to 4:46 p.m. the Anderson phone is using that same

3    cell site.

4    Q    So if I can just stop you there.  So when the Anderson

5    phone travels first to A and then to B, and the Martin phone

6    travels to the vicinity of tower 1, is that consistent with

7    those phones traveling together?

8    A    Yes, especially when looked at in totality with the

9    records from the previous map where both phones were located

10   using the same tower in the vicinity of the Martin residence.

11   Q    So you said that -- if we can just enlarge the box in

12   the center of the screen, it's a little hard to read.  You

13   said that the Anderson phone then connects to the tower in

14   the vicinity of the Anderson mother residence from 3:07 to

15   4:46 p.m.; is that right?

16   A    Yes, that's correct.

17   Q    During that time frame does the Martin phone go

18   elsewhere?

19   A    Yes, it does.

20        MS. DEAN:  If we can just zoom out for the jury so

21   we can all look at that together.

22   Q    Please explain the movement of the Martin phone during

23   that time period.

24   A    So we next see the Martin phone at 3:13 p.m. utilizing

25   tower reference 2 located just north of Canarsie Park on the

1    left side of the screen and then we see it using tower

2    reference 3 at 4:21 p.m., that's located to the northwest or

3    the left side of the map.

4    Q    Are you able to determine from this data if the Anderson

5    and Martin phones traveled together to Brooklyn on April 7th?

6    A    This would not be consistent with the phones traveling

7    together to Brooklyn from the vicinity of Anderson's mother's

8    residence.

9    Q    And looking at the 4:21 p.m. incoming call that you

10   mapped on the far left side by tower 3, who was the Martin

11   phone receiving a call from?

12   A    The Anderson phone.

13   Q    Let's take a look at slide 21, does that continue on

14   April 7th, 2018?

15   A    Yes, it does.

16        MS. DEAN:  If we can just zoom out a little so we

17   can see everything.

18   Q    Where is the Martin phone connecting during this time

19   frame, and please tell us the time frame?

20   A    This is 5:20 p.m. to 7:26 p.m.  This is showing activity

21   only of the Martin phone, which is using the towers in

22   sectors indicated all of which are located in the general

23   vicinity of Canarsie Park.

24   Q    I'd like to zero in with you on the time frame between

25   7:23, 7:24, 7:25 and 7:26 p.m.  During those minutes, does

1    the Martin phone connect to multiple cell sites on this map?

2    A    It does, yes.

3    Q    Which ones, just so we can focus on those?

4         THE WITNESS:  If you're able to just zoom in enough

5    so I can make sure I get the times correct that would be

6    great.  And then just slide over a little bit.  Yes, that's

7    good.

8         So at 7:23 p.m. we see the phone using tower

9    reference 4 which is on the lower left, the lower left

10   portion of the screen for two incoming text messages.  And

11   then at 7:25 and 7:26 we see it utilizing tower reference 5,

12   which is on the further right portion of the screen.  And

13   then at 7:26 we also see it using sector reference 3, which

14   is on the tower that's north of Canarsie Park, but the sector

15   that's facing towards the lower right portion of the screen.

16        So during that time its using three sectors from

17   three separate towers that are all generally facing toward

18   the general direction of Canarsie Park.

19   Q    Can you explain what this tells us about the location of

20   the Martin phone during this time frame that it's connecting

21   in that same group of minutes to all three of those cell

22   sites?

23   A    So this is likely an area of overlapping coverage which

24   is what we would expect to see in the network so that

25   connections can be continuously maintained.  The reason why

1    it may be bouncing between the sectors could just -- it's

2    very likely indicative of some movement within the area that

3    it's varying which sector is providing the better coverage at

4    a time -- at any given time between those three sectors,

5    which are, I would say are generally providing coverage

6    roughly in this area is where you're going have that overlap.

7              MS. DEAN:  The witness has placed a pink circle

8    around the outside of Canarsie Park, which is marked by a CP.

9    Q    Are the Martin and Anderson phones connecting during

10   this time frame?

11   A    Yes, they are.  There was one voice call and 26 SMS

12   messages between the Martin and Anderson phones during this

13   time.

14   Q    And I don't think I asked you this yet, but just in case

15   anyone doesn't know, what is an SMS message?

16   A    SMS is a text message that would be reflected in the

17   call detail records.

18   Q    Specifically, are the Martin and Anderson phones

19   connecting during those minutes that we just zeroed in on

20   7:23, 7:25 and 7:26?

21   A    Yes, those are all communications between the Martin and

22   Anderson phones.

23             MS. DEAN:  Can we move to the next slide please,

24   slide 22.

25             (Exhibit published.)

Busick - Direct - Ms. Dean                711

1  Q    Did you map roughly the same time frame for the Anderson
2  phone?

3  A    I did, yes.

4  Q    What is the time frame you mapped on slide 22?

5  A    This is 5:20 to 7:31 p.m.

6  Q    What is the location information you mapped for the
7  Anderson phone in this time frame?

8  A    So the Anderson phone is using only the cell site and
9  sector indicated on the map in the vicinity of the residence
10 of Anderson's mother.

11 Q    During the time period where the Martin phone is
12 connecting in the vicinity of Canarsie Park and the Anderson
13 phone is connecting where you placed it on this map, are the
14 users of the Martin and Anderson phones together or separate?

15 A    It would be separate at this time.

16 Q    Can we turn to slide 23 now.

17        Did you map the phones for the remainder of
18 April 7th?

19 A    Yes, I did.

20 Q    What is the time frame for this slide?

21 A    The slide depicts 7:40 p.m. through 11:33 p.m. on
22 April 7th.

23 Q    Where does the Martin phone connect to at 7:40 p.m.?

24 A    It connects to the same cell site being used by the
25 Anderson phone located in the vicinity of Anderson's mother

1    residence.

2            MS. DEAN:  Mr. Rader, if you can enlarge that area

3    with the box as well.

4    Q    Who does the Martin phone call at 7:40:16 p.m.?

5    A    The Martin phone calls the Anderson phone.

6    Q    Where is the Anderson phone at that point?

7    A    It is on the same cell site in the vicinity of the

8    residence of Anderson's mother.

9    Q    Is it fair to say there are multiple contacts between

10   those two phones at 7:40 and 7:41 p.m.?

11   A    Yes.

12           MS. DEAN:  If we can just zoom out.

13   Q    Was there additional activity for both phones that you

14   were able to map?

15   A    Yes.  We additionally see both of those phones utilizing

16   the cell site depicted in the vicinity of the Martin

17   residence.

18   Q    And at the end of April 7th, the last location

19   information for both the Martin and Anderson phones, where

20   does it put those phones?

21   A    At or in the vicinity of the Martin residence.

22   Q    In the records that you reviewed for April 7th for the

23   Anderson phone, was there any data whatsoever that suggested

24   that the Anderson phone traveled to Brooklyn?

25   A    No, there was not.

Busick - Direct - Ms. Dean                     713

1    Q    Have you reviewed a calendar for April of 2018?

2    A    Yes, I have.

3    Q    What day of the week was April 8th, 2018?

4    A    As I recall, April 8th was a Sunday.

5    Q    So would it be correct that April 7th into April 8th

6    would be a Saturday into a Sunday?

7    A    Yes.

8             MS. DEAN:  If we can look at slide 24 now, please.

9             (Exhibit published.)

10   Q    Did you map the location of the Anderson phone and

11   Martin phones for April 8th?

12   A    Yes, I did.

13   Q    What does slide 24 show as far as time frame?

14   A    This shows the time from 9:09 a.m. through 1:18 p.m. on

15   the 8th.

16   Q    What is the first time on April 8th that the Martin

17   phone has activity?

18   A    9:18 a.m.

19   Q    And what is the first time on April 8th that the

20   Anderson phone has activity?

21   A    9:09 a.m.

22   Q    Where are the two phones during the time frame you

23   mapped, 9:09 a.m. to 1:18 p.m.?

24   A    Both using the same tower and sector in the vicinity of

25   the Martin residence.

1          MS. DEAN:  If we can move on to slide 25.

2          (Exhibit published.)

3     Q    Is this still April 8th?

4     A    Yes, it is.

5     Q    What is the time frame?

6     A    This is 2:23 p.m. through 10:58 p.m.

7     Q    And what are the reference points on this map?

8     A    We have the Martin residence again in red in the center

9     left portion of the screen, and then we have the Green Acres

10    Mall in purple with mall written on it in white letters which

11    is located to the northeast of the Martin residence, which is

12    at Sunrise Highway, Valley Stream, New York.

13         MS. DEAN:  The witness circled around the reference

14    point for Green Acres Mall.

15    Q    Moving chronologically, could you talk us through what

16    this map shows?

17    A    So this map shows that between 2:28 and -- between 2:23

18    and 3:29 p.m. the Anderson phone is utilizing the cell sites

19    which is the -- located to the west, northwest of the Green

20    Acres Mall, which I'm marking on the map here, and then

21    between 3:28, which overlaps that time and 3:46 p.m., it's

22    utilizing the cell site which is located to the southwest of

23    the Green Acres Mall.

24         During this time frame the Martin phone is

25    utilizing the cell site and sector in the vicinity of the

1  Martin residence, and at 4:55 p.m. the Anderson phone is

2  again also using that same cell site and sector in the

3  vicinity of the Martin residence where the Martin phone is

4  using and the Anderson phone remains on that cell site

5  through 10:58 p.m.

6  Q    So during the time period where the Anderson phone moves

7  toward the vicinity of the Green Acres Mall, do the Anderson

8  and Martin numbers have any contact with each other?

9  A    If I could just refresh my recollection with the notes.

10        MS. DEAN:  If we can just zoom out first and

11  then -- yes, if we can just zoom out.

12  Q    Would that be reflected at the top of this page?

13  A    Oh, yes, thank you.

14        Yes, there are four voice calls and three text

15  messages between the Martin and Anderson phones between 2:28

16  and 3:28 p.m.

17  Q    What is the last time on April 8th that there is any

18  activity from the Martin phone?  If we can zoom in on your

19  pop out box for the Martin phone.

20  A    It would be 6:36 p.m.

21  Q    Now what day of the week was April 9th, 2018?

22  A    April 9th was a Monday.

23  Q    And again, so it would be correct that April 8th into

24  the 9th was a Sunday into a Monday?

25  A    Correct.

1           MS. DEAN:  If we can look together now at slide 26.

2    Could you just zoom out for a moment Mr. Rader.

3           (Exhibit published.)

4    Q    What date and time frame did you map on slide 26?

5    A    This is April 9th, 2018 between 7:25 a.m. and 11:06 a.m.

6    Q    Tell us what you mapped here?

7    A    Depicting activity of the Anderson phone during that

8    time period, the phone is using a tower and sector in the

9    vicinity of the Martin residence.

10   Q    If we can now zoom in on that pop out box.  For this

11   time frame, 7:25 a.m. to 11:06 a.m., do the Anderson and

12   Martin phones contact each other at all on April 9th?

13   A    They do not.

14   Q    Is there any activity from the Martin phone on this

15   slide?

16   A    There is not, no.

17   Q    This includes calls and texts, right?

18   A    That is correct.

19          MS. DEAN:  If we could zoom back out please and if

20   we can turn now to slide 27.

21          (Exhibit published.)

22   Q    What is the first time that there is activity from the

23   Martin phone on April 9th, 2018, a Monday?

24   A    11:14 a.m.

25   Q    And what is the time frame on the map for slide 27?

1  A    11:14 a.m. through 12:59 p.m.

2  Q    When the Martin phone activity first begins, where is

3  the Martin phone?

4  A    The Martin phone is located in the vicinity of the

5  Queens County Criminal Court.  It's marked with a yellow

6  marker in the upper center portion of the screen, which is

7  located at 125-01 Queens Boulevard in Queens, New York.

8  Q    And for all of the activity from 11:14 a.m. to

9  12:59 p.m., is the Martin phone in the vicinity of the Queens

10 County Criminal Court?

11 A    The last connection for the Martin phone during this

12 period is at 12:27 p.m.  So between 11:14 a.m. and 12:27 p.m.

13 all connections are located in the vicinity of the Queens

14 Criminal Court.

15 Q    How many calls and texts do the Anderson and Martin

16 phones have with each other during this time period?

17 A    There's approximately 40.

18 Q    During this time frame what is the approximate location

19 of the Anderson phone?

20 A    The Anderson phone is using the cell site sector in the

21 vicinity of the Martin residence.

22 Q    I want to direct your attention specifically to

23 11:44 a.m.  If we can zoom in on the blue pop out box.  At

24 11:44 a.m., is there a specific call to the Anderson phone?

25 A    Yes.  The Martin phone calls the Anderson phone at

Busick - Direct - Ms. Dean                    718

1    11:44 a.m.

2    Q    And what is the duration of that call?

3    A    292 seconds, which I believe comes out to four minutes

4    and 52 seconds.

5    Q    Does the next slide continue to show the activity of

6    these phones on April 9th?

7    A    Yes, it does.

8              MS. DEAN:  Let's turn to slide 28, please.

9              (Exhibit published.)

10   Q    Please describe what slide -- what is the time frame for

11   this slide?

12   A    Continuing on April 9th between 1 p.m. and 3:18 p.m.

13   Q    What is slide 28 show?

14   A    It shows that between 1 p.m. and 3:10 p.m., the Anderson

15   phone continues to use the same cell site sector in the

16   vicinity of the Martin residence, and we see that at

17   1:10 p.m. the Martin phone uses tower reference 1, which is

18   located just to the north of the Martin residence during an

19   incoming call from the Anderson phone, and then between 1:26

20   and 3:18 p.m. it uses the tower in the vicinity of the

21   residence of Anderson's mother but using the sectors that are

22   facing away from that residence.

23   Q    And turning to slide 29, what is the time period on

24   April 9th for slide 29?

25   A    3:22 p.m. and 7:59 p.m.

Busick - Direct - Ms. Dean                    719

1    Q    Can you describe to us chronologically what you mapped

2    here regarding the movement of the Martin and Anderson phones

3    during this time frame?

4    A    Yes.  This is a little bit of a busy slide.

5    Essentially, it's showing that the Martin phone is beginning

6    using the cell site on the left, which is in the vicinity of

7    Anderson's mother's residence, and then travels back towards

8    the Martin residence where we see it using that cell site and

9    sector beginning at 5:48 p.m.  And then the Anderson phone we

10   see is beginning in the vicinity of the Martin residence at

11   3:22 p.m. and then traveling back in the direction of the

12   Anderson's mother's residence where it's using that cell site

13   and sector at 7:58 p.m.  So they're essentially switching

14   general -- they are switching the towers and sectors -- the

15   Martin phone is moving generally from west to east, and the

16   Anderson phone is generally moving from east to west.

17   Q    During different time frames, right?

18   A    Yes.

19   Q    They are not moving at the same time?

20   A    Correct.

21        MS. DEAN:  Can we turn to slide 30 now.

22        (Exhibit published.)

23   Q    Did you finish mapping the movement for these phones on

24   April 9th?

25   A    Yes, I did.

Busick - Direct - Ms. Dean                    720

1    Q    Can you tell us what is the time frame on this slide?

2    A    9:01 to 10:11 p.m. on the 9th.  We have the Anderson

3    phone at 9:01 p.m. using tower reference 1 in the vicinity of

4    Anderson's mother's residence, then using that cell site and

5    sector between 9:01 and 9:27 p.m.  At 9:40 p.m. it's using

6    tower reference 2 and then between 9:56 and 10:11 p.m. it's

7    utilizing tower reference 3 in the vicinity of the Martin

8    residence, and the only connections from the Martin phone

9    during this time are at 9:40 and 9:56 p.m., both of which the

10   Martin phone is using the tower and sector in the vicinity of

11   the Martin residence.

12            MS. DEAN:  Can I just have one minute, please?

13            (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. DEAN:   (Continuing)

2    Q    So by 9:56 p.m. on April 9th both of the Martin and

3    Anderson phones are connecting in the vicinity of the Martin

4    residence?

5    A    Yes.  The Anderson phone during that connection between

6    the two phones is actually using the north facing sector, but

7    it is in the vicinity of the Martin residence.

8    Q    And by what time is the Anderson phone using the same

9    sector as the Martin phone?

10   A    10:04 p.m.

11   Q    Did you also map location information for these phones

12   for certain time periods on April 10th of 2018?

13   A    Yes, I did.

14   Q    If we could turn to slide 31, please.  Starting with the

15   Anderson phone, well, what is the time period for this slide?

16   A    6:55 a.m. to 8:10 a.m. on April 10th.

17   Q    Could you talk us through this slide starting with the

18   Anderson phone?

19   A    Yes.  So the Anderson phone is using the cell site in the

20   vicinity of the Martin residence between 6:55 and 8:10 a.m.

21   Q    What about the location information you mapped for the

22   Martin phone?

23   A    The Martin phone first connects at 6:55 a.m. and it's

24   connecting with the Anderson phone.  The Martin phone is using

25   tower reference one, located just north of the Martin

1   residence.  We next see it utilizing tower references two and

2   three at 7:55 a.m. and 8:10 a.m., both of which are in the

3   vicinity of Canarsie Park.

4               MS. DEAN:  We're going to take one moment for the

5   technology.

6   Q    If we could zoom in on the left side of the screen where

7   you said the Martin phone was back in the vicinity of Canarsie

8   Park.

9   A    Yes.

10  Q    What are the times that the Martin phone receives a call

11  when it's in the vicinity of Canarsie Park on April 10th?

12  A    7:55 a.m. using tower reference two and 8:10 a.m. on

13  tower reference three.

14  Q    And from whom does it receive the calls?

15  A    The Anderson phone.

16  Q    We can zoom back out, please.  Let's go to slide 32,

17  please.  Actually, if we could go back to slide 31.

18              During this time period that you mapped, are the

19  Martin and Anderson phones together?

20  A    During this time period, no.

21  Q    Now we can go to slide 32, please.  What is the time

22  frame for slide 32 on April 10th?

23  A    This is continuing on in the morning.  This is from

24  9:50 a.m. to 12:10 p.m.

25  Q    What is the approximate location of the Martin and

1   Anderson phones for the activity in this time frame on

2   April 10th?

3   A    This slides depicts both phones back in the vicinity of

4   the Martin residence.

5   Q    If you could go to slide 33, please.  Could you summarize

6   for us the activity that you mapped for April 10th between

7   12:19 p.m. and 12:57 p.m.?

8   A    Yes.  So this slide, in conjunction with the previous

9   slide which showed both phones using the same tower and sector

10  in the vicinity of the Martin residence, will be consistent

11  with both phones traveling together into Brooklyn during this

12  time.

13  Q    If we could go to slide 35, please.  Is this next slide

14  still April 10th?

15  A    Yes.

16  Q    What time period is this for?

17  A    This picks back up at 1:12 p.m. and goes through 2:22

18  p.m.

19  Q    And what does your map show?

20  A    Again, generally, this is just showing that the records

21  are consistent with the Martin and Anderson phones traveling

22  back from Brooklyn into Queens.

23  Q    What does the next slideshow?

24  A    The slide continues on from the last slide.  It shows

25  activity, both the Martin and Anderson phones between

1   3:01 p.m. and 11:54 p.m. on April 10th.  The Martin phone is

2   back on the cell site sector in the vicinity of the Martin

3   residence at 3:01 p.m., and the Anderson phone is on that same

4   sector beginning at 3:53 p.m., both phones remain on that

5   tower and sector until 9:30 p.m. when the Martin phone is

6   using the sector that's located just to the north of the

7   Martin residence.

8          It's -- that's the last connection by the Martin

9   phone.  The only one that's not on the tower and sector in the

10  vicinity of the Martin residence, and the Anderson phone

11  continues to use the sector in the vicinity of the Martin

12  residence until 11:54 p.m.

13  Q    And at that one connection you mentioned, the one you

14  said was the only one for the Martin phone that was not in the

15  vicinity of the Martin residence, at 9:30 p.m. who was the

16  incoming call from to the Martin phone?

17  A    From the Anderson phone.

18  Q    And for the record, this is slide 35, right?

19  A    Yes.

20  Q    For all of the other activity, except for 9:30 p.m.

21  during this time frame, what is the approximate location of

22  the Martin and Anderson phone?

23  A    The records are consistent with both the Martin and

24  Anderson phones being located at or in the vicinity of the

25  Martin residence.

*K. Busick - Direct - Ms. Dean*                                      725

1   Q    In we could turn to the next slide.  This concludes your

2   report, Agent Busick; is that correct?

3   A    Yes.

4   Q    I'm going to ask that Agent Busick be shown Government's

5   305, certified records from Sprint.  Sprint is now what

6   company, can you remind us?

7   A    Sprint was absorbed by T-Mobile.

8   Q    Can you scroll down, please, on Government's 305.  Do you

9   see a number under request type next to subject number?

10  A    Yes.

11  Q    What is the subject number of these records?

12  A    518-730-5202.

13          MS. DEAN:  I'll just ask Mr. Rader to scroll to

14  page 2, so the jurors can see the full record.

15  Q    Were there any records returned from Sprint for

16  518-730-5202 during the requested time range of March 8, 2018

17  to May 8, 2018?

18  A    No, there was not.

19  Q    Is it correct that there was no location information for

20  this number returned from the company that you could map?

21  A    Correct.

22  Q    Did you look, as part of your analysis in this case, at

23  Government's 303?

24  A    Yes, I did.

25  Q    Can we pull up Government's 303, please, and start with

1    the file that begins sub underscore AMDOCS.

2              Is there a subscriber name associated with the

3    T-Mobile record?

4    A    Yes.

5    Q    What is the name?

6    A    Brandy K. Odom.

7    Q    What is the subscriber address?

8    A    249-45 148th Road, Jamaica, New York.

9    Q    Can you read next to MSISDN, what is the number

10   associated with these records?

11   A    516-309-7437.

12   Q    If we could turn to another document in these records,

13   which starts with copy of 2039337.

14             And we will scroll for you as I ask you this

15   question.  What is the date span of these phone records?

16   A    March 8th of 2018 through May 9th of 2018.

17   Q    Is it fair to say, Agent Busick, that the user activity

18   for this phone number stops well before May 9th of 2018?

19   A    Yes.

20   Q    Between March 8th and March 20th of 2018, what is the

21   phone activity like for the Brandy Odom phone number?

22   A    It's a frequent usage, primarily SMS text messages more

23   so than calls.

24   Q    If we could now scroll down to line 1053.  How does that

25   change when you get to approximately March 21st to April 2nd

*K. Busick - Direct - Ms. Dean*                                    727

1    for these phone records?

2    A    The usage during that time becomes very infrequent,

3    particularly in reference to the previous amount of usage.

4    Q    Is there cell site data in these records?

5    A    Yes, there is.

6    Q    Did you map the data for which location information for

7    this phone could be determined?

8    A    I did, yes.

9    Q    Can we show the witness, the witness only, please,

10   Government's Exhibit 27.

11          Do you recognize Exhibit 27?

12   A    Yes, I do.

13   Q    What is this?

14   A    This is an analysis of the cell site activity that I

15   conducted on that 7437 phone we were just looking at.

16          MS. DEAN:  I ask that Government's 27 be received in

17   evidence, Your Honor.

18          THE COURT:  Any objection?

19          MS. THIELE:  No objection.

20          THE COURT:  That's in evidence.

21          (Government's Exhibit 27 was received in evidence.)

22          MS. DEAN:  Could we publish, please.  Thank you.

23   BY MS. DEAN:

24   Q    So if we look at the first page of Government's 27, which

25   is only three pages, correct?

*K. Busick - Direct - Ms. Dean*                                728

1   A    Yes.

2   Q    What does the first page show?

3   A    So the first page is an overview of all of the locatable

4   records for that Odom 7437 phone between March 8, 2018 and

5   April 10th of 2018.

6          Something important to understand about the T-Mobile

7   records versus the AT&T records, which we were just looking

8   at, AT&T typically retains cell site information for text

9   messages.

10          T-Mobile generally does not.  So while it will list

11  the text message on the records, most of the time there is no

12  cell site associated with that.  So what that means is that

13  during this time frame there are over a thousand total

14  communications shown for the phone, but only 22 of those had

15  cell site information.

16  Q    And just focusing, first, what was the reference point

17  you placed on this map?

18  A    So this map I referenced, again, the Martin residence in

19  red located in the center, or left portion of the screen.

20  Q    If we could focus first, and if we can zoom on the right

21  pop out box on the screen.  For all the cell site data for

22  this Brandy Odom number that was available to you, was there

23  just one call that was in a location, other than all the other

24  data?

25  A    Yes.

1  Q    Are we looking at that here, this one that says
2  9:27 p.m.?
3  A    Yes, we are.
4  Q    What was the date?
5  A    That is March 9, 2018.
6  Q    And who was the call to?
7  A    That was an outgoing call to the Martin 1072 number we
8  had seen depicted in black on my previous report.
9  Q    You said the 1072 number?
10 A    I'm sorry.  The Anderson number.  This is why I color
11 code them.  The Anderson 1072 number, which we saw depicted in
12 blue on the previous map.
13 Q    For all of the other activity that had cell site
14 locations you could place on a map and determine the
15 approximate location of the phone, did you map that on the
16 left-hand side of the slide?
17 A    Yes.
18 Q    And where was all of the other cell site activity where
19 you could pinpoint the location of the phone?
20 A    It was all on two cell sites, which were located in the
21 vicinity of the Martin residence.
22 Q    Could you go through all of the dates that the Brandy
23 Odom phone was located in the vicinity of the Martin
24 residence?
25 A    Yes.  March 8th, March 9th, March 11th, March 12th, March

1  13th, March 14th, March 16th, March 17th, and March 29, 2018.

2          MS. DEAN:  We can just zoom out, please, now, Mr.

3  Rader.  We can go to the second slide.

4  Q    For slides two and three, did you isolate the data you've

5  just described to us?

6  A    Yes.  This is just a more zoomed in view.

7  Q    And the same with slide three?

8  A    Correct.

9  Q    Slide three, is that a March 9, 2018 call?

10 A    Yes.

11 Q    If we could now go back to the document called copy of

12 2039337 in Government's 303.

13         Can we scroll down to lines 1064 and 1065?  Was the

14 March 29th cell site location for the Brandy Odom phone the

15 last location that you were able to place on a map?

16 A    Yes.

17 Q    And on March 29th, the Odom phone was in the vicinity of

18 what reference point?

19 A    Of the Martin residence.

20 Q    I want to just look at lines 1064 and 1065 with you,

21 April 2nd, 2018.  If we could look at them and scroll to the

22 right, please.

23         Was there a cell site location information -- if we

24 could just keep scrolling -- was there cell site location

25 information for these two calls that were -- if we could go

1  back to the left a little -- these two calls that were flagged

2  abnormal completion on April 2nd?

3  A    Yes.   T-Mobile includes cell site information for those

4  calls.

5  Q    If we could go all the way back to the left.  Are these

6  incoming or outgoing?

7  A    The April 2nd calls are incoming calls.

8  Q    Why didn't you place on the map the cell site location

9  reflected in these records for these two April 2nd, 2018,

10  incoming calls?

11  A    This is somewhat of an idiosyncrasy in T-Mobile records.

12  What we're seeing with those two calls are incoming calls, in

13  other words, calls to the 7437 phone, but there's no duration

14  listed for the call, meaning there was no time elapse that the

15  phones are connected.

16        And the connection type is listed as abnormal

17  completion.  So what that basically means is that the network

18  tried to contact the phone, but we can't say definitively that

19  it actually connected the phone and that the phone was located

20  on that cell site at that particular time.  So generally

21  speaking, I don't map those calls.

22  Q    And so am I understanding you correctly, for the cell

23  site provided for those two April 2nd calls, the phone was

24  either located at that cell site or what, Agent Busick?

25  A    So the way that I look at it is that T-Mobile looked for

1  the phone on the cell site that was listed, and knew the phone

2  was no longer on that cell site or had recently been on it.

3         Typically, when we look at these types of things in

4  conjunction with other available information when we have it,

5  T-Mobile is looking for the phone at the last place, the last

6  cell site that it knew the phone to be.

7         So that's often why we'll see these calls shown on

8  the record.  However, when the connection is not made it might

9  mean the phone at the time listed on here may not be on that

10 cell site anymore.  We just can't know without more

11 information.

12 Q    So we can go to Government's 27.

13        THE COURT:  It's a little bit after 1:00.  Are you

14 at a convenient stopping point, or do you want to finish up

15 with this topic?

16        MS. DEAN:  Maybe I could just finish up with this

17 one question.  I'll just have a few questions after lunch.  I

18 am almost done but I don't want to make people wait for lunch.

19        THE COURT:  People are all right.  Can we go another

20 ten minutes or so?

21        MS. DEAN:  I'll definitely be done.

22        THE COURT:  Go ahead.

23 BY MS. DEAN:

24 Q    So if we could go to slide two, please.  If we can zoom

25 in on the red reference point, the area around there.  The

1    cell site information provided by T-Mobile for the Brandy Odom

2    phone on April 2nd was which cell site that we see on the map?

3    A    I believe it was cell site number 5324, which is the

4    circular depiction I have here on the screen, which is an

5    omnidirectional cell site.  In other words, that's an antenna

6    broadcasting in 360 degrees and is not sectorized, such as the

7    one we have on the screen here.

8    Q    Does that mean that the Brandy Odom phone was either

9    there on April 2nd or that was the last cell site that the

10   network found it at?

11   A    It's very likely that the last time that the network

12   connected with the phone at or prior to that time was on that

13   cell site, which is why it was looking for the phone there on

14   April 2nd.

15   Q    If I could zoom in on the bottom call out box.  Was that

16   the cell site number 53264-6?

17   A    Yes.

18   Q    If I could return one last time to Government's 300.  We

19   can look at line 1067, which is April 4th, 2018.

20        Is this activity between the Odom number and 2296

21   and then 2296 and the Odom number, is that consistent with

22   user activity or is that something else?

23   A    In reviewing all these records, I would say it's unlikely

24   to be indicative of user activity.

25   Q    What is it indicative of?

1    A    Oftentimes we'll see in the call detail records these

2    types of short codes, which are some type of background

3    communication between the T-Mobile network and the phone.  And

4    even though sometimes it will appear as an outgoing message,

5    it's generally just background signaling traffic and it

6    doesn't necessarily mean that somebody sent off a text

7    message.

8    Q    The same question if we could look at line 1076 through

9    1079, there's lines with 611 and the Odom number and then the

10   Odom number and 611 back and forth.

11        Is that indicative of user activity on April 12,

12   2018 or is that indicative of something else?

13   A    In this case I think that these records are consistent

14   with there being no user input into the phone, even though it

15   is shown as an outgoing text message.  We can see that with

16   the exception of these short code messages, the 2296 we looked

17   at and the 611, all the others are incoming text messages to

18   the target phone.

19        There are no other outgoing messages sent.  In fact,

20   when we see the short codes, such as the 2296, we see an

21   incoming and outgoing in approximately the same second.  I

22   think that's 5:01 p.m. and 19 seconds on April 4th, and then

23   for the 611, we have 12:19 and 35 seconds, 12"19 and 36

24   seconds, and then further below 12:38 and 27 seconds, 12:38

25   and 28 seconds.

1          This is consistent with what we see when there's

2    some background signaling going on between the network and the

3    phone.

4    Q    So if we can look back up at line 1063.

5          When was the last date that there was user generated

6    activity on this phone based on your review of these records?

7    A    So the last apparent user generated activity was on March

8    29th, and this is in universal coordinated time, that's 22:16,

9    or 10:16 p.m., which in local time would be 6:16 p.m. on the

10   29th.  And that was an outgoing call from the 7437 phone to

11   another number.

12          MS. DEAN:  I have no further questions.

13          THE COURT:  All right.  So we'll break for lunch

14   now.  We'll meet again, let's say at 2:30.  Enjoy your lunch.

15   Please don't talk about the case at all.  I'll see you later

16   this afternoon.

17          (Jury not present.)

18          THE COURT:  Everybody can sit down.  The agent can

19   step down.  Anything before we break for lunch?

20          MS. DEAN:  No thank you, Your Honor.

21          THE COURT:  I don't know how long the cross will be

22   of this witness, and you don't have to tell me, but I was

23   trying to figure out what else we can get done this afternoon.

24          MS. DEAN:  We have two additional witnesses on deck.

25   We can fill the day.

1              THE COURT:  Great.  Let's do it.  Wonderful.  Thank

2    you so much.  See you after lunch.

3              (Recess taken.)

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **AFTERNOON SESSION**

2                  (In open court; jury not present.)

3                  THE COURT:  Hi.  Everyone can be seated.

4                  We can put the witness back on the stand.

5                  (Witness resumes the stand.)

6                  THE COURTROOM DEPUTY:  All rise.

7                  (Jury enters.)

8                  THE COURTROOM DEPUTY:  You may be seated.

9                  THE COURT:  Hi, everybody.  Welcome back.

10                 We're ready to resume with the cross-examination

11  of the special agent.

12                 Go ahead.

13                 THE COURTROOM DEPUTY:  The witness is reminded

14  he's still under oath.

15                 THE WITNESS:  Thank you.

16  **RICHARD BUSICK**,

17      resumed as a witness, having been previously duly

18      sworn, was examined and testified as follows:

19  CROSS-EXAMINATION

20  BY MS. THIELE:

21  Q    Good afternoon, Special Agent Busick.

22  A    Good afternoon.

23  Q    You received historical call detail records as part of

24  your analysis in this case, correct?

25  A    Yes, that's correct.

1    Q    And some of those records from AT&T were associated

2    with a phone number ending in 4723?

3    A    Yes.

4    Q    And some records from AT&T associated with a number

5    ending in 1072?

6    A    That's correct.

7    Q    And some were from T-Mobile associated with a number

8    ending in 7437.

9    A    Yes, that's correct.

10   Q    And you did not rely on any other call detail records

11   as part of your analysis, correct?

12   A    Yes.

13   Q    In order to prepare this report, you fed call detail

14   record data into a software called E-S-P-A?

15   A    ESPA.

16   Q    ESPA.

17   A    Correct.

18   Q    And did you ensure that the software did, in fact, map

19   each specific entry correctly?

20   A    Yes.  The software is just a tool to help visualize the

21   data.  I analyze each record individually within that

22   software.

23   Q    Okay.

24        Cell site data, as you testified on direct, cannot

25   be used to precisely locate a device.

1           THE COURT:  Is that a question?

2     Q     Correct?

3     A     I guess that depends on what you mean precision.

4     Q     Sure.  Call detail records cannot tell you at any point

5     a specific address at which the device is located.

6     A     That is correct, yes.

7     Q     Is there technology that can be used to precisely

8     locate a device?

9     A     I mean, generally speaking in the world of technology,

10    yes.

11    Q     Would you say that a preferred technology would be GPS?

12          MS. DEAN:  Objection.

13          THE COURT:  Can you answer the question?

14    A     I guess preferred in what way?

15    Q     Would GPS, or global positioning system, put a device

16    in a more specific location than a call detail record?

17    A     I wouldn't say that, no.

18    Q     Isn't it true that GPS records can give you specific

19    coordinates at which a device is located?

20    A     GPS is more than just the particular coordinates.  It

21    depends on how that information was arrived at.  GPS refers

22    to global positioning system.  When we get GPS coordinates,

23    it's going to depend on a lot of things how precise or

24    accurate that is.  So oftentimes we'll have a set of

25    coordinates within a area of uncertainty surrounding those

R. Busick - Cross - Ms. Thiele                740

1  particular coordinates.

2       So while it is possible, depending on the

3  technology or the applications or the uses that have very

4  precise GPS coordinates, in terms of conducting historical

5  location analysis in a manner such as this, I can't just say

6  that GPS would be more precise.  And furthermore, it would

7  have to be available.

8  Q    Okay.  Right.

9       But historical call records like that reviewed in

10 this case do not show you any coordinates at which the

11 device itself was located, correct?

12 A    You are correct, yes.

13 Q    Okay.  So a data point in a call detail record may tell

14 us that a device is in an area in Rosedale, Queens or around

15 Rosedale, Queens?

16 A    It will tell us the cell site that the phone connected

17 to, which is a precise GPS coordinate, and then a

18 directional facing of the antenna from that cell site.  And

19 then based on an analysis of the surrounding network we can

20 ascertain, to some degree, what the approximate coverage

21 area would be.

22       But as you're saying, I cannot say based solely on

23 the records that this means that the phone was at

24 such-and-such address or such-and-such intersection.

25 Q    And based solely on the records, you would not be able

1    to tell us if a device was in a particular room in a

2    building.

3    A    Correct.

4    Q    Or on a specific floor of that building.

5    A    Correct.

6    Q    Or in any particular building within the coverage area.

7    A    Right.  Based just on the records, I couldn't tell you

8    which building within the coverage area the phone may have

9    been in.

10   Q    Or whether the device is in a building versus outside

11   on the sidewalk.

12   A    Correct.

13            MS. THIELE:  Mr. Gover, could we please pull up

14   Government Exhibit 26 and publish for the jury at page 15.

15            (Exhibit published.)

16   Q    Agent Busick, do you see that in front of you?

17   A    Yes, I do.

18   Q    And you see the legend where it says Walmart at

19   77 Green Acres Road?

20   A    Yes.

21   Q    It's correct that the Government requested that you put

22   the Walmart indicator on this map, correct?

23   A    Correct.

24   Q    The call detail records themselves did not give you any

25   information for you to independently put the Walmart on this

1  map.

2  A    Yes, that's correct.

3  Q    And I believe you testified that a device will only

4  connect to a cell tower if it sends or receives either an

5  SMS text message or a voice call; is that right?

6  A    The records will only reflect the location in those

7  circumstances, correct.

8  Q    So there are some entries that indicate other sorts of

9  activities or communications on the phone that might have

10 been over cellular data or wifi, correct?

11 A    I'm sorry.  Could you just rephrase that?

12 Q    Sure.

13       In the records, there may be entries related to

14 activity over cellular data or wifi?

15 A    Yes.  There are some records that indicate that the

16 phone was connected using wifi, but we cannot determine the

17 location.  There's no wifi location information in the

18 records.  Just we can tell that the phone was using wifi for

19 certain transactions.

20 Q    Right.  Okay.

21       MS. THIELE:  Mr. Gover, can you again pull up

22 Government Exhibit 26, at page 7.

23       (Exhibit published.)

24 Q    Agent Busick, you testified that the blue dots on this

25 map are the locations of AT&T cell sites; is that right?

R. Busick - Cross - Ms. Thiele                743

1    A    Yes.

2    Q    And you would agree that the cell sites in this area,

3    or these areas depicted on the screen in front of you, are

4    more spaced out than, say, in Manhattan?

5    A    Yes, correct.

6    Q    And so is it fair to say that the coverage area of

7    these cell sites are probably more than a few blocks in any

8    direction?

9    A    It could be.  They're often extending for a few blocks

10   in a given direction.  But depending on the particular cell

11   site, it could be beyond just a few blocks, yes.

12   Q    It could be a quarter mile?

13   A    Yeah, potentially, yes.

14   Q    Or maybe more than a quarter mile, right?

15   A    Possibly, for some of these cell sites, yes.

16   Q    Based on connections to various cell sites, you may be

17   able to get a general idea of a device's movements, right?

18   A    Yes, by analyzing them over time.

19   Q    For example, if the device seems to be at one time in a

20   particular area and then in another location at another

21   time, then you could make a general conclusion about the

22   fact that the device has moved, right?

23   A    Yes.

24   Q    But with only call detail records, you cannot say for

25   sure what specific time a device arrived to an area, right?

R. Busick - Cross - Ms. Thiele                744

1  A    Correct.  We can only know when a call or a text

2  message was made or received on a given cell site.  And so

3  whether the phone arrived a certain time before then or

4  departed a certain time after, if we're looking on the other

5  end, we can't tell that without looking at, you know, what

6  any other records are.

7  Q    It's only at the time that a device making a connection

8  to a particular cell tower.

9  A    Correct.

10 Q    Or cell site, rather.

11 A    Yes.

12 Q    So here's a hypothetical:  If the data told you that

13 there is one hit off of one cell tower at 8 p.m., then a

14 second hit off the same cell tower at 8 a.m. the next

15 morning, you would not be able to conclude that the device

16 stayed in that location overnight, correct?

17 A    Right.  If there are no other records in that time, we

18 can't say what the device was doing during that time.

19 Q    And the same is true if there is one hour, let's say,

20 in between two connections to the same cell site.

21 A    Correct.  I can only say that the phone used only that

22 cell site at those particular times.

23 Q    And in the call detail records you reviewed, it's true

24 that there are hours during which there are no connections

25 to cell sites at all, right?

1    A    Yes.

2    Q    And another limitation in using call detail records to

3    get an idea of a device's movements is whether there is

4    sufficient usage of the device during the period analyzed;

5    is that right?

6    A    Certainly the more usage, the more data we have that we

7    can determine the location of the phone; and the less, then

8    the less data points we have.

9    Q    As part of your training, you learned about cell phone

10   companies and their networks?

11   A    Yes.

12   Q    And cell phone companies have an interest in maximizing

13   coverage for customers?

14   A    Yes.

15   Q    In particular, in areas like New York City that are

16   densely populated?

17   A    Correct, yes.

18   Q    To ensure reliable coverage, the range of these cell

19   sites often exceed their intended coverage areas, right?

20   A    Correct.  I would say the range far exceeds the

21   coverage areas.

22   Q    In other words, their coverage areas overlap?

23   A    They're designed specifically to have overlapping

24   coverage areas, yes.

25   Q    You did not receive records relating to the specific

1  range of the cell sites relevant to this case, right?

2  A    No, there are no -- no records maintained regarding the

3  range of the cell sites that we could have access to.

4  Q    And you did not receive records relating to the

5  characteristics of the particular cell sites that these

6  devices connected to, right?

7           MS. DEAN:  Objection.

8           THE COURT:  Overruled.

9  A    I didn't receive -- that's not part of the call detail

10 records.  We do take the information in the call detail

11 records in conjunction with a cell site list from AT&T, if

12 we're talking about the AT&T phones during the time, which

13 provides some additional information about this particular

14 cell sites -- really all of the cell sites of the network.

15 Of course the ones of interest are the ones that we're

16 specifically looking at.  So there is information about

17 those cell sites.

18 Q    And can you share generally what other information

19 those records would provide?

20          THE COURT:  Which records are you talking about?

21          MS. THIELE:  The additional records from AT&T, for

22 example, that relate to the particular cell sites in this

23 case.

24          THE COURT:  First of all, what kind of records are

25 those?

1      THE WITNESS:  So each of the service providers

2   periodically, and it depends on the provider, will update

3   their list of cell sites, their global list of cell sites in

4   what's called the cell site database which is maintained by

5   the national communications -- the National Domestic

6   Communications Assistance Center, and that has a list of all

7   of the cell sites as provided by each provider, and they

8   update them periodically as they update the networks.  So,

9   for instance, in the case here where I'm analyzing records

10   from April of 2018, I need to consult with an AT&T cell site

11   list that would have been in effect in April 2018.

12          These call detail records, and this is just a

13   little background to understand what we're talking about, as

14   we saw, the call detail records do include information about

15   the cell sites to include latitude and longitude,

16   directional facing of the antenna.  But in order to verify

17   the accuracy of that, because that data is populated at the

18   time the records are pulled, which could be from a later

19   version of the list, we need to go back to the list in

20   effect at the time.

21          So I take the unique identifier for a particular

22   call, say, I look up that information for the particular

23   cell site and the antenna within the database to verify, for

24   instance, the latitude and longitude of that cell site.  It

25   will indicate the directional facing of the antenna.  And

R. Busick - Cross - Ms. Thiele                748

1   depending on the version of the list or the provider, it

2   will tell us other information, often the elevation of that

3   particular cell site -- in other words, how off the ground

4   is the antenna -- is it a macro or large site, is it a micro

5   site, or a very small site designed to provide coverage in a

6   smaller area.  Sometimes it will include information about

7   the particular frequency used.  So there's a variety of

8   other information that's contained in there, as well.

9           I'm sorry.  So back to your -- if you could ask me

10  your question again.

11          THE COURT:  I think I asked it, and I don't

12  remember what it was.

13          Go ahead.

14  BY MS. THIELE:

15  Q    So your testimony is that you reviewed those records

16  that you just spoke about in conjunction with the call

17  detail records that were produced by AT&T, for example?

18  A    Yes.

19  Q    To make sure that what was in your report was as

20  accurate as possible?

21  A    Correct.

22  Q    And when a call is made, a device typically looks for

23  the strongest signal?

24  A    Yes, generally.  We will generally refer to it as the

25  best serving signal.  It's typically the strongest and

1    clearest.  However, especially as networks have evolved,

2    most recently there are other factors that play into that,

3    as well.

4    Q    You testified on direct that a device would be very

5    likely to connect to the closest cell site?

6    A    All things being equal, I would expect a cell phone or

7    device to connect to the closest cell site just because the

8    frequency -- the strength of the signal will be stronger the

9    closer we are.  So if one is a quarter mile away and one is

10   a half a mile away, I would expect that the one a quarter

11   mile away, if everything is equal in a perfect world, is

12   going to provide the better and stronger signal.  However,

13   there are some other factors that would affect that.

14   Q    Would you be able to say something like a device

15   connected to the closest cell site 80 percent of the time?

16   A    No, I can't -- I can't quantify because every

17   connection to the network, there's an infinite number of

18   possibilities of location of device, you know, relative to

19   the -- relative to the surrounding network.

20          And as the network has become very dense, and

21   particularly -- I'm just thinking of Manhattan, but in other

22   areas here where there are different types of cell sites in

23   very close proximity, it may not be the very closest cell

24   site and often it's not the closest because there are --

25   sometimes on a city block in Manhattan you could have a

1    dozen cell sites providing specified coverage.

2              So I would never say that the phone is definitely

3    on this block because it connected to this.  Rather, I'd

4    overestimate that coverage area if we don't know precisely

5    just because of those intricacies of the network.

6    Q    But you can comfortable say that the device, at the

7    time the connection is made, is within that cell site's

8    coverage area?

9    A    Yes, it has to be within the coverage area.

10   Q    And you've talked about this a bit, but there are a

11   number of factors that will determine which cell site has

12   the strongest signal?

13   A    Yes.

14   Q    Like phone bandwidth?

15   A    No, that shouldn't affect it.

16   Q    How about terrain?

17   A    Terrain could affect it, yes.

18   Q    And as you said on direct, if a device is above ground

19   or below ground?

20   A    Yes, that could have an effect on the best signal, for

21   sure.

22   Q    How about the weather?

23   A    Generally not.  The cell sites are operating at

24   frequencies that are designed to work in all types of

25   weather.

1    Q    And how about how high the cell site is off the ground?

2    A    Yeah, that could have an effect.

3    Q    And other design characteristics of the cell site?

4    A    Yes.

5    Q    Is it possible that a cell site could be out of

6    service?

7    A    It is possible, yes.

8         MS. THIELE:  Mr. Gover, can you please pull up

9    Government Exhibit 26 again, at page 4.

10        (Exhibit published.)

11   Q    Agent Busick, you include these sector illustrations

12   throughout your report; is that correct?

13   A    Yes.

14   Q    And you testified that the shaded arc generally

15   indicates the direction of the radiofrequency signal?

16   A    Yes, but is not the coverage boundary.

17   Q    Right.

18        And looking at this illustration, the lines that

19   are extending out from the cell site, these don't exactly

20   correspond to the coverage area, correct?

21   A    Correct.  It's an illustration just to show the

22   direction of the signal from the cell site.

23   Q    The call detail records themselves do not tell you how

24   large or small the coverage area is for each cell site?

25   A    Correct.

1    Q    You also mentioned something about drive tests.  Can

2    you tell us about that?

3    A    Sure.

4         So a drive test would be if we wanted to

5    determine, as precisely as possible, the actual coverage

6    area of a particular cell site, we would utilize this

7    equipment.  It's basically a scanner that scans all the

8    cellular frequencies.  And we would drive around the

9    entirety of the area surrounding that cell site collecting

10   data on the strength of the radiofrequency throughout the

11   area that we've driven until we've done enough to get the

12   boundaries of that particular cell site, and that would

13   allow us to illustrate more precisely where that coverage is

14   and where it is not.

15   Q    So was that test conducted in this case?

16   A    No.  And the thing about a drive test is that it has to

17   be conducted -- it generally needs to be conducted

18   contemporaneously or as close as possible in time to the

19   records that are being mapped.  The reason being that the

20   AT&T cellular network of 2018 is going to look a bit

21   different than it does now as, you know, technologies have

22   been rolled out, 5G coverage has been enhanced.

23        So even if I was to do a drive test, say, today on

24   any one of these particular cell sites, the picture we get

25   may not be reflective of what it was in 2018.

1    Q    So if you received the call detail records from April

2    2018 in this case at the time, getting the records in

3    April 2018, a drive test at that point would have helped

4    validate the analysis in your report?

5    A    Certainly a drive test would have allowed seeing

6    precisely the coverage area boundaries of the cell site.

7              I will say that in the vast majority of cases, we

8    don't do drive testing because it's not -- there's certain

9    circumstances where we do do it, but oftentimes it's not

10   adding a lot to the analysis because I still am not going to

11   be able to say that the phone was -- even if, say, a

12   particular location was within the boundaries of the actual

13   coverage areas as mapped, I'm still not going to say that

14   the phone was definitely at that address.

15             So there are times where that is important, but

16   given the volume and the number of cell sites that are in a

17   lot of these reports, it is typically not adding a lot of

18   clarity to my assessment of the approximate location of the

19   phone.

20             MS. THIELE:  Mr. Gover, can you please pull up

21   Government Exhibit 26 again, at page 23.

22             (Exhibit published.)

23   Q    Agent Busick, did any data in the call detail records

24   in this case, specifically for numbers ending in 4723 and

25   number ending in 1072, indicate cell site connections in

1   Canarsie, Brooklyn after 11:33 p.m. on April 7, 2018?

2   A    Not between 11:33 and midnight on -- if you're asking

3   just about the 7th, no.

4         MS. THIELE:  And, Mr. Gover, can you please go to

5   page 24.

6   Q    And what about in between 12 a.m. and 9:09 a.m. on

7   April 8th?

8   A    No, there was no usage, recorded usage by either of the

9   phones until 9:09 a.m.  So no location information.

10        MS. THIELE:  Can you please go to page 25.

11  Q    Are there any recorded connections to cell sites in or

12  around Canarsie, Brooklyn, after 10:58 p.m. on April 8,

13  2018?

14  A    No, not on April 8th after 10:58 p.m., no.

15        MS. THIELE:  Page 26, Mr. Gover.

16  Q    How about any connection to cell sites in or around

17  Canarsie, Brooklyn between 12 a.m. and 7:25 a.m. on April 9,

18  2018?

19  A    No.

20  Q    Okay.  I believe we're on page 26.

21        How about between 7:25 and 11:06 a.m. on April 9,

22  2018, are there any connections to cell sites in Canarsie?

23  A    No, there were not.

24        MS. THIELE:  Page 27, Mr. Gover.

25  Q    What about in between 11:14 a.m. and 12:59 p.m. on

1    April 9, 2018, any Canarsie connections?

2    A    No.

3    Q    From the data you analyzed for phone numbers ending in

4    1072 and 4723 in this case, it's true that you cannot tell

5    us the precise locations of either device at any time

6    between April 2nd and April 10th of 2018, correct?

7    A    I wouldn't -- I don't characterize it that way, but I

8    cannot tell you a precise address that the phone was at

9    based solely on the records at any given time.

10   Q    And based solely on the records, you also cannot tell

11   us even the general vicinity that either of these devices

12   were in in between connections to cell sites, right?

13   A    Depending on the distance, amount of time.  But no, if

14   there's no connection, I can't tell you where the phone was

15   or was not.  If there's two connections very close together,

16   we can assess that the phone probably did not go far.  But

17   in some of the examples you gave, if there's eight hours of

18   time between connections, I can't tell you where the phone

19   was or was not during that time.

20            MS. THIELE:  Thank you, Agent Busick.  No further

21   questions.

22            THE COURT:  Any redirect?

23            MS. DEAN:  Just very briefly, Your Honor.

24            THE COURT:  Okay.

25            MS. DEAN:  Thank you.

R. Busick - Redirect - Ms. Dean                 756

1   REDIRECT EXAMINATION

2   BY MS. DEAN:

3   Q    Agent Busick, what happens to cell site location

4   information if you turn your phone off?

5   A    If you turn your phone off, then it won't be connected

6   to the network and there will not be any location

7   information generated for the phone during whatever time

8   that it's off and disconnected from the network.

9   Q    Let's zero in on two time frames that you were just

10  asked about on cross-examination.

11          MS. DEAN:  I want to first put up slides -- let's

12  start with slide 25.

13          (Exhibit published.)

14  Q    On April 8, 2018, what is the last time that there was

15  user activity from the Cory Martin phone?

16  A    On April 8th -- and I apologize, you'll have to zoom in

17  a little bit -- 6:36 p.m.

18  Q    Now let's turn to slide 26 that you were just asked

19  about -- actually, let's go to slide 27, on April 9th.

20          After 6:36 p.m. on April 8th, what is the next

21  time there is any cell phone user activity on the Cory

22  Martin phone?

23  A    11:14 a.m.

24  Q    Let's look at April 7th into April 8th.

25          MS. DEAN:  If we can go to slide 23.

*R. Busick - Recross - Ms. Thiele*                    757

1   Q    On April 7th, what is the last time that there was any

2   user activity on the Cory Martin phone?

3   A    11:01 p.m.

4   Q    And turning to slide 24, what is the next time the

5   morning of April 8th that there's any user activity on the

6   Cory Martin phone?

7   A    If you could just zoom in again for me, please.  Thank

8   you.

9             9:18 a.m.

10            MS. DEAN:  No further questions.

11            THE COURT:  Any recross?

12            MS. THIELE:  Briefly, Your Honor.  Thank you.

13  RECROSS EXAMINATION

14  BY MS. THIELE:

15  Q    Agent Busick, can you from the call detail records

16  only, actually tell us whether user activity ended at any of

17  these times?

18  A    I can only tell you when the last -- the last recorded

19  interaction with the network was based on a call or text

20  message.

21  Q    So it's possible that the person could have been on

22  Facebook?

23  A    Yes.

24  Q    Or sending a Facebook message?

25  A    Yes.

*R. Busick - Recross - Ms. Thiele*                758

1   Q    Or making a Facebook call?

2   A    That is possible, yes.

3            MS. THIELE:  Nothing further.

4            THE COURT:  Anything else?

5            MS. DEAN:  No, thank you, Your Honor.

6            THE COURT:  All right.

7            You can step down.  Thanks so much.

8            THE WITNESS:  Thank you.

9            (Witness is excused.)

10           THE COURT:  Are you ready to call your next

11  witness?

12           MS. HAJJAR:  Yes, Your Honor.  The Government

13  calls Cedric Raymondo.

14           (Witness takes the stand.)

15           THE COURTROOM DEPUTY:  Raise your right hand for

16  me, please.

17           (Witness sworn.)

18           THE COURTROOM DEPUTY:  Please state your name for

19  the record?

20           THE WITNESS:  My name is Officer Cedric Raymondo

21  from 76th Precinct.

22           THE COURTROOM DEPUTY:  Thank you.  Have a seat.

23           THE COURT:  Officer Raymondo, that chair doesn't

24  move, but you can pull the microphone.

25           THE WITNESS:  Got it.

*C. Raymondo - Direct - Ms. Hajjar*          759

1          THE COURT:  That moves.  You can pull it all the
2    way up if you want.
3          Now, I have a feeling you might be a fast talker.
4          THE WITNESS:  I'll slow down.
5          THE COURT:  The court reporter has to take down
6    everything that you say, so --
7          THE WITNESS:  Slow.
8          THE COURT:  Like you've turned whatever the knob
9    is on a tape -- well, that's too old-fashioned.
10          So really do your best just to speak slowly.
11          THE WITNESS:  Okay.
12          THE COURT:  I do want to make sure everybody hears
13    you at both tables and of course the jury.
14          If there is a question that you're asked that you
15    don't understand or you want to have repeated, just let me
16    know.  Okay?
17          THE WITNESS:  No problem.
18          THE COURT:  Go ahead.
19    **CEDRIC RAYMONDO**,
20          called as a witness, having been first duly
21          sworn/affirmed, was examined and testified as
22          follows:
23    DIRECT EXAMINATION
24    BY MS. HAJJAR:
25    Q    Good afternoon, Officer Raymondo.

*C. Raymondo - Direct - Ms. Hajjar*                    760

1   A    Good afternoon.

2   Q    How long have you worked for the NYPD?

3   A    About seven years now.

4   Q    And can you tell us where you worked for the NYPD?

5   Where did you start your career?

6   A    I started my career in the 105th Precinct.

7   Q    And how long were you there for?

8   A    About five and a half years.

9   Q    And after that?

10  A    The 76th Precinct, currently.

11  Q    What are your duties and responsibilities now?

12  A    I patrol.

13  Q    And what years did you -- you said -- what years did

14  you work at the 105th Precinct?

15  A    2017 to 2023.

16  Q    And what area does that cover?

17  A    105 covers Rosedale, Springfield Gardens, New Hyde

18  Park, Queens Village.

19  Q    Is that all in Queens, New York?

20  A    All in Queens, yes.

21  Q    And directing your attention to January 7, 2018, were

22  you working in the 105th Precinct that day?

23  A    Yes.

24  Q    What were your hours that day?

25  A    I was working 2315 to 0750.

C. Raymondo - Direct - Ms. Hajjar          761

1   Q    Is that 11:15 to 7:50 a.m.?

2   A    Yes.

3   Q    With that's an overnight shift?

4   A    Yes, overnight shift.

5   Q    What was your assignment that day?

6   A    I was patrol.

7   Q    Were you alone or with a partner?

8   A    The with a partner.

9   Q    And were you in uniform or plain clothes?

10  A    In uniform.

11  Q    On foot or in a vehicle?

12  A    In a vehicle.

13  Q    Directing your attention to about midnight on

14  January 27, 2018, did you receive a new job on the radio?

15  A    Yes.

16  Q    What was that?

17  A    It was a assault in progress.

18  Q    And where was that job?

19  A    It was at 249-45 148th Road in Rosedale.

20  Q    That's in Queens, New York?

21  A    Yes.

22  Q    What did you do?

23  A    I -- the central raised me saying that there was a job

24  at that location, and I acknowledged.

25  Q    Can you just explain to the jury what it means to

C. Raymondo - Direct - Ms. Hajjar                762

1   receive a job and to acknowledge --

2   A    The central raises the sector and concern of where that

3   job is located, and whoever is patrolling the area, we just

4   respond saying we're responding to that location.

5   Q    Is that like in response to an emergency call?

6   A    Yes.

7   Q    Did you respond to that particular job?

8   A    Yes, I did.

9   Q    What information did you have at the time you

10  responded?

11  A    At the time of responding, it was -- central told us

12  there was a female outside and that she was getting hit by

13  her boyfriend.

14  Q    Okay.  Can you describe the area that you responded to?

15  A    Residential.

16  Q    And did you report to the address you were given?

17  A    Yes, we reported to the address, and when we got to the

18  location, a female was on the corner.  We got out of the

19  car, started to talk to her.  She was a female wearing a,

20  like, black robe, and she was outside and she was crying and

21  she was frantic, and she was telling us what happened, why

22  she called 911 and why she was outside.

23          She just told us that her boyfriend came home, and

24  he was really drunk, and he punched her in the face on both

25  sides, she said.  He also put his hands around her throat,

*C. Raymondo - Direct - Ms. Hajjar*                    763

1    and also he threatened to slice her throat and her kid's

2    throat.  She also said that he was in the house and he had a

3    knife with him.

4    Q    Did you learn this woman's name at any point?

5    A    Yes.

6    Q    What was her name?

7    A    Adelle Anderson.

8    Q    And you said that she reported that someone threatened

9    her and her child?

10   A    Yes.

11   Q    Did she provide a gender of the child?

12   A    No, I don't remember.

13   Q    You don't remember.

14        Did she say anything else about who was in the

15   house?

16   A    She said that my sister's in the house, but she's

17   locked in her bedroom, she doesn't want to come out.

18   Q    And what did she say she did when her boyfriend

19   assaulted her?

20   A    That she -- she ran outside.

21   Q    Can you describe the woman?

22   A    Female, black.

23   Q    Did you say she was wearing something specific?

24   A    A black robe.

25   Q    Did you learn if anyone else was inside the house?

C. Raymondo - Direct - Ms. Hajjar                764

1   A    She told me her boyfriend was in the house and her

2   sister was in the house.

3   Q    Now, did there come a time where someone was arrested

4   inside the residence?

5   A    Yes.

6   Q    Do you know what that person's name was?

7   A    Cory Martin.

8   Q    Were you involved in that arrest?

9   A    No.

10  Q    Did there come a time that you took photographs of

11  Anderson?

12  A    Yes.

13       MS. THIELE:  I'd like to show the witness what's

14  marked for identification only as Government Exhibit 996.

15       THE COURT:  Did other police officers respond?

16       THE WITNESS:  Excuse me?

17       THE COURT:  Did other police officers respond?

18       THE WITNESS:  Yes, they did, yes.

19  Q    Do you recognize this exhibit?

20  A    Yes.

21  Q    And what do you recognize it as?

22  A    That's Adelle Anderson.  That's inside of her home in

23  the picture.

24  Q    Is that a photograph that you took?

25  A    Yes.

C. Raymondo - Direct - Ms. Hajjar                765

1        MS. HAJJAR:  I offer Government Exhibit 996 and
2   ask that it be published.
3        THE COURT:  Any objection?
4        MR. CECUTTI:  No objection.
5        THE COURT:  All right.  That will be in evidence.
6        (Government's Exhibit 996 received in evidence.)
7        (Exhibit published.)
8   Q    This is the photograph that you took of Adelle
9   Anderson, Officer Raymondo?
10  A    Yes.
11       MS. HAJJAR:  You can take that down.
12  Q    Do you remember if you ever met the woman inside the
13  home that Ms. Anderson described as her sister?
14  A    I don't.
15  Q    Did she say anything about her?
16  A    No.  She just said that when she was screaming for
17  help, that her sister was banging on the door of her bedroom
18  and that's how she was able to get away and run outside.
19  That's all she said.  When we got to the scene, when we
20  asked her who was in the house, she said her sister and her
21  boyfriend, and she said, well, can you call her to tell her
22  to come out?  She doesn't know -- I can't -- she doesn't
23  want to come out because she's locked in her bedroom; she's
24  scared.
25  Q    Did you have any other involvement in this incident or

1    any further investigation into this case?

2    A    No.

3              MS. HAJJAR:  No further questions, Your Honor.

4              THE COURT:  Any cross-examination?

5              MR. CECUTTI:  Yes, Your Honor.

6    CROSS-EXAMINATION

7    BY MR. CECUTTI:

8    Q    Good afternoon.

9    A    Good afternoon.

10   Q    As part of your responsibilities on the night of

11   January 27th, you completed reports?

12   A    Yes.

13   Q    You completed an arrest report?

14   A    Yes.

15   Q    Complaint report?

16   A    Yes.

17   Q    And some incident reports?

18   A    Yes.

19   Q    And in your incident report, you indicated that

20   Ms. Anderson didn't have any visible marks, correct?

21   A    That's correct.

22             MR. CECUTTI:  I have nothing further.

23             THE COURT:  Any redirect?

24             MS. HAJJAR:  No, Your Honor.

25             THE COURT:  All right, Officer, thanks so much.

*Proceedings*                                                767

1          THE WITNESS:  Thank you.

2          (Witness is excused.)

3          THE COURT:  Are you ready to call your next

4    witness?

5          MR. PALACIO:  Yes, Your Honor.

6          But, Your Honor, before I call the next witness,

7    I'd like to read in a stipulation.

8          THE COURT:  Sure.

9          MR. PALACIO:  Your Honor, this is Government

10   Exhibit 1202.  It's a stipulation that reads:

11         It is hereby stipulated and agreed by and between

12   the United States of America, by the undersigned Assistant

13   United States Attorneys, and the defendant, Cory Martin, by

14   his undersigned attorneys, as follows:

15         1:  Government Exhibit 102 contains surveillance

16   footage from a residence located at 249-44 148th Road,

17   Queens, New York, between April 2, 2018 through April 9,

18   2018.

19         2:  Government Exhibit 103 contains surveillance

20   footage from two cameras of a DVR system belonging to a

21   residence located at 249-40 148th Road, Queens, New York,

22   between April 7 and April 10, 2018.  The DVR system did not

23   contain video surveillance footage before April 7, 2018.

24         3:  Government Exhibit 111 contains surveillance

25   footage from a residence located at 93-19 Schenck Street,

*Proceedings*                                                         768

1    Brooklyn, New York, between April 2, 2018 and April 5, 2018,

2    as well as video from April 6, 2018 and April 9, 2018.  The

3    date depicted on the video of Government Exhibit -- it

4    should be 111 -- is accurate, and the time on the video is

5    approximate two minutes slow.

6              4:  Government Exhibit 104 contains surveillance

7    footage from a residence located at 249-39 148th Road,

8    Queens, New York, for certain time periods between April 2,

9    2018 and April 5, 2018.  The date depicted on the video of

10   Government Exhibit 104 is accurate, and the time on the

11   video is approximately 8 hours and 15 minutes fast.

12             This stipulation is admissible in evidence as

13   Government Exhibit 1202.  It's dated with today's date and

14   signed by the parties.

15             Your Honor, at this time the Government calls

16   Detective Omar Santiago.

17             (Witness takes the stand.)

18

19             (Continued on the following page.)

20

21

22

23

24

25

Proceedings                                          769

1                (In open court; Jury present.)

2                (Witness takes the witness stand.)

3                THE COURTROOM DEPUTY:  Raise your right hand for

4     me, please.

5                THE WITNESS:  Yes.

6                THE COURTROOM DEPUTY:  Please state your name for

7     record.

8                THE WITNESS:  Detective Omar Santiago.

9                (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O. Santiago - Direct - Mr. Palacio          770

1    **OMAR SANTIAGO**,

2         called as a witness by the Government, having been first

3    duly sworn/affirmed by the Courtroom Deputy, was examined and

4    testified as follows:

5              THE COURTROOM DEPUTY:  Thank you.

6              THE COURT:  All right, Detective, just a couple of

7    things.  I want to make sure everybody can hear you.  So

8    just -- that chair doesn't move, sorry.  We should have a

9    sign on it.  The microphone does.  And I do want to make sure

10   that everybody can hear you, so just make sure you're making

11   good use of it.  Don't speak too fast.  It's very hard on the

12   court reporter and I don't want her to quit.

13             If there's a question that you don't understand or

14   want to have repeated, just let me know.  Okay?

15             THE WITNESS:  Okay, no problem.

16             THE COURT:  Go ahead.

17             MR. PALACIO:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. PALACIO:

20   Q    Detective, how long have you been with the NYPD?

21   A    In July it will be 21 years.

22   Q    Can you tell us about your career following graduation

23   from the academy?

24   A    Once I graduated I went to the 7-5 Precinct in East New

25   York.  I was there for six months.

O. Santiago - Direct - Mr. Palacio            771

1          In July of -- in July of '04 I ended up in the 8-4

2    Precinct, it covers downtown Brooklyn, this area here.

3          In July of 2014, I was transferred to the 6-0

4    Detective Squad that covers the Coney Island area of Brooklyn

5    and Brighton Beach area also.

6          In January of 2018, I was temporarily assigned to

7    Brooklyn South Homicide for a year and a half.  So I went

8    back to the 6-0 in July of '19.

9          In July of '20, they had me start the video team,

10   which is where I'm at today, I'm assigned to today.

11   Q     Can you tell us what the video team is?

12   A     So we go out and we get videos for different

13   instances -- incidents, shootings, homicide, any case that

14   makes the media they need help with, give us a call.  Hate

15   crimes, arsons, they'll call us up and we'll get the videos

16   for those incidents and then we'll make compilations.

17   Q     In what type of videos do you collect?

18   A     All types of videos from houses, businesses, vehicles,

19   doorbell cameras, pretty much anything.

20   Q     How do you assist other detectives through your work in

21   the video team?

22   A     Having video of the incidents what makes a case

23   sometimes, you know.  Or you see witnesses on it.  It makes

24   the case.

25   Q     And you said that you make compilation videos; is that

O. Santiago - Direct - Mr. Palacio                772

1   right?

2   A    Yes.

3   Q    Can you tell us what a compilation video is?

4   A    The compilation video is you collect videos from

5   different locations in the city, you keep just a probative

6   portion of those videos and then you splice them together to

7   make like a movie, what happened.

8   Q    Can you tell us what a DVR is?

9   A    A DVR is a digital recording system for cameras.  The

10  cameras get the footage and it's recorded on to a DVR.

11  Q    So when you respond to a location, how do you generally

12  collect surveillance video?

13  A    We go -- normally we go straight to the DVR, put in a

14  thumb drive and we ascertain if there's a time difference, if

15  the timestamp is accurate, we note that, and if there's a

16  time difference we adjust for the time we're looking for and

17  then we download it on to a thumb drive.

18  Q    How do you verify the accuracy of a date and timestamp

19  on surveillance video that you collect?

20  A    So you go to the live feed, it's the time that's now,

21  and you compare the time on the monitor to the time on your

22  watch or your phone.

23  Q    Are there other ways to verify the accuracy of a

24  timestamp?

25  A    Yes.

O. Santiago - Direct - Mr. Palacio          773

1   Q    Can you tell us how you do that?

2   A    So if you have two locations where the camera footage,

3   the camera angle cross, and you know that this camera is off

4   or this camera is accurate and you're looking at camera B and

5   you -- and it's off by hours or whatever, you know that

6   something happened on camera A at 1 o'clock, when you see

7   that same incident on camera B you know that that incident

8   happened at 1 o'clock, so you could adjust the timestamp, the

9   real time from the timestamp.

10  Q    Now based on your training and experience, are there

11  times when a DVR system differs from realtime?

12  A    Many times.

13  Q    Can you tell us what causes that?

14  A    DVRs, just like everything else, DVRs, there's -- there

15  is a time differences.  It uses, let's say one DVR loses one

16  second every month.  This DVR loses one second every three

17  months.  This DVR loses one second every three days.  It is

18  never in sequence.  So just like a microwave may not matches

19  the time on the wall, but then after a couple of months the

20  time is different.

21  Q    And do DVR systems automatically account for Daylight

22  Savings Time?

23  A    Most systems you have to set up to do that.

24  Q    Now you told us that you create compilation videos, can

25  you tell us how you do that?

O. Santiago - Direct - Mr. Palacio                    774

1   A    I use a software, we use Camtasia.

2           THE COURT:  What is it called?

3           THE WITNESS:  Camtasia.

4           THE COURT:  Camtasia?

5           THE WITNESS:  Yes.

6   BY MR. PALACIO:

7   Q    Can you describe that a little bit more for us, what is

8   Camtasia and what does it allows you to do?

9   A    Camtasia is a video editing software.  The department

10  gives us Camtasia, so we use Camtasia.  You could splice, cut

11  video, add other videos to it and just make compilations of

12  it, make videos with it.

13  Q    Approximately how many video compilations have you made

14  over the course of your career?

15  A    Hundreds.

16  Q    Now do you also train other detectives in using Camtasia

17  and how to create compilation videos?

18  A    Yes.

19  Q    Did there come a point in time when you became involved

20  in an investigation into the discovery of a dismembered

21  female named Brady Odom in Canarsie Park, Brooklyn?

22  A    Yes.

23  Q    When did you first become involved in that

24  investigation?

25  A    On April 10th of 2018.

O. Santiago - Direct - Mr. Palacio          775

1    Q    Did you actually respond to Canarsie Park that day?

2    A    On April 10th, yes.

3    Q    Are you aware when Ms. Odom's body was initially

4    discovered?

5    A    Yes.

6    Q    When was that?

7    A    On the 9th, April 9th of 2018.

8    Q    When you responded to the park on April 10th, 2018, did

9    you speak with other detectives investigating the case?

10   A    Yes.

11   Q    And did you conduct a video canvass?

12   A    Yes.

13   Q    Can you tell the jury what a video canvass is?

14   A    So a video canvass is you walk around and try to get

15   cameras that may have captured what you're looking for, may

16   have capture the incident.  So you walk around, see how many

17   cameras could you find to see how many cameras that capture

18   the area you want --

19            THE COURT:  Slow down just a little bit.

20            THE WITNESS:  All right.

21            THE COURT:  That's fine.

22   A    Capture the area you want and you collect those videos.

23   Q    When you say you walk around, what type of locations do

24   you go to?

25   A    Different locations, mostly commercial, like stores,

O. Santiago - Direct - Mr. Palacio          776

1   bodegas, or residentials, many residential houses.

2   Q    And did you begin collecting surveillance video that day

3   on the 10th?

4   A    Yes.

5   Q    Did you continue to canvass for surveillance video past

6   April 10th?

7   A    Yes.

8   Q    About how long did that canvass continue?

9   A    I think the last video I collected was on April 20th.

10  Q    Did other detectives participate in the video canvass?

11  A    Yes.

12        MR. PALACIO:  Now if we could show the witness

13  what's in evidence as Government's Exhibit 12.  If we can

14  sort of zoom in.

15  Q    Detective Santiago, were there particular locations or

16  areas that you focused on for collecting video?

17  A    I focused on the surrounding area of Canarsie Park.

18  Seaview Avenue, which is the avenue just above the park, and

19  Skidmore which is on the east side, the top -- the top east

20  side of the park, and then Schenck, which is the bottom east

21  side and there is also one that's off the camera angle, East

22  93rd Street, I also canvassed there.

23  Q    I think you should be able to touch the screen and maybe

24  if you could draw a line along Seaview Avenue.

25  A    Seaview Avenue.

O. Santiago - Direct - Mr. Palacio          777

1  Q    Okay.  And the other locations?

2  A    This is Skidmore and this is Schenck this way.  And then

3  93rd is up here.

4  Q    You've indicated with your finger the locations of these

5  streets; is that correct?

6  A    Correct.

7  Q    Why did you focus on these particular areas?

8  A    Because going with the assumption that whoever took --

9  put the body there had to go through one of these streets

10 since this is the only access -- this is essentially the only

11 access to the park.

12 Q    Did you look for surveillance video on the residential

13 blocks along Seaview Avenue as well?

14 A    Yes.

15 Q    What did you do?

16 A    I went -- I first got footage on Seaview Avenue, then I

17 went -- I tried to get video from at least every block, every

18 block, so, like, a person or vehicle passes up and down the

19 block I could at least have one video showing the person or

20 the vehicle.

21 Q    When you say blocks, are you talking from the 80s until

22 the 90s along Seaview Avenue?

23 A    Yes, I got from 85th, I tried from 84th and also East

24 80th, all the way to East 93rd Street.

25 Q    Were you able to collect surveillance video from these

O. Santiago - Direct - Mr. Palacio                778

1   various areas?

2   A     From a lot of the areas, yes.

3   Q     From what type of locations?

4   A     One was a dentist and the rest were residential houses.

5   Q     Now, at that point in time in the investigation, was

6   there a general time frame that you were focused on as you

7   collected surveillance video near Canarsie Park?

8   A     So we were going with the assumption that the body was

9   dropped off during the daytime on the 8th, 'cause it -- we

10  assumed it would have been reported.  So we started on just

11  before dusk, just before nighttime on the 8th and we

12  collected -- I collected up to around eight, 9 o'clock on the

13  ninth.

14        THE COURT:  9 o'clock a.m. or p.m.?

15  A     A.m., sorry.

16  Q     Why until 9 o'clock a.m. more or less on the 9th?

17  A     Because by that time it was reported that the body had

18  already been discovered.

19  Q     Can you tell us, as you collected video, what you were

20  looking for?

21  A     We had no information, we were looking for anything

22  suspicious.  So initially we were just collecting the video

23  and then whatever recorded recorded and then we would go

24  through it later.

25  Q     Approximately how many hours of surveillance video did

O. Santiago - Direct - Mr. Palacio          779

1  you and other detectives collect?

2  A    Me alone was over 250 hours.

3  Q    Now, other than collecting surveillance video, were you

4  involved in the actual investigation into the homicide of

5  Brandy Odom?

6  A    No.

7  Q    Did there also come a time when you received

8  surveillance video collected by other detectives?

9  A    Yes.

10 Q    Did that include video collected from detectives from

11 the following locations in Queens:  249-40 148th Road, 249-44

12 148th Road and 249-39 148th Road?

13 A    Yes.

14 Q    What type of locations are those addresses?

15 A    Those are all residential houses.

16 Q    Did there come a point on April 8th, 2023 when you drove

17 around Canarsie Park in connection with this case?

18 A    Yes.

19 Q    And who did you drive around the park with?

20 A    I drove around with -- a couple of prosecutors, a FBI

21 agent, and Adelle Anderson.

22 Q    Had you ever met Adelle Anderson?

23 A    No.

24 Q    What was reason for the drive with Ms. Anderson?

25 A    I wanted to see what route was driven to the park and

O. Santiago - Direct - Mr. Palacio                780

1   also where -- where the vehicle was stopped at.

2   Q    And during the drive around the park with Ms. Anderson,

3   where did she sit?

4   A    She sat in the passenger seat.

5   Q    Can you tell us what locations you drove with her?

6   A    We started by the Belt Parkway on Rockaway Parkway.  We

7   drove north, and then we turned on to Skidmore Avenue.  And

8   drove down to the corner here of Skidmore and Schenck.

9   Q    You've drawn a circle around the location where Skidmore

10  and Schenck meet, correct?

11  A    Correct.

12        MR. PALACIO:  I'd like to show you what's in

13  evidence as 992A.

14        There should be a bottom at the bottom to clear.

15        THE COURT:  On the left.  It says clear.

16        THE WITNESS:  There we go.

17  Q    Detective, you told us you went with Ms. Anderson to the

18  corner of Skidmore and Schenck?

19  A    Yes.

20  Q    What location is this at Government's 992A?

21  A    That's the corner of Skidmore and Schenck.

22  Q    Can you just describe that area for us, how it enters

23  the park?

24  A    It's -- it's like a U-turn there.  Skidmore runs into

25  Schenck, like it almost like a U-turn and then there's

O. Santiago - Direct - Mr. Palacio          781

1   entrances that you could walk into the park and there's one

2   entrance that's an official entrance to drive into the park,

3   which they lock down, and in 2018 there was a spot where cars

4   could unofficially drive in through the park.

5   Q    And where else did you drive to with Ms. Anderson?

6   A    We went back to towards the Belt Parkway and Rockaway

7   Parkway, we drove up Rockaway Parkway and turned westbound on

8   to Seaview Avenue, up to -- we drove up to East 88th Street.

9            MR. PALACIO:  I'd like to show you what's in

10  evidence as 992D.

11  Q    What location is this?

12  A    That's Seaview and East 88th Street.

13  Q    And did Ms. Anderson draw your attention to that

14  intersection?

15  A    Yes.

16  Q    Where else did you drive with Ms. Anderson?

17  A    Made a U-turn and we went westbound to Remsen and

18  Seaview Avenue.

19  Q    Just to be clear here on 992D, the street on the

20  right-hand side of the photo is that Seaview Avenue?

21  A    This is Seaview Avenue.

22  Q    Where would Remsen be?

23  A    Remsen would be over here somewhere.  Not that block,

24  the following block.

25  Q    So you've indicated towards the center of the photo

O. Santiago - Direct - Mr. Palacio          782

1   where Remsen Avenue would be, correct?

2   A    Correct.

3   Q    Over the course of your involvement in this

4   investigation, did you learn what type of car Ms. Anderson

5   drove in 2018?

6   A    Yes.

7   Q    And what type of car was that?

8   A    A Maxima, a Nissan Maxima.

9           MR. PALACIO:  I'd like show you what's in evidence

10  as Government's Exhibit 909.

11          (Exhibit published.)

12  Q    Did you receive these photographs from the government?

13  A    Yes.

14  Q    What did you notice about the car?

15  A    The car had fade marks on the roof of the car, so I

16  guess up here it has fade marks.

17  Q    How would you describe those fade marks?

18  A    Big, and they stand out.  It's like a gray, gray color

19  to them.

20          MR. PALACIO:  If we could show the witness

21  Government's Exhibit 913 is evidence.

22          (Exhibit published.)

23  Q    Did you notice any other fade marks to that vehicle?

24  A    Yes.  The fade marks continue on the roof up here.  And

25  then on the trunk of the vehicle down here.

O. Santiago - Direct - Mr. Palacio                783

1    Q    And what type of car is this again?  I'm sorry.

2    A    Nissan Maxima.

3         MR. PALACIO:  You can take this down.

4    Q    After the drive with Ms. Anderson and after reviewing

5    those pictures of what her car looked like in 2018, did you

6    go back to review video that you had originally collected in

7    this case?

8    A    Yes.

9    Q    And how did that drive and the review of those pictures

10   help your reevaluation of the surveillance video?

11   A    Because now I knew what I was looking for, where I was

12   looking at and what items to also look for.

13   Q    So what did you do?

14   A    So I went to the footage.

15   Q    Did you have a more narrow time frame?

16   A    Yes.

17   Q    Were you able to see that Nissan Maxima in the area

18   around Canarsie Park?

19   A    Yes.

20   Q    On which date?

21   A    On April 9th, 2018.

22   Q    Did there come a point when you were asked by the

23   government to create a compilation for this case?

24   A    Yes.

25   Q    Did the overall compilation cover a particular time

O. Santiago - Direct - Mr. Palacio                784

1   frame?

2   A    Yes.

3   Q    What were the dates?

4   A    It covers from April 4th, 2018 -- I'm sorry, April 2nd,

5   2018 to April 9th, 2018.

6   Q    So to be clear, from April 2nd to April 9th, 2018?

7   A    Correct.

8   Q    And did you break down the compilation by day?

9   A    Yes.

10  Q    Now, in total, how many different camera locations did

11  you use to create the compilation for this case?

12  A    I used -- for the compilation I used nine locations.

13  Q    And was there another location that you used as a

14  reference point?

15  A    Yes.

16  Q    Would that be 10 locations in total?

17  A    Correct.

18         MR. PALACIO:  Your Honor, if we could show the

19  witness for ID only, Government's Exhibit 100.

20  Q    Detective, can you tell us what's in front of you as

21  Government's Exhibit 100?

22  A    This is a list of the locations where -- that I used in

23  the compilation and one location where I just has as a

24  reference.

25  Q    What other information does this chart include?

O. Santiago - Direct - Mr. Palacio                785

1  A    It shows the address and the time discrepancies between

2  the timestamp and actual time.

3        MR. PALACIO:  Your Honor, I'm offering into

4  evidence as Government's Exhibit 100.

5        THE COURT:  Any objection?

6        MS. THIELE:  No objection.

7        THE COURT:  That will come into evidence.

8        (Government's Exhibit 100 was received in

9  evidence.)

10       MR. PALACIO:  Mr. Rader, maybe we could focus in on

11  the first five.

12  Q    Detective, if you could give us the Government Exhibit

13  number and then the location of the video that were used in

14  this compilation as well as the time differences, please.

15  A    Okay.  GX102, that's 249-44 148th Road, and the time

16  discrepancy is 18 minutes and 57 seconds fast.

17       Next is GX103, which is 249-40 148th Road, and the

18  time discrepancy is five minutes and 32 seconds fast.

19       Next is the reference location which is GX104,

20  which is 249-39 148th Road and the time discrepancy is eight

21  hours and 15 minutes fast.

22       The next location is GX105, which is 1481 East 89th

23  street, and the time discrepancy is seven seconds slow.

24       The next location is GX106, which is 1459 East 87th

25  Street, and the time discrepancy is six seconds slow.

O. Santiago - Direct - Mr. Palacio                786

1    Q     If we could focus on the last five locations.

2    A     The next location is GX107, which is 1656 East 91st

3    Street, and the time discrepancy is accurate.

4          The next location is GX108, which is 1469 East 88th

5    Street, and the time discrepancy is 16 minutes, and 37

6    seconds fast.

7          Next location is GX109, which is 1669 East 92nd

8    Street, time discrepancy is 21 seconds slow.

9          Next location is GX110, and that's 1465 East 85th

10   Street, and the time discrepancy is 52 minutes and five

11   seconds slow.

12         Next location is GX111, that's 9319 Schenck Street

13   and the time discrepancy is two minutes slow.

14   Q     Okay.  And Detective Santiago, at these locations, how

15   many did you personally collect?

16   A     Six of them.

17   Q     Which numbers would those be?

18   A     GX105, GX106, GX107, GX108, GX109, GX110, and that's it.

19   Q     When you collected those videos, did you document any

20   time differences at or around the time you collected those

21   videos?

22   A     Yes.

23         MR. PALACIO:  With the Court's permission, I'd like

24   to show the witness what's marked as Government's Exhibit 101

25   for identification.

O. Santiago - Direct - Mr. Palacio          787

1          THE COURT:  All right.

2    Q    Detective, can you tell us what is marked as

3    Government's Exhibit 101 for identification containing

4    Government's Exhibits 102 and 111?

5    A    Repeat that question.

6    Q    Can you tell us what's in front of you as Government's

7    Exhibit 101 which contains Government's Exhibits 102 and 111?

8    A    It's a hard drive which contains the videos I used in

9    the compilation and the reference video.

10   Q    Does that contain all of the original footage from the

11   locations we just saw on the chart, Government's Exhibit 100?

12   A    Yes.

13          MR. PALACIO:  Your Honor offering into evidence as

14   Government's Exhibit 101.

15          THE COURT:  Any objection?

16          MS. THIELE:  No objection.

17          THE COURT:  All right.  That's in evidence.

18          (Government's Exhibit 101 was received in

19   evidence.)

20   Q    Detective Santiago, were you able to collect any video

21   from the early morning hours of April 8th?

22   A    The early hours of April 8th, in some locations, but

23   mostly no.

24   Q    Was any of that video probative?

25   A    No.

O. Santiago - Direct - Mr. Palacio                788

1    Q    Now coming back to the compilation video, did your

2    compilation focus on a house located at 249-45 148th Road in

3    Canarsie Park as well as Canarsie Park?

4    A    Yes.

5    Q    Now I'd like to focus first on the Queens portion of the

6    compilation video.  I'd like to show you what's marked as

7    Government's Exhibit 13 for identification.

8            MR. PALACIO:  Your Honor, may we also show

9    Government's Exhibit 13A for identification?

10           THE COURT:  Yes.

11   Q    Detective, do you recognize what's in front of you as

12   Government's Exhibit 13 and 13A?

13   A    Thirteen, yes.  And 13A, yes.

14   Q    Are these the same thing?

15   A    Yes.

16   Q    What do they show?

17   A    It shows a map, a map and insert in the map of Queens.

18   Q    Of what location?

19   A    Of 249-45 148th Road.

20           MR. PALACIO:  Your Honor, offering into evidence.

21           THE COURT:  Any objection?

22           MS. THIELE:  No objection.

23           THE COURT:  That's in evidence.

24           (Government's Exhibits 13 and 13A were received in

25   evidence.)

O. Santiago - Direct - Mr. Palacio          789

1        (Exhibit published.)

2        MR. PALACIO:  Your Honor, would we be able to post

3   this here?

4        THE COURT:  Yes, I want to make sure, Ms. Thiele,

5   if you want to come over and see what's going on, that's

6   fine.

7   Q    Detective, can you tell us what is highlighted by that

8   yellow bubble?

9   A    That's the insert I put to highlight the area around

10  249-45 148th Road.

11  Q    What neighborhood is this?

12  A    Rosedale.

13  Q    And do you see a street on the left-hand side that's

14  marked red?

15  A    Yes.

16  Q    What's the name of that street?

17  A    That's Brookdale Boulevard.

18  Q    Is that Brookville Boulevard?

19  A    Brookville Boulevard, I'm sorry, yes.

20  Q    Is it known by any other names?

21  A    Yes, Snake Road.

22  Q    Can you describe that road for us?

23  A    On the north side of the road it's a residential area,

24  then once you past that and you get to the middle it's like a

25  marsh land.  It used to be swampy, but now it's like

O. Santiago - Direct - Mr. Palacio          790

1   marshlands, it connects to the airport and to Five Towns.

2   Q    What is Five Towns?

3   A    Five Towns is a eyesore, it has a shopping center, but

4   it's an area in, I don't know if it's Long Island, where it's

5   like a shopping center.

6   Q    Do you see Five Towns on the map?

7   A    The Five Towns Shopping Center, it starts right here,

8   down here.  These white buildings at the bottom.

9   Q    You've indicated to the bottom of Government's

10  Exhibit 13; is that correct?

11  A    Yes.

12  Q    And have you driven down Snake Road?

13  A    Yes.

14  Q    And are you familiar with a location called Green Acres

15  Mall?

16  A    Yes.

17  Q    Do you see that on this map?

18  A    Yes.

19  Q    Can you tell us where that is?

20  A    It's in the top up here.

21  Q    And what type of businesses are in that location?

22  A    That's also a shopping center or shopping mall.

23  Q    What have you inserted in the map?

24  A    I put Home Depot, where Home Depot is at and Walmart,

25  where Walmart is at.

O. Santiago - Direct - Mr. Palacio          791

1   Q    Now what type of location is 249-45 148th Road?

2   A    A residential house.

3   Q    Did the compilation include video from locations around

4   that house?

5   A    Yes.

6   Q    Did those locations include 249-40 148th Road and 249-44

7   148th Road?

8   A    Yes.

9          MR. PALACIO:  If we could show the witness

10  Government's Exhibit 16.  Just for the witness only.

11  Q    Detective Santiago, can you tell us what we're looking

12  at here?

13  A    We're looking at a blown up version of the insert in the

14  previous photo.

15  Q    And what address is shown?

16  A    249-45 148th Road.

17  Q    Does this map show us the area around that address?

18  A    Yes.

19         MR. PALACIO:  Your Honor, offering into evidence as

20  Government's Exhibit 16?

21         THE COURT:  Any objection?

22         MS. THIELE:  No objection.

23         THE COURT:  All right, it's in evidence.

24         (Government's Exhibit 16 was received in evidence.)

25

O. Santiago - Direct - Mr. Palacio          792

1   Q    Detective, can you tell us where those two addresses

2   that were used in the compilation are in relation to 249-45?

3   A    They are across the street, so in the photo right

4   underneath them.

5   Q    And you said that there was a reference location that

6   you used 249-39 where is that?

7   A    That's next door, so it would be like under the "d" in

8   road, so right here, right under that circle.

9   Q    You're indicating on the same side of the street as

10  249-45?

11  A    Correct.  Next door.

12  Q    Now we see some red shading from 249-40 and 249-44, what

13  is that meant to show us?

14  A    That's the approximate camera angles of the videos from

15  those two locations.

16  Q    So in other words, does that show us the approximate

17  coverage of the video?

18  A    Yes.

19  Q    What are the cross streets here for that address?

20  A    The cross street is 256 Street and 249th Street.

21  Q    Now before you created the video compilation, were you

22  able to determine the time difference for the videos from

23  249-44 and 249-40 148th Road?

24  A    Yes.

25  Q    Can you tell us how you did that?

O. Santiago - Direct - Mr. Palacio          793

1  A     So it's documented that 249-39 is fast by eight hours

2  and 15 minutes.  So I looked for -- I went through the

3  footage and I looked for a moment in the video which shows

4  the incident.  It was just a guy like opening a trunk and I

5  knew that from the camera angle that it was -- that gentleman

6  opening the trunk would also be captured on the video from

7  249-44.  So now I took the timestamp, which is the time

8  that's embedded in the video, and I subtracted eight hours

9  and 15 minutes from the timestamp and it gave me a time of

10 113 and 30 seconds p.m. in the afternoon.  So then I knew

11 when the guy opened the trunk it was at 1:13:30 in the

12 afternoon, and 30 seconds in the afternoon.  So I went to the

13 249-44 video and I looked for that same -- same incident, the

14 guy opening the trunk and I found it, but I saw the time was

15 different on the timestamp, which means the timestamp is off

16 because we know that he opens the trunk at 1:13 and 30

17 seconds.  So then I subtracted the 1:13 and 30 seconds the

18 time, the actual time from the timestamp and determined that

19 the reason the time is off is 'cause the timestamp is fast by

20 18 minutes and 57 seconds.

21 Q     Fast or slow?

22 A     Fast.

23 Q     And did you use that same method to determine the time

24 difference for 249-40 148th Road?

25 A     Yes.

O. Santiago - Direct - Mr. Palacio          794

1   Q     What was time difference for that location?

2   A     The time difference was five minutes and 32 seconds

3   fast.

4   Q     Did you use that same method to look at different events

5   throughout the day that were captured on the same cameras to

6   make sure that the time differences were the same?

7   A     Yes.  I was able to confirm that the time differences

8   were accurate by looking at different events that were

9   captured by multiple cameras.

10  Q     Now, approximately how many hours of video did you watch

11  from these two locations?

12  A     Over a hundred.

13  Q     Did you watch continuous video from both of those

14  locations?

15  A     Yes.

16  Q     Did the compilation include all the movements in and out

17  of that house at 249-45 148th Road between April 2nd and

18  April 9, 2018?

19  A     Yes.

20  Q     Now, I'd like to talk to you about the Brooklyn portion

21  of the compilation video, and if we could show the witness

22  what's marked as Government's Exhibit 11 for identification.

23          Detective Santiago, can you tell us what's in front

24  of you as Government's Exhibit 11?

25  A     Yes, it's a map of the area around Canarsie Park.

O. Santiago - Direct - Mr. Palacio                   795

1    Q    And what else does the map show us?

2    A    The map shows addresses where the video was collected

3    from and approximate camera angles that they cover.

4              MR. PALACIO:  Your Honor, offering into evidence as

5    Government's Exhibit 11.

6              THE COURT:  Any objection?

7              MS. THIELE:  No objection.

8              THE COURT:  Okay.

9              (Government's Exhibit 11 was received in evidence.)

10             MR. PALACIO:  Mr. Rader, if we could focus in on

11   that area around Seaview.

12   Q    Detective Santiago, what do the yellow addresses show us

13   now that we have the exhibit in front of all of us?

14   A    Those are the locations where I collected video from.

15   Q    And the red shading, again what is that meant to show?

16   A    The approximate camera angle.

17   Q    And the location on the corner of East 88th Street and

18   Seaview Avenue, what type of location is that?

19   A    East 88th, that's a Jewish school.

20   Q    During your video canvass in 2018, were you able to

21   recover any video that captured the corner of East 88th and

22   Seaview Avenue?

23   A    The very corner, no.

24   Q    And if we could go to the area around Skidmore and

25   Schenck.  There is another location here, 9319 Schenck

O. Santiago - Direct - Mr. Palacio          796

1   Street, can you tell us the significance of that address?

2   A    That address -- the video from that address is also used

3   in the compilation.

4            MR. PALACIO:  We can take that down.

5   Q    Detective, now I'd like to turn to the actual

6   compilation you created for this case.

7            Can you tell us what Google Earth is and how you

8   used it in the compilation?

9   A    Google Earth is a mapping program.  It's just like

10  Google Maps but Google Earth you could zoom in and zoom out

11  and different -- use different camera angles and get a video

12  out of that.

13  Q    Did you do anything to indicate the passage of time

14  between different clips on the compilation?

15  A    Yes, I put a black screen and I indicated the time

16  that -- when it jumped from one time to another.

17  Q    Did you do anything to indicate the end of one day and

18  the start of another day?

19  A    Yes, I put the day that we're about to view.

20  Q    Did you include any effects in the videos?

21  A    Yes.

22  Q    Such as what?

23  A    I put a clock on the top right-hand corner that shows

24  the approximate actual time so it -- it's already built in

25  the time difference from the timestamp.

O. Santiago - Direct - Mr. Palacio                    797

1              In the bottom I put captions which show the address

2    of the video we're looking -- the location where the video is

3    taken from is shown in the bottom right-hand corner.

4              I put arrows to have you focus in on a particular

5    object or person.

6              I circled -- I put circles so you could -- to

7    highlight a portion of the video.

8              I put stills, I inserted stills in front of the

9    video so you could compare the footage with the still.

10   Q    Did you speed time of any portions?

11   A    Yes.  Some portions it's long so I sped through it and I

12   put how fast I sped through it.  There's one portion where I

13   had to slow down the video download -- downloaded fast this

14   happened, so I slowed it down to actual time and again

15   indicated on top.

16   Q    Now other than those effects, did you alter the videos

17   in any way?

18   A    Alter, no.  I also put a picture-in-picture.

19   Q    What is that?

20   A    I put picture-in-picture which is one video on top of

21   another video to show two things happening at approximately

22   the same time.

23              (Continued on the next page.)

24

25

1    BY MR. PALACIO:   (Continuing.)

2             MR. PALACIO:  Are we able to show Government's

3    Exhibit 112 to the witness only?  Ms. Greene, I think we have

4    to change from Mr. Rader.

5    Q    Detective Santiago, do you see what's in front of you as

6    Government's Exhibit 112?

7    A    Yes.

8    Q    What is this?

9    A    It's the compilation I made.

10   Q    Does this compilation include the videos from the

11   locations that we've talked about spanning the time of

12   April 2nd to April 9th, 2018?

13   A    Yes.

14            MR. PALACIO:  Your Honor, offering into evidence

15   Government's Exhibit 112.

16            THE COURT:  Any objection?

17            MS. THIELE:  No objection.

18            THE COURT:  All right.

19            (Government's Exhibit 112 was received in evidence.)

20   Q    Before we begin, Detective --

21            MR. PALACIO:  Are we able to dim the lights a little

22   bit?

23            THE COURT:  Just fair warning, sometimes every light

24   goes off so don't be alarmed.  But I think we should be able

25   to do it.

1          (Video played throughout examination.)

2  Q    Detective, I'll refer to the elapsed time at the bottom

3  of the video and I'll ask you from time to time the actual

4  converted time.

5          Here at about seven seconds into the video, what

6  locations are we focused on?

7  A    We're focused on the house on 249-45, the Rosedale area

8  of Queens, and the Canarsie Park -- around the Canarsie Park

9  area in Brooklyn.

10 Q    Just pausing here at 24 seconds into the video, can you

11 tell us what you've inserted before we begin?

12 A    On the top right I inserted a clock which shows

13 approximate time; and on the bottom right I show I inserted --

14 the caption shows the address of the location where we

15 received the video from.

16 Q    Do you see where 249-45 148th Road is?

17 A    Yes.

18 Q    Can you indicate that?

19 A    Yes.  It's like here.

20 Q    You've indicated the area where we see looks like a black

21 car in the driveway?

22 A    Yes.

23 Q    If you don't mind clearing that, please.

24 A    Yes.  I don't have the clear option here.  You have to

25 move the video.

1          THE COURTROOM DEPUTY:  It's right there in the

2    corner.

3    Q    And can you tell us what we see on the ground?

4    A    Snow.

5    Q    What is the converted time?

6    A    11:37 and 12 seconds in the morning.

7    Q    I'll play it from 24 seconds into the video.

8          Can you tell us what we see here at about 52 seconds

9    into the video?

10   A    An individual walking from 253rd Street into the driveway

11   of 249-45.

12   Q    And at about 1:29, can you tell us what we see here?

13   A    An individual walking out of the driveway of 45 and

14   walking up to 253rd Street.

15   Q    What is the converted time?

16   A    12:11, about 12:12 in the afternoon.

17   Q    I'm going to skip ahead to 4 minutes and 25 seconds into

18   the video.  By the way, what day of the week was April 2nd?

19   A    Monday.

20   Q    Here at about 4 minutes and 25 seconds into the video,

21   can you give us the converted time?

22   A    7:54 p.m.

23   Q    About 5 minutes into the video, can you tell us what we

24   see?

25   A    A vehicle is driving out of the driveway onto 148th Road

1    and turn to the left onto 253rd Street.

2    Q    About an hour-and-a-half later, can you tell us what we

3    see here?

4    A    A vehicle driving from 253rd Street onto 148th Road and

5    drives into the driveway.

6    Q    Does that appear to be the same vehicle that left earlier

7    that evening?

8    A    Yes.

9    Q    Can you give us the converted time?

10    A    9:22 p.m.

11    Q    I'm going to jump ahead to Wednesday, April 4th, about

12    11:06 into the video.  Can you give us the converted time?

13    A    4:40 in the afternoon.

14    Q    At 11 minutes and 41 seconds into the video, can you tell

15    us what we see?

16    A    You see two individuals walk down the driveway of 45 and

17    walk towards 253rd Street.

18    Q    Can you describe their size relative to one another?

19    A    One is tall and one is shorter.

20    Q    About 41 minutes later, can you give us the converted

21    time?  This is about 12 minutes and 22 seconds elapsed into

22    the video.

23    A    5:22 and 10 seconds, p.m.

24    Q    What do we see happening?

25    A    Two individuals walking back, walking from 253rd Street

1   towards 249-45.

2   Q    Do you see anything in their hands?

3   A    Yes.  One is carrying a white object.

4   Q    Do they appear to be the same two individuals we saw

5   earlier that afternoon?

6            MS. THIELE:  Objection.  Speculation.

7            THE COURT:  The jury can make its own conclusions.

8   Q    Detective, I'm going to skip ahead a little bit to

9   22 minutes and 30 seconds into the video.  On the afternoon of

10  April 5th, did you watch all of the video for that afternoon?

11  A    Yes.

12  Q    And between the hours of about 2:00 to 2:45 p.m., did you

13  see the black sedan in the driveway of 249-45 leave and return

14  to that house?

15  A    Yes.

16  Q    How many times?

17  A    Three times.

18  Q    And after that sedan returned to the driveway after about

19  2:45, what did you see on video?

20  A    The driver comes out of the car, the vehicle, and

21  crouches down in front of the car and appears to like do work

22  in front of the car.

23            MS. THIELE:  Objection.

24            THE COURT:  Overruled.  Are you going to play it?

25            MR. PALACIO:  Yes.

C. Santiago - Direct - Mr. Palacio                803

1          THE COURT:  Why don't we just do that.

2     Q    Playing from 22:30.  About 23 minutes into the video, can

3     you tell us what you did here?

4     A    I sped it up by 60 times.

5     Q    Can you describe what we see on video over the course of

6     that sped up time?

7     A    An individual doing some work in front of the vehicle.

8          MS. THIELE:  Objection.

9          THE COURT:  I mean the jury can see.  I mean, if the

10    detective wants to point it out, that's fine but the jury's

11    evaluation will control.

12    Q    Detective, I paused the video about 26 minutes and

13    6 seconds into the video.  Approximately how long did you see

14    that male, that individual outside of the car in the driveway?

15         MS. THIELE:  Objection.

16         THE COURT:  Overruled.

17    A    Approximately three hours.

18    Q    I'm going to skip ahead to 44 minutes into the video.

19    And 44 minutes into the video, can you give us the date of the

20    video?

21    A    The date is April 6, 2018.

22    Q    What is the day of the week?

23    A    Friday.

24    Q    Can you give us the converted time, as well?

25    A    2:42 and 31 seconds in the afternoon.

1  Q    At about 45 minutes into the video, can you describe what

2  we see in the video?

3  A    A box truck backed up into the driveway of 249-45.

4  Q    At about 47 minutes and 30 seconds into the video, can

5  you give us the converted time?

6  A    It's 3:23 and 57 seconds in the afternoon.

7  Q    Can you tell us what we see happen?

8  A    The box truck drives off the driveway and down 148th Road

9  towards 249th Street.

10 Q    And about two hours later, can you give us the converted

11 time?

12 A    5:22 p.m.

13 Q    This is 47 minutes and 48 seconds into the video.  Can

14 you describe what we see here?

15 A    An individual walking down the driveway of 249-45,

16 towards 253rd Street.

17 Q    About an hour-and-a-half later, this is 48 minutes and 18

18 seconds into the video, can you give us the converted time?

19 A    6:52 and 33 seconds p.m.

20 Q    Can you describe what we see here?

21 A    A vehicle came out of 253rd Street and turned onto 148th

22 Road and turned into the driveway of 249-45.

23 Q    I'm just going to zoom in on the area around the

24 driveway.  This is about 49 minutes and 30 seconds into the

25 video.  Can you describe what we see here?

1   A    The driver is getting out of the vehicle.

2   Q    What do we see about 50 minutes into the video?

3   A    The driver is walking towards the house carrying some

4   objects, some white objects.

5   Q    I'm going to jump ahead to 1 hour, 13 minutes and 10

6   seconds into the video.  What is the date of this video?

7   A    That's April 8th, 2018.

8   Q    What day of the week was April 8th?

9   A    Sunday.

10  Q    Here, this is actually 1:13:04 into the video.  Can you

11  give us the converted time?

12  A    It's 1:52 and 52 seconds in the a.m.

13  Q    Is that 1:55?

14  A    Sorry, 1:55 and 52 seconds a.m.

15  Q    I'm sorry.  Actually, now we're at 1:13:30.  Can you give

16  us the converted time?

17  A    It's 6:06 and 57 seconds in the morning.

18  Q    Can you tell us what the red arrow meant to show?

19  A    It indicates one individual.

20  Q    And the white arrow, what is that meant to show us?

21  A    To indicate when the trunk opens and closes.

22  Q    Can you describe what we just saw?

23  A    The individual came from the house, opened the trunk of

24  the car, put something in the trunk, and walked back towards

25  the house.

1  Q    At about 1:14:49, can you describe what we see?

2  A    An individual walking from the side of the car to the

3  front of the car and crouched down in front of the car.

4  Q    How many times did you see the trunk open and close?

5  A    That was twice.

6  Q    What do we see here at 1 minute and 15:41, I'm sorry,

7  1 hour 15:41.

8  A    An individual walking from the house carrying a white

9  object and putting it in the rear passenger side of the

10  vehicle.

11  Q    You see a green arrow at 1:16:44.  What is that meant to

12  show?

13  A    It indicates a second individual.

14  Q    Where did the second individual go?

15  A    The driver's seat of the vehicle.

16  Q    Detective Santiago, I'm pausing this at 1:18:02.  Can you

17  tell us what you've done here?

18  A    Yes.  So I inserted the photo the government gave to me,

19  and I highlighted the fade marks on the roof and the back of

20  the vehicle.  I'm indicating that on the video.

21         So the blue circle indicates the fade mark on the

22  front top of the roof.  The yellow indicates the fade mark on

23  the rear roof, and the teal color indicates fade marks the

24  trunk of the vehicle.

25  Q    Does that appear to be the Nissan Maxima in the

1  photographs?

2  A    Yes.

3  Q    At about 1:18:46, can you describe what we see?

4  A    The passenger of the vehicle gets out and walks towards

5  the house.

6  Q    And then what happens?

7  A    An individual returns and jumps in the passenger seat.

8  Q    About 42 minutes later, can you tell us what we see here?

9  This is about 1:19:49 into the video.

10  A    The vehicle is driving from 253rd Street into the

11  driveway.

12  Q    What is the converted time?

13  A    It's 7:11 and almost 40 seconds in the morning.

14  Q    At about 1:21:05, can you describe what we see?

15  A    Yes.  The passenger of the Maxima went to the rear seat

16  and pulled out a white object and walked toward the house,

17  while the driver of the Maxima walked into the house.

18  Q    About seven hours later, 1:22:01 into the video, what is

19  the converted time?

20  A    2:10 and 41 seconds in the afternoon.

21  Q    Is this still April 8th?

22  A    Yes.

23  Q    At about 1:25:49 into the video, can you tell us what we

24  see here?

25  A    Somebody crouched, an individual crouched down in front

1    of the vehicle and doing something in front of the vehicle.

2    Q      What is the converted time?

3    A      It's 6:36 and 32 seconds p.m.

4    Q      Two-and-a-half hours later on the 8th, this is about

5    1:27:26 elapsed time, can you give us the converted time?

6    A      9:19 and 40 seconds p.m.

7                   (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*O. Santiago - Direct - Mr. Palacio*                809

1   (Continuing.)

2   BY MR. PALACIO:

3   Q    At about 1:28:51, can you tell us what we see?

4   A    An individual gets out of the car parked in the

5   driveway, and that individual looks like he's carrying a

6   pizza box, walks to --

7               MS. THIELE:  Objection.

8               THE COURT:  Well, I think the jury will look at it

9   and see what they can conclude from it.

10              (Video is played.)

11  Q    Detective Santiago, about 2 hours and 20 minutes later,

12  this is elapsed time 1:31:26, what does the original date

13  stamp say?

14  A    The original date stamp says April 9, 2018.

15  Q    Is that on the Monday?

16  A    Yes.

17  Q    And what's the converted time?

18  A    It's 11:45 and 20 seconds p.m.

19  Q    Is it still actually April 8th?

20  A    Correct.

21              (Video is played.)

22  Q    Detective Santiago, at 1:32:22 you inserted a white

23  arrow.  Again, remind us what's that meant to show.

24  A    To show when the trunk opens and close.

25  Q    And how were you able to tell that the trunk opened and

*O. Santiago - Direct - Mr. Palacio*          810

1  closed?

2  A    So if you see, like, where the arrow is at, there's a

3  white -- a white light there.  That's the license plate

4  reflection.  So you could see --

5              MS. THIELE:  Objection.

6              THE COURT:  Overruled.

7  A    You can see -- you can see that it moves up when the

8  trunk opens and moves down when the trunk closes.

9              (Video is played.)

10  Q    And here you have two arrows at 1:32 52.  Again just

11  remind us what's that meant to show.

12  A    Two separate individuals.

13  Q    And how can you tell there was two separate

14  individuals?

15  A    From the -- when the doors opened, the lights from the

16  doors turn on, and you see two different individuals.

17              THE COURT:  And once again, everybody, you're the

18  factfinders, so it's for you to make the determination.

19              (Video is played.)

20  Q    We're at about 1:34:47.  Is it now after midnight on

21  the 9th?

22  A    Yes.

23              (Video is played.)

24  Q    At 1:35:05, shortly after midnight, can you tell us

25  what we see?

*O. Santiago - Direct - Mr. Palacio*                          811

1   A    An individual comes out of the passenger side of the

2   Maxima and walks up the driveway towards the house.

3            (Video is played.)

4   Q    Detective Santiago, I'm pausing this at 1:36:34 into

5   the video.  We see a red circle.  Can you explain to the

6   jury what that's meant to show?

7   A    To show the light pattern on the vehicle.

8   Q    Can you describe that light pattern for the jury?

9   A    So the light pattern, there's two lights that I'll call

10  spillage that comes out the sides of the vehicle, like from

11  a 45-degree angle.  Here's one and here's another.  Okay, so

12  you can see what I'm talking about.  So to the sides of the

13  spillage, on the sides here, you see almost like a halo when

14  the car moves.  Same thing on the passenger side.

15           So between the car, there's a space right here

16  where there's no light, and then you see the light.  So

17  there's a space where there's no light, and then you see the

18  sharp light of the spillage right there and the halo around

19  it, and that's actually the same thing you see on the

20  passenger side.

21           And then in front of the vehicle here, it's dimmer

22  than the rest of the area, and the headlights are more in

23  front of the vehicle.

24  Q    And to be clear, we're talking about the headlights,

25  right?

O. Santiago - Direct - Mr. Palacio                812

1   A    Yes.

2   Q    Is that something that helped you locate the Nissan?

3   A    Yes, correct.

4        (Video is played.)

5   Q    Can you tell us what we see happen at about 1:37:58?

6   A    Individual walked down the driveway, down 148th Road,

7   and gets into the passenger seat of the Maxima.

8        (Video is played.)

9   Q    What to we transition to now on this portion of the

10  video?

11       THE COURT:  Actually, could I just -- just pause

12  it for a second.

13       Could I see counsel at the sidebar?  Just

14  scheduling-wise.  No need for the reporter.

15       (Discussion held off the record at sidebar outside

16  the presence of the jury and audience.)

17       THE COURT:  All right, everybody.  I realize that

18  I didn't give you a break this afternoon, so I hope

19  everybody's okay.

20       But I do think, just in terms of what we have

21  left, this is a good time to stop.  And so we'll be

22  adjourning for the day and we won't meet again until Monday

23  morning at 9:30.

24       So just to emphasize, I know I sound like a broken

25  record, but please don't research anything.  Don't look

*Proceedings*                                                  813

1    anything up.  Obviously don't go to any places that have

2    been mentioned.  Don't talk to anybody about the case.

3            But I hope you're able to do something enjoyable

4    this weekend, and then we'll see you all again on Monday

5    morning at 9:30.  And as always, please stay healthy.

6            All right.  Have a great weekend.

7            THE COURTROOM DEPUTY:  All rise.

8            (Jury exits.)

9            THE COURT:  Everybody can have a seat.

10           You can step down, Detective.  Just come back on

11   Monday.

12           (Witness exits the stand.)

13           THE COURT:  Anything before we break?

14           MS. DEAN:  Nothing from the Government.  Thank

15   you.

16           MR. CECUTTI:  Judge, just one issue.

17           There were several instances where the witness

18   characterized certain things.  There are limitations; there

19   are boundaries.

20           THE COURT:  Right.

21           MR. CECUTTI:  That's where we made objections.

22           THE COURT:  Right.

23           MR. CECUTTI:  Perhaps the Government can speak

24   with their witness when we resume on Monday and keep to

25   simply --

*Proceedings*                                                        814

1          THE COURT:  I mean, it is fine to point out

2    certain things, and I've cautioned the jury that it's their

3    interpretation that controls, so I don't think there's been

4    any harm done.

5          But it's fine to point things out.  I think --

6    what did he say, something about pizza?

7          MR. CECUTTI:  A pizza box is an example.

8          THE COURT:  I don't think the pizza box is

9    unfairly prejudicial.  But again, I take the point that the

10   witness should not be doing too much interpretation about

11   what's actually happening.  But to the extent they're

12   observations that are sort of neutral, that's fine.  All

13   right?

14         Anything else?

15         MR. CECUTTI:  No, Judge.

16         THE COURT:  All right.  Have a good weekend,

17   everybody.

18         Thank you to the marshals.

19         (Trial adjourned until Monday, February 26, 2024,

20   at 9:30 a.m.)

21

22                          *     *     *

23

24

25

815

1                      I N D E X

2

3    WITNESS                                      PAGE

4

5    JUNAID SAEED

6        DIRECT EXAMINATION BY MS. DEAN:           637

7    RICHARD BUSICK

8        DIRECT EXAMINATION BY MS. DEAN            643

9        CROSS-EXAMINATION BY MS. THIELE           737

10       REDIRECT EXAMINATION BY MS. DEAN          756

11       RECROSS EXAMINATION BY MS. THIELE         757

12   CEDRIC RAYMONDO                               759

13       DIRECT EXAMINATION BY MS. HAJJAR          759

14       CROSS-EXAMINATION BY MR. CECUTTI          766

15   OMAR SANTIAGO

16       DIRECT EXAMINATION BY MR. PALACIO:        770

17

18

19

20

21

22

23

24

25

NJS     OCR     RMR     CRR     RPR

816

1                    E X H I B I T S

2

3    Government's Exhibit 1203                       636

4

5    Government's Exhibit 353 and 354                640

6

7    Government's Exhibits 300, 301, 303, 305,

8    and 308                                         642

9

10   Government's Exhibit 26                         673

11

12   Government's Exhibit 27                         727

13

14   CROSS-EXAMINATION BY MS. THIELE                 737

15

16   Government's Exhibit 996                        765

17

18   Government's Exhibit 100                        785

19

20   Government's Exhibit 101                        787

21

22   Government's Exhibits 13 and 13A                788

23

24   Government's Exhibit 16                         791

25

817

1

2      Government's Exhibit 11                          795

3

4      Government's Exhibit 112                         798

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25